UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, TX 75039

          Plaintiff,

v.

CORPORACIÓN CIMEX S.A.
Edificio Sierra Maestra,
Calle 1 E/ 0 y 2
La Puntilla, Miramar
Havana, Cuba

AND

UNIÓN CUBA-PETRÓLEO
Oficios 154 E / Amargura y Tte Rey,
Habana Vieja
Havana, Cuba

          Defendants.

Case No. <u>19-CV-1277</u>

## COMPLAINT

For its Complaint in this action, Plaintiff Exxon Mobil Corporation ("Plaintiff" or

"ExxonMobil") states as follows:

## NATURE OF ACTION

1.     Plaintiff brings this Complaint against Defendant Corporación CIMEX S.A.

("CIMEX") and Defendant Unión Cuba-Petróleo ("CUPET") (collectively "Defendants") for

unlawful trafficking in Plaintiff's confiscated property in violation of Title III of the Cuban

Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the "Act"), and specifically Title III of the Act, codified at 22 U.S.C. §§ 6081–6085.

2.      Plaintiff holds a certified claim from the Foreign Claims Settlement Commission ("FCSC") for property that was expropriated by the Fidel Castro regime in 1960, including oil refineries and service stations, which are still in use today even though Plaintiff has never received any compensation for this property.[1]  Plaintiff's certified claim is attached hereto as Exhibit 1.  CIMEX uses and continues to profit from the confiscated property by, among other things, operating service stations in cooperation with CUPET, the state-owned oil company of Cuba.  CUPET additionally uses and continues to profit from the confiscated property through its use of the Ñico Lopez Refinery (formerly known as the Belot Refinery) and certain terminals and plants used in conjunction with the refinery operations.

3.      Title III of the Act, 22 U.S.C. §§ 6081–6085, permits Plaintiff to bring private actions against any person who, like CIMEX and CUPET, knowingly and intentionally traffics in confiscated property without authorization from the rightful owner.  However, Plaintiff has not yet had the opportunity to do so because, until recently, private rights of action were suspended pursuant to the authority given to the President of the United States under the Act.

4.      The President has delegated the suspension authority to the United States Secretary of State.  On March 4, 2019, the State Department announced a partial lifting of the suspension to permit private actions to proceed, beginning March 19, 2019, against Cuban entities or sub-entities identified on the State Department's restricted entities list.  On or about April 2, 2019, the partial lifting of the suspension was extended again through May 1, 2019.

---

[1] Congress established the FCSC, a quasi-judicial, independent agency within the Department of Justice, which adjudicates claims of U.S. nationals against foreign governments for expropriation and other issues.

Most recently, on April 17, 2019, the State Department announced a full lifting of the suspension beginning May 2, 2019.  In his remarks regarding the decision, Secretary of State Pompeo made clear that "[e]ffective May 2nd … the right to bring an action under Title III of the Libertad Act will be implemented in full."

5.      Because Defendants CIMEX and CUPET are trafficking in confiscated property in violation of the Act, they are subject to private actions under Title III of the Act.  Accordingly, Plaintiff brings this statutory action to vindicate its long-outstanding claim and obtain the compensation it is rightfully due under the Act.

## JURISDICTION AND VENUE

6.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1330 because this action is a nonjury civil action against agencies or instrumentalities of a foreign state, as that term is defined in 28 U.S.C. § 1603(b), on a claim for judgment with respect to which there is no sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA") pursuant to both (i) the FSIA's commercial activity exception for acts that occur "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" under 28 U.S.C. § 1605(a)(2), and (ii) Title III of the Act, which imposes civil liability on any person (including agencies or instrumentalities of foreign states) who traffics in property confiscated by the Cuban Government and which mandates that the provisions of Title III of the Act control over the provisions of Title 28 of the U.S. Code.  *See* 22 U.S.C. §§ 6023(11), 6082.

7.      Subject matter jurisdiction also is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Act, codified at 22 U.S.C. § 6021 *et seq.*

8.      Pursuant to 28 U.S.C. § 1330(b), personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) once service has been made under 28 U.S.C. § 1608.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

10.     The amount in controversy exceeds $50,000 as required by 22 U.S.C. § 6082(b).

11.     Contemporaneous with this filing, Plaintiff will pay the special fee for filing an action under Title III of the Helms-Burton Act, which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES

12.     Plaintiff Exxon Mobil Corporation is a U.S. national and a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039.  Plaintiff was formerly known as the Standard Oil Company ("Standard Oil") and is the recipient and owner of the certified claim attached as Exhibit 1.

