## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
EXXON MOBIL CORPORATION,                )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No.: 19-1277 (APM)
                                        )
CORPORACIÓN CIMEX, S.A.,                )
Edificio Sierra Maestra                 )
Calle Primera Esquina 0                 )
Miramar, Playa, La Habana, Cuba,        )
                                        )
AND                                     )
                                        )
UNIÓN CUBA-PETRÓLEO                     )
Avenida Salvador Allende No. 666        )
Entre Soledad y Oquendo                 )
Municipio Centro Habana, La Habana      )
Cuba,                                   )
            Defendants.                 )
_____     )


### DEFENDANTS CORPORACIÓN CIMEX, S.A. AND UNIÓN CUBA-PETRÓLEO'S
### MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF MOTION TO DISMISS THE ACTION AND FOR A PARTIAL STAY

*On the Brief*:                 Michael Krinsky (USDC, DC #NY0302)
Nathan Yaffe                    Lindsey Frank (USDC, DC #NY0301)
                                Rabinowitz, Boudin, Standard, Krinsky &
                                Lieberman, P.C.
                                14 Wall Street, Suite 3002
                                New York, New York 10005
                                (212) 254-1111
                                mkrinsky@rbskl.com
                                lfrank@rbskl.com



Dated:  October 8, 2019         *Attorneys for Defendants*

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

STATEMENT OF THE CASE ........................................................................................1

ARGUMENT ...................................................................................................................7

I.     THIS ACTION FAILS TO SATISFY THE FOREIGN SOVEREIGN
      IMMUNITY ACT'S "DIRECT EFFECT" REQUIREMENT FOR SUBJECT-
      MATTER JURISDICTION ..................................................................................7

      A.  The Facts Alleged in the Complaint Fail to Satisfy the "Direct Effect"
          Requirement ...........................................................................................7

      B.  The Action Cannot Satisfy the "Direct Effect" Requirement for the Additional
          Reason that Plaintiff's Claim is that of a U.S. Parent Whose Third-Country
          Subsidiary Suffered A Property Loss ...................................................16

II.    TITLE III OF THE CUBAN LIBERTY AND DEMOCRATIC SOLIDARITY
      (LIBERTAD) ACT OF 1996 DOES NOT OVERRIDE THE FSIA AND
      PROVIDE A NEW GRANT OF SUBJECT-MATTER JURISDICTION ...........22

III.   THE ACTION AGAINST CUPET FAILS FOR LACK OF PERSONAL
      JURISDICTION ..................................................................................................30

      A.  The Due Process Requirements for Personal Jurisdiction Are Not Met ............30

      B.  Plaintiff Has Not Overcome the *Bancec* Presumption that the Due Process
          Limitations on Personal Jurisdiction Apply .........................................31

IV.   THE ACTION AGAINST CIMEX FAILS FOR LACK OF PERSONAL
      JURISDICTION ..................................................................................................39

V.    THE COURT SHOULD STAY LITIGATION OF PERSONAL JURISDICTION
      UNTIL SUBJECT-MATTER JURISDICTION IS RESOLVED .........................41

CONCLUSION ...............................................................................................................44

## TABLE OF AUTHORITIES

**Cases** ......................................................................................................................... **Page**

*Adler v. Fed. Republic of Nigeria*,
    107 F.3d 720 (9th Cir. 1997) ........................................................................ 12

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*,
    183 F.3d 1277 (11th Cir. 1999) .............................................................. 33, 34

*Allen v. Russian Federation*,
    522 F. Supp. 2d 167 (D.D.C. 2007) ............................................................ 10, 11

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998) ..................................................................................... 29

*Antares Aircraft, L.P. v. Federal Republic of Nigeria*,
    999 F.2d 33 (2d Cir. 1993) ................................................................. 10, 12, 14

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ................................................................................. 7, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 16

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    813 F.3d 98 (2d Cir. 2016) .......................................................................... 15

*Banco Nacional de Cuba v. Chase Manhattan Bank*,
    505 F. Supp. 412 (S.D.N.Y. 1980) .............................................................. 18

*Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*,
    658 F.2d 903 (2d Cir. 1981) ........................................................................ 33

*Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*,
    782 F.2d 377 (2d Cir. 1986) ........................................................................ 33

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ............................................................................... 19, 35

*Banco Para el Comercio Exterior de Cuba v. First Nat. City Bank*,
    658 F.2d 913 (2d Cir. 1981) ........................................................................ 33

*Bank Markazi v. Peterson*,
    136 S.Ct. 1310 (2016) .................................................................................. 22

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran,
    734 F.3d 1175 (D.C. Cir. 2013) ............................................................... 9, 10, 13, 15

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't,
    533 F.3d 1183 (10th Cir. 2008) ............................................................... 19, 20

Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,
    137 S.Ct. 1312 (2017) ............................................................... 15, 16, 42

BPA Int'l, Inc. v. Kingdom of Sweden,
    281 F. Supp. 2d 73 (D.D.C. 2003) ............................................................... 11

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County,
    137 S.Ct. 1773 (2017) ............................................................... 31

*Carey v. Nat'l Oil Corp.,
    592 F.2d 673 (2d Cir. 1979) ............................................................... 20, 21

*Cicippio-Puleo v. Islamic Republic of Iran,
    353 F.3d 1024 (D.C. Cir. 2004) ............................................................... 23

Coal. for Common Sense in Gov't Procurement v. United States,
    821 F. Supp. 2d 275 (D.D.C. 2011) ............................................................... 29

Cosmos Trading Corp. of Panama v. Banco Nacional de Cuba,
    No. 07-20008-MC, 2007 WL 9706399  (S.D. Fla. Feb. 16, 2007) ............................................................... 33

Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada,
    600 F.3d 661 (D.C. Cir. 2010) ............................................................... 13

Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,
    244 F. Supp. 3d 100 (D.D.C. 2017) ............................................................... 15, 16

*Daimler AG v. Bauman,
    571 U.S. 117 (2014) ............................................................... 30

Dames & Moore v. Regan,
    453 U.S. 654 (1981) ............................................................... 18, 19

DRI, Inc. v. Republic of Honduras,
    71 F. Supp. 3d 201 (D.D.C. 2014) ............................................................... 36, 37

EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,
    894 F.3d 339 (D.C. Cir. 2018) ............................................................... 14, 15

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   246 F. Supp. 3d 52 (D.D.C. 2017) ................................................................ 14

*El-Fadl v. Cent. Bank of Jordan*,
   75 F.3d 668 (D.C. Cir. 1996) ...................................................................... 44

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
   606 F. Supp. 2d 59 (D.D.C. 2009) .............................................................. 33

*\*Epic Sys. Corp. v. Lewis*,
   138 S.Ct. 1612 (2018) ................................................................................ 22

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) .................................................................................. 23

*F.E.R.C. v. Mississippi*,
   456 U.S. 742 (1982) .................................................................................. 28

*F.T.C. v. Mandel Bros., Inc.*,
   359 U.S. 385  (1959) .................................................................................. 28

*Firebird Global Master Fund II Ltd. v. Republic of Nauru*,
   915 F. Supp. 2d 124 (D.D.C. 2013) ............................................................ 12

*\*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983) ............................................................................ *passim*

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ............................................................................ 30, 31

*GSS Grp. Ltd v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012) .............................................................. 31, 39

*\*GSS Grp. Ltd. v. Nat'l Port Auth.*,
   822 F.3d 598 (D.C. Cir. 2016) ........................................................ 32, 33, 34

*Gulf Oil Corp. v. Copp Paving Co., Inc.*,
   419 U.S. 186 (1974) .................................................................................. 25

*Gulf Resources America v. Republic of Congo*,
   276 F. Supp. 2d 20 (D.D.C. 2003) .............................................................. 12

*Hagen v. Utah*,
   510 U.S. 399 (1994) .................................................................................. 22

*I.A.M. Nat'l Pension Fund Ben. Plan C. v. Stockton TRI Indus.*,
727 F.2d 1204 (D.C. Cir. 1984) ........................................................... 27

*Immigration & Naturalization Serv. v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ........................................................................... 25

*In re Papandreou*,
139 F.3d 247 (D.C. Cir. 1998) ............................................................ 44

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ........................................................................... 25

*\*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
376 F.3d 1123 (D.C. Cir. 2004) ................................................... 42, 44

*Lempert v. Republic of Kazakstan*,
223 F. Supp. 2d 200 (D.D.C. 2002) ..................................................... 12

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*,
995 F. Supp. 14 (D.D.C. 1998) ...................................................... 12, 13

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ........................................................................... 22

*Natural Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ............................................................ 22

*OBB Personenverkehr AG v. Sachs*,
136 S.Ct. 390 (2015) .......................................................................... 22

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
No. 05-CV-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ................ 14

*Odhiambo v. Republic of Kenya*,
764 F.3d 31 (D.C. Cir. 2014) ................................................................ 9

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987) ............................................................................. 27

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017) ............................................................ 16

*Palmore v. Superior Court*,
515 F.2d 1294 (D.C. Cir. 1975) .......................................................... 22

v

*Peterson v. Islamic Republic of Iran*,
　563 F. Supp. 2d 268 (D.D.C. 2008) ........................................................... 44

*Phoenix Consulting, Inc. v. Republic of Angola*,
　216 F.3d 36 (D.C. Cir. 2000) ................................................... 7, 15, 44

*Price v. Socialist People's Libyan Arab Jamahiriya*,
　294 F.3d 82 (D.C. Cir. 2002) ................................................... 35, 36

*Princz v. Fed. Republic of Germany*,
　26 F.3d 1166 (D.C. Cir. 1994) ................................................... 21

*Republic of Argentina v. NML Capital, Ltd.*,
　134 S.Ct. 2250 (2014) ........................................................... 44

*Republic of Argentina v. Weltover, Inc.*,
　504 U.S. 607 (1992) ........................................................... 20

*Rubin v. Islamic Republic of Iran*,
　637 F.3d 783 (7th Cir. 2011) ................................................... 44

*Samantar v. Yousuf*,
　560 U.S. 305 (2010) ........................................................... 22

*Saudi Arabia v. Nelson*,
　507 U.S. 349 (1993) ........................................................... 7

*Soudavar v. Islamic Republic of Iran*,
　67 F. App'x. 618 (D.C. Cir. 2003) ........................................................... 12

*Strata Heights Int'l Corp. v. Petroleo Brasileiro, S.A.*,
　67 F. App'x 247 (5th Cir. 2003) ........................................................... 15

*Tatneft v. Ukraine*,
　301 F. Supp. 3d 175 (D.D.C. 2018) ........................................................... 16

*Texas Children's Hosp. v. Azar*,
　315 F. Supp. 3d 322 (D.D.C. 2018) ........................................................... 29

*TIFA, Ltd. v. Republic of Ghana*,
　No. 88-CV-1513, 1991 WL 179098 (D.D.C. Aug. 27, 1991)................................................. 13

*TJGEM LLC v. Republic of Ghana*,
　26 F. Supp. 3d 1 (D.D.C. 2013) ........................................................... 11

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005) ................................................ 32

*\*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000) ................................ 32, 33, 34

*Transamerican S.S. Corp. v. Somali Democratic Republic*,
  767 F.2d 998 (D.C. Cir. 1985) ................................... 13, 15

*United States v. Fausto*,
  484 U.S. 439 (1988) ............................................................. 22

*United States v. Santos*,
  553 U.S. 507 (2008) ............................................................. 29

*US W. Commc'ns, Inc. v. F.C.C.*,
  177 F.3d 1057 (D.C. Cir. 1999) .......................................... 29

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) .............................................. 6, 41, 44

*Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*,
  336 F.2d 354 (2d Cir. 1964) ................................................ 19

*Wye Oak Tech., Inc. v. Republic of Iraq*,
  No. 1:10-CV-01182-RCL, 2018 WL 5983385 (D.D.C. Nov. 14, 2018) ................................ 37

**Statutes**

15 U.S.C. § 56 ......................................................................... 29

15 U.S.C. § 1477 ..................................................................... 29

20 U.S.C. § 1415 ..................................................................... 29

22 U.S.C. § 1643b ................................................................... 18

22 U.S.C. § 1643d ................................................................... 18

22 U.S.C. § 1643f .................................................................... 18

22 U.S.C. § 6023 .......................................................... 2, 23, 36

22 U.S.C. § 6082 .............................................................. *passim*

22 U.S.C. § 6085 ....................................................................... 3

26 U.S.C. § 6751 ................................................................................................... 29

*28 U.S.C. § 1330 ......................................................................................... *passim*

