UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, TX 75039

        Plaintiff,

v.

CORPORACIÓN CIMEX S.A. (Cuba)
Edificio Sierra Maestra,
Calle Primera Esquina 0
Miramar, Playa, La Habana, Cuba

CORPORACIÓN CIMEX S.A. (Panama)
Edificio Sierra Maestra,
Calle Primera Esquina 0
Miramar, Playa, La Habana, Cuba

AND

UNIÓN CUBA-PETRÓLEO
Avenida Salvador Allende No. 666,
Entre Soledad y Oquendo
Municipio Centro Habana
La Habana, Cuba

        Defendants.

Case No. 19-cv-1277-APM

## SECOND AMENDED COMPLAINT

For its Second Amended Complaint in this action, Plaintiff Exxon Mobil Corporation

("Plaintiff" or "ExxonMobil") states as follows:

## NATURE OF ACTION

1.    Plaintiff brings this Complaint against Defendant Corporación CIMEX S.A., an

entity registered in Cuba, (a/k/a Corporación de Importación y Exportación S.A.) ("CIMEX

Cuba"), Defendant Corporación CIMEX S.A., a Panamanian entity ("CIMEX Panama"), and Defendant Unión Cuba-Petróleo ("CUPET") for unlawful trafficking in Plaintiff's confiscated property in violation of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the "Act"), codified at 22 U.S.C. §§ 6081–6085.

2.      Plaintiff holds a certified claim from the Foreign Claims Settlement Commission ("FCSC") for property that was expropriated by the Fidel Castro regime in 1960, in violation of international law since no compensation has been paid to the owners, including oil refineries and service stations, which are still in use today even though Plaintiff has never received any compensation for this property.[1]  Plaintiff's certified claim is attached hereto as Exhibit 1.[2]

3.      CIMEX Cuba and CIMEX Panama (collectively, "CIMEX") are alter egos of one another, sharing the ultimate same ownership, with the same officers and directors, working out of the same office at the same address without any regard for corporate formalities or respecting the separateness of either entity.

4.      CIMEX uses and continues to profit from the confiscated property by, among other things, operating service stations in cooperation with CUPET, the state-owned oil company of Cuba.

5.      CUPET additionally uses and continues to profit from the confiscated property through its use of the Ñico López Refinery (formerly known as the Belot Refinery) and certain terminals and plants used in conjunction with the refinery operations.

---

[1] Congress established the FCSC, a quasi-judicial, independent agency within the Department of Justice, which adjudicates claims of U.S. nationals against foreign governments for expropriation and other issues.

[2] Foreign Claims Settlement Commission's Decision No. CU-3838 (Sept. 3, 1969).

6.      Title III of the Act, 22 U.S.C. §§ 6081–6085, permits Plaintiff to bring private actions against any person who, like CIMEX and CUPET, knowingly and intentionally traffics in confiscated property without authorization from the rightful owner.  However, Plaintiff has not yet had the opportunity to do so because, until recently, private rights of action were suspended pursuant to the authority given to the President of the United States under the Act.

7.      The President has delegated the suspension authority to the United States Secretary of State.  On March 4, 2019, the State Department announced a partial lifting of the suspension to permit private actions to proceed, beginning March 19, 2019, against Cuban entities or sub-entities identified on the State Department's restricted entities list.  On or about April 2, 2019, the partial lifting of the suspension was extended again through May 1, 2019. Most recently, on April 17, 2019, the State Department announced a full lifting of the suspension beginning May 2, 2019.  In his remarks regarding the decision, Secretary of State Pompeo made clear that "[e]ffective May 2nd … the right to bring an action under Title III of the Libertad Act will be implemented in full."

8.      Because Defendants CIMEX and CUPET are trafficking in confiscated property in violation of the Act, they are subject to private actions under Title III of the Act.  Accordingly, Plaintiff brings this statutory action to enforce its long-outstanding claim and obtain the compensation it is rightfully due under the Act.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1330 because this action is a nonjury civil action against agencies or instrumentalities of a foreign state, as that term is defined in 28 U.S.C. § 1603(b), on a claim for judgment with respect to which there is no sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA") pursuant to (i) the FSIA's commercial activity exception for acts that occur "outside the territory

of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" under 28 U.S.C. § 1605(a)(2), (ii) the FSIA's expropriation exception under 28 U.S.C. § 1605(a)(3), because rights in property taken in violation of international law are in issue and that property (or property exchanged therefor) is "owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States," and/or (iii) Title III of the Act, which imposes civil liability on any person (including agencies or instrumentalities of foreign states) who traffics in property confiscated by the Cuban Government and which mandates that the provisions of Title III of the Act control over the provisions of Title 28 of the U.S. Code.  *See* 22 U.S.C. §§ 6023(11), 6082.

10.     Subject matter jurisdiction also is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Act, codified at 22 U.S.C. § 6021 *et seq.*

11.     Pursuant to 28 U.S.C. § 1330(b), personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) once service has been made under 28 U.S.C. § 1608.

12.     Alternatively, pursuant to 28 U.S.C. § 1330(b) and consistent with the United States Constitution and laws, personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) due to Defendants' contacts with this District and with the United States as a whole as a result of their unlawful trafficking activities and their commercial activities, which are explained in detail below.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

14.     The amount in controversy exceeds $50,000 as required by 22 U.S.C. § 6082(b).

15.     Plaintiff paid the special fee for filing an action under Title III of the Helms-
Burton Act contemporaneous with the original Complaint (Dkt. 1), which is $6,548 pursuant to
the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES

16.     Plaintiff Exxon Mobil Corporation is a U.S. national and a corporation organized
and existing under the laws of the state of New Jersey, with its principal place of business at
5959 Las Colinas Boulevard, Irving, Texas 75039.  Plaintiff was formerly known as the Standard
Oil Company ("Standard Oil") and is the recipient and owner of the certified claim attached as
Exhibit 1.

17.     Defendant CIMEX Cuba is a commercial conglomerate owned by the government
of Cuba and is an alter ego of CIMEX Panama.  Specifically, CIMEX Cuba is a *sociedad
anónima* with nominative shares[3] owned by Cuban government officials and entities and
subordinated to the Cuban Ministry of the Revolutionary Armed Forces ("MINFAR").  CIMEX
Cuba has its principal place of business at Edificio Sierra Maestra, Calle Primera Esquina 0,
Miramar, Playa, La Habana, Cuba.  CIMEX Cuba, which is Cuba's largest commercial
conglomerate with annual revenues reportedly as high as $2.6 billion as of 2015,[4] engages in a
variety of foreign commerce across a variety of industries.  On information and belief, CIMEX
Cuba was registered in Cuba in 1995.