13.     Defendant CIMEX is a "sociedad anónima" incorporated in Cuba, with its principal place of business at Edificio Sierra Maestra, Calle 1 E/ 0 y 2, La Puntilla, Miramar, Havana, Cuba.

14.     CIMEX reportedly is a holding company owned by the government of Cuba.

15.     CIMEX reportedly operates in a variety of industries, including operating hundreds of service stations in cooperation with CUPET.

16.     Defendant CUPET is the Cuban state-owned oil company, with its principal place of business at Oficios 154 E / Amargura y Tte Rey, Habana Vieja, Havana, Cuba.

17.     Among other things, CUPET operates Cuba's oil refineries and supplies domestic needs for petroleum products.

## BACKGROUND

18.     Over 100 years ago, when Plaintiff was known as Standard Oil, it initiated

business operations in Cuba by obtaining an interest in a refinery near Havana, Cuba.

19.     As Standard Oil grew its business in Cuba, it established several subsidiaries.

These subsidiaries included:  (1) Esso Standard Oil, S.A. ("Essosa"), a wholly owned

Panamanian subsidiary, formed in 1951, with responsibility for operations in the Caribbean

Basin and headquartered in Havana until 1959; and (2) Esso Standard (Cuba) Inc. and Esso

(Cuba) Inc., two Delaware corporations organized in 1957 and qualified to do business in Cuba

for exploring for and producing crude oil (collectively, the "Exploration Companies").

**Expropriation by the Cuban Government**

20.     Plaintiff's certified claim involves the property formerly owned by Essosa and the

Exploration Companies.

21.     Prior to 1959, the Exploration Companies maintained an office in Cuba for

geological studies and owned assets incident to the functioning of the office.

22.     On October 30, 1959, Cuban government inspectors from Fomento Nacional

(National Development) arrived at the office of the Exploration Companies and confiscated and

copied all files, maps, and other records of geological exploration.  After the copying incident

and the passage of Law 625 of November 29, 1959, which changed the basis for granting mineral

concessions, the Exploration Companies stopped all exploration efforts on the island.  On

February 1, 1960, the Exploration Companies closed their office in Cuba.

23.     On July 1, 1960, Essosa's property rights were expropriated pursuant to

Resolution No. 33 issued by the Cuban Petroleum Institute, which was issued pursuant to

Resolution No. 190 of June 30, 1960 by Cuban Prime Minister Fidel Castro.  The Director

General of the Cuban Petroleum Institute appointed Major Onelio Pino as "Interventor" of Essosa for "all the properties and installations that [Essosa] may have in Cuba."

24.     As a result, Essosa not only lost control over its assets, but it was also forced to end its ongoing operations.  Essosa was prohibited from operating its expanded Belot Refinery, which was completed in early 1958 and employed 530 people.  Essosa was also forced to abandon its Cuban-based marketing operation with over 500 employees who were engaged in selling and distributing products through more than one thousand retail outlets.  And Essosa was also forced to cease operating its service stations in Cuba.

25.     Essosa subsequently appeared on the list of nationalized entities published in Resolution No. 1 of August 6, 1960 pursuant to Cuba's Law 851.

26.     The Cuban Government expropriated the following assets from Essosa:

(a)  Belot Refinery (Havana), a new 35,000 barrel-per-day refinery, including:

     i.   a marine terminal;
    ii.  a 8,800 pounds-per-day grease plant;
   iii. a 205 barrel-per-day lube blending and packaging plant; and
   iv.  109 storage tanks with a total capacity of 2.4 million barrels.

(b)  Bulk products terminals, including:

     i.   three ocean terminals;
    ii.  seven inland terminals; and
   iii. seven bulk and packaging plants.

(c)  Service station properties, including:

     i.   117 service station properties; and
    ii.  176 loans outstanding to service station owners secured by mortgages.

27.     These assets are hereinafter referred to as the "Confiscated Property."

28.     Cuba has never paid, and Plaintiff has never received, compensation for the expropriation of the Confiscated Property.

**Certification of Plaintiff's Claim by the Foreign Claims Settlement Commission**

29.     In response to the expropriation of the Confiscated Property, Standard Oil filed a claim with the FCSC pursuant to Title V of the International Claims Settlement Act of 1949, which gives the FCSC jurisdiction over expropriation claims of U.S. nationals against the Government of Cuba.

30.     Pursuant to 22 U.S.C. § 1643b(a), the FCSC "shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States."

31.     Pursuant to 22 U.S.C. § 1643a(3), "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba …."

32.     As required by the International Claims Settlement Act, the FCSC determined the validity and amount of Standard Oil's claim and the value of the expropriated properties, rights, or interests by the valuation most appropriate to the Confiscated Property.