28 U.S.C. § 1331 ........................................................................................... 1, 5, 6

28 U.S.C. § 1446 ................................................................................................... 29

28 U.S.C. § 1602 ..................................................................................................... 1

*28 U.S.C. § 1603 ............................................................................................ 7, 36

*28 U.S.C. § 1604 .............................................................................................. 4, 5

*28 U.S.C. § 1605 ......................................................................................... *passim*

28 U.S.C. § 1605A ............................................................................................... 26

28 U.S.C. § 1605B ............................................................................................... 26

28 U.S.C. § 1610 ................................................................................................... 35

28 U.S.C. § 2072 ................................................................................................... 29

38 U.S.C. § 8126 ................................................................................................... 29

39 U.S.C. § 409 .................................................................................................... 28

42 U.S.C. § 6992 ................................................................................................... 29

48 U.S.C. 1822 ..................................................................................................... 29

Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132,
    104th Cong. (1996) ......................................................................................... 26

*Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996,
    Pub. L. No. 104-114 (1996) ....................................................................... *passim*

*International Claims Settlement Act of 1949, Pub. L. 88-666, 78 Stat. 1365 (1964) ................ 18

Terrorism Risk Insurance Act, Pub. L. 107-297,
    116 Stat. 2337, Note (2002) ........................................................................... 35

Pub. L. 100-669, 102 Stat. 3969 (1988) .............................................................. 26

Pub. L. 110–181, Div. A, title X, § 1083(a)(1), 122 Stat. 338 (2008) ........................................... 26

Pub. L. 110-181, Div. A, Title X, § 1083(b)(3), 122 Stat. 341 (2008) ........................................... 35

Pub. L. 114-222, 130 Stat. 853 (2016)........................................................................................... 26

Pub. L. 114-319, 130 Stat. 1618 (2016)......................................................................................... 26

**Rules**

Fed. R. Civ. P. 12(b) ........................................................................................................... *passim*

Fed. R. Civ. P. 12(h) ................................................................................................................ 7, 41

**Regulations**

31 C.F.R. § 515.201 .................................................................................................................... 31

31 C.F.R. § 515.204 .................................................................................................................... 31

**Constitutional Provisions**

*U.S. Const. Amend. V ........................................................................................................ 1, 6, 30

**Other Materials**

*In the Matter of the Claim of International Group, the Electric Storage Battery Company,*
    Claim No. CU-0846, Decision No. CU-19, FCSC (Aug. 23, 1967) ........................................ 19

*In the Matter of the Claim of Pepsico, Inc.,*
    Claim No. CU-3596, Decision No. CU-5841, FCSC (Sept. 16, 1970).................................... 19

*In the Matter of the Claim of Revlon, Inc.,*
    Claim Nos. CU-2698, Decision No. CU-5940, FCSC (Nov. 4, 1970) .................................... 18

**Legislative/Administrative Materials**

134 Cong. Rec. H6484 (1988) ..................................................................................................... 35

141 Cong. Rec. H9394-95 (daily ed. Sept. 21, 1995).................................................................. 25

141 Cong. Rec. S15217 (daily ed. Oct. 17, 1995) ....................................................................... 25

141 Cong. Rec. S15277-78, 82 (daily ed. Oct. 18, 1995)............................................................ 25

H.R. 271, 106th Cong. (1999) ..................................................................................................... 35

H.R. 3026, 105th Cong. (1997) ................................................................... 35

H.R. 3763, 100th Cong. (1988)................................................................... 35

H.R. 927, 104th Cong. (as introduced in the House, Feb. 14, 1995)........................................... 24

S. 381, 104th Cong. (1995) (as introduced in the Senate, Feb. 9, 1995) ...................................... 24

*H.R. Rep. No. 104-468 (1996) (Conf. Rep.) ...................................................... 25, 28

*Foreign Sovereign Immunities Act Amendments: Hearings on H.R. 3763*
   *Before the S. Comm. on the Judiciary*, 100th Cong., S. Hrg. 100-1061 (Oct. 5, 1988) .......... 35

**Markup Before the Comm. on Int'l Relations on H.R. 927*,
   104th Cong. (June 30 and July 13, 1995) ................................................ 24

*Markup Before the Subcomm. on the Western Hemisphere of the Comm. on Int'l Relations on*
   *H.R. 927*, 104th Cong. (March 22, 1995) ................................................ 24

Defendants Corporación Cimex, S.A. ("CIMEX") and Unión Cuba-Petróleo ("CUPET") respectfully submit this Memorandum of Points and Authorities in support of their motion, made pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2), to dismiss this action with prejudice:

(a)     for lack of subject-matter jurisdiction, because neither (*i*) the provision of the Foreign Sovereign Immunities Act ("FSIA") relied upon by Plaintiff, the third prong of the FSIA's "commercial activity" exception to immunity, 28 U.S.C. § 1605(a)(2); nor (*ii*) Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104-114, §§ 301–06 (1996), 22 U.S.C. §§ 6081–6085 ("Title III") or 28 U.S.C. § 1331, also invoked by Plaintiff, provides subject-matter jurisdiction over this action; and

(b)     for lack of personal jurisdiction, because the Due Process Clause of the Fifth Amendment precludes the exercise of jurisdiction over Defendants.

In addition, Defendants move the Court to stay further proceedings on personal jurisdiction until final determination of subject-matter jurisdiction, including appellate decision on an interlocutory appeal taken of right by Defendants from any adverse ruling on their contention that the FSIA, 28 U.S.C. §§ 1330(a), 1602 *et seq.*, requires dismissal of the action.[1]

## STATEMENT OF THE CASE

Plaintiff sues Defendants, Cuban companies located in Cuba, for their alleged use in Cuba, in connection with their commercial activities outside of the United States, of property located in Cuba. The property—an oil refinery and related facilities, and gas service stations— had been owned by a Panamanian company, Esso Standard Oil, S.A. ("Essosa"), Plaintiff's

---

[1] Defendants also move to dismiss for lack of statutory personal jurisdiction, which necessarily fails with lack of subject-matter jurisdiction under the FSIA. *See* 28 U.S.C. § 1330(b).  No challenge is made to service of process.

wholly-owned subsidiary, until the property was nationalized by the Republic of Cuba in 1960. Complaint ¶¶ 19, 25–26.

Defendants show below that, under the clear and settled law of this Circuit, this action fails to satisfy the requirements for subject-matter and personal jurisdiction.

1.      Plaintiff claims Defendants are liable under Title III of the LIBERTAD Act, which provides that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages [.]" Title III, § 302(a)(1)(A); 22 U.S.C. § 6082(a)(1)(A).

"Traffics" is defined to include "knowingly and intentionally" "manag[ing]," "possess[ing]", or "us[ing]" "confiscated property," and "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property," "without the authorization" of the U.S. national "who holds a claim to the property." LIBERTAD Act, §4(13)(A)(i)-(ii); 22 U.S.C. § 6023(13)(A)(i)–(ii).

"Confiscated" refers to the "nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 without—  . . . the property having been returned or adequate and effective compensation provided." LIBERTAD Act, §4(4); 22 U.S.C. § 6023(4)(A)(i).

Plaintiff claims statutory damages in a sum treble that of the claimed value of the property at the time of the confiscation (treble $71,611,002.90), plus pre-judgment interest. Complaint, Demand for Relief. No demand for trial by jury is made.

Although Title III was enacted in March 1996 as part of broader legislation concerning Cuba, President Clinton, and each President thereafter, invoked the President's authority under

Title III, § 306(c); 22 U.S.C. § 6085(c), to suspend the right to bring an action under its provisions at six-month intervals, until President Trump did not renew the suspension, effective May 2, 2019.

2.      Plaintiff alleges that CUPET, "an agenc[y] or instrumentalit[y] of a foreign state, as that term is defined in" the FSIA, Complaint ¶ 6, is "the Cuban state-owned oil company," with its principal place of business in Cuba.  Complaint ¶ 16.  Plaintiff alleges that CUPET is trafficking by its possession, management and use of fixed, immobile property located in Cuba that had been owned by Essosa: the Belot Refinery (Havana), including related terminals, plants and tanks; bulk products terminals; and gas service stations.  Complaint ¶¶ 25, 26.

The Complaint also appears to allege trafficking because of CUPET's sale, outside of the United States, of petroleum products produced at the nationalized Essosa facilities. Complaint ¶ 65.

Finally, Plaintiff alleges CUPET is trafficking because of its operation, with CIMEX, of gas service stations in Cuba that had been owned by Essosa.  Complaint ¶ 59.

All of the claimed acts of CUPET's trafficking are acknowledged to be acts "'outside of the territory of the United States in connection with a commercial activity of the [Defendant] elsewhere.'" Complaint ¶ 6 (*quoting* 28 U.S.C. § 1605(a)(2)).

3.      Plaintiff alleges that CIMEX, also an "agenc[y] or instrumentalit[y] of a foreign state, as that term is defined in" the FSIA, is a "commercial corporation" "owned by the government of Cuba," with its principal place of business in Cuba.  Complaint ¶¶ 6, 13–14, 56. Plaintiff alleges that CIMEX is trafficking because it operates gas service stations that had been owned by Essosa. Complaint ¶ 59. In addition, Plaintiff alleges that CIMEX is trafficking because it makes available at those service stations gasoline and other petroleum products

produced through CUPET's use of the nationalized Essosa oil production facilities.  Complaint ¶ 60. The claimed acts of CIMEX's trafficking are acknowledged to be acts "outside of the territory of the United States in connection with a commercial activity of the [Defendant] elsewhere." Complaint ¶ 6 (*quoting* 28 U.S.C. § 1605(a)(2)).

4.      Plaintiff invokes subject-matter jurisdiction under the FSIA. The FSIA provides agencies or instrumentalities with immunity from the jurisdiction of U.S. courts, *see* 28 U.S.C. § 1604, and subject-matter jurisdiction for actions against them that fall within the statute's limited, enumerated exceptions to that immunity. *See* 28 U.S.C. § 1330(a).

Plaintiff relies upon the third prong of the commercial activity exception to immunity, 28 U.S.C. § 1605(a)(2), Complaint ¶ 6, but its action does not satisfy the "direct effect" requirement of that exception: that the action be "based . . . upon an act outside of the territory of the United States in connection with a commercial activity of the foreign state elsewhere"—here, Defendants' alleged use in Cuba of nationalized Essosa property in Cuba in connection with commercial activities outside of the United States—"and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

In its Complaint, Plaintiff does not identify the factual predicates for its conclusory assertion that the third prong of the FSIA's commercial activity exception to immunity, with its "direct effect" requirement, applies here, and the Complaint is devoid of the necessary allegations.

 Plaintiff alleges that it is a U.S. corporation with its principal place of business in the United States, Complaint ¶ 12, but, under settled Circuit law, that is insufficient to satisfy the "direct effect" requirement.  Plaintiff does not allege financial harm from Defendants' use of the allegedly confiscated property, but, in any event, the argument that any financial harm suffered

by Plaintiff in some sense is suffered at its domicile in the United States has been repeatedly rejected by this Circuit as insufficient, including in cases that, as here, are based upon allegedly wrongful use of the plaintiff's property in the foreign country. There are no allegations that the Defendants use the allegedly confiscated property to export goods or services to the United States. For these reasons, the action fails to satisfy the "direct effect" requirement, requiring its dismissal.

Plaintiff cannot satisfy the "direct effect" requirement for another, independent reason. Plaintiff's is the derivative claim of a parent company, but a parent's derivative claims do not satisfy the "direct effect" requirement.

5.   Plaintiff alleges that Title III not only establishes Defendants' liability for trafficking but also overrides the FSIA's grant of immunity, 28 U.S.C. § 1604, and establishes a new head of subject-matter jurisdiction for Title III actions. Complaint ¶ 6.