---

[3] The shares of a Cuban "*sociedad anonima*" must be nominative shares by Law 498 of
1959.

[4] This was reported by CIMEX's Vice President Leticia Morales during the 2016 IMTC
Conference in Cuba.

(Continued…)

18.     CIMEX Cuba is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary.  Also, CIMEX Cuba is rightfully treated as an agent of the government of Cuba with respect to the conduct at issue here.

19.     On information and belief, Defendant CIMEX Panama, which was incorporated in the Republic of Panama on May 8, 1979,[5] is an alter ego of CIMEX Cuba.  On information and belief, CIMEX Panama shares the same address, the same officers and directors, and the same ownership and control by MINFAR.  Plaintiff reasonably expects discovery to reveal that Defendants, MINFAR, and the government of Cuba have disregarded corporate formalities with respect to CIMEX Panama and have used it to perpetuate fraud.

20.     CIMEX Panama is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary.  Also, CIMEX Panama is rightfully treated as an agent of the government of Cuba with respect to the conduct at issue here.

21.     Defendant CUPET is the Cuban state-owned oil company, with its principal place of business at Oficios 154 E / Amargura y Tte Rey, Habana Vieja, Havana, Cuba.  Among other things, CUPET operates Cuba's oil refineries and produces and distributes petroleum products.

22.     CUPET is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary.  Also, CUPET is properly treated as an agent of the government of Cuba with respect to the conduct at issue here.

---

[5] Public Deed (Escritura Publica) No. 5,412 of May 8, 1979.  Notaria Quinta del Circuito. Panama, Republica de Panama.

## BACKGROUND

23.     Over 100 years ago, when Plaintiff was known as Standard Oil, it initiated

business operations in Cuba by obtaining an interest in a refinery near Havana, Cuba.

24.     As Standard Oil grew its business in Cuba, it established several subsidiaries.

These subsidiaries included: (1) Esso Standard Oil, S.A. ("Essosa"), a wholly owned

Panamanian subsidiary, formed in 1951, with responsibility for operations in the Caribbean

Basin and headquartered in Havana until 1959; and (2) Esso Standard (Cuba) Inc. and Esso

(Cuba) Inc., two Delaware corporations organized in 1957 and qualified to do business in Cuba

for exploring for and producing crude oil (collectively, the "Exploration Companies").

**Expropriation by the Cuban Government**

25.     Plaintiff's certified claim involves the property formerly owned by Essosa and the

Exploration Companies.

26.     Prior to 1959, the Exploration Companies maintained an office in Cuba for

geological studies and owned assets incident to the functioning of the office.

27.     On October 30, 1959, Cuban government inspectors from Fomento Nacional

(National Development) arrived at the office of the Exploration Companies and confiscated and

copied all files, maps, and other records of geological exploration.  After the copying incident

and the passage of Law 625 of November 29, 1959, which changed the basis for granting mineral

concessions, the Exploration Companies stopped all exploration efforts on the island.  On

February 1, 1960, the Exploration Companies closed their office in Cuba.

28.     On July 1, 1960, Essosa's property rights were expropriated in violation of

international law pursuant to Resolution No. 33 issued by the Cuban Petroleum Institute, which

was issued pursuant to Resolution No. 190 of June 30, 1960 by Cuban Prime Minister Fidel

Castro.  The Director General of the Cuban Petroleum Institute appointed Major Onelio Pino as

"Interventor" of Essosa for "all the properties and installations that [Essosa] may have in Cuba."

29.	As a result, Essosa not only lost control over its assets, but it was also forced to

end its ongoing operations.  Essosa was prohibited from operating its expanded Belot Refinery,

which was completed in early 1958 and employed 530 people.  Essosa was also forced to

abandon its Cuban-based marketing operation with over 500 employees who were engaged in

selling and distributing products through more than one thousand retail outlets.  And Essosa was

also forced to cease operating its service stations in Cuba.

30.	Essosa subsequently appeared on the list of nationalized entities published in

Resolution No. 1 of August 6, 1960 pursuant to Cuba's Law 851.

31.	The Cuban Government expropriated the following assets from Essosa in violation

of international law:

(a)  Belot Refinery (Havana), a new 35,000 barrel-per-day refinery, including:

   i.   a marine terminal;
   ii.  a 8,800 pounds-per-day grease plant;
   iii. a 205 barrel-per-day lube blending and packaging plant; and
   iv.  109 storage tanks with a total capacity of 2.4 million barrels.

(b)  Bulk products terminals, including:

   i.   three ocean terminals;
   ii.  seven inland terminals; and
   iii. seven bulk and packaging plants.

(c)  Service station properties, including:

   i.   117 service station properties; and
   ii.  176 loans outstanding to service station owners secured by mortgages.

32.	These assets are hereinafter referred to as the "Confiscated Property."

33.     Cuba has never paid, and Plaintiff has never received, compensation for the expropriation of the Confiscated Property.

**Certification of Plaintiff's Claim by the Foreign Claims Settlement Commission**

34.     In response to the expropriation of the Confiscated Property, Standard Oil filed a claim with the FCSC pursuant to Title V of the International Claims Settlement Act of 1949, which gives the FCSC jurisdiction over expropriation claims of U.S. nationals against the Government of Cuba.

35.     Pursuant to 22 U.S.C. § 1643b(a), the FCSC "shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States."

36.     Pursuant to 22 U.S.C. § 1643a(3), "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba …."

37.     As required by the International Claims Settlement Act, the FCSC determined the validity and amount of Standard Oil's claim and the value of the expropriated properties, rights, or interests by the valuation most appropriate to the Confiscated Property.

38.     After reviewing Standard Oil's ownership, the FCSC found that Standard Oil qualified as a U.S. national within the meaning of the International Claims Settlement Act. *See* Ex. 1 at 2.