33.     After reviewing Standard Oil's ownership, the FCSC found that Standard Oil qualified as a U.S. national within the meaning of the International Claims Settlement Act.  *See* Ex. 1 at 2.[2]

34.     The FCSC then evaluated Standard Oil's property claim.  It noted that Standard Oil provided "extensive evidence in support of the claim" including a balance of Essosa's assets that was prepared by Essosa's employees following the expropriation of Essosa.  This balance of assets was even approved by the Cuban Institute of Petroleum before the Cuban Government permitted it to be delivered to the comptroller of Essosa for the permanent records of the company.

35.     The FCSC also reviewed various documents and affidavits in support of Standard Oil's claim, including records pertaining to: "[banking balances,] cash on hand, accounts receivable, investments, inventories, property, plant and equipment, as well as prepaid and deferred charges, and extensive data pertaining to the liabilities of Essosa."  Ex. 1 at 5.

36.     After an extensive review of Essosa's assets and liabilities, the FCSC certified that Standard Oil suffered a loss of $71,611,002.90 as a result of the Cuban government's expropriation of the Confiscated Property.  The FCSC certified the claim in this amount and further awarded interest on this amount at the rate of 6 percent per annum from the date of loss to the date of settlement.  Ex. 1 at 9.

37.     Standard Oil changed its name to Exxon Corporation in 1972.  In 1999, Exxon Corporation changed its name to Exxon Mobil Corporation, the Plaintiff in this action.

_____

[2] Exhibit 1 is the Foreign Claims Settlement Commission's Decision No. CU-3838 (Sept. 3, 1969).

38.     Plaintiff has never settled the outstanding certified claims or received any

payment from any entity with respect to the principal or interest due on its certified claim.

**The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

39.     On March 12, 1996, President Clinton signed into law the LIBERTAD Act of

1996 (also known as the "Helms-Burton Act" and referred to herein as the "Act").  Title III of

the Act provides a right of action to U.S. nationals who owned property in Cuba that was

confiscated on or after January 1, 1959.

40.     Title III authorizes the President to suspend the right of action for sequential

periods of up to six months.  On July 16, 1996, President Clinton notified Congress that he

would be allowing the Act to go into effect on August 1, 1996, but that he would suspend the

right of action under Title III for six months.  Since that decision, every President (or Secretary

of State) has issued a sequential six-month suspension of the right of action until recently.

41.     On January 16, 2019, Secretary of State Pompeo reported to Congress that Title

III would be suspended for forty-five days beyond February 1, 2019 as the State Department

conducted a "careful review of the right to bring action under Title III in light of the national

interests of the United States and efforts to expedite a transition to democracy in Cuba."

42.     On March 4, 2019, Secretary Pompeo reported to Congress that the suspension of

Title III would be maintained for 30 days through April 17, 2019 except as to certain Cuban

entities or sub-entities that were identified by name on the State Department's List of Restricted

Entities and Sub-entities Associated with Cuba (known as the Cuba Restricted List).

43.     On April 3, 2019, Secretary Pompeo announced his decision to continue this

partial suspension of Title III for two additional weeks, through May 1, 2019.

44.     On April 17, 2019, Secretary Pompeo announced that Title III will go into full effect as of May 2, 2019.  In his remarks, Secretary Pompeo re-affirmed the commitment of the United States to stand with the Cuban people and against the current Cuban Government, which "continues to deprive its own people of the fundamental freedoms of speech, press, assembly, and association" and which "undermines the security and stability of countries throughout the [Western Hemisphere], which directly threatens United States national security interests."  The Secretary concluded, "[t]oday we are holding the Cuban Government accountable for seizing American assets."

45.      Section 302 of the Act provides the following civil remedy:

*SEC 302: (a) Civil Remedy.—*

(1) Liability for trafficking.--(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . .  22 U.S.C. § 6082(a)(1).

46.     Section 302 implements a fundamental purpose of the Act, which is to permit US nationals to bring claims against Cuban ministries and state-owned enterprises that engage in unlawful trafficking.  For example:

a.  Congress found that trafficking in property confiscated from U.S. nationals benefits "the current Cuban Government" and "undermines the foreign policy of the United States."  22 U.S.C. § 6081(6).

b.  Regarding remedies, Congress found that "[t]he international judicial system … lacks fully effective remedies" thereby permitting unjust enrichment "by governments and private entities at the expense of the rightful owners of the property."  *Id.* § 6081(8).

c.  Congress further recognized the U.S. Government's "obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies."  *Id.* § 6081(10).