Title III does not provide the subject-matter jurisdiction that is denied by FSIA immunity. It contains no express amendment of the FSIA or express grant of subject-matter jurisdiction. Further, provisions to override the FSIA and establish a separate head of jurisdiction for Title III actions were struck from the bill reported out of subcommittee, and Title III was enacted without them. Settled rules of statutory construction preclude Plaintiff's contention that Congress altered the FSIA immunity regime and provided subject-matter jurisdiction for Title III actions *sub silentio* and *by implication*.

6.   Finally, Plaintiff's assertion that 28 U.S.C. § 1331 confers subject-matter jurisdiction founders on the Supreme Court's ruling that actions against a foreign state or its agencies or instrumentalities do not fall under the general statutory grant of subject-matter

jurisdiction in § 1331 but exclusively under the FSIA, and requires no further discussion. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983).

7.      Plaintiff's Complaint is devoid of the allegations required by the Due Process Clause for general personal jurisdiction, that the Defendants are "at home" in the United States, or those required for specific jurisdiction, that the Plaintiff's claims arise out of the Defendants' contacts with the United States. To the contrary, the Complaint affirmatively alleges the opposite—that the Defendants are located in Cuba, and their use of the allegedly confiscated property is their use in Cuba of property in Cuba in connection with commercial activities outside of the United States.

This Circuit has held that agencies or instrumentalities of a foreign state are protected by the Due Process Clause's limitations on personal jurisdiction, unless the plaintiff can overcome the *Bancec* presumption (*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983)) that an agency or instrumentality endowed with juridical personality is to be treated as separate from the foreign state (which, under Circuit law, is not a "person" within the Due Process Clause). The Complaint alleges that the Defendants are endowed with juridical personality, giving rise to the *Bancec* presumption. It nonetheless fails to make the allegations needed to overcome the presumption (and, indeed, does not address the *Bancec* presumption at all, whether in conclusory terms or otherwise), requiring dismissal of this action. The *Bancec* presumption is also raised by the accompanying expert declaration on Cuban law, which Plaintiff has the burden to overcome with evidence, in the event that the Complaint is not dismissed as facially defective.

8.      While Defendants have moved for dismissal for lack of personal jurisdiction at the same time that they have moved for dismissal for lack of subject-matter jurisdiction in order

to avoid waiver of the objection under Fed. R. Civ. P. 12(h), they request that the Court stay further proceedings on the personal jurisdiction issue until final determination of subject-matter jurisdiction, including appellate decision on an interlocutory appeal taken of right by Defendants from any adverse ruling on the FSIA immunity issue.  The Circuit has held that FSIA immunity is immunity from the entanglements, burdens and intrusions of litigation, not just immunity from judgment, and, for that reason, has held that an interlocutory appeal lies of right from denial of FSIA immunity.  It would be incongruous to require the Defendants to litigate personal jurisdiction, including the *Bancec* presumption, before final resolution of FSIA immunity.

## ARGUMENT

I.    **THIS ACTION FAILS TO SATISFY THE FOREIGN SOVEREIGN IMMUNITY ACT'S "DIRECT EFFECT" REQUIREMENT FOR SUBJECT-MATTER JURISDICTION**

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state" in U.S. courts.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, a "foreign state," which is defined to include its "agency or instrumentality," 28 U.S.C. § 1603(a), "is presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). "If no exception [to immunity] applies . . . [t]he district court lacks subject matter jurisdiction over the plaintiff's case" and the case must be dismissed.  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000); *see also* 28 U.S.C. § 1330(a).

### A.    The Facts Alleged in the Complaint Fail to Satisfy the "Direct Effect" Requirement

Plaintiff, alleging that Defendants are agencies or instrumentalities of the Cuban State, Complaint ¶ 6, invokes jurisdiction under the third prong of the commercial activity exception to immunity, 28 U.S.C. § 1605(a)(2). The third prong provides as follows:

7

(a)  A foreign state shall not be immune from the jurisdiction of courts of the
United States or of the States in any case—
. . .
(2) in which the action is based . . . upon an act outside the territory of the
United States in connection with a commercial activity of the foreign state
elsewhere and that act causes a direct effect in the United States[.]

Plaintiff does not identify the factual allegations it contends support the Complaint's

conclusory assertion that the third prong of the FSIA's commercial activity exception to

immunity, with its "direct effect" requirement, applies here.  The Complaint's allegations, such

as they are, fail to establish jurisdiction.

As explained in the Statement of the Case, Plaintiff's claim is based upon alleged use of

property ("trafficking") located exclusively in Cuba; the alleged acts of trafficking are

exclusively in Cuba; and there are no allegations that the Defendants use the allegedly

confiscated property to export goods or services to the United States.  By invoking the third

prong of the commercial activity exception, Plaintiff alleges that Defendants' use of the

confiscated property is not only an "'act . . . outside of the territory of the United States'" but that

Defendants' use of the property is "'in connection with a commercial activity [of the Defendants]

elsewhere.'"  Complaint ¶ 6 (*quoting* 28 U.S.C. § 1605(a)(2)).[2]  These allegations do not, as a

matter of settled law, satisfy the "direct effect" requirement.

Plaintiff alleges that it is a U.S. national with its principal place of business in the United

States, but that does not, under settled Circuit law, rescue Plaintiff's action.  Plaintiff does not

allege financial harm from the trafficking, but, even it had, reliance on the theory that a U.S.

company in some sense experiences financial harm from a foreign tort at its domicile also would

not save Plaintiff's action: it would be a contention that is foreclosed by the settled law of this

---

[2] In contrast, the first prong concerns actions "based upon a commercial activity carried on in the
United States," and the second prong concerns actions based "upon an act performed in the
United States in connection with a commercial activity . . . elsewhere."  28 U.S.C. § 1605(a)(2).

Circuit, under which such an allegation is facially insufficient to satisfy the "direct effect" requirement.

The Court of Appeals' decision in *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175 (D.C. Cir. 2013) establishes that the FSIA's "direct effect" requirement is not satisfied here. The Circuit held that the "direct effect in the United States" requirement is not satisfied "simply by virtue of [the plaintiff's] U.S. citizenship," or, relatedly, by virtue of a company domiciled in the United States having suffered "financial loss from a foreign tort." *Id.* at 1184–86. The plaintiff in *Bell Helicopter* argued that the defendant's alleged violation of its "property right[s]" abroad "directly harms the owner where it lives," in the United States, but the D.C. Circuit explicitly rejected that such harm constituted a "direct effect in the United States." *Id.* at 1184, 1186 (internal quotations omitted). *See also Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014) ("[Plaintiff] does not argue that his U.S. presence or U.S. citizenship alone suffices to create a direct effect in the United States. . . . [T]he relevant precedents would foreclose any such contention.").

In *Bell Helicopter*, the manufacturer of helicopters, a U.S. company with its principal place of business in the United States, sued an Iranian defendant under the Lanham Act for using, without authorization, its distinctive trade dress for helicopters. The Iranian defendant's manufacture of helicopters using that trade dress was in Iran, at a plant once owned by the plaintiff, and the defendant sold helicopters with the trade dress exclusively outside of the United States. Bell Helicopter argued that the Iranian defendant's unauthorized use of its trade dress deprived it of its "exclusive right to reap" the "financial . . . rewards" of its "intellectual property." *Bell Helicopter*, 734 F.3d at 1184, 1186.

9

The D.C. Circuit in *Bell Helicopter* relied extensively on the Second Circuit's decision in *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33 (2d Cir. 1993).  There, a U.S. plaintiff brought an action for damages for the purported wrongful detention in Nigeria by the Nigerian Airport Authority of plaintiff's sole asset, an aircraft registered in Nigeria, causing the aircraft physical damage. *See id.* at 34.  The Second Circuit found no "direct effect in the United States" where (*i*) the aircraft was registered in Nigeria; (*ii*) there was "no evidence that the use of the aircraft was related to substantial commerce with the United States;" and (*iii*) the "detention of, and physical damage to, the plane happened in Nigeria." *Id.* at 36.  In a passage in *Antares* quoted extensively and favorably by the D.C. Circuit in *Bell Helicopter*, the court squarely rejected plaintiff's theory that "the fact that an American individual or firm suffers some financial loss from a foreign tort . . . suffice[s] to trigger the exception [to FSIA immunity]." *Id.* (internal quotations omitted); *see also Bell Helicopter*, 734 F.3d at 1184–85 (same).

Plaintiff's allegations here mirror those of the plaintiffs in *Bell Helicopter* and *Antares*. In this case, as in those cases, the act upon which the action is based is allegedly wrongful use of property abroad, and here, as in those cases, there is no allegation that the property is used in connection with sales to, or other commercial activities in, the United States.  The same result, dismissal for lack of subject-matter jurisdiction, is thus required.

The construction of the "direct effect" requirement set forth in *Bell Helicopter* and *Antares* has been applied in a wide variety of circumstances, including, as in those cases and particularly relevant here, where the claim is based on defendant's allegedly wrongful use of the plaintiff's property abroad.

For example, in *Allen v. Russian Federation*, the court held that there was no "direct effect" from a Russian agency or instrumentality's actions in Russia, in coordination with the

10

Russian Federation, "effectively expropriat[ing]" a Russian oil company, making U.S. plaintiffs' stock in the oil company "effectively worthless." 522 F. Supp. 2d 167, 174, 177, 189 (D.D.C. 2007).  The district court held that "where the Russian Federation is accused of engaging in conduct . . . within its own territory that resulted in reduced funds flowing to the investors in a Russian company . . . [t]his type of financial injury cannot be characterized as a 'direct effect' under the commercial activities exception because a mere financial loss to United States residents, without more, is not a direct effect in the United States." *Id.* at 189–90 (internal quotations omitted).

In *TJGEM LLC v. Republic of Ghana*, the D.C. Circuit affirmed the district court's holding that there was no "direct effect" from plaintiff's alleged loss of an infrastructure project in Ghana where "plaintiff [] offered no rationale as to why the alleged misappropriation [of plaintiff's business plans it provided to Ghanaian defendant] or any other tortious activity by the Ghana Defendants has had any 'direct effect' in the United States beyond an alleged loss to 'an American individual and firm.'" 26 F. Supp. 3d 1, 11 (D.D.C. 2013), *aff'd*, No. 14-7036, 2015 WL 3653187, at *1 (D.C. Cir. June 5, 2015).

Similarly, in *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73 (D.D.C. 2003), plaintiff alleged, *inter alia*, that defendants used plaintiff's copyrighted materials, client lists, and confidential information from plaintiff's Swedish branch without compensation, contending that "the alleged seizure of Plaintiffs' assets 'has a direct effect in the United States by diminishing the value of assets owned by [plaintiff] and harming its ability to earn a profit.'" *Id.* at 81. The district court rejected the argument, holding that a "financial loss in the United States, when all the acts giving rise to the claim occurred outside this country, is insufficient to show the 'direct effect' in the United States that FSIA requires." *Id.*

In *Gulf Res. America v. Republic of Congo*, 276 F. Supp. 2d 20, 22–24 (D.D.C. 2003), *rev'd and remanded on other grounds*, 370 F.3d 65 (D.C. Cir. 2004), the court likewise found there was no "direct effect" where the Republic of the Congo had seized oil to which plaintiff held the title that had been extracted from Congolese oil fields. "[R]eneging on the delivery of [plaintiff's] portion of [the] oil," whether characterized as "expropriation or conversion[,] . . . occurred at dockside in Congo, nowhere else." *Id.* at 27.   The court rejected plaintiffs' argument that the alleged confiscation or conversion in the Congo had a "direct effect" in the United States because the proceeds from the sale of the seized oil were previously committed for use in a U.S. transaction: "Adverse impact alone on economic interests in the United States from an act or omission of a foreign state abroad in a commercial context is insufficient as a matter of law . . . to deprive the foreign state of its immunity under section 1605(a)(2) of the FSIA." *Id.*   The court noted that it has been consistently held that "'mere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'" *Id.* (*quoting Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726–27 (9th Cir. 1997)).