39.     The FCSC then evaluated Standard Oil's property claim.  It noted that Standard Oil provided "extensive evidence in support of the claim" including a balance of Essosa's assets that was prepared by Essosa's employees following the expropriation of Essosa.  This balance of assets was even approved by the Cuban Institute of Petroleum before the Cuban Government permitted it to be delivered to the comptroller of Essosa for the permanent records of the company.

40.     The FCSC also reviewed various documents and affidavits in support of Standard Oil's claim, including records pertaining to:  "[banking balances,] cash on hand, accounts receivable, investments, inventories, property, plant and equipment, as well as prepaid and deferred charges, and extensive data pertaining to the liabilities of Essosa."  Ex. 1 at 5.

41.     After an extensive review of Essosa's assets and liabilities, the FCSC certified that Standard Oil suffered a loss of $71,611,002.90 as a result of the Cuban government's expropriation of the Confiscated Property.  The FCSC certified the claim in this amount and further awarded interest on this amount at the rate of 6 percent per annum from the date of loss to the date of settlement.  Ex. 1 at 9.

42.     Standard Oil changed its name to Exxon Corporation in 1972.  In 1999, Exxon Corporation changed its name to Exxon Mobil Corporation, the Plaintiff in this action.

43.     Plaintiff has never settled the outstanding certified claims or received any payment from any entity with respect to the principal or interest due on its certified claim.

**The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

44.     On March 12, 1996, President Clinton signed into law the LIBERTAD Act of 1996 (also known as the "Helms-Burton Act" and referred to herein as the "Act").  Title III of the Act provides a right of action to U.S. nationals who owned property in Cuba that was confiscated on or after January 1, 1959.

45.     Title III authorizes the President to suspend the right of action for sequential periods of up to six months.  On July 16, 1996, President Clinton notified Congress that he would be allowing the Act to go into effect on August 1, 1996, but that he would suspend the right of action under Title III for six months.  Since that decision, every President (or Secretary of State) has issued a sequential six-month suspension of the right of action until recently.

46.     On January 16, 2019, Secretary of State Pompeo reported to Congress that Title III would be suspended for forty-five days beyond February 1, 2019 as the State Department conducted a "careful review of the right to bring action under Title III in light of the national interests of the United States and efforts to expedite a transition to democracy in Cuba."

47.     On March 4, 2019, Secretary Pompeo reported to Congress that the suspension of Title III would be maintained for 30 days through April 17, 2019 except as to certain Cuban entities or sub-entities that were identified by name on the State Department's List of Restricted Entities and Sub-entities Associated with Cuba (known as the Cuba Restricted List).

48.     On April 3, 2019, Secretary Pompeo announced his decision to continue this partial suspension of Title III for two additional weeks, through May 1, 2019.

49.     On April 17, 2019, Secretary Pompeo announced that Title III will go into full effect as of May 2, 2019.

50.     Section 302 of the Act provides the following civil remedy:

*SEC 302: (a) Civil Remedy.—*

(1) Liability for trafficking.--(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . .  22 U.S.C. § 6082(a)(1).

51.     Section 302 implements a key purpose of the Act, which is to permit U.S.

nationals to bring claims against Cuban ministries and state-owned enterprises that engage in

unlawful trafficking.  For example:

    a.  Congress found that trafficking in property confiscated from U.S. nationals benefits "the current Cuban Government" and "undermines the foreign policy of the United States."  22 U.S.C. § 6081(6).

    b.  Regarding remedies, Congress found that "[t]he international judicial system … lacks fully effective remedies" thereby permitting unjust enrichment "by governments and private entities at the expense of the rightful owners of the property."  *Id.* § 6081(8).

    c.  Congress further recognized the U.S. Government's "obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies."  *Id.* § 6081(10).

52.     Given these findings, Section 302 of the Act unsurprisingly includes Cuban

governmental entities within its scope.

53.     Specifically, the definition of a "person" who may be liable for trafficking

includes "any person or entity, including any agency or instrumentality of a foreign state" as

defined by the FSIA, 28 U.S.C. § 1603(b).  *See* 22 U.S.C. § 6023(1), (11).

54.     A person is liable for trafficking in confiscated property under the Act "if that

person knowingly and intentionally—

    i.  sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

    ii.  engages in a commercial activity using or otherwise benefiting from confiscated property, or

    iii.  causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property."  22 U.S.C. § 6023(13).

55.     Since Plaintiff has never authorized any person to engage in the activities covered by the Act's definition of trafficking with respect to the Confiscated Property, Section 302 provides Plaintiff with a private right of action against any person—including Cuba's state-owned enterprises—that has trafficked in the Confiscated Property.

**The Act's Presumption in Favor of Certified Claims**

56.     Section 302(d) of the Act mandates a presumption in favor of the Plaintiff's certified claims:

> There **shall be a presumption** that the amount for which a person is liable . . . is the amount that is certified [by the FCSC under the International Claims Settlement Act of 1949]. 22 U.S.C. § 6082(a)(2) (emphasis added).

57.     The Act's presumption in favor of certified claims extends not only to the amount of liability, but also to the claimant's ownership and entitlement to treble damages.  According to Section 303(a)(1), which deals with the "[c]onclusiveness of certified claims," in any action brought under Title III, "the court shall accept as **conclusive proof of ownership** of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC under Title V of the International Claims Settlement Act of 1949]."  22 U.S.C. § 6083(a)(1) (emphasis added).

58.     Under Section 302(a)(3) of the Act, "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages if a U.S. national owns a certified claim to that property.  22 U.S.C. § 6082(a)(3)(A) & (3)(C).

59.     Congress intentionally conferred these entitlements on certified claims.  The utilization of the certified claim process was viewed as a positive feature of the Act.  The Conference Report from the Committee of Conference states that "courts shall give a strong presumption to the findings of the FCSC."  The Conference report continued:

> The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III].  The committee of conference also notes the recognized special expertise of the FCSC in determining the amount and validity of claims to confiscated properties overseas.  H.R. Rep. 104-468, at 63 (1996).

60.     Under the text of the Act and in accordance with the intent of Congress, Plaintiff's certified claim is entitled to (i) a presumption of accuracy with regard to its amount; (ii) be treated as conclusive proof with regard to Plaintiff's ownership of the Confiscated Property; and (3) a judgment on the claim that includes treble damages.

**Cuba's Control over Plaintiff's Confiscated Property**

61.     The Communist Party of Cuba has been the ruling party in Cuba for the past six decades, during which time leadership of the Party, and the country as a whole, has been dominated by the Castro family.