47.     Given these findings, Section 302 of the Act unsurprisingly includes Cuban governmental entities within its scope.

48.     Specifically, the definition of a "person" who may be liable for trafficking includes "any person or entity, including any agency or instrumentality of a foreign state" as defined by the FSIA, 28 U.S.C. § 1603(b).  *See* 22 U.S.C. § 6023(1), (11).

49.     A person is liable for trafficking in confiscated property under the Act "if that person knowingly and intentionally—

> i.    sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> ii.   engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> iii.  causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property."
>
> 22 U.S.C. § 6023(13).

50.     Since Plaintiff has never authorized any person to engage in the activities covered by the Act's definition of trafficking with respect to the Confiscated Property, Section 302 provides Plaintiff with a private right of action against any person—including Cuba's state-owned enterprises—that has trafficked in the Confiscated Property.

**The Act's Presumption in Favor of Certified Claims**

51.     Section 302(d) of the Act mandates a presumption in favor of the Plaintiff's certified claims:

> "There **shall be a presumption** that the amount for which a person is liable . . . is the amount that is certified [by the FCSC under the International Claims Settlement Act of 1949]."  22 U.S.C. § 6082(a)(2) (emphasis added).

11

52.     The Act's presumption in favor of certified claims extends not only to the amount of liability, but also to the claimant's ownership and entitlement to treble damages.  According to Section 303(a)(1), which deals with the "[c]onclusiveness of certified claims," in any action brought under Title III, "the court shall accept as **conclusive proof of ownership** of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC under Title V of the International Claims Settlement Act of 1949]."  22 U.S.C. § 6083(a)(1) (emphasis added).

53.     Under Section 302(a)(3) of the Act, "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages if a U.S. national owns a certified claim to that property.  22 U.S.C. § 6082(a)(3)(A) & (3)(C).

54.     Congress intentionally conferred these entitlements on certified claims.  The utilization of the certified claim process was viewed as a positive feature of the Act.  The Conference Report from the Committee of Conference states that "courts shall give a strong presumption to the findings of the FCSC."  The Conference report continued:

> The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III].  The committee of conference also notes the recognized special expertise of the FCSC in determining the amount and validity of claims to confiscated properties overseas.

55.     Under the text of the Act and in accordance with the intent of Congress, Plaintiff's certified claim is entitled to (i) a presumption of accuracy with regard to its amount; (ii) be treated as conclusive proof with regard to Plaintiff's ownership of the Confiscated Property; and (3) a judgment on the claim that includes treble damages.

**Defendants' Businesses and Their Trafficking of Plaintiff's Property**

56.     CIMEX, which is Cuba's largest commercial corporation with annual revenues reportedly as high as $1.3 billion, engages in a variety of foreign commerce across a variety of industries.  For example, CIMEX reportedly maintains a financial division that manages all remittance wire transfers from the United States and a tourism company that is the exclusive provider of travel from the United States.

57.     CUPET is a Cuban state-owned oil company and engages in a variety of commercial activities for the purpose of producing, refining, and distributing petroleum products.

58.     For example, CUPET and CIMEX operate over 300 service stations across Cuba under the brand "Servi-Cupet", as many media reports have confirmed.[3]

59.     Upon information and belief, some of the service stations operated by CIMEX and CUPET involve Confiscated Property and have been, and continue to be, operated and used by CIMEX and CUPET for their own profit and benefit, as well as the benefit of others, without Plaintiff's authorization.

60.     Upon information and belief, some of the gasoline and other petroleum products available at these service stations are produced using the Confiscated Property, specifically the Belot Refinery and the plants and terminals used in conjunction with the Belot Refinery's operations and the production of petroleum products.

---

[3] *E.g.*, *Reuters*, Cuban state-run media confirms gasoline shortage (Apr. 21, 2017), https://www.reuters.com/article/us-cuba-energy-shortage/cuban-state-run-media-confirms-gasoline-shortage-idUSKBN17N2FZ (reporting that CIMEX and CUPET jointly operate most service stations in Cuba); *Reuters*, Factbox: Cimex, Cuba's largest commercial corporation (Sept. 27, 2010), https://uk.reuters.com/article/us-cuba-corporation-factbox-idUSTRE68Q 55320100927 (reporting that CIMEX operates 363 Servi-Cupet gas stations); *BN Americas*, Unión Cuba Petróleo, https://subscriber.bnamericas.com/company-profile/en/union-cubapetroleo-cupet (reporting that CUPET runs a service station chain in association with CIMEX).

61.     The Belot Refinery is now known as the Ñico López Refinery.  Essosa operated

the refinery in the 1950s before it was nationalized in 1960 by the Government of Cuba.