Numerous other cases are to the same effect.  *See, e.g.*, *Soudavar v. Islamic Republic of Iran*, 67 F. App'x. 618, at *1 (D.C. Cir. 2003) (holding that forced transfer of title to property in Iran did not have a direct effect in the United States "[a]lthough appellant was a legal resident of the United States at the time of this transaction," because "a mere financial loss by a resident of the United States does not constitute a 'direct effect' in the United States").[3]

---

[3] *See also Lempert v. Republic of Kazakstan*, 223 F. Supp. 2d 200, 204 (D.D.C. 2002), *aff'd*, 62 F. App'x. 355 (D.C. Cir. 2003) (finding no direct effect where "plaintiff's theory is that [defendant's] refusal to pay caused a direct effect in the United States, namely, his financial loss"); *Firebird Global Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124 (D.D.C. 2013) (same); *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14, 22 (D.D.C. 1998) (citing *Antares* for holding that "mere financial loss due to commercial activity

The cases in which the D.C. Circuit and D.C. district courts have found "direct effect" stand in sharp contrast to the above, controlling line of authority and to the action here.  For example, in *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, cited by *Bell Helicopter*, 734 F.3d at 1185, a Canadian agency or instrumentality—the Royal Canadian Mounted Police (RCMP)—contracted with a U.S. company for three cruise ships to travel to Vancouver during the 2010 Olympic Winter Games.  The D.C. Circuit upheld the settled rule that "harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement." 600 F.3d 661, 665 (D.C. Cir. 2010). It found a "direct effect" not because of nationality or financial harm from a foreign tort; instead, it relied on the fact that the contracts terminated by RCMP required performance to take place in part in the United States and by U.S. companies. *See id.* at 663–66. In so holding, the D.C. Circuit reaffirmed that the "direct effect" requirement is not satisfied where, as here, the nexus stems entirely from the U.S. nationality and location of the plaintiff.

In addition to contractual obligations to perform in the United States, D.C. Circuit and district courts have found a direct effect where the defendant causes plaintiff to part with its money in the United States or uses the property abroad at issue to carry out exports to the United States, neither of which is the case here. In *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998 (D.C. Cir. 1985), an action based on defendants' wrongful detention of plaintiff's ship in Somalia, the D.C. Circuit held there to be a "direct effect" based on defendants' demand that the plaintiff effectuate ransom payments from the United States. The court relied on the fact that, at the Somali defendant's "insistence, a significant transaction was

---

abroad is not, in itself, sufficient to form a 'direct effect'"); *TIFA, Ltd. v. Republic of Ghana*, No. 88-CV-1513, 1991 WL 179098, at *6–7 (D.D.C. Aug. 27, 1991) (same).

effectuated in the United States, [] an American corporation [plaintiff] transfer[ed] $28,000 from a New York bank to the Somali government's D.C. bank" in order to release plaintiff's ship. *Id.* at 1004.  In *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 05-CV-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006), in which the plaintiffs sought damages for the loss of an oil and gas concession for the area between East Timor and Australia ("Timor Gap"), the district court found a "direct effect" because plaintiffs had asserted that defendants "shipp[ed] and s[old] petroleum from Timor Gap *in the United States* for [the agency or instrumentality's] commercial profit" and that "the proceeds of these sales" were "deposit[ed] … to the [agency or instrumentality's] bank accounts *in the United States*." *Id.* at *5 (emphasis added).

Similar is *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, where the D.C. Circuit re-affirmed *Bell Helicopter* (and the Second Circuit's holding in *Antares*) that "'financial loss from a foreign tort cannot, standing alone, suffice to trigger the [direct effect] exception.'" 894 F.3d 339, 348 (D.C. Cir. 2018), *cert. denied*, 139 S.Ct. 1324 (2019) (*quoting Antares*).

In *EIG Energy*, the Circuit found a direct effect because Petrobras, a Brazilian agency or instrumentality, had engaged in a "years-long scheme" "specifically targeted [at] U.S. investors" "to part [them] from [their] money under false pretenses," including by sending its agents into the United States where they successfully engaged in the conduct that constituted fraudulent inducement. *Id.* at 342, 348. As this Court found, *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 71–72 (D.D.C. 2017), "the injury to the [plaintiff] Funds occurred at the time [defendant state entity Petrobras] successfully induced them to invest…" Thus, where a defendant reaches into the United States and induces the plaintiff to "part [it] from its money under false pretenses," such a scheme of fraudulent inducement in the United States,

combined with the making of an investment from the United States as a direct result of that fraud, satisfies the direct effect requirement.

In accord are *Strata Heights Int'l Corp. v. Petroleo Brasileiro, S.A.*, 67 F. App'x 247, at *4 (5th Cir. 2003) ("direct effect" where Petrobras "actively solicited [American corporations] participation" as joint venture partners); and *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 103–04, 110–11 (2d Cir. 2016), cited in *EIG Energy* ("direct effect" in securities fraud case where defendant "marketed the Subordinated Notes [at issue in that case] 'extensively in the United States,' . . . [and] sent representatives to the United States . . . to meet with investors and to assure them . . . .") (internal quotations omitted).

*EIG Energy* fits squarely in line with *Transamerican*, in which the D.C. Circuit emphasized that payments "effectuated in the United States" at defendant's insistence constitute a direct effect of the wrongful conduct. *Transamerican*, 767 F.2d at 1004. The critical elements in *Transamerican, EIG Energy*, *Strata Heights*, and *Atlantica* are absent here.

Where, as here, a defendant "has asserted the jurisdictional defense of immunity under the FSIA, the court's focus shifts to the exceptions to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *see also Bell Helicopter*, 734 F.3d at 1183 ("[T]he plaintiff bears the initial burden to overcome" the FSIA's presumption of immunity). To survive a Rule 12(b)(1) motion to dismiss in an FSIA action, the Plaintiff must come forward with "factual allegations … [that] make out a legally valid claim" that an exception applies. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1316 (2017).[4]

---

[4] Even when a plaintiff comes forward with sufficient factual allegations, the defendant has the opportunity to "persuad[e] the Court of the absence of a factual basis for jurisdiction by a preponderance of the evidence." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244

Here, Plaintiff fails to meet even its threshold burden because, although invoking FSIA jurisdiction, it does not allege facts that would satisfy the "direct effect" requirement of the FSIA exception to immunity upon which it relies.  Instead, Plaintiff has pled a bare legal conclusion, which is insufficient, *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and such allegations as appear in the Complaint are inadequate.  In FSIA actions, courts are required to be particularly vigilant at the gateway to ensure that only cases satisfying the FSIA's requirements move forward. *See Helmerich*, 137 S.Ct. at 1316; *Owens v. Republic of Sudan*, 864 F.3d 751, 779 (D.C. Cir. 2017), *cert. granted in part on unrelated question sub nom. Opati v. Republic of Sudan*, 139 S.Ct. 2771 (U.S. June 28, 2019) (No. 17-1268).  The action should be dismissed for lack of subject-matter jurisdiction.

### B.   The Action Cannot Satisfy the "Direct Effect" Requirement for the Additional Reason that Plaintiff's Claim is that of a U.S. Parent Whose Third-Country Subsidiary Suffered A Property Loss

Plaintiff also cannot satisfy the FSIA's "direct effect" requirement because its claim is that of a U.S. parent company whose third-country subsidiary suffered a property loss.  Both the Tenth and Second Circuits have held that the FSIA's requirement of a "direct effect in the United States" is not satisfied in those circumstances.

Plaintiff's claim here is the claim certified in 1969 by the Justice Department's Foreign Claims Settlement Commission ("FCSC").  For its "Count [] – Trafficking in Confiscated Property," the Complaint alleges that Plaintiff is a U.S. national and "owns the claim to property that was confiscated by the Cuban Government after January 1, 1959 (*i.e.*, the Confiscated

---

F. Supp. 3d 100, 109 n.12 (D.D.C. 2017), *aff'd*, 760 F. App'x 1 (D.C. Cir. 2019); *see also Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 186 (D.D.C. 2018), *aff'd*, 771 F. App'x 9 (2019) ("The burden of persuasion … shifts to . . . the foreign sovereign that is claiming immunity[] to establish the absence of the factual basis [for an exception to immunity] by a preponderance of the evidence.") (internal quotations omitted).

Property). The Claim is certified and is attached as Exhibit 1." Complaint ¶ 67.  Because it is the FCSC-certified claim that is presented, Plaintiff demands the special Title III benefits for certified claims.[5]  Title III, § 302(a)(5)(A), 22 U.S.C. § 6082(a)(5)(A), would bar Plaintiff from bringing a Title III action other than the claim filed with and certified by the FCSC.[6]

The FCSC claim was brought by Standard Oil Company, now Exxon Mobil, for the loss of property in Cuba in 1960 that had been owned by Esso Standard Oil, S.A. ("Essosa"), Standard Oil Company's Panamanian subsidiary, not Standard Oil.  As the FCSC stated:

> STANDARD OIL COMPANY, hereafter referred to as claimant, has asserted this claim for loss of the Cuban assets of Esso Standard Oil, S.A., hereinafter referred to as Essosa, a Panamanian corporation and a wholly-owned subsidiary of claimant.

FCSC Decision 2, ECF 1.1.  The FCSC certified an amount according to "[t]he Cuban assets and liabilities of Essosa." *Id.* at 4.[7]

---

[5] Plaintiff claims that the FCSC certification must "be treated as conclusive proof" of "ownership of the Confiscated Property," Complaint ¶ 55; that Plaintiff is entitled to a presumption as to the value of the property, and hence the extent of Defendants' liability, in the amount certified by the FCSC, Complaint ¶¶ 51–52; that it is entitled to "damages in the amount of the certified claim, plus pre-judgment interest at the rate of 6 per cent awarded by the FCSC," Complaint ¶ 75, and that it is entitled to treble damages. Complaint ¶¶ 52–53, 55, 75.

[6] Section 302(a)(5)(A), 22 U.S.C. § 6082(a)(5)(A) provides as follows:

> In the case of a United States national who was eligible to file a claim with the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 [22 U.S.C. 1643 et seq.] but did not so file the claim, that United States national may not bring an action on that claim under this section.

[7] Plaintiff acknowledges that the "certified claim involves the property formerly owned by Essosa …," Complaint ¶ 20; *see also* Complaint ¶ 23 (it is "Essosa's property rights [that] were expropriated"); Complaint ¶ 26 ("The Cuban Government expropriated the following assets from Essosa…").  Elsewhere, Plaintiff uses imprecise and misleading language, describing the confiscated property as "Plaintiff's Confiscated Property." *See* Complaint ¶¶ 1, 64, 65 and heading on top of page 13.  However, as is clear from both the FCSC decision and the Complaint, the allegedly confiscated property was Essosa's.

17

Enacted in 1964, Title V of the International Claims Settlement Act of 1949, Pub. L. 88-666, 78 Stat. 1365 (1964) ("Title V"), charged the FCSC with hearing and determining the category of claims against the Government of Cuba prescribed by the statute. The FCSC's function under its Title V program, concluded in 1972, as under its numerous other claims programs, was to certify the validity and amount of claims within the prescribed categories for the Secretary of State's possible use in the negotiation of a state-to-state settlement of claims with Cuba, and for the Executive's possible use in the distribution of any funds obtained through a lump sum settlement or Executive blocking of Cuban assets.[8] The proceedings are entirely *ex parte*. *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F. Supp. 412, 449–51 (S.D.N.Y. 1980), *aff'd*, 658 F.2d 875 (2d Cir. 1981).

Under Title V, the FCSC 's mandate included claims by U.S. corporations arising from the nationalization of property in which they held "rights or interests," "directly or *indirectly*." Title V, § 503(a); 22 U.S.C. § 1643b(a) (emphasis added).  The FCSC was required to hear claims under this provision by U.S. parent corporations for property losses suffered by companies in which they held an interest, provided those companies were not themselves U.S. nationals. *See* Title V, § 505(b); 22 U.S.C. § 1643d(b).

The FCSC certified many such "indirect[]" claims, expressly terming them as such.  *See, e.g.*, *In the Matter of the Claim of Revlon, Inc.*, Claim Nos. CU-2698, Decision No. CU-5940, FCSC, at 2–5 (Nov. 4, 1970) (U.S. corporation Revlon, Inc. only able to make a claim "indirectly" based on fact that it "owned all of the outstanding capital stock of Revlon Overseas

---

[8] *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 679–81 (1981); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F. Supp. 412, 449–50 (S.D.N.Y. 1980), *aff'd* 658 F.2d 875 (2d Cir. 1981); 22 U.S.C. § 1643f (Commission to certify its determinations to the Secretary of State); FCSC Decision 10 (certifying decision to "the Secretary of State for possible use in future negotiations with the Government of Cuba.").