62.     Under the rule of the Castro family and their communist allies, the Cuban government has established a system that repudiates private property ownership in favor of a socialist economic system based on government ownership of property as the fundamental means of production and the government's total control over the planned direction of the economy.  The State directs, regulates, and monitors economic activity, reconciling national, territorial, collective, and individual interests supposedly for the benefit of society.  Socialism is enshrined in the Cuban Constitution (*see, e.g.*, Article 19, Cuban Constitution of 2019), and socialist planning constitutes the central component of the system of governance for economic and social development.

63.     Property in Cuba belongs to the State, and the State decides who is permitted to operate it and under what terms.  Cuban laws, government functions, and corporate structures

can be—and frequently are—altered whenever it suits the interests of the Castro family and their allies.

64.     The state of "property rights" in Cuba has been well established in Cuba's Socialist Constitutions of 1976 and 2019.  Article 15 of the 1976 Constitution,[6] as amended in 1992 and 2002, defines the State property of all the people to include all commercial property, with only a minor exception for small farmers and cooperative lands.  It also makes a clear reference to expropriation as the origin of State property by including "the sugar mills, factories, fundamental means of transportation, and all enterprises, banks, and installations that have been nationalized and expropriated from imperialists, large landowners, and the bourgeoisie."[7]

65.     According to Article 23 of the 2019 Cuban Constitution, the following are socialist property of the people:  the lands that do not belong to individuals or cooperatives composed of these individuals, the subterranean areas, mineral deposits, the mines, the forests, the waters, the beaches, the means of communication, and the natural resources both living as well as nonliving within the exclusive economic zone of the Republic.  And according to Article 24 of the 2019 Constitution, socialist property that belongs to the entire population includes other assets, such as general interest infrastructure, key industries, and economic and social facilities, as well as other goods that are strategic for the country's economic and social development.[8]

66.     Thus, the Confiscated Property and virtually all other commercial property in Cuba belongs to the Cuban government.  These properties may not be transferred as property to

---

[6] *See* Art. 15 of the 1976 Cuban Constitution as amended in 2002.

[7] *Id.*

[8] *See also* Art. 1.1. of the Cuban Decree-Law 227 of 2012 (the "State Patrimony Law" defining State property to include the set of assets and rights subject to the socialist state property regime of all the people and those acquired, built or created by the State).

natural or legal persons and are governed by principles that render them unalienable, imprescriptible, and unseizable under Cuban law.  Additionally, any transfer of other rights not involving the transfer of the properties themselves must have the prior approval of the Council of Ministers, which is a body of Cuban government officials charged with overseeing the country's economic and social development and protecting the political, economic, and social foundations of the State.

67.     The Cuban government assigns State property to budgeted entities, unions, and enterprises as prescribed in the law, but these entities cannot transfer, encumber, or disposal of State property.  Therefore, these entities act as administrators of State property.  While these entities have their own assets, mainly accounts receivables, inventory, and other assets for working capital purposes, they act as agents of the Cuban government, which dictates all aspects of their operations.

68.     For example, it was the Cuban government, through its Council of Ministers, that decided to transfer Plaintiff's Confiscated Property to CUPET and CIMEX.  The government created CUPET, and permitted it to operate the confiscated Ñico López Refinery (formerly known as the Belot Refinery) and certain confiscated terminals and plants used in conjunction with the refinery operations, when it ordered the merger of two other state-owned entities to form CUPET.  The government also ordered the transfer of confiscated services stations to CIMEX as part of the state-mandated break up of another Cuban commercial conglomerate called CUBALSE.

69.     For the time being, CIMEX and CUPET are permitted to operate Plaintiff's Confiscated Property, but their operations remain subject to the control of the Cuban government, which retains ownership of the Confiscated Property.

**Cuba's Control over Defendants and Facilitation of Trafficking in Plaintiff's Property**

70.     The control that the Cuban government exercises over CIMEX and CUPET is extensive and exceeds the normal supervisory control exercised by a parent over a subsidiary.

71.     CIMEX is a *de facto* branch of the Cuban military, engaging in commercial activities to fund the military.  Since at least 2010, CIMEX has been wholly owned, operated, and controlled by MINFAR, acting through a conglomerate called Grupo de Administración Empresarial S.A. ("GAESA").

72.     According to a report by the Miami Herald in 2017, MINFAR's web of state-owned enterprises has increased its control over the Cuban economy in the past decade, including by absorbing CIMEX into GAESA in 2010.  GAESA now operates in "virtually every profitable area of the Cuban economy" and is led by a general in the Cuban army who is also a member of the Castro family.[9]

73.     Although CIMEX is denominated as a *sociedad anónima*, in reality it fails to observe the corporate formalities associated with independent corporate entities.  CIMEX normally issues stock certificates—without consideration—to government entities and select few government officials including high-ranking members of its management team who act on behalf of GAESA, MINFAR, and the Cuban government as the ultimate owner and beneficiary of CIMEX's profits.  Another indicator from CIMEX's corporate records is that all shareholders are usually present at shareholder meetings, which further shows that the company is actually controlled by a small group of government officials, entities, and their agents.

---

[9] *See* Nora Gámez Torres, "High on Cuba policy proposal: restricting U.S. business deals with Cuba's military-run entities," *Miami Herald* (June 12, 2017), available at https://www.miamiherald.com/news/nation-world/world/americas/cuba/article155772469.html.

(Continued…)

74.     CIMEX serves another important goal of the Cuban government, which is to break the U.S. embargo against Cuba.  Since CIMEX Panama's creation in the late 1970s, CIMEX has functioned as a Cuban intelligence vehicle to circumvent the embargo.[10]  CIMEX Panama, as a Panamanian company with unknown shareholders, was able to open accounts in different banks around the world, obtain credits, and conduct import-export transactions to and from Cuba, including operations in the United States through affiliates and other Cuban agents. That was one of the reasons why the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated CIMEX, its affiliates, and agents as Specially Designated Nationals during the Reagan Administration.

75.     In reality, CIMEX lacks any separateness or independence from MINFAR, and instead, it is dominated by MINFAR and the Cuban government and operated for the benefit of MINFAR and the Cuban government.

76.     The head of CIMEX is a former officer in the Cuban military, and senior MINFAR officers are in charge of the various commercial activities conducted by CIMEX, including CIMEX's operation of service stations.