Thereafter, the Belot Refinery was merged with another refinery and became known as the Ñico

López Refinery, which remains in operation today.

62.     According to CUPET's website, the Ñico López Refinery is one of four Cuban

refineries.  (The others are Sergio Soto, Camilo Cienfuegos, and Hermanos Diaz).  One of the

refineries' main objectives is to supply the domestic needs for petroleum products, including

gasoline, diesel, and fuel oil.

63.     CUPET also reportedly has business agreements with foreign companies.  Among

other things, these agreements allow CUPET to import crude oil to supply the domestic needs for

petroleum products.

64.     Upon information and belief, CUPET imports and refines crude oil using

Plaintiff's Confiscated Property, specifically the Belot Refinery and the plants and terminals

used in conjunction with the Belot Refinery's operations and the production of petroleum

products.

65.     Plaintiff has not authorized CIMEX or CUPET to refine crude oil using Plaintiff's

Confiscated Property, nor has Plaintiff authorized them to produce, transport, make available for

sale, or otherwise engage in any commercial activity involving any petroleum products that are

or have been produced using Plaintiff's Confiscated Property.

66.     Accordingly, Defendants have violated the Act by trafficking in the Confiscated

Property after the expiration of the grace period under the Act.  Plaintiff is therefore entitled to

all relief available under the Act, including actual damages, treble damages, prejudgment and

postjudgment interest, costs and reasonable attorneys' fees, pursuant to 22 U.S.C. § 6082.

## COUNT I – TRAFFICKING IN CONFISCATED PROPERTY

### (22 U.S.C. § 6082)

67.    Plaintiff is a U.S. national and owns the claim to property that was confiscated by the Cuban Government after January 1, 1959 (*i.e.*, the Confiscated Property).  The claim is certified and is attached as Exhibit 1.

68.    CIMEX and CUPET are persons under the Act, as defined by 22 U.S.C. § 6023(11).

69.    Based on the facts alleged herein and on information and belief, CIMEX and CUPET have and continue to traffic in the Confiscated Property to which Plaintiff owns the claim, including (i) by extracting, importing, and refining crude oil, (ii) by operating service stations in Cuba, and (iii) by engaging in commercial transactions involving petroleum products that are or have been produced using the Confiscated Property.

70.    Additionally, CIMEX and CUPET have generated revenues, obtained profits and realized other benefits from these activities.

71.    Thus, CIMEX and CUPET have engaged in trafficking in violation of Title III of the Act through, at a minimum: (i) managing, possessing, and using the Confiscated Property; (ii) engaging in commercial activities using or otherwise benefiting from the Confiscated Property; and (iii) causing, directing, participating in, and profiting from trafficking in the Confiscated Property by another person, in furtherance of their operations.

72.    At all relevant times, CIMEX and CUPET have conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Act.

73.    CIMEX and CUPET have engaged in unlawful trafficking after November 1, 1996, the end of the 3-month grace period after the Act became effective on August 1, 1996.

74.     Because Plaintiff holds a certified claim, it is not required to give notice under 22 U.S.C. § 6082(a)(3).

75.     Therefore, Plaintiff is entitled to damages in the amount of the certified claim, plus pre-judgment interest at the rate of 6 percent awarded by the FCSC.  Plaintiff also is entitled to treble damages, attorneys' fees, costs, and post-judgment interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants:

a.  Awarding Plaintiff actual damages in the amount of $71,611,002.90;

b.  Awarding Plaintiff pre-judgment interest at the rate of 6% per annum from July 1, 1960, as set forth in the FCSC's award;

c.  Awarding Plaintiff treble damages pursuant to 22 U.S.C. § 6082(a)(3);

d.  Ordering Defendants to pay Plaintiff's reasonable attorney's fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a);

e.  Awarding Plaintiff post-judgment interest; and

f.  Granting all other relief that the Court deems just and proper.


Date: May 2, 2019                                    Respectfully submitted,

                                                     By:____/s/ Steven K. Davidson_____

                                                     Steven K. Davidson (DC Bar #407137)
                                                     sdavidson@steptoe.com
                                                     Michael J. Baratz (DC Bar #480607)
                                                     mbaratz@steptoe.com
                                                     Jared R. Butcher (DC Bar #986287)
                                                     jbutcher@steptoe.com
                                                     STEPTOE & JOHNSON LLP
                                                     1330 Connecticut Ave NW
                                                     Washington, DC 20036
                                                     Telephone:  202-429-3000
                                                     Facsimile:  202-429-3902

                                                     *Counsel for Plaintiff*