Corporation, C.A., organized under the laws of Venezuela (Venezuelan subsidiary), . . . [that] in turn, owned a branch in Cuba" that had real and personal property in Cuba that was nationalized); *In the Matter of the Claim of Pepsico, Inc.*, Claim No. CU-3596, Decision No. CU-5841, FCSC, at 2–3, 6 (Sept. 16, 1970) (U.S. corporation Pepsico, Inc. had claim based on "indirect ownership" for loss based on nationalization of land and a bottling plant in Cuba that was owned by its wholly-owned Canadian subsidiary); *In the Matter of the Claim of International Group, the Electric Storage Battery Company*, Claim No. CU-0846, Decision No. CU-19, FCSC, at 2–4 (Aug. 23, 1967) (U.S. corporation's claim for loss based on nationalization of equipment and other assets of its wholly-owned Panamanian subsidiary). (The decisions are available on the FCSC's website, https://www.justice.gov/fcsc.)

Although Plaintiff's "indirect" claim fell within the FCSC's statutory mandate, it does not fall within the FSIA's commercial activity exception relied upon by Plaintiff because of the "direct effect" requirement, as shown below.[9]

Both the Court of Appeals for the Tenth Circuit and the Court of Appeals for the Second Circuit have held that the FSIA "direct effect" requirement is not satisfied when the U.S. parent's claim is derivative of an injury to its foreign subsidiary. *See Big Sky Network Canada, Ltd. v.*

---

[9] While adherence to the FSIA's jurisdictional limitations would be required anyway, it may be noted that any ruling that a certified claim does not come within the FSIA's immunity exceptions would not undermine the Executive's ability to use the FCSC's certifications as intended, in diplomatic claims settlement negotiations and the distribution of funds. Indeed, when it was established in 1949 and continuing until today, claims brought before the FCSC under its Cuba and other programs typically could not be brought in the courts by reason, *inter alia*, of sovereign immunity, other jurisdictional limitations or the act of state doctrine. *See Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 357 (2d Cir. 1964) (absolute sovereign immunity recognized by U.S. courts until "restrictive theory" of immunity adopted; restrictive theory continued to bar claims based on nationalizations); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 430–31 (1964) (act of state doctrine barred claims in U.S. courts based on Cuban nationalizations); *cf. Dames & Moore v. Regan*, 453 U.S. at 679–86 (explaining authority and history of Executive in negotiating claims settlements).

*Sichuan Provincial Gov't*, 533 F.3d 1183 (10th Cir. 2008) (then Gorsuch, J.); *Carey v. Nat'l Oil Corp.*, 592 F.2d 673 (2d Cir. 1979) (per curiam). The result in those cases is compelled by the Supreme Court's holding in *Republic of Argentina v. Weltover, Inc.* that the "direct effect" requirement under the FSIA requires that the effect "follows as an immediate consequence of the defendant's . . . activity." 504 U.S. 607, 618 (1992) (alteration in original) (internal quotation marks omitted).

In *Big Sky Network Canada*, a British Virgin Islands subsidiary ("Big Sky Networks") of a U.S. parent company ("China Broadband") sued a sub-division of the Chinese government for unjust enrichment and intentional interference with contractual relations. 533 F.3d at 1184–85, 1190. The claim arose from China's prohibition on foreign joint ventures operating cable television networks. Big Sky Network, which previously operated a joint venture, lost its investment. *Id.* at 1184–85.

The Tenth Circuit held that the injuries of the U.S. parent for its British Virgin Islands subsidiary's lost investment in China did not satisfy the FSIA "direct effect" requirement. *See id.* at 1191. The U.S. parent corporation's "financial injuries—while ultimately felt in the United States—are derivative of a financial injury [the foreign subsidiary] suffered in China, and thus are not sufficiently direct under our case law to invoke the commercial activity exception." *Id.* The court acknowledged that the financial effect on the U.S. parent corporation was substantial, resulting in the U.S. parent's being "forced to restructure its operations," but this did not change the result. *Id.* at 1192.

In *Carey*, the U.S. parent ("NEPCO") of a wholly-owned Bahamian subsidiary ("PETCO") claimed an FSIA "direct effect" on the basis of breach by the National Oil Company

20

("NOC"), wholly owned by the Libyan government, of its contracts with PETCO for NOC to supply oil to PETCO outside the United States. *See* 592 F.2d at 675.

The Second Circuit held that, although cancellation of the contracts had "an admitted effect on NEPCO, an American company, that effect can only be deemed indirect, through NEPCO's relations with PETCO and [another subsidiary][.]" *Id.* at 676. The Second Circuit reasoned that PETCO, "[t]hough a subsidiary of NEPCO, [] was a separate corporate entity," so it declined to "pierce the corporate veil in favor of those who created that veil." *Id.* (internal quotations omitted). Notwithstanding the fact that "the Libyan oil embargo"—pursuant to which NOC canceled its contracts with PETCO—"was expressly aimed at affecting the United States" and that "the Libyan government and NOC were aware that the refineries in the Bahamas [where PETCO operated] were being used primarily to channel oil into the United States," *id.*, there was no direct effect within the meaning of the FSIA because, *inter alia*, any effect on the parent was derivative of the injury to the foreign subsidiary. *Id.*

This Circuit, no less than the Tenth and Second Circuits in *Big Sky Network* and *Carey*, has recognized *Weltover*'s controlling construction:  that a "direct effect" is only "one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (internal quotations omitted).  As it did in *Big Sky Network* and *Carey* the "intervening element" of the plaintiff's third-country subsidiary—here, Essosa, which owned and operated the allegedly confiscated property—precludes Plaintiff from satisfying the "direct effect" requirement.

II.   **TITLE III OF THE CUBAN LIBERTY AND DEMOCRATIC SOLIDARITY (LIBERTAD) ACT OF 1996 DOES NOT OVERRIDE THE FSIA AND PROVIDE A NEW GRANT OF SUBJECT-MATTER JURISDICTION**

Plaintiff asserts that Title III both overrides the FSIA, which the Supreme Court has repeatedly held "provides the sole basis for obtaining jurisdiction over a foreign state," *OBB Personenverkehr AG v. Sachs*, 136 S.Ct. 390, 393 (2015), in decisions that both pre-date and post-date Title III's enactment,[10] and provides a new grant of subject-matter jurisdiction for claims brought under Title III, *see* Complaint ¶ 6—*all without any express provision in Title III amending the FSIA or granting subject-matter jurisdiction.* Plaintiff's position is untenable.

Given the glaring absence in Title III of any explicit amendment to the FSIA or explicit grant of subject-matter jurisdiction, the strong presumption against amendment of a statute by implication fully applies here. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1624 (2018) (applying the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute.") (internal quotations and alterations omitted); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007); *Hagen v. Utah*, 510 U.S. 399, 416 (1994); *United States v. Fausto*, 484 U.S. 439, 452–53 (1988). "[I]t is well settled that amendments by implication (like repeals by implication) are disfavored." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988). The presumption applies with particular force to jurisdictional statutes, such as the FSIA. *Palmore v. Superior Court*, 515 F.2d 1294, 1307 (D.C. Cir. 1975), *vacated on other grounds*, 429 U.S. 915 (1976).

---

[10] In addition to *OBB Personenverkehr AG v. Sachs*, *see, e.g.*, *Bank Markazi v. Peterson*, 136 S.Ct. 1310, 1317 n.1 (2016); *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).

Plaintiff fails to overcome this presumption, or, indeed, to sustain its position even apart from the presumption.

In its jurisdictional allegations, Plaintiff asserts that Title III "mandates that the provisions of Title III . . . control over the provisions of Title 28 of the U.S. Code," Complaint ¶ 6, citing in support section 4(11) of the LIBERTAD Act and section 302 of Title III. Section 4(11) defines "person" to "mean any person or entity, including any agency or instrumentality of a foreign state." LIBERTAD Act, § 4(11); 22 U.S.C. § 6023(11). Section 302 establishes the "[l]iability" of "any person," which includes agencies or instrumentalities, for trafficking. Title III, § 302(a); 22 U.S.C. § 6082(a).

The cited provisions subject agencies or instrumentalities to *liability* under Title III, but that does not support Plaintiff's position one iota. To the contrary, as the Court of Appeals has reaffirmed, "[t]here is a clearly settled distinction in federal law between statutory provisions that waive sovereign immunity and those that create a cause of action." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). Plaintiff makes the fatal error of "conflat[ing] two 'analytically distinct' inquiries": (1) whether jurisdiction exists because an exception to immunity applies; and (2) if so, "whether the source of substantive law upon which the claimant relies provides an avenue for relief." *F.D.I.C. v. Meyer*, 510 U.S. 471, 484 (1994) (citation omitted). Section 302 addresses only the second inquiry (the substantive cause of action) and does not address the first (whether an exception to FSIA immunity applies).

The legislative history of Title III also forecloses Plaintiff's contention, as it affirmatively shows that Congress deliberately chose to leave the FSIA immunity regime and Title 28 jurisdictional grants unchanged.

As introduced in the House, the bill ultimately enacted as the LIBERTAD Act, in a subsection headed "Waiver of Sovereign Immunity," would have amended the FSIA to add a new exception to immunity from suit to the limited exceptions enumerated in 28 U.S.C. § 1605(a):  for "any case . . . (7) in which the action is brought with respect to confiscated property under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995." H.R. 927, 104th Cong. § 302(c) (as introduced in the House, Feb. 14, 1995).

In the following sub-section, headed "Jurisdiction," the bill would have added the following to Chapter 85 of Title 28 (the chapter of Title 28 headed "District Courts; Jurisdiction"):

> 1331a. Civil actions involving confiscated property
> The district courts shall have exclusive jurisdiction, without regard to the amount in controversy, of any action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995.

*Id.* at § 302(b). Identical provisions appeared in the companion bill introduced in the Senate. *See* S. 381, 104th Cong. § 302(c), (b) (as introduced in the Senate, Feb. 9, 1995).

Dispositive of Plaintiff's contention, both provisions were struck, and Title III was enacted without them.

The two provisions were in the House bill as reported out by the Subcommittee on the Western Hemisphere to the full House Committee on International Relations. *See Markup Before the Subcomm. on the Western Hemisphere of the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 57-58 (March 22, 1995) (Appendix: An Amendment in the Nature of a Substitute to H.R. 927 Offered by Rep. Burton).  The provision amending the FSIA was deleted when the full House Committee on International Relations took up the bill. *See Markup Before the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 172, 232–33 (June 30 and July 13, 1995) (Appendix:

Amendment in the Nature of a Substitute to H.R. 927 Offered by Rep. Burton).[11] The provision adding section 1331a to chapter 85 of Title 28 was later stricken during the House-Senate Conference. *See* H.R. REP. NO. 104-468, at 35 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 558.[12]

As this legislative history makes clear, Plaintiff seeks to obtain by means of judicial construction that which Congress explicitly considered, and deliberately rejected, in enacting Title III.  Yet, "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987); *see also, e.g.*, *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 563 (1981) (elimination of provision in Conference Committee shows that Congress "rejected the very concept which petitioner seeks to have the Court judicially legislate"); *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 200 (1974) (a Conference Committee's deletion of provision passed by the House "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"). This "compelling" principle is fully applicable here. Congress "discarded" provisions that would have provided Plaintiff what it now asks for, and instead chose to enact Title III without those provisions.

---

[11] "As a result of consultations between the International Relations Committee and the Judiciary Committee, a number of changes were made in the text of H.R. 927," and, "[c]onsequently, the Judiciary Committee [did] not … mark up H.R. 927." 141 CONG. REC. H9394-95 (daily ed. Sept. 21, 1995).

[12] In the Senate, Title III had been withdrawn in its entirety before the Senate sent the LIBERTAD Act to Conference for the stated reason that a motion for cloture had failed with Title III in the bill and the bill's sponsors could not obtain cloture on the broader legislation without deleting it.  141 CONG. REC. S15217 (daily ed. Oct. 17, 1995); 141 CONG. REC. S15277-78, 82 (daily ed. Oct. 18, 1995).