77.     The extensive control exerted by MINFAR over CIMEX was further confirmed when the State Department added CIMEX as a sanctioned entity on the Cuba Restricted List ("CRL").  CIMEX was placed on the CRL as part of a broader initiative by the U.S. government to impose sanctions on businesses controlled by the Cuban military.  Specifically, the CRL represents "the U.S. Department of State's list of entities and subentities under the control of, or acting for or on behalf of, the Cuban military, intelligence, or security services or personnel with

---

[10] *See* Maria C. Werlau, "Fidel Castro, Inc.:  A Global Conglomerate," Association for the Study of the Cuban Economy (2005).

(Continued…)

18

which direct financial transactions would disproportionately benefit such services or personnel at the expense of the Cuban people or private enterprise in Cuba."[11]

78.     Like CIMEX, CUPET is subordinate to the Cuban government.  Its operations are dictated by the Ministry of Energy and Mines.

79.     CUPET was established on March 25, 1992 by Resolution No. 23/1992, issued by the Cuban Ministerio de la Industria Básica (Ministry of Basic Industry).  As provided for in that Resolution, Unión del Petróleo and Unión del Combustible were merged to form CUPET, which "for all legal purposes, is a continuation of Unión del Petróleo and Unión del Combustible and is subrogated to their place and status."

80.     CUPET is one of a prominent group of Cuban entities called Organizaciónes Superiores de Dirección Empresarial ("OSDEs").  Pursuant to Decree 336 of 2017, the Cuban Council of Ministers creates OSDEs as subordinated entities to the Cuban government and determines their organizational structure, including decisions regarding mergers, acquisitions, and liquidations.  Under Cuban law, the OSDEs are considered national entities for all relevant purposes.

81.     The President of the Council of Ministers appoints the President or General Director of CUPET and other OSDEs. The Council of Ministers appoints a Vice President of its body or a Minister to exercise controlling functions over CUPET and other OSDEs, including the following:

---

[11] "List of Restricted Entities and Subentities Associated with Cuba as of March 12, 2019," U.S. Department of State (Mar. 12, 2019), available at https://www.state.gov/cuba-sanctions/cuba-restricted-list/list-of-restricted-entities-and-subentities-associated-with-cuba-as-of-march-12-2019/.

    a. Evaluating the socio-economic results of CUPET based on the indicators approved in the plan;

    b. Controlling the investment process and development programs;

    c. Controlling the implementation of the Cuban government's Economic and Social Policy Guidelines, as appropriate;

    d. Controlling compliance with the provisions on the transfer of technology to and from abroad, ensuring the technological sovereignty of the country;

    e. Controlling the economic effects in Cuba from the companies that make up CUPET, including its foreign trade operations;

    f. Controlling the application of foreign investment policy, collaboration, and its results;

    g. Evaluating the President or Director General of CUPET and approving his work plan; and

    h. Fulfilling any other purpose assigned by the Council of Ministers or provided by law;

82. The Cuban Ministry of Energy and Mines, as designated by the Cuban Council of Ministers, is responsible for the following controlling functions over CUPET among others:

    a. Approving short and mid-term plans, submitted by CUPET, ensuring compliance with government directives;

    b. Advising the Minister and the Governing Board of CUPET in its direction and control of the enterprises;

    c. Establishing the indicators to evaluate the results of the management of CUPET and its enterprises, controlling its compliance with government directives;

    d.   Dictating the performance of CUPET quarterly and annually;

    e.   Investigating jointly with CUPET business opportunities with foreign capital to be presented to the Executive Council of Ministers or the Council of State, as prescribed by law, for further authorizations;

    f.   Directing, coordinating, executing and controlling compliance with the policy approved by Cuban government for the sustainable development of the activities of the oil and gas sector in the country.

83.    In light of these facts, it is not surprising that CUPET describes itself on LinkedIn as a "Government Agency" that "is owned and operated by the Cuban national government."

84.    Not only does the Cuban government control CUPET's operations, but it also dictates the uses of CUPET's profits, including the taxes to be paid and the distribution and uses of the remaining profits.  Furthermore, the Cuban government uses CUPET to subsidize operations of other state-owned enterprises, which are assigned quotas of gasoline for their vehicles by the Cuban Ministry of Economy and Planning and which receive prepaid gas cards issued by CIMEX subsidiary FINANCIERA CIMEX S.A. ("FINCIMEX").[12]  In this way, the Cuban government diverts profits from gasoline sales to subsidize the gasoline consumption of various state-owned enterprises.

---

[12] Financiera Cimex, S.A. (FINCIMEX Panama) was originally created and registered in the Republic of Panama by Public Deed (Escritura Publica) No. 474 of January 24, 1984 and later created as a Cuban *sociedad anonima* (FINCIMEX Cuba) by Public Deed (Escritura Publica) No. 172 of May 15, 1995.  Both FINCIMEX Panama and FINCIMEX Cuba are currently active and acting as partners of remittance forwarders in the United States, as set forth below.

85.     Like CIMEX, CUPET lacks any separateness or independence from the Cuban government, and instead, it is dominated by the Cuban government and operated for the benefit of the Cuban government.

**Defendants' Trafficking of Plaintiff's Property**

86.     Congress explicitly found that trafficking in confiscated property has direct effects in the United States when it passed the Act.  Specifically, Congress found that trafficking (i) poses a national security threat to the United States by supporting the Castro regime, (ii) undermines U.S. foreign policy, (iii) jeopardizes the rightful claims of U.S. nationals, (iv) impedes the ability of the U.S. government to return confiscated property to the rightful owners, and (v) undermines the "free flow of commerce."  *See* 22 U.S.C. §§ 6021, 6022, 6081.

87.     Defendants' unlawful trafficking, as set forth herein, materially contributes to these direct effects in the United States.

88.     Defendants' unlawful trafficking also unjustly enriches Defendants at the expense of Plaintiff by denying Plaintiff both capital and the continued use of the Confiscated Property, which is another effect that Congress found when it passed the Act.  *See* 22 U.S.C. § 6081(8).

89.     Defendants' unlawful trafficking, as set forth herein, is, and has been, conducted without Plaintiff's authorization, which Defendants are, and have been, required to obtain from Plaintiff in the United States.  *See* 22 U.S.C. § 6023(13)(A).