Moreover, Congress clearly knows how to amend the FSIA and the jurisdictional sections of Title 28, and, when it wants to, it has always done so expressly. Indeed, in the very section of Title III relied upon by Plaintiff, section 302, Congress expressly amended a provision of the FSIA related to execution, while leaving the FSIA provisions related to jurisdictional immunity from suit untouched. *See* Title III, § 302(e); 22 U.S.C. § 6082(e).

The fact that Congress expressly amended one provision of the FSIA in enacting Title III undercuts Plaintiff's contention that, in the same enactment, Congress amended another provision of the FSIA—but *sub silentio* and by implication. Moreover, less than two months after enacting Title III, the same Congress expressly amended the FSIA to add an exception to immunity for suit for a different cause of action than Title III, actions for terrorist acts against designated state sponsors of terrorism. *See* Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241 (1996) (codified at 28 U.S.C. § 1605(a)(7), *repealed and replaced by* 28 U.S.C. § 1605A). Since its passage in 1976, Congress has amended the FSIA multiple additional times, each time expressly, both before and after Title III's enactment.[13]

Congress' practice of express amendments of the FSIA is still one more barrier to Plaintiff's already untenable position that, in Title III, Congress sought to amend the FSIA *sub silentio* and after discarding text that would have explicitly amended the FSIA. When, as here, Congress demonstrates that it knows how to implement its intentions with clear and express

---

[13] *See, e.g.*, 28 U.S.C. § 1605(a)(6); Pub. L. 100-669, § 2, 102 Stat. 3969 (1988) (suits to enforce arbitration agreement or award); 28 U.S.C. § 1605A; Pub. L. 110-181, Div. A, Title X, § 1083(a)(1), 122 Stat. 338 (2008) (terrorism exception); 28 U.S.C. § 1605B; Pub. L. 114-222, 130 Stat. 853 (2016) (international terrorism against United States); 28 U.S.C. § 1605(h); Pub. L. 114-319, 130 Stat. 1618 (2016) (excluding from commercial activities exception activities in connection with loans of certain art works by foreign states for temporary exhibit in the United States and excepting Nazi-era claims).

provisions, the absence of such a provision weighs heavily against any suggestion that Congress intended an unspoken result nonetheless. *See, e.g.*, *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987) ("Congress knows how to authorize nationwide service of process when it wants to provide for it. That Congress failed to do so here argues forcefully that such authorization was not its intention."); *see also I.A.M. Nat'l Pension Fund Ben. Plan C. v. Stockton TRI Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984) ("Congress knows how to withdraw jurisdiction expressly when that is its purpose.").

In citing section 302 to support its assertion that "the provisions of Title III control over the provisions of Title 28," Complaint ¶ 6, Plaintiff presumably refers only to section 302(a), the provision establishing liability, and not also to section 302(c), headed "Procedural Requirements."  The latter provision would contradict Plaintiff's assertion that Title III "controls over Title 28" because it provides that "Title 28, United States Code" "appl[ies]." Title III, § 302(c)(1); 22 U.S.C. § 6082(c)(1).

In any event, any reliance on the "Procedural Requirements" provision would be unsustainable, for the reasons already shown and for still additional reasons.

No less than with respect to section 302's liability provision, the strong presumption against implied amendments and implied grants of jurisdiction fully applies to the "Procedural Requirements" provision, which also lacks any express amendment of the FSIA or express grant of jurisdiction.  So too does the dispositive import of the legislative history of Title III, and of the Congressional practice of amending the FSIA by express provision.

Further, the provision's text makes clear that it does not speak to FSIA immunity or jurisdictional grants: "Procedural Requirements - Except as provided in this title, the provisions of title 28, United States Code, and the rules of the courts of the United States shall apply to

27

actions under this section to the same extent as such provisions and rules apply to any other action under section 1331 of title 28, United States Code." Title III, § 302(c)(1); 22 U.S.C. § 6082(c)(1).

Rather than amend the FSIA or grant subject-matter jurisdiction—neither of which is mentioned—the subsection establishes a consistent procedural framework for any action brought under Title III, even when such an action is filed in state court. Section 302(c) is similar to other provisions designed to ensure that, despite concurrent state and federal jurisdiction over a cause of action that may have been vested exclusively in federal courts, uniform procedures govern any suit involving that cause of action. *See, e.g.*, 39 U.S.C. § 409 (providing, in light of concurrent state and federal court jurisdiction, for the application of the "provisions of Title 28" to tort claims involving the U.S. Postal Service regardless of where filed); *F.E.R.C. v. Mississippi*, 456 U.S. 742, 771–72 (1982) (discussing "procedural requirements" Congress prescribed for use in actions before state utility commissions brought under federal law). The provision in the House bill granting jurisdiction for Title III actions was a grant of "exclusive" federal jurisdiction; when the provision was deleted at Conference, opening the way to state court Title III actions, the "Procedural Requirements" provision was added, mandating that the provisions of Title 28 would be applied in state court. *See* H.R. REP. NO. 104-468, at 35 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 558.

Section 302(c)'s heading provides one more conclusive reason why reliance on that provision would be futile. The Supreme Court has recognized that, where statutory text is ambiguous—which is not the case here, for the reasons already discussed—a statutory heading is "a useful aid in resolving an ambiguity." *F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959);

*Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998). Accordingly, courts in this Circuit routinely consider headings in determining the meaning of ambiguous text.[14]

The heading, "Procedural Requirements," literally speaks to something different than jurisdiction, and, although the heading phrase "procedural requirements"—or a close variation thereof—appears dozens of times in Title 28 and elsewhere in the U.S. Code, it is never used to refer to a court's jurisdiction.[15] This is important because of the "obligation to maintain the consistent meaning of words in statutory text," *United States v. Santos*, 553 U.S. 507, 523 (2008); courts should "normally attribute consistent meanings to statutory terms," unless context dictates otherwise. *US W. Commc'ns, Inc. v. F.C.C.*, 177 F.3d 1057, 1060 (D.C. Cir. 1999). Reliance on section 302(c) would thus, on top of everything else, impermissibly require ascribing an unprecedented meaning to a common statutory term.

Plaintiff has failed to overcome the strong presumption against implied repeals or amendments, and, further, there is no support for Plaintiff's remarkable position that Congress in Title III, *sub silentio and by implication*, amended the FSIA to alter its immunity regime and provided a new grant of subject-matter jurisdiction.

---

[14] *See, e.g.*, *Texas Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 331 (D.D.C. 2018) ("The heading of a statutory section is a tool available for the resolution of a doubt about the meaning of a statute."); *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 281 (D.D.C. 2011) (looking to statutory heading in 38 U.S.C. § 8126 to inform reading of ambiguous text), *aff'd*, 707 F.3d 311 (D.C. Cir. 2013).

[15] *See, e.g.*, 15 U.S.C. § 56(a)(4) (using "procedural requirement" to refer to time for entering pleading or notice of appeal); 48 U.S.C. § 1822 (defining, for a territorial court, "procedural requirements" for indictment as expressly distinct from "jurisdiction" of the court); 28 U.S.C. § 1446(b)–(c) (setting forth "[p]rocedur[al] . . . [r]equirements" for removal of actions); 15 U.S.C. § 1477 (referring to "procedural requirements" for State Attorneys General to institute actions in federal district courts, including notice and filing rules); 42 U.S.C. § 6992(a) (discussing "procedural requirements" that agencies must observe with respect to waste managed in facilities under their "jurisdiction"); 20 U.S.C. § 1415 (referring, in subsection (f)(3)(E)(iii), to "procedural requirements" for hearings in state educational entities); *see also* 28 U.S.C. § 2072 ("rules of procedure"); 5 U.S.C. § 706(2)(D) ("procedure required by law"); 26 U.S.C. § 6751 (using "procedural requirement" to refer to procedure for notifying taxpayer of tax penalty).

### III.    THE ACTION AGAINST CUPET FAILS FOR LACK OF PERSONAL JURISDICTION

If the Court reaches the issue of personal jurisdiction, it should grant CUPET's motion to dismiss the action on that basis.  The Plaintiff's own Complaint establishes that the due process requirements for personal jurisdiction over a foreign defendant are lacking here.  The Circuit has held that an agency or instrumentality of a foreign state is entitled to those due process limitations on personal jurisdiction, unless the plaintiff can overcome the *Bancec* presumption that an agency or instrumentality endowed with juridical personality is to be treated as separate from the foreign state and establish that, instead, it should be equated with the foreign state (which, under Circuit law, is not a "person" within the Due Process Clause).

The Complaint itself raises the *Bancec* presumption but fails to allege facts to overcome that presumption, requiring dismissal of this action for lack of personal jurisdiction. The accompanying expert declaration on Cuban law and declaration of CUPET's Deputy Director further establish that the *Bancec* presumption applies here; in the event the Complaint is not dismissed for failure to adequately allege personal jurisdiction, both the Complaint and the declarations place upon Plaintiff the burden of coming forward with evidence to overcome the *Bancec* presumption and establish that CUPET is to be equated with the Cuban State.

### A.  The Due Process Requirements for Personal Jurisdiction Are Not Met

It does not require elaborate discussion to show that the due process requirements for personal jurisdiction are lacking here.  General jurisdiction over CUPET requires that it is "at home" in the United States.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (identifying as the "paradigm forum for the exercise of general jurisdiction" the place where a "corporation is fairly regarded as at home").  Generally, a corporation is at home "where it is incorporated or has its principal place of business[.]" *Id.*; *see also Goodyear Dunlop Tires Operations, S.A. v.*

*Brown*, 564 U.S. 915, 924 (2011) (identifying place of incorporation and principal place of business as paradigm bases for the exercise of general jurisdiction). As Plaintiff alleges, CUPET is organized under Cuban law, and its principal place of business is in Cuba. Complaint ¶ 16–17.

Although "in an exceptional case, . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home" in that forum, Plaintiff does not allege, nor could it, that there is any room for this exception here. It does not allege that CUPET maintains any offices in the United States, or, indeed, that it has any operations in the United States at all.  (The U.S. embargo laws, in effect for six decades, prohibit CUPET from having any offices or operations in the United States, or even engaging in commerce with the United States, directly or indirectly, without a specific license granted by the Treasury Department's Office of Foreign Assets Control.  *See* Cuban Assets Control Regulations, 31 C.F.R. §§ 515.201(b), 515.204.)

Plaintiff likewise cannot establish specific jurisdiction, which requires that "the suit must *arise out of or relate to the* defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S.Ct. 1773, 1780 (2017) (emphasis added).  As the Complaint itself makes clear, that is plainly not the case here.

### B.  Plaintiff Has Not Overcome the *Bancec* Presumption that the Due Process Limitations on Personal Jurisdiction Apply

1.      The Circuit has held that an agency or instrumentality of a foreign state is entitled to due process limitations on personal jurisdiction, unless the plaintiff can overcome the presumption that an agency or instrumentality endowed with juridical personality is to be treated as separate from the foreign state, and establish that, instead, it should be equated with the foreign state.  *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 813, 817 (D.C. Cir. 2012) (holding that plaintiff must overcome "the *Bancec* presumption, which . . . guarantees the [state-

31

owned entity's] treatment as a separate 'person' entitled to due process protection;" courts "must" apply *Bancec* to "the question whether a foreign instrumentality has due process rights under the Fifth Amendment"); *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) ("we must determine whether the [agency or instrumentality] has a constitutional status different from that of the State . . ., a question with respect to which the Supreme Court's decision in [*Bancec*] guides our way.")

In the *Bancec* case, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, the Supreme Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," and that such "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. 611, 626–27 (1983).[16]

To overcome the *Bancec* presumption and equate an agency or instrumentality with the state for due process purposes, a plaintiff must establish that the agency or instrumentality is so "extensively controlled" by the state that the state's control amounts to "complete domination" and the two are not "meaningfully distinct entities," or, alternatively, that the state exercises its control so as to make the agency or instrumentality its "agent" "under normal agency principles" with respect to the substance of the matter in suit. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000); *see also GSS Grp. Ltd. v. Nat'l Port Auth.*, 822 F.3d 598, 605 (D.C. Cir. 2016).