90.     Plaintiff's investigation is ongoing, and Plaintiff reasonably believes that discovery is likely to reveal additional trafficking and commercial activities conducted by Defendants or their agents either in the United States or directly affecting the United States.

**Defendants' Trafficking of Plaintiff's Property:  Commercial Activities in the Oil Market**

91.     CUPET is a Cuban state-owned oil company and engages in a variety of commercial activities in the global oil market.

92.    The Belot Refinery is now known as the Ñico López Refinery.  Essosa operated the refinery in the 1950s before it was nationalized in 1960 by the Government of Cuba. Thereafter, the Belot Refinery was merged with another refinery and became known as the Ñico López Refinery, which is currently operated by CUPET.

93.    According to CUPET's website, the Ñico López Refinery is one of four Cuban refineries owned and operated by CUPET.[13]  (The others are Sergio Soto, Camilo Cienfuegos, and Hermanos Diaz.)  One of the refineries' main objectives is to supply the domestic needs for petroleum products, including gasoline, diesel, and fuel oil.

94.    According to CUPET's website, prior to 1960, Essosa and other "transnational" companies "assumed the import, refining, and supply of fuel in Cuba."  The companies were paid by the Cuban government for barrels of oil extracted from their wells and also for the "refining and the production of derivatives" that would be sold at the companies' "network of gas stations."[14]

95.    Prior to 1960, Essosa had extensive marketing operations in Cuba and in connection with such operations, owned three ocean terminals, one island terminal and seven bulk and package plants at commercially strategic points throughout the island.  Ex. 1 at 4.

96.    Prior to 1960, Plaintiff also maintained oil exploration operations in Cuba. Plaintiff and Texaco, in partnership with Cuba's Economic and Social Development Bank, financed twenty-five drilling rigs in the Camagüey Province, extracting seepage oil from the newly discovered North Cuba Basin – an oil field that extended about forty miles inland and a hundred miles offshore from the Camagüey Province to well-beyond Cuba's northwestern tip.

---

[13] The website is available at https://www.cupet.cu/?lang=en.

[14] The website is available at https://www.cupet.cu/operaciones/refinacion/?lang=en.

97.     CUPET imports and refines crude oil using Plaintiff's Confiscated Property, specifically the Belot Refinery and the plants, terminals, and infrastructure used in the Belot Refinery's operations and the production of petroleum products.

98.     CUPET, along with foreign partners, uses Plaintiff's Confiscated Property for the exploration for and extraction of oil.

99.     CUPET also reportedly has business agreements with foreign companies.  Among other things, these agreements allow CUPET to import crude oil to supply the domestic needs for petroleum products and engage in joint oil exploration projects in Cuba and the Gulf of Mexico.

100.    CIMEX partners, affiliates, associates, or the like with CUPET in business ventures that involve or benefit from CUPET's oil exploration and importation activities.

101.    Defendants' unlawful trafficking activities are commercial activities that cause direct effects in the United States by competing with Plaintiff and other U.S. companies in the global oil market.  In particular:

   a.  CUPET touts its global reach on its website, where it claims to do business in Canada, Mexico, Venezuela, Angola, Russia, China, Brazil, Argentina, Norway, Trinidad and Tobago, and Vietnam.

   b.  In addition, according to the International Economic Association, CUPET does business through partnerships, associations, affiliations, and the like with foreign companies that do business in the United States and compete with Plaintiff and other U.S. companies.  For example, CUPET partners with Canadian-based Sherritt International Corp. to operate the joint venture Energas S.A., which produces energy in Cuba.  Sherritt has reportedly forecasted for 2019 the export of 1,800-2,100 barrels of oil equivalent that it produces per day.

c.   CUPET has also provided offshore exploration opportunities for a range of international companies that compete with Plaintiff and other U.S. companies.  In 2011, companies from around the globe were "lining up to hire" Cuba's Scarabeo 9 rig to "search for what are believed to be substantial oil deposits." [15]   While much of this off-shore drilling was not successful, CUPET continues to host annual conferences seeking foreign partners in oil and gas exploration and production—touting, among other things, "existing service and logistics infrastructure."[16]

d.   CUPET's offshore oil exploration partnerships include notable participants in the global oil market, such as Venezuela's state-owned oil company Petróleos de Venezuela S.A., the Spanish major oil company Repsol-YPF S.A., China's state-owned oil company China National Petroleum Corporation, Sonangol Group of Angola, and Melbana Energy Ltd. of Australia.  These partnerships are focused on oil exploration and offshore drilling in the Gulf of Mexico.

e.   CUPET has attempted to solicit oil exploration partnerships with U.S. companies, despite the U.S. embargo.

102.   Defendants' unlawful trafficking also causes a direct effect in the United States because CUPET has engaged in commercial activity in the United States in support of its trafficking activities—specifically by obtaining or attempting to obtain financing using the New York capital markets.  According to the U.S. government's complaint for forfeiture in *U.S. v.*

---

[15] Michael Voss, "Cuban oil project fuels US anxieties," *BBC News* (Nov. 15, 2011), https://www.bbc.com/news/world-latin-america-15737573.

[16] The website is available at https://cuba-energy.com/about-cuba.

*$717,200,000 in U.S. Currency*, Case No. 18-cv-10783 (S.D.N.Y.) various entities in Cuba, including CUPET, worked with a multinational bank to structure, conduct, and conceal U.S. dollar transactions using the U.S. financial system in connection with U.S. dollar credit facilities involving Cuba, including facilities provided to Cuban banks and other entities controlled by Cuba and to Cuban and foreign corporations for business conducted in Cuba.  More than $10 billion worth of transactions were conducted through financial institutions located in the County of New York.  Two of the largest transactions were consummated to finance oil transactions between a Dutch commodities trading firm and CUPET.  The court entered default judgment in favor of the United States on May 29, 2019.

103.    Defendants' unlawful trafficking also causes a direct effect in the United States because CUPET's negligent operation of the Ñico López refinery has caused and continues to cause considerable environmental damage to the Florida Straits as a result of CUPET's failure to properly maintain the refinery and failure to adhere to the requirements of multilateral environmental treaties to which Cuba is a party.  As one commentator explained, Cuba's oil refineries are "deemed by experts to be among the heaviest polluters in the country."[17]  The Ñico López refinery, in particular, dumps hydrocarbons and industrial waste into Havana Bay leading to 25 to 40 times the normal amount of heavy metals in the water.  "The polluted waters are going out of the bay during low tide, running northeasterly 40-50 miles,"[18] which would bring the pollution at or near the United States-Cuba maritime boundary.