---

[16] The Supreme Court explained in *Bancec*, a case involving Cuba, that respecting the "separate status of government instrumentalities" is compelled by "principles of comity between nations" and "[d]ue respect for the actions taken by foreign sovereigns," *Bancec*, 462 U.S. at 626, including their "determination that its instrumentality is to be accorded separate legal status," *id.* at 626, and is buttressed both by the FSIA, *id.* at 621, and principles common both to international law and federal common law. *Id.* at 623.

As to "complete domination," the foreign state's ownership, control of the board of directors (or equivalent), appointment of key executives, capitalization and appropriations for capital, appropriations to cover loses, financial assistance, requiring authorization for major decisions, involvement in major decisions, and exercising its power as a "regulator" are not enough, separately or in combination. *See GSS Grp.*, 822 F.3d at 606–08; *Transamerica Leasing*, 200 F.3d at 848–49, 851–54; *Bancec*, 462 U.S. at 624.  The courts have consistently rejected efforts to equate Cuban entities with the Cuban State on grounds of domination.[17]

As to "normal agency principles," the Circuit has held that an agency is not established simply by the state's control over the agent or instrumentality.  It is also necessary, although it may not be sufficient, for the state to manifest its desire for the entity to "act upon the parent's behalf" with respect to a matter, for the subsidiary to consent to so act, for the parent to have the right to exercise control over the subsidiary with respect to the matter, and for the parent in fact to exercise that control in a more direct manner than by voting its stock in the company or appointing directors.  *See Transamerica Leasing*, 200 F.3d at 849–50; *GSS Grp.*, 822 F.3d at 606.  This basis for overcoming *Bancec* typically has been invoked, although usually without success, when it is claimed that the agency or instrumentality was acting as the agent of the state with respect to a particular transaction, as was claimed in *Transamerica Leasing* and *GSS Group*.

---

[17] *See Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277 (11th Cir. 1999) (national telephone company); *Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*, 658 F.2d 903 (2d Cir. 1981) (national bank); *Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*, 782 F.2d 377 (2d Cir. 1986) (same); *Banco Para el Comercio Exterior de Cuba v. First Nat. City Bank*, 658 F.2d 913 (2d Cir. 1981), *rev'd on other grounds*, 462 U.S. 611 (1983) (export bank); *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011) (export enterprise); *Cosmos Trading Corp. of Panama v. Banco Nacional de Cuba*, No. 07-20008-MC, 2007 WL 9706399, at *5 (S.D. Fla. Feb. 16, 2007), *report and recommendation adopted*, No. 07-20008-MC, 2007 WL 9706400 (S.D. Fla. Mar. 28, 2007) (food import enterprise).

It is possible that, in "exceptional cases," "fraud" or "misuse of the corporate form" to promote injustice in the transaction sued upon, or misuse of the corporate form to defeat statutory goals in certain circumstances—grounds drawn from and circumscribed by traditional corporate "veil piercing" law—may provide the basis for overcoming *Bancec*. *See GSS Grp.*, 822 F.3d at 608; *Transamerica Leasing*, 200 F.3d at 854.

This is not to be confused with judicially-promulgating exceptions to *Bancec* in order to advance what may be considered to be Congress' goals; it is for the Congress to evaluate and balance the competing considerations, and decide whether to override *Bancec* in order to advance its goals, and to do so clearly and expressly.  In *Alejandre*, 183 F.3d at 1286–88, a case arising from the death of U.S. persons resulting from the Republic of Cuba's shoot-down of aircraft flown by the Miami-based Brothers to the Rescue, the Court of Appeals for the Eleventh Circuit refused to disregard the separate status of the Cuban national telephone company on the argument that it would advance the legislative goal of the anti-terrorism statutes to facilitate recoveries on judgments against designated state sponsors of terrorism by broadening the pool of assets subject to execution.  Before doing so, the Eleventh Circuit held, it would have been necessary for *Congress* to have taken the "further step of overriding the *Bancec* presumption by making instrumentalities responsible for the debts of their related terrorist-sponsoring governments" with a "clear expression" in the legislation.  *Id.* at 1287.

As with the anti-terrorism statues before the Eleventh Circuit in *Alejandre*, Congress did not override *Bancec* in Title III.[18]  In contrast, Congress did override the "act of state" doctrine

---

[18] Even as Title III was first introduced, it did not include a *Bancec* provision. Prior to its introduction, efforts in Congress to overturn *Bancec* had failed. In 1988, the House had adopted an amendment to the FSIA that the property of an agency or instrumentality of a foreign state engaged in a commercial activity in the United States would not be immune from execution on a judgment against the foreign state for which the foreign state was not immune under the FSIA.

for Title III actions, a different limitation on suits against Cuban agencies or instrumentalities,

famously applied in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), to bar claims

based on the Cuban nationalizations.  *See* Title III, § 302(a)(6); 22 U.S.C. § 6082 (a)(6) (act of

state doctrine not to be applied to Title III lawsuits). Additionally, unlike for suits under Title III,

Congress (subsequent to *Alejandre*) did override *Bancec* for suits under anti-terrorism

legislation.[19] And Title III itself distinguishes agencies or instrumentalities from the foreign state,

including the Cuban State, by making only a "person," a term that is not normally used to

connote a foreign state in U.S. law, *see Price v. Socialist People's Libyan Arab Jamahiriya,* 294

---

See H.R. 3763, 100th Cong. § 3(1)(D) (1988); 134 CONG. REC. H6484 (1988). In the Senate, however, the House proposal encountered substantial opposition, *see Foreign Sovereign Immunities Act Amendments: Hearings on H.R. 3763 Before the S. Comm. on the Judiciary*, 100th Cong., S. Hrg. 100-1061 (Oct. 5, 1988), including strong opposition by both the Justice and State Departments, H. Hrg. 100-1061, at, *e.g.*, 17–19, 29–30, 37, 46–47, 50–52, 55–56, and the Senate Judiciary Committee did not report H.R. 3763 out.

Legislative efforts soon after Title III's passage to override *Bancec* also failed.  *See* H.R. 3026, 105th Cong., §§ 2-3 (as introduced in House, Nov. 12, 1997; referred to House Committee on Judiciary without further action) (eliminating agency and instrumentality's immunity from execution on judgments against Libyan State for PanAm Flight 103 attack); H.R. 271, 106th Cong., §§ 2–3 (as introduced in House, Jan. 6, 1999; referred to House Committee on Judiciary without further action) (same with respect to judgments against Federal Republic of Germany for acts of genocide by predecessor government during World War II).

[19] In Pub. L. 110-181, Div. A, Title X, § 1083(b)(3), 122 Stat. 341 (2008), codified at 28 U.S.C. § 1610(g), Congress provided that terrorism judgments against designated state sponsors of terrorism may be enforced against the property of the foreign state's agency or instrumentality, notwithstanding that the agency is a "separate juridical entity" and "regardless of - (A) the level of economic control over the property by the government of the foreign state; (B) whether the profits go directly to that government; (C) the degree to which officials of that government manage the property or otherwise control its daily affairs; (D) whether that government is the sole beneficiary in interest of the property; or (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations." Earlier, in the Terrorism Risk Insurance Act, Pub. L. 107-297, Title II, § 201(a), (b), (d), 116 Stat. 2337, Note (2002), 28 U.S.C. §1610, Congress provided for execution against the blocked property of agencies and instrumentalities in satisfaction of terrorism judgments against designated state sponsors of terrorism.

F.3d 82, 96 (D.C. Cir. 2002), liable for trafficking, Title III, § 302(a), 22 U.S.C. § 6082(a), and by defining "person" to include an "agency or instrumentality of a foreign state" but not the foreign state.  *See* LIBERTAD Act, § 4(11); 22 U.S.C. § 6023(11).[20]

2.      The Complaint does not make any factual allegations to overcome the *Bancec* presumption, even though the presumption is triggered on the face of the Complaint itself.  (Nor does the Complaint even make a conclusory allegation of law that CUPET is not entitled to the *Bancec* presumption and is to be equated with the Cuban State.)

By alleging that CUPET is an agency or instrumentality as that "term is defined in 28 U.S.C. §1603(b)," Complaint ¶ 6, Plaintiff necessarily alleges that, as defined in that provision, CUPET is a "separate legal person, corporate or otherwise," 28 U.S.C. § 1603(b)(1) (defining "agency or instrumentality").  The Complaint does not allege that CUPET is part of the Cuban State, but, rather, that it is a "separate legal person," 28 U.S.C. § 1603(b)(1), *owned* by the State.  Complaint ¶ 2.

Nothing more is needed to raise the *Bancec* presumption, which arises from the defendant's "separate legal status" under foreign law. *Bancec*, 462 U.S. at 626–27; *see also, e.g.*, *DRI, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 212 (D.D.C. 2014) (relying on the "unequivocal statement in [the foreign law] establishing [the agency's] independent juridical

---

[20] Indeed, to disregard the separate status of agencies or instrumentalities on the rationale of advancing Congressional goals would not only invade Congress' province but contradict the statute: if agencies or instrumentalities are equated with the Cuban State, and the Cuban State by Title III's own terms is not subject to Title III actions, then they too would not be subject to Title III actions, contrary to Title III's express inclusion of them as among the "persons" liable for trafficking under Title III.

Were Plaintiff to succeed here in overcoming the *Bancec* presumption on a different rationale – contrary to the arguments and showing made on this motion – it would bring to the fore at a later stage of this litigation, after resolution of subject-matter jurisdiction, the question whether the Defendants fall within Title III's exclusion of the state from the scope of Title III's liability.

identity"); *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-CV-01182-RCL, 2018 WL 5983385, at *17 (D.D.C. Nov. 14, 2018).  Consequently, the Court need go no further: the Complaint is fatally defective for failure to allege any facts to overcome the *Bancec* presumption that the Complaint itself raises.

In any event, the accompanying expert declaration of Dr. Marta Milagro Moreno Cruz, Dean of the University of Havana School of Law, on Cuban law ("Moreno Decl.") and the declaration of CUPET's Deputy Director Roberto Suárez Sotolongo ("Suárez Decl.") further establish that the *Bancec* presumption applies here (and, indeed, provide a formidable showing of CUPET's entitlement to due process limitations on personal jurisdiction).

CUPET was established by ministerial resolution as a "Union," one of the categories of "legal persons" recognized by Cuban law; the state is separately recognized in Cuban law as a different "legal person." Moreno Decl. at ¶¶ 4a–4b. As a legal person, CUPET, under Cuban law, owns its own assets, has the legal capacity to sue and be sued, and otherwise to be the subject of rights and obligations.  *Id.* at ¶ 4c.  Its assets and liabilities are distinct from those of the state. *Id.* at  ¶ 4d.  It answers with its own assets for its obligations. *Id.* at ¶¶ 4d-e. The state is not responsible for its obligations, and it is not responsible for the state's obligations. *Id.* at ¶¶ 4a–4e. It enters into contracts in its own name; it cannot bind the state to a contract, nor can the state bind it to a contract. *Id.* at ¶¶ 4a, 4h. It does not require the state's approval to enter into a contract, except, like all entities in Cuba, for transactions subject to the country's Foreign Investment Law. *Id.* at ¶ 4l.

CUPET's "corporate purpose," defined by law, is "to commercialize hydrocarbons and their derivative products, as oils, fats, and lubricants." *Id.* at ¶ 4f.  Only those legal persons "having a business mission, that is to say, those identified by primary activities related to

production, trade and services that are commercial in nature," are endowed with a "corporate purpose." *Id.* CUPET has no governmental or regulatory authority. *Id.* at ¶¶ 4e–4g.

The Cuban Constitution specifies the institutions that constitute the Cuban State. CUPET is not among them. Rather, they are the National Assembly (parliament), the Council of State, President, Vice President, the Council of Ministers, the Courts, the Attorney General's office, and Comptroller General's office, ministries and certain named National Institutes and National Offices. *Id.* at ¶ 4i.