---

[17] Sergio Diaz-Briquets, et al. *Conquering Nature: The Environmental Legacy of Socialism in Cuba* 191, (2000); *see also* Michael Martinez, "In Cuba, A Hard River to Clean," *Chicago Tribune* (Sept. 25, 2007), https://www.chicagotribune.com/news/ct-xpm-2007-09-25-0709250060-story.html.

[18] Sergio Diaz-Briquets, et al. *Conquering Nature: The Environmental Legacy of Socialism in Cuba* 193 (2000).

104.    In an effort to mitigate this problem, OFAC has allowed for special licensing of U.S. oil spill mitigation service companies to provide services in Cuba.  U.S. companies have obtained licenses from OFAC.  On information and belief, CUPET has solicited and/or contracted with these U.S. companies.

**Defendants' Trafficking of Plaintiff's Property:  Service Stations**

105.    CIMEX, which is Cuba's largest commercial corporation with annual revenues reportedly as high as $2.6 billion as of 2015, engages in a variety of foreign commerce across a variety of industries.

106.    For example, CIMEX operates over 600 service stations that sell gas and consumer goods across Cuba.[19]  CUPET and CIMEX own and operate over 300 of those service stations under the brand "Servi-Cupet", as many media reports have confirmed.[20]

107.    Some of the service stations operated by CIMEX and CUPET are built on or maintained on Confiscated Property and have been, and continue to be, operated and used by CIMEX and CUPET for their own profit and benefit, as well as the benefit of others, without Plaintiff's authorization.

108.    Some of the gasoline and other petroleum products available at these service stations are produced using the Confiscated Property, specifically the Belot Refinery and the

---

[19] This was reported by CIMEX's Vice President Leticia Morales during Conference IMTC Cuba 2016.

[20] *E.g.*, *Reuters*, Cuban state-run media confirms gasoline shortage (Apr. 21, 2017), https://www.reuters.com/article/us-cuba-energy-shortage/cuban-state-run-media-confirms-gasoline-shortage-idUSKBN17N2FZ (reporting that CIMEX and CUPET jointly operate most service stations in Cuba); *Reuters*, Factbox: Cimex, Cuba's largest commercial corporation (Sept. 27, 2010), https://uk.reuters.com/article/us-cuba-corporation-factbox-idUSTRE68Q 55320100927 (reporting that CIMEX operates 363 Servi-Cupet gas stations); *BN Americas*, Unión Cuba Petróleo, https://subscriber.bnamericas.com/company-profile/en/union-cubapetroleo-cupet (reporting that CUPET runs a service station chain in association with CIMEX).

plants and terminals used in conjunction with the Belot Refinery's operations and the production of petroleum products.

109.     Additionally, CIMEX and CUPET use Confiscated Property to sell American goods to Cuban consumers.  The service stations, including the Servi-Cupet stations, are the functional equivalent of a 7-Eleven convenience store.  The service stations offer for sale a variety of American products, including poultry, cereal, rice, cleaning supplies, frozen vegetables, and alcoholic beverages.  CIMEX sources these products from U.S. companies.

110.     Upon information and belief, CIMEX also obtains other goods and services from companies in the United States from time to time. For example:

    a.   Tiendas Panamericanas, a chain of grocery stores owned by CIMEX, similarly offers for sale a variety of American food products.

    b.   CIMEX also reportedly contracted with a Panamanian company to purchase medical supplies manufactured by a U.S.-based company called Orthofix.

**Defendants' Trafficking of Plaintiff's Property:  Remittances from the United States**

111.     Defendants' trafficking includes the use of Confiscated Property—specifically service stations—to process remittances.

112.     Remittances are a substantial source of income in the Cuban economy.  Cuba received an estimated $3.6 billion U.S. dollars in 2018 from remittances, and it is estimated that 90% of these remittances come from the United States.  Remittances currently represent over 50% of the Cuban population's income.

113.    The entire remittance process is tightly controlled by the government through the Central Bank of Cuba.[21]  The Cuban government (through the Cuban Central Bank) has granted CIMEX's financial division, FINCIMEX, a license to manage all remittance wire transfers from the United States.  CIMEX facilitates remittance transactions through its partnership with a U.S.-based remittance provider.

114.    FINCIMEX is the exclusive agent in Cuba of the US-based remittance provider. Through this partnership, FINCIMEX currently operates hundreds of agent locations in Cuba and processes remittances from agent locations in all fifty states, the District of Columbia, and online services via www.aisremesascuba.com.  It has 500 locations in Cuba, including over 250-shared locations with CIMEX, to deliver the remittances to the Cuban population all over the country.  FINCIMEX operates the only Electronic Card Processing Center in Cuba, with modern means and systems endorsed internationally and backed by a partnership with a leading foreign bank.  FINCIMEX operates the international cards of VISA, MASTERCARD, and CABAL cards; it also issues and operates all domestic (Cuban) cards to its clients, including but not limited to all the family remittances that are received by official means and processed by Cuban banks.[22]

115.    CIMEX and CUPET's service stations function as agent locations in Cuba. Remittances may be sent to a variety of locations using their network of service stations, including Servi-Cupet service stations operated through CIMEX's partnership with CUPET.

---

[21] Cuban Central Bank granted specific licenses to FINCIMEX under Resolution No. 103 of 1998 and later under Resolution No. 109 of 1999. See http://www.bc.gob.cu/institucion/nobancaria/18.

[22] According to CIMEX's Vice President Leticia Morales during Conference IMTC Cuba 2016.

116.    Some of the agent locations in Cuba (including Servi-Cupet locations and other locations) have been maintained or built on Plaintiff's Confiscated Property.  This means that CIMEX and CUPET are using the Confiscated Property to facilitate the transfer of funds from the United States to Cuba.

117.    Remittances are a key component of the Cuban economy, providing a much-needed source of hard currency (U.S. dollars) for the Cuban government.  Beginning in 2004, the Cuban government required remittances from the United States to be converted to the Cuban Convertible Peso ("CUC") at a rate controlled by the Cuban Central Bank.  The government also imposes a 10 percent tax on remittances.