Under Cuban law, CUPET is to be run, together with the enterprises integrated to it (all of which also have their own juridical personality and assets), as a distinct, integrated commercial organization. *Id.* at ¶ 4j; Suárez Decl. at ¶4. It covers its expenses with its revenues and earns a profit. Moreno Decl. at ¶ 4j. It hires its own employees. *Id.* at ¶ 4u.

By law, CUPET is required to pay taxes to the State Treasury on its net profits, establish reserves from its post-tax profit for losses and contingencies, and pay a minimum of 50% of the remainder of the profit to the state (which the Complaint, ¶ 2, alleges to be CUPET's "owner"). *Id.* at ¶¶ 4n–4p. What remains from the net profit must be used by CUPET for working capital, capital investments, additional compensation for its employees, research and development, reduction of debt and/or reserves for other matters. *Id.* at ¶ 4q.

CUPET is governed and managed by a *Consejo de Direccion*, which has all the legal authority needed to operate the company. *Id.* at ¶ 4k. A governmental authority appoints CUPET's General Director and Deputy General Director, Suárez Decl. at ¶ 1; the General Director appoints the other members of the *Consejo de Direccion*. Moreno Decl. ¶ 4k. CUPET formulates an annual plan, which a governmental body approves. *Id.* at ¶¶ 4v–4w; Suárez Decl. at ¶¶ 2–3.

Even if the Complaint did not itself raise the *Bancec* presumption, requiring dismissal for its failure to make allegations sufficient to overcome that presumption, the submitted declarations would be sufficient to do so (and more) and place the burden on Plaintiff to come forward with evidence that overcomes the *Bancec* presumption and establish that CUPET should be treated the same as the state for personal jurisdiction due process purposes.  *See GSS Grp.*, 680 F.3d at 817 ("[T]he [state-owned entity] claimed to be an independent juridical entity in its motion to dismiss, and [plaintiff] failed to contest that characterization. [Plaintiff]'s omission left intact the *Bancec* presumption, which . . . guarantees the [state-owned entity] treatment as a separate 'person' entitled to due process protection.").

## IV.   THE ACTION AGAINST CIMEX FAILS FOR LACK OF PERSONAL JURISDICTION

As with CUPET, this action does not satisfy the due process requirements for personal jurisdiction over CIMEX.  The Complaint does not allege that CIMEX is "at home" in the United States, as required for general jurisdiction, but to the contrary, alleges it is a Cuban corporation located in Cuba. Complaint ¶¶ 13, 56. The Complaint does not allege that Plaintiff's claim, which is for the use of gas service stations in Cuba, arises out of CIMEX's contacts with the United States.  (The Complaint only makes the unrelated assertions that CUPET maintains a financial division that manages remittance wire transfers from the United States and owns a tourism company that is the exclusive provider of travel from the United States. Complaint ¶ 56.)

As with CUPET, the Complaint's own allegations give rise to the *Bancec* presumption with respect to CIMEX: that it is an "agency or instrumentality" as that term is defined in the FSIA, *i.e.*, a "separate legal person;"; that this separate legal person is "owned" by the Cuban State, and that it is a "commercial corporation." Complaint ¶¶ 13–14, 56.  The

39

Complaint's failure to make allegations to overcome the *Bancec* presumption it itself raises is fatal.

In addition, the Complaint alleges that CIMEX (unlike CUPET) is a "*sociedad anónima* incorporated in Cuba." As explained in the Moreno Decl. at ¶¶ 4b, 4r, 4u, a "*sociedad anónima*" (abbreviated "S.A.,") is a type of "legal person" recognized by Cuban law. It thus, as a legal person, has the rights, capacities, obligations and status that are different from those of the state, a different legal person, giving rise, as discussed above in connection with CUPET, to the *Bancec* presumption.

*Sociedades anónimas* are a category of Mercantile Companies (*Compañías Mercantiles*). Moreno Decl. at ¶ 4r. They are formed by two or more persons agreeing to place assets in common to achieve profits. They form a common fund, owned by them in proportion to their shares, and they entrust the management of the company, which, upon formation, obtains a legal personality, to removable delegates or administrators, who represent the company. *Id.*

*Sociedades anónimas* are subject, like all Cuban commercial entities, to tax on their profits at the rate of 35%. *Id.* at ¶ 4o. They are required by law to maintain reserves for losses and contingencies, *id.* at ¶ 4n, and to utilize the amount of profits that remain after taxes, the mandatory reserves and dividends for working capital, capital investments, increased compensation for its employees, research and development, reduction of debt and/or reserves for other matters. *Id.* at ¶ 4q. If the S.A. is integrated with an OSDE, a Superior Organization of Business Development (discussed in the Moreno Decl. at ¶¶ 4c, 4k, 4m, 4t, 4v), its use of the remainder after taxes, mandatory reserves and dividends is approved by a *Junta de Gobierno* pertaining to the OSDE, and its annual plan is consolidated into the OSDE's annual plan for approval by the Ministry of Economy and Planning. *Id.* at ¶ 4t.

40

As the Complaint itself (with or without the Moreno Declaration explaining "*sociedad anónima*") raises the *Bancec* presumption but fails to allege facts to overcome it, CIMEX is entitled to due process protections, and the action should be dismissed for lack of personal jurisdiction.  Even if the Complaint did not itself raise the presumption, the Moreno Declaration's explication of "*sociedad anónima*" would be sufficient to do so and place the burden on Plaintiff to come forward with evidence that overcomes the *Bancec* presumption and establishes that CIMEX should be treated the same as the state.

## V.   THE COURT SHOULD STAY LITIGATION OF PERSONAL JURISDICTION UNTIL SUBJECT-MATTER JURISDICTION IS RESOLVED

Defendants have moved to dismiss for lack of personal jurisdiction at the same time that they have moved for dismissal for lack of subject-matter jurisdiction in order not to waive that objection under Fed. R. Civ. P. 12(h). Defendants, however, request a stay of further proceedings on the personal jurisdiction issue until final determination of subject-matter jurisdiction, including appellate decision on an interlocutory appeal of right from any adverse ruling on their contention that the FSIA requires dismissal of the action.

Under the FSIA, a court must find subject-matter jurisdiction *before* addressing personal jurisdiction because one of the requirements for the exercise of personal jurisdiction is that an exception to FSIA immunity applies (thereby conferring subject-matter jurisdiction on the court). *See* 28 U.S.C. § 1330(a)–(b). "At the *threshold* of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the exceptions [to immunity] applies[.]" *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983) (emphasis added).

Further, the Court of Appeals for this Circuit has held that FSIA immunity is immunity from the entanglements, burdens and intrusions of litigation in a foreign court, not just immunity

41

from judgment.  Expressly for that reason, the Circuit has held that an interlocutory appeal lies of right from denial of FSIA immunity. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (so holding, and citing cases). The Supreme Court has recently reaffirmed that a "basic objective" of the FSIA is to avoid "embroil[ing] the foreign sovereign in an American lawsuit" before the issue of immunity has been resolved. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1321 (2017).

It would be incongruous, and contrary to the rationale for affording interlocutory appeals on FSIA immunity as of right, to require the Defendants to litigate personal jurisdiction before final resolution of FSIA immunity.

Reason enough for the requested stay, this common-sense conclusion has additional pertinence and force here.

First, the question of personal jurisdiction in this case, unlike in most FSIA actions, does not turn on mundane questions about service of process (there is no challenge to service), or on whether the due process rules normally applicable to foreign businesses are satisfied.

Rather, personal jurisdiction turns on *Bancec*. The Supreme Court explained that it was "le[]d[] . . . to conclude" that U.S. courts must observe a presumption respecting the status of foreign agencies or instrumentalities in large part because of "principles of comity between nations," and "[d]ue respect for the actions taken by foreign governments," and, specifically, "due respect" for the foreign sovereign's "determination that its instrumentality is to be accorded separate legal status." *Bancec*, 462 U.S. at 626.  The Court found as well that the long-term national interest in international trade supports respect for the separate juridical status of agencies or instrumentalities.  *See id.* at 624–28.  Without the requested stay, the Court would risk making a decision on personal jurisdiction with these fraught implications needlessly.

Second, the course here of litigation over subject-matter jurisdiction as compared to personal jurisdiction is such that the requested stay best serves the settled principle that FSIA immunity is immunity from litigation, not just immunity from judgment.

The issue of subject-matter jurisdiction requires only legal interpretation of the FSIA's "direct effects" requirement and consideration of the legal validity of Plaintiff's implied subject-matter jurisdiction argument. Defendants maintain that the Complaint on its face is inadequate to satisfy the "direct effect" requirement. (Even aside from this, it is difficult to conceive of any disputed issues of fact emerging on the FSIA "direct effect" issue.)  Plaintiff's assertion of implied subject-matter jurisdiction presents only a question of law.

In contrast to the subject-matter jurisdiction issue, the personal jurisdiction issue presents questions of foreign as well as U.S. law, and also, potentially, questions of disputed fact and discovery.  Defendants have presented an expert declaration on Cuban law with respect to the *Bancec* issue; Plaintiff may very well not leave it unanswered, in which event Defendants would respond with further submissions on Cuban law. Plaintiff may seek to establish one of the (narrow) exceptions to the *Bancec* rule by fact affidavits, to which Defendants may well respond with their own fact affidavits (as well as legal arguments on the sufficiency of Plaintiff's affidavits).  Plaintiff may seek fact discovery on the *Bancec* exceptions, occasioning, presumably, litigation over the right to and scope of fact discovery, and, depending on its outcome, imposition of the intrusions and burdens of discovery on Defendants.

Consequently, whatever may be the case in other FSIA actions, litigation here of personal jurisdiction before final resolution of FSIA immunity would be at odds with FSIA immunity being immunity from litigation.

This is so regardless of discovery. The possibility of discovery demands adds still another reason to move forward to final resolution of subject-matter jurisdiction first.  *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 795 (7th Cir. 2011) ("[I]t is widely recognized that the FSIA's immunity provisions aim to protect foreign sovereigns from the burdens of litigation, including the cost and aggravation of discovery").[21]

There would be nothing untoward in staying litigation of personal jurisdiction. To the contrary, that the courts must determine FSIA immunity "at the threshold," *Verlinden,* 461 U.S. at 493–94, and that an interlocutory appeal lies of right from an adverse decision on that threshold issue, *Kilburn*, 376 F.3d at 1126, fully support the requested stay, and here there are additional, weighty factors particular to this case that support the request.

## CONCLUSION

For the foregoing reasons, the branch of Defendants' motion to dismiss this action for lack of subject-matter jurisdiction with prejudice should be granted, and the branch of Defendants' motion to dismiss the action for lack of personal jurisdiction should be stayed

---

[21] *See also, e.g.*, *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) ("In order to avoid burdening a sovereign that proves to be immune from suit . . . jurisdictional discovery . . . should not be authorized at all if the defendant raises . . . a different jurisdictional . . . ground[] . . . the resolution of which would impose a lesser burden upon the defendant"); *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 274 (D.D.C. 2008) (*quoting Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998), *quoting El-Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 671 (D.C. Cir. 1996) ("'[J]urisdictional discovery should not be ordered when to do so 'would frustrate the significance and benefit of entitlement to immunity from suit'"); *In re Papandreou*, 139 F.3d 247, 253 (D.C. Cir. 1998) (noting that a district court "authorizing discovery to determine whether immunity bars jurisdiction must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits the immunity was to ensure"); *Republic of Argentina v. NML Capital, Ltd.*, 134 S.Ct. 2250, 2258 n.6 (2014) (suggesting that a district court, in exercising its discretionary authority over discovery, "may appropriately consider comity interests and the burden that the discovery might cause to the foreign state").

44

pending final determination of subject-matter jurisdiction or, in the alternative, granted with

prejudice.

Dated: October 8, 2019                    Respectfully submitted,


*On the Brief*:                                /s/  Michael Krinsky
Nathan Yaffe                               Michael Krinsky (USDC, DC #NY0302)
                                           Lindsey Frank (USDC, DC #NY0301)
                                           RABINOWITZ, BOUDIN, STANDARD,
                                           KRINSKY & LIEBERMAN, P.C.
                                           14 Wall Street, Suite 3002
                                           New York, New York 10005
                                           (212) 254-1111
                                           mkrinsky@rbskl.com
                                           lfrank@rbskl.com

                                           *Attorneys for Defendants*