118.    CIMEX, on behalf of the Cuban Central Bank, keeps 100 percent of the remittance fee and delivers the dollars from each remittance to the Cuban Central Bank.  The remittance recipient in Cuba receives CUCs (not dollars), which are loaded onto a plastic card when he or she goes to an agent location to retrieve a remittance.  The plastic card is akin to a debit card and is distributed and operated by American International Service, S.A. ("AIS").[23] AIS is part of the financial division of CIMEX.  AIS cards may be used for the purchase of goods and services at more than 6,500 points of sale, including service stations.

119.    CIMEX, CUPET, and the Cuban government generate substantial revenue from the remittance transactions.  In addition to taxes, CIMEX uses its state-assigned monopoly over the AIS cards to lock Cuban nationals into purchasing products with high mark-ups at its retail locations.  For example, CIMEX charges a 240 percent mark-up on purchases of goods with an AIS card, including goods sold at Servi-Cupet stations and other service stations.  Both CIMEX

---

[23] American International Service, S.A. is a Panamanian company registered in the Republic of Panama under Public Deed (Escritura Publica) No. 3,362 by Notaria Primera del Circuito on April 25, 1988.

and CUPET profit by ensuring that customers who receive remittances will have to spend those remittances at their stations.

120.    Defendants' remittance business is a commercial activity that occurs in the United States and causes direct effects in the United States.

121.    Defendants' remittance business occurs in the United States because U.S. dollars are transferred by persons in the United States using agent locations in the United States.  This is not an incidental or tangential occurrence.  A primary function of the remittance business, as described above, is to obtain U.S. dollars for the Cuban government and the Cuban financial system, which have limited access to hard currency.

122.    Defendants' remittance business is successful because it offers the only conduit for persons residing in the United States to transfer U.S. dollars to support family and friends in Cuba.  This, in turn, causes direct effects in the United States by creating demand for remittance services in the United States and by enabling transactions—the export of U.S. dollars—in the United States.

**Defendants' Trafficking Without Plaintiff's Authorization**

123.    Defendants' trafficking activities have been conducted without Plaintiff's authorization.

124.    Plaintiff has not authorized CIMEX or CUPET to refine crude oil using Plaintiff's Confiscated Property, nor has Plaintiff authorized them to produce, transport, make available for sale, or otherwise engage in any commercial activity involving any petroleum products that are or have been produced using Plaintiff's Confiscated Property.

125.    Plaintiff has not authorized CIMEX or CUPET to possess, use, manage, or hold any of Confiscated Property, including the service station properties, nor has Plaintiff authorized

Defendants to engage in any commercial activity involving the Confiscated Property, including the service station properties.

126.     Accordingly, Defendants have violated the Act by trafficking in the Confiscated Property after the expiration of the grace period under the Act.  Plaintiff is therefore entitled to all relief available under the Act, including actual damages, treble damages, prejudgment and postjudgment interest, costs and reasonable attorneys' fees, pursuant to 22 U.S.C. § 6082.

## COUNT I – TRAFFICKING IN CONFISCATED PROPERTY
### (as against all Defendants)
### (22 U.S.C. § 6082)

127.     Plaintiff is a U.S. national and owns the claim to property that was confiscated by the Cuban Government after January 1, 1959 (*i.e.*, the Confiscated Property).  The claim is certified and is attached as Exhibit 1.

128.     CIMEX Cuba is a person under the Act, as defined by 22 U.S.C. § 6023(11).

129.     CIMEX Panama is a person under the Act, as defined by 22 U.S.C. § 6023(11).

130.     CUPET is a person under the Act, as defined by 22 U.S.C. § 6023(11).

131.     Based on the facts alleged herein and on information and belief, CIMEX Cuba, CIMEX Panama, and/or CUPET have and continue to traffic in the Confiscated Property to which Plaintiff owns the claim, including (i) by extracting, importing, and refining crude oil, (ii) by operating service stations in Cuba, and (iii) by engaging in commercial transactions involving the Confiscated Property.

132.     Additionally, CIMEX Cuba, CIMEX Panama, and/or CUPET have generated revenues, obtained profits, and realized other benefits from these activities.

133.     Thus, CIMEX Cuba, CIMEX Panama, and/or CUPET have engaged in trafficking in violation of Title III of the Act through, at a minimum:  (i) managing, possessing, and using

the Confiscated Property; (ii) engaging in commercial activities using or otherwise benefiting

from the Confiscated Property; and (iii) causing, directing, participating in, and profiting from

trafficking in the Confiscated Property by another person, in furtherance of their operations.

134.    At all relevant times, CIMEX Cuba, CIMEX Panama, and/or CUPET have

conducted this trafficking "without the authorization of any United States national who holds a

claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Act.

135.    CIMEX Cuba, CIMEX Panama, and/or CUPET have engaged in unlawful

trafficking after November 1, 1996, the end of the 3-month grace period after the Act became

effective on August 1, 1996.

136.    Because Plaintiff holds a certified claim, it is not required to give notice under 22

U.S.C. § 6082(a)(3).

137.    Therefore, Plaintiff is entitled to damages in the amount of the certified claim,

plus pre-judgment interest at the rate of 6 percent awarded by the FCSC.  Plaintiff also is entitled

to treble damages, attorney's fees, costs, and post-judgment interest.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants:

a.  Awarding Plaintiff actual damages in the amount of $71,611,002.90;

b.  Awarding Plaintiff pre-judgment interest at the rate of 6% per annum from July 1, 1960, as set forth in the FCSC's award;

c.  Awarding Plaintiff treble damages pursuant to 22 U.S.C. § 6082(a)(3);

d.  Ordering Defendants to pay Plaintiff's reasonable attorney's fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a);

e.  Awarding Plaintiff post-judgment interest; and

f.  Granting all other relief at law or in equity that the Court deems just and proper.


Date: March 6, 2020

Respectfully submitted,

By: ____/s/ *Steven K. Davidson*_____

Steven K. Davidson (DC Bar #407137)
sdavidson@steptoe.com
Michael J. Baratz (DC Bar #480607)
mbaratz@steptoe.com
Jared R. Butcher (DC Bar #986287)
jbutcher@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-3000
Facsimile: 202-429-3902

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2020, the foregoing was filed with Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

/s/     *Steven K. Davidson*
          Steven K. Davidson