UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------------------------------------------

EXXON MOBIL CORPORATION )
)
　　　　　　Plaintiff, )
)
v. )　　　　Case No. 19-cv-1277-APM
)
CORPORACIÓN CIMEX S.A. (Cuba); )
CORPORACIÓN CIMEX S.A. (Panama); and )
UNIÓN CUBA-PETRÓLEO )
)
　　　　　　Defendants. )
--------------------------------------------------------------------


**DEFENDANTS CORPORACIÓN CIMEX, S.A. (CUBA), CORPORACIÓN CIMEX, S.A. (PANAMA) AND UNIÓN CUBA-PETRÓLEO'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS WITH PREJUDICE, AND FOR OTHER RELIEF**

*On the Brief*:　　　　　　　　Michael Krinsky (USDC, DC #NY0302)
Adam Belsky　　　　　　　　　Lindsey Frank (USDC, DC #NY0301)
Jules Lobel　　　　　　　　　　Rabinowitz, Boudin, Standard, Krinsky &
Nathan Yaffe　　　　　　　　　Lieberman, P.C
　　　　　　　　　　　　　　　14 Wall Street, Suite 3002
　　　　　　　　　　　　　　　New York, New York 10005
　　　　　　　　　　　　　　　(212) 254-1111
　　　　　　　　　　　　　　　mkrinsky@rbskl.com
　　　　　　　　　　　　　　　lfrank@rbskl.com

Dated: June 16, 2020　　　　　　*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. v

STATEMENT OF THE CASE ............................................................................. 1

ARGUMENT ....................................................................................................... 5

    I.    The Foreign Sovereign Immunities Act Does Not Provide Subject-Matter Jurisdiction ................................................................ 5

        A.    The Commercial Activity Exception ......................................... 5

            1.    The FSIA's Expropriation Exception Alone Controls ...................... 5

            2.    The Commercial Activity Exception's "Direct Effect" Requirement ................................................................ 8

                A.    The Requirement Cannot Be Satisfied Because Plaintiff's Claim Is that of a U.S. Parent for Trafficking in Its Subsidiary's Property ................................................. 8

                B.    Financial Harm Does Not Satisfy the Requirement ..................... 9

                C.    CIMEX's Remittance Activities Do Not Satisfy the Requirement ............................................................. 11

                    1.    No Legally Significant Acts Take Place in the United States ................................................ 12

                    2.    The Remittance Activities Do Not Cause an Injury in the United States ........................................ 13

                    3.    The Remittance Activities' Alleged "Effects" Are Not "Direct" ........................................................ 14

                    4.    The Action Is Not "Based On" the Remittance Activities Assertedly Causing a "Direct Effect" ................ 14

                    5.    The Claimed "Effect" of Using Some Property for Remittance Activities Is Implausible and Trivial .................. 15

                D.    CUPET's Alleged Competition with Plaintiff in the Global Oil Market Does Not Satisfy the Requirement ............... 15

E.  A French Bank's Accessing N.Y. Capital Markets to Provide Credit to a Dutch Trader Engaged in Transactions with CUPET Does Not Satisfy the Requirement ...................................................................16

F.  Alleged Environmental Damage "At or Near the United States-Cuba Maritime Boundary" Does Not Satisfy the Requirement ..................................................16

G.  Congress's Title III "Findings" Do Not Satisfy the Requirement .........................................................16

B.  The Expropriation Exception .................................................17

1.  Plaintiff Fails to Satisfy the Nexus Requirement for Suits Against States, Applicable Here on Account of Plaintiff's Allegations ...............................................................17

2.  Even If Applicable, Plaintiff Fails to Satisfy the Nexus Requirement for Suits Against Agencies ..........................18

A.  Plaintiff Alleges Only Past, Discontinued Activity with Respect to CUPET ...............................................18

B.  Even if Relevant, CUPET'S Alleged Past Activity Would Be Insufficient .....................................18

C.  CIMEX's Remittance Activities Are Insufficient ......................19

3.  Plaintiff Cannot Satisfy the Exception's International Law Requirement ...............................................20

A.  The Action Does Not Put in Issue Rights in Property Taken in Violation of International Law Because It Was the Property of Plaintiff's Subsidiary that Was Expropriated .........21

B.  Plaintiff Cannot Satisfy the Violation of International Law Requirement Because the Expropriation Was for Essosa's Refusal to Refine the Cuban State's Oil in Violation of Cuban Law, and Because Essosa's Refusal Was at the United States' Request Pursuant to Its Plan to Overthrow the Cuban Government ...........................................25

1.  The Expropriation Was for Violation of Cuban Law ...............................................26

       **2. Essosa's Refusal to Refine the Cuban State's Oil Posed a Grave External Threat** .........................28

    **C. Even Apart from the Circumstances of the Essosa Expropriation, Cuba Was Not Under Any Obligation to Provide Compensation** ...................................................31

    **D. Assuming *Arguendo* an Obligation of Compensation, Plaintiff Cannot Show that Cuba Failed to Satisfy Its Obligations** ........................................................33

       **1. Law No. 851 Would Have Provided Substantial Compensation and Its Provisions Were Well Within the Range of State Practice** ........................................33

       **2. The United States Decided Against Negotiations in Favor of Dealing with the "Successor" Government to Follow from the Bay of Pigs Invasion** .................36

    **E. The Expropriation Was a Permissible Countermeasure** ...........38

    **F. Plaintiff Cannot Meet Its Burden Because of the Political Question Doctrine** ...........................................40

**II. Title III Does Not Provide a New Grant of Subject-Matter Jurisdiction** ......................................................43

**III. 28 U.S.C. § 1331 Does Not Provide Subject-Matter Jurisdiction** ...................45

**IV. There Is No Subject-Matter Jurisdiction for Lack of Article III Standing** ....45

**V. Litigation of Personal Jurisdiction Should Await Final Determination of FSIA Immunity** .................................................46

**VI. Personal Jurisdiction Is Lacking** .......................................47

    **A. Defendants Are Entitled to Due Process Limitations on Personal Jurisdiction** ......................................47

    **B. Defendants Lack Due Process Contacts with the United States** ...........54

       **1. CUPET Is Not Subject to Specific Jurisdiction** ...................54

       **2. CIMEX (Cuba) Is Not Subject to Specific Jurisdiction** ...................55

    A.  Alleged Sale of U.S.-Origin Goods to Cuban Consumers ...........56

    B.  Service Stations Where Remittances Are Paid ...........................56

    C.  The Other, More Numerous Service Stations .............................58

    3.  CIMEX (Panama) Is Not Subject to Specific Jurisdiction.................59

VII.  A More Definite Statement of Plaintiff's Service Station Allegations Is Required ..........................................................................................60

CONCLUSION ...........................................................................................60

# TABLE OF AUTHORITIES

**Authority**........................................................................................................ **Page**

**CASES**

\* *Africa Growth Corp. v. Rep. of Angola,*
No. 17-cv-2469, 2019 WL 3253367 (D.D.C. July 9, 2019)..................................... 5, 6, 7, 12, 57

*AG&E Co. v. SEC,*
134 F.2d 633 (D.C. Cir. 1943) ............................................................... 30

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
528 F.3d 934 (D.C. Cir. 2008) ............................................................... 20

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,*
183 F.3d 1277 (11th Cir. 1999)............................................................. 47

*Alfred Dunhill of London, Inc. v. Rep. of Cuba,*
425 U.S. 682 (1976) ............................................................................... 6

*Allen v. Russian Fed'n,*
522 F. Supp. 2d 167 (D.D.C. 2007) ......................................... 5–7, 15, 22

*Allen v. Wright,*
468 U.S. 737 (1984) ............................................................................. 46

*Al-Tamimi v. Adelson,*
916 F.3d 1 (D.C. Cir. 2019) ................................................................. 40

*Amorrortu v. Rep. of Peru,*
570 F. Supp. 916 (S.D. Tex. 2008) ...................................................... 22

*Antares Aircraft, L.P. v. Fed. Rep. of Nigeria,*
948 F.2d 90 (2d Cir. 1991), *vacated,* 112 S.Ct. 3020 (1992).................... 10

*Antares Aircraft, L.P. v. Fed. Rep. of Nigeria,*
999 F.2d 33 (2d Cir. 1993)................................................................... 10

*Argentine Rep. v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989) ........................................................................ 5, 16

\* *Asahi Metal Indus. v. Sup. Crt,*
480 U.S. 102 (1987) ...................................................................... 54, 59

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................. 15

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   813 F.3d 98 (2d Cir. 2016) ......................................................................... 11

*Azima v. RAK Investment Authority*,
   305 F. Supp. 3d 149 (D.D.C. 2018), *rev'd*, 926 F.3d 890 (D.C. Cir. 2019) ............................ 15

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*,
   665 F. Supp. 289 (S.D.N.Y. 1987) ......................................................... 50, 51

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................... 40, 42, 43

*Banco Nacional de Cuba v. Chase Manhattan Bank*,
   658 F.2d 875 (2d Cir. 1981) .............................................. 32, 33, 34, 36

*Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*,
   658 F.2d 903 (2d Cir. 1981) ...................................................................... 47

*Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*,
   782 F.2d 377 (2d Cir. 1986) ...................................................................... 47

*Banco Nacional de Cuba v. Sabbatino*,
   307 F.2d 845 (2d Cir. 1962), *rev'd*, 376 U.S. 398 (1964) ...................... 32, 33, 34, 39

* *Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ............................................................................. 31, 32

*Banco Para el Comercio Exterior de Cuba v. First Nat'l City Bank*,
   658 F.2d 913 (2d Cir. 1981), *rev'd*, 462 U.S. 611 (1983) ........................... 47

*Bazarian Int'l Fin. Assoc. v. Desarrollos Aerohotelco, C.A.*,
   168 F. Supp. 3d 1 (D.D.C. 2016) ............................................................... 59

* *Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran*,
   734 F.3d 1175 (D.C. Cir. 2013) ................................... 10, 12, 13, 14, 15

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*,
   533 F.3d 1183 (10th Cir. 2008) .................................................................. 8

*BPA Int'l., Inc. v. Kingdom of Sweden*,
   281 F. Supp. 2d 73 (D.D.C. 2003) ............................................................. 10

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   447 F.3d 411 (5th Cir. 2006) ........................................................................ 52, 53

\* *Bristol-Myers Squibb Co. v. Sup. Crt*,
   137 S.Ct. 1773 (2017) ........................................................................... 54, 56, 58

*Capital Bank Int'l Ltd. v. Citigroup, Inc.*,
   276 F. Supp. 2d 72 (D.D.C. 2003) ............................................................... 55

*Carey v. Nat'l Oil Corp.*,
   592 F.2d 673 (2d Cir. 1979) ......................................................................... 8

*Cicippio-Puleo v. Islamic Rep. of Iran*,
   353 F.3d 1024 (D.C. Cir. 2004) ................................................................... 44

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158 (D.D.C. 2018) ............................................................. 57

*Consolidated Dev. v. Sherritt*,
   216 F.3d 1286 (11th Cir. 2000) .................................................................... 56

*Cont'l Transfert Technique, Ltd. v. Nigeria*,
   No. 08-cv-2026, 2019 WL 3562069 (D.D.C. Aug. 6, 2019),
   *appeal dismissed*, No. 19-7107, 2020 WL 1268963 (D.C. Cir. Mar. 4, 2020) ....................... 48

*Cortez Byrd v. Corporacion Forestal*, 974 F. Supp. 2d 264 (S.D.N.Y. 2013),
   *aff'd sub nom. Byrd v. Rep. of Honduras*, 613 F. App'x 31 (2d Cir. 2015) ............................ 51

*Cosmos Trading Corp. of Panama v. Banco Nacional de Cuba*, No. 07-20008-MC,
   2007 WL 9706399  (S.D. Fla. Feb. 16, 2007), *report and recommendation adopted*,
   No. 07-20008-MC, 2007 WL 9706400 (S.D. Fla. Mar. 28, 2007) ........................................... 47

*Creighton v. Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) ..................................................................... 57

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*,
   600 F.3d 661 (D.C. Cir. 2010) ..................................................................... 11

*Crystallex v. Venezuela*,
   932 F.3d 126 (3d Cir. 2019), *cert. denied*, --- S.Ct. ---, 2020 WL 2515508 (2020) ............... 52

*de Csepel v. Rep. of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013) ...................................................................... 6

*De Letelier v. Rep. of Chile*,
   748 F.2d 790 (2d Cir. 1984) ..................................................................... 17, 18

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) ........................................................... 48

*DRC, Inc. v. Honduras*, 71 F. Supp. 3d 201 (D.D.C. 2014) .................................... 48, 50

*Eacho v. N D Res., Inc.*, No. 83-cv-2903, 1984 WL 2398 (D.D.C. Feb. 2, 1984) ...................... 59

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
    246 F. Supp. 3d 52 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018)................................ 10

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339 (D.C. Cir. 2018) ..... 10, 11

*El-Shifa Pharm. Indus. Co. v. U.S.*,
    607 F.3d 836 (D.C. Cir. 2010) (*en banc*) ...................................................... 40, 41, 43

*EM Ltd. v. Rep. of Argentina*, 473 F.3d 463 (2d Cir. 2007) ........................................... 18

*EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78 (2d Cir. 2015) .................... 48

* *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
    606 F.Supp.2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011)............................ 47, 52

*Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Rep.*,
    No. 18-cv-2228, 2020 WL 1935554 (D.D.C. Apr. 22, 2020) .................................................. 54

* *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612 (2018) ...................................................... 43

*F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) ................................................................. 44

*First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 858 F. Supp. 2d 658,
    676–79 (E.D. La. 2012), *aff'd*, 703 F.3d 742 (5th Cir. 2012)............................................ 49, 50

* *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) .................................................................................... *passim*

*Flatow v. Islamic Rep. of Iran*, 308 F.3d 1065 (9th Cir. 2002) ...................................... 48

*F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385 (1959)...................................................... 45

*Garb v. Rep. of Poland*, No. 99-cv-3487,
    207 F.Supp.2d 16 (E.D.N.Y. 2002), *aff'd*, 440 F.3d 579 (2d Cir. 2006) .................................. 6

*Garb v. Rep. of Poland*, 440 F.3d 579 (2d Cir. 2006) ............................................. 5, 7

*Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F. Supp. 3d 304 (S.D.N.Y. 2019) ........................ 52

*Gen. Star Nat. Ins. v. Administratia Asigurarilor de Stat*,
   713 F. Supp. 2d 267 (S.D.N.Y. 2010) ........................................................ 49

*Gerding v. France*, 943 F.2d 521 (4th Cir. 1991) ......................................................... 19

*Gibbons v. Rep. of Ireland*, 532 F. Supp. 668 (D.D.C. 1982) ...................................... 48

*Gregorio v. Gordon*, 215 F. Supp. 3d 1 (D.D.C. 2015) ............................................... 55

\* *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016) ................................................. 17, 47, 48, 50, 53

*Gulf Res. America v. Rep. of Congo*,
   276 F. Supp. 2d 20 (D.D.C. 2003), *rev'd*, 370 F.3d 65 (D.C. Cir. 2004) ................................ 10

*Haig v. Agee*, 453 U.S. 280 (1981) .............................................................................. 40

*Hamdan v. U.S.*, 696 F.3d 1238 (D.C. Cir. 2012) ........................................................ 21

*Harris v. Lloyds TSB Bank, PLC*, 281 F. App'x 489 (6th Cir. 2008) ............................ 56

*Health Commc'n, Inc. v. Mariner Corp.*, 860 F.2d 460 (D.C. Cir. 1988) ............................. 55, 57

*Helicopteros Nacionales de Colombia v. Hall*,
   466 U.S. 408 (1984) ............................................................................................. 56

*Helmer v. Doletskaya*,
   393 F.3d 201 (D.C. Cir. 2004) .......................................................................... 58, 59

*Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*,
   971 F.Supp.2d 49 (D.D.C. 2013) ......................................................................... 13

*Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*,
   185 F. Supp. 3d 233 (D.D.C. 2016) ....................................................................... 54

*Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*,
   784 F.3d 804 (D.C. Cir. 2015), *vacated*, 137 S.Ct. 1312 (2017) ............................... 13

*Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*,
   137 S.Ct. 1312 (2017) ......................................................................................... 46

\* *Helmerich & Payne Int'l Drilling Co. v. Venezuela*,
   743 F. App'x 442 (D.C. Cir. 2018) ........................................ 21–23, 25, 27, 31, 32

*Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989)............................. 53

*Humane Soc. of U.S. v. Babbitt*,
    46 F.3d 93 (D.C. Cir. 1995) ................................................................................... 46

*Hwang Geum Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005)......................................... 41

*I.A.M. Nat'l Pension Fund Ben. Plan C. v. Stockton TRI Indus.*,
    727 F.2d 1204 (D.C. Cir. 1984) ............................................................................ 45

* *Idas Res. N.V. v. Empresa Nacional De Diamantes De Angola E.P.*,
    No. 06-cv-00570, 2006 WL 3060017 (D.D.C. Oct. 26, 2006) ............................ 20

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ........................................................ 44

*Jaber v. U.S.*,
    861 F.3d 241 (D.C. Cir. 2017) .............................................................................. 43

*Kalamazoo Spice Extraction Co. v. Provisional Mil. Gov't of Socialist Ethiopia*,
    616 F. Supp. 660 (W.D. Mich. 1985)................................................................. 52, 53

*Kilburn v. Libya*,
    376 F.3d 1123 (D.C. Cir. 2004) ............................................................................ 46

*Kirschenbaum v. 650 Fifth Ave.*,
    830 F.3d 107 (2d Cir. 2016)................................................................................... 49

*Kirschenbaum v. Assa Corp.*,
    934 F.3d 191 (2d Cir. 2019)................................................................................... 48

*Kroger Co. v. Malease Foods Corp.*,
    No. a-06-ca-141, 2006 WL 8432084 (W.D. Tex. Aug. 7, 2006), *report and recomm. approved*,
    2006 WL 8432652 (W.D. Tex. Dec. 19, 2006)...................................................... 58

*Kroger v. Legalbill.com LLC*,
    No. 04-cv-2189, 2005 WL 4908968 (D.D.C. Apr. 7, 2005) ................................. 58

*Luxexpress 2016 Corp. v. Gov't of Ukraine*,
    No. 18-cv-812, 2020 WL 1308357 (D.D.C. March 19, 2020)............................... 13

*Mazza v. Verizon Washington DC*,
    852 F. Supp. 2d 28, 41 (D.D.C. 2012) ................................................................. 60

*McDonnell Douglas Corp. v. Islamic Rep. of Iran*,
    758 F.2d 341 (8th Cir. 1985)................................................................................. 20

*Merlin v. Canada*,
926 F.3d 21 (1st Cir. 2019) ........................................................................ 7

*Minpeco, S.A. v. Hunt*,
686 F. Supp. 427 (S.D.N.Y. 1988) ........................................................ 49, 51

*Mobarez v. Kerry*,
187 F. Supp. 3d 85 (D.D.C 2016) ............................................................. 43

*Molock v. Whole Foods Mkt., Inc.*,
297 F. Supp. 3d 114 (D.D.C. 2018), *aff'd*, 952 F.3d 293 (D.C. Cir. 2020) ............................ 56

*Monkton Ins. Serv., Ltd. v. Ritter*,
768 F.3d 429 (5th Cir. 2014) ................................................................... 56

*Morgan Equip. Co. v. Novokrivorogsky State Ore Min. & Processing Enter.*,
57 F. Supp. 2d 863 (N.D. Cal. 1998) ....................................................... 20

*Naegele v. Albers*,
110 F. Supp. 3d 126 (D.D.C. 2015) .......................................................... 57

*Natural Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .................................................................. 43

*Nnaka v. Fed. Rep. of Nigeria*,
238 F. Supp. 3d 17 (D.D.C. 2017) ............................................................ 13

* *OBB Personenverkehr AG v. Sachs*,
136 S.Ct. 390 (2015) ..................................................................... 7, 8, 43

*Oceanic Expl. Co. v. ConocoPhillips, Inc.*,
No. 05-cv-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ................................. 10

*Odhiambo v. Rep. of Kenya*,
764 F.3d 31 (D.C. Cir. 2014) ............................................................. 10, 19

* *Oetiker v. Jurid Werke, G.m.b.H.*,
556 F.2d 1 (D.C. Cir. 1977) ..................................................................... 59

*Ofisi v. Al Shamal Islamic Bank*,
No. 15-cv-2010, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ................................. 55

*Okolie v. Future Serv. Gen. Trading & Contracting Co.*,
102 F. Supp. 3d 172 (D.D.C. 2015) .......................................................... 57

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987) ..................................................................................... 45

*Orient Mineral Co. v. Bank of China*,
  506 F.3d 980 (10th Cir. 2007) ................................................................... 20

*Palmore v. Superior Court*,
  515 F.2d 1294 (D.C. Cir. 1975), *vacated*, 429 U.S. 915 (1976) ............... 43

*Patel v. Patel*,
  No. 16-cv-02411, 2017 WL 4217098 (D.D.C. Sept. 19, 2017) .................. 55

*People's MoJahedin Org. of Iran v. Dep't of State*,
  182 F.3d 17 (D.C. Cir. 1999) ........................................................ 41, 42, 43

*Petersen Energia Inversora S.A.U. v. Argentine Rep. and YPF S.A.*,
  895 F.3d 194 (2d Cir. 2018) ......................................................................... 8

*Peterson v. Saudi Arabia*,
  332 F. Supp. 2d 189 (D.D.C. 2004), *aff'd*, 416 F.3d 83 (D.C. Cir. 2005) .............. 17

*Philipp v. Fed. Rep. of Germany*,
  248 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 894 F.3d 406 (D.C. Cir. 2018) ................ 20

*Phoenix Consulting, Inc. v. Rep. of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ....................................................................... 5

*Poling v. Farrah*,
  131 F. Supp. 2d 191 (D.D.C. 2001) ........................................................... 59

*Potash Antitrust Litig.*,
  686 F. Supp. 2d 816 (N.D. Ill. 2010) ......................................................... 53

*Princz v. Fed. Rep. of Germany*,
  26 F.3d 1166 (D.C. Cir. 1994) .............................................................. 9, 15

*Quarles v. Fuqua Indus.*,
  504 F.2d 1358 (10th Cir. 1974) .................................................................. 51

*Ranza v. Nike, Inc.*,
  793 F.3d 1059 (9th Cir. 2015) .................................................................... 51

*Regan v. Wald*,
  468 U.S. 222 (1984) ................................................................................... 27

*Reno v. Am.-Arab Anti-Discrimination Comm.*
  525 U.S. 471 (1999) ................................................................................... 43

\* *Rep. of Argentina v. Weltover, Inc.*
   504 U.S. 607 (1992) ............................................................................................... 9, 14

*Richard v. Bell Atl. Corp.*,
   946 F. Supp. 54 (D.D.C. 1996) ................................................................................. 51

*Robinson v. Gov't of Malaysia*,
   269 F.3d 133 (2d Cir. 2001) ..................................................................................... 12

\* *Rong v. Liaoning Province Gov't*,
   452 F.3d 883 (D.C. Cir. 2006) ............................................................................... 6, 7

*S & Davis Int'l  v. Rep. of Yemen*,
   218 F.3d 1292 (11th Cir. 2000) ................................................................................ 53

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) .................................................................................. 59

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) .................................................................................................... 5

*Schlesinger v. Reservists Comm. To Stop the War*,
   418 U.S. 208 (1974) ................................................................................................... 40

\* *Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ...................................................................... 41, 42, 43

*Schubarth v. Fed. Rep. of Germany*, 220 F. Supp. 3d 111 (D.D.C. 2016),
   *aff'd in part*, 891 F.3d 392 (D.C. Cir. 2018) ........................................................... 18

\* *Schubarth v. Fed. Rep. of Germany*,
   891 F.3d 392 (D.C. Cir. 2018) ............................................................................ 12, 18

*Sequeira v. Rep. of Nicaragua*,
   No. 19-cv-11656, 2020 WL 2499808 (11th Cir. May 14, 2020) ....................... 5, 7–8

*Soudavar v. Islamic Rep. of Iran*,
   67 F. App'x 618 (D.C. Cir. 2003) ............................................................................. 10

*Spectrum Stores, Inc. v. Citgo Corp.*,
   632 F.3d 938 (5th Cir. 2011) .................................................................................... 43

\* *Spokeo v. Robins*,
   136 S.Ct. 1540 (2016) .......................................................................................... 45, 46

*Sukyas v. Romania*,
  No. 15-cv-1946, 2017 WL 6550588 (C.D. Cal. Sept. 21, 2017),
  *rev'd*, 765 F. App'x 179 (9th Cir. 2019) .................................................................. 18

*Tamam v. Fransabank Sal*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010) ...................................................................... 55

*Taylor v. KBR Servs., Inc.*,
  658 F.3d 402 (4th Cir. 2011) .................................................................................... 40

*Taylor v. Kingdom of Sweden*,
  No. 18-cv-1133, 2019 WL 3536599 (D.D.C. Aug. 2, 2019) .................................. 18

*Texas Trading v. Fed. Rep. Nigeria*,
  647 F.2d 300 (2d Cir. 1981) ..................................................................................... 20

*Theo. H. Davies & Co. v. Rep. of Marshall Islands*,
  174 F.3d 969 (9th Cir. 1998) .................................................................................... 20

*Thompson Hine, LLP v. Taieb*,
  734 F.3d 1187 (D.C. Cir. 2013) ......................................................................... 55, 57

*TIFA, Ltd. v. Rep. of Ghana*, No. 88-cv-1513,
  1991 WL 179098 (D.D.C. Aug. 27, 1991) .............................................................. 13

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005) ........................................................................... 17, 52

\* *Transamerica Leasing, Inc. v. La Rep. de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000) ........................................... 17, 47, 48–50, 53, 54

*Transamerican S.S. Corp. v. Somali Dem. Rep.*,
  767 F.2d 998 (D.C. Cir. 1985) ........................................................................... 10, 11

*Triple A Int'l, Inc. v. Dem. Rep. Congo*,
  721 F.3d 415 (6th Cir. 2013) .................................................................................... 20

*Triple Up Ltd. v. Youku Tudou Inc.*,
  235 F. Supp. 3d 15 (D.D.C. 2017) ........................................................................... 58

*U.S. ex rel. Scollick v. Narula*,
  215 F. Supp. 3d 26, 37 (D.D.C. 2016) ..................................................................... 60

*U.S. v. Ayo-Gonzales*,
  536 F.2d 652 (5th Cir. 1976) .................................................................................... 28

*U.S. v. Santos,*
   553 U.S. 507 (2008) ........................................................................................ 45

*U.S. v. Spawr Optical Res.,*
   685 F.2d 1076 (9th Cir. 1982) ........................................................................ 43

*Vasquez v. Whole Foods Mkt., Inc.,*
   302 F. Supp. 3d 36 (D.D.C. 2018) .................................................................. 59

* *Verlinden B.V. v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) ................................................................................. 45, 46

*Virtual Countries, Inc. v. Rep. of South Africa,*
   300 F.3d 230 (2d Cir. 2002) ........................................................................... 14

*Walden v. Fiore,*
   571 U.S. 277 (2014) ................................................................................. 55, 56

*Walter Fuller Aircraft Sales v. Philippines,*
   965 F.2d 1375 (5th Cir. 1992) ........................................................................ 48

*World-Wide Volkswagen v. Woodson,*
   444 U.S. 286 (1980) ........................................................................................ 56

*Wultz v. Islamic Republic of Iran,*
   755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................... 59

* *Zedan v. Saudi Arabia,*
   849 F.2d 1511 (D.C. Cir. 1988) ................................................................ 12, 19

## INTERNATIONAL CASES AND ARBITRAL DECISIONS

*Agrotexim et al. v. Greece*, 330 Eur. Ct. H.R. (ser. A) (1995) ...................... 23

*Ahmadou Sadio Diallo (Rep. of Guinea v. Dem. Rep. of the Congo),*
   Judgment, 2010 I.C.J. 639 (Nov. 30) .............................................................. 22

*Aminoil v. Kuwait*, Award of 24 March 1982, 21 I.L.M. 976 (1982) ............. 38

*Antoine Goetz et al. v. République du Burundi*, ICSID Case No. ARB/95/3, Award (1999) ....... 38

* *Barcelona Traction, Light & Power Co. (Belg. v. Spain),*
   Judgment, 1970 I.C.J. 3 (Feb. 5) ................................................. 21, 22, 23, 24

*Bischoff Case* (1903), *reprinted in* 10 R.I.A.A 420 (1960) ........................... 28

*Burlington v. Ecuador*, ICSID Case No. ARB/08/5, Award (2012).............................................. 38

\* *Case Concerning Gabcikovo-Nagymaros Project (Hung. v. Slov.)*,
 Judgment, 1997 I.C.J. Rep. 7 (Sept. 25)............................................................................... 37, 39

*E. R. Kelley v. United Mexican States*, IV R.I.A.A. 608 (1930).................................................. 29

\* *Fisheries Jurisdiction Case (U.K. & N. Ireland v. Iceland)*, 1974 I.C.J. 3 (July 25) ............... 37

*Gogitidze et al. v. Georgia*, App. No. 6862/05, Eur. Ct. H.R. (12 May 2015)............................ 28

*Interhandel Case (Switzerland v. U.S.)*, 1959 I.C.J. 6 (Mar. 21).................................................. 30

*LIAMCO v. Libya*, Award of 12 April 1977, 62 I.L.R. 141 (1982).............................................. 38

*Maria Luz*, *in* Marjorie Whiteman, Damages in International Law (1962)...................... 28

*Mary Lowell Case*, *in* John Bassett Moore, Moore's Digest of International Law,
 Vol. III (1898) .................................................................................................................. 28, 29

*North Sea Continental Shelf (F.R.G. v. Den. & Neth.)*,
 Judgment, 1969 I.C.J. 3 (Feb. 20)............................................................................................ 37

Panel Report, *Russia–Measures Concerning Traffic in Transit*,
 WT/DS512/R, ¶ 7.52 (5 April 2019)........................................................................................ 43

*Pelletier's Case*, *in* John Bassett Moore, History And Digest Of The International
 Arbitrations To Which The United States Has Been A Party Vol. II (1898) ............... 28

*Raimondo v. Italy*, 281 Eur. Ct. H.R. (ser. A) (1994) ................................................................. 28

*Robert Wilson Case*, *in* John Bassett Moore, History And Digest Of The International
 Arbitrations To Which The United States Has Been A Party Vol. IV (1898) .............. 28

*Sedco, Inc. v. Nat'l Iranian Oil Co.*, 9 Iran-U.S. C.T.R. 248 (1985)............................................ 28

*Tecmed v. Mexico*,
 ICSID Case No. AF/00/2, Award (29 May 2003)................................................................ 26, 27

*Tidewater Inc. v. Bolivarian Rep. of Venezuela*,
 ICSID Case No. ARB/10/5, Award (2015)............................................................................... 38

*Wiener's Case*, John Bassett Moore, Moore's Digest of International Law,
 Vol. IV (1906).......................................................................................................................... 29

## STATUTES

An Act to Regulate the Collection of Duties, 1 Stat. 29 (July 31, 1789), ch. 5 ........................... 28

Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996,
    Pub. L. No. 104-114, §§ 301–06, 22 U.S.C. §§ 6081–6085 (1996).................................. *passim*

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583,
    28 U.S.C. §§ 1330, 1441(d), 1602 *et seq.* (1976),.............................................................. *passim*

Trading with the Enemy Act of 1917, Ch. 106, § 16(2), 40 Stat. 411, *amended*, Pub. L. 73-1,
    48 Stat. 1 (1933), *continued*, Pub. L. 95-223, 91 Stat. 1625 (1977) ......................................... 27

19 U.S.C. § 1581 ...................................................................................................... 27, 28

22 U.S.C. § 1643b ............................................................................................................ 9

22 U.S.C. § 1643d ............................................................................................................ 9

22 U.S.C. § 1643f ............................................................................................................. 9

22 U.S.C. § 6021 .............................................................................................................. 17

22 U.S.C. § 6023 ........................................................................................... 2, 13, 43, 57

22 U.S.C. § 6082 ........................................................................................... 2, 14, 44, 45

22 U.S.C. § 6084 .............................................................................................................. 59

22 U.S.C. § 6085 ............................................................................................................... 2

28 U.S.C. § 1331 ........................................................................................................ 4, 45

39 U.S.C. § 409 ............................................................................................................... 45

60 Stat. 50, 50 U.S.C. App. § 32(a)(5) (1946) .......................................................... 30

## FOREIGN STATUTES

Australia
Criminal Code Act 1995, No. 12 of 1995 (as amended), § 94.1 .................................. 27

Trading with the Enemy Act, No. 14 of 1939 (as amended), § 5 ................................ 31

Canada
Criminal Code of Canada, R.S.C., c. C-46, § 83.14 (1985)........................................ 27

Criminal Code of Canada, R.S.C., c. C-46, § 490.2 (1985)............................................................ 28

Regulations Respecting Trading with the Enemy, §§ 21–23, 62–63,
Order in Council P.C. 3959 (Aug. 21, 1940) (Can.) ........................................................ 30, 31

Guatemala
Leg. Decree 630 (25 May 1949), Art. 8................................................................................. 31

United Kingdom
Criminal Justice (Terrorism and Conspiracy) Act of 1998, ch. 40, § 4 (U.K.) ........................... 27

Criminal Justice Act of 1988, ch. 33, § 69 (U.K.) ...................................................................... 28

Trading with the Enemy Act, §§ 1(1)–2, 7, 2 & 3 Geo. 6, Ch. 89 (Sep. 5, 1939),
*amended* (1943) (U.K.) .................................................................................................... 30

Northern Ireland (Emergency Provisions) Act, 1973, 21 & 22, ch. 53, §11(3) (U.K.) ................ 27

## TREATIES AND INTERNATIONAL INSTRUMENTS

Charter of the Organization of American States, 2 U.S.T. 2394, T.I.A.S. 2361,
119 U.N.T.S. 3 (April l0, 1948) .................................................................................... 38, 39

Final Act of the Inter-American Conference on Systems of Economic and Financial Control,
Washington, D.C., July 10, 1942, § VII, Art. 1(a) ................................................................ 31

Single Convention on Narcotic Drugs, 1961, art. 37, Mar. 30, 1961, 18 U.S.T. 1407, 520
U.N.T.S. 151 (entered into force Dec. 13, 1964)................................................................. 28

United Nations, Charter of the United Nations, 1945, 1 U.N.T.S. XVI ...................................... 39

## RULES

Fed. R. Civ. P. 12(b)(1) and (2) ...................................................................................... 1

Fed. R. Civ. P. 12(e) ......................................................................................................... 1

Fed. R. Civ. P. 12(h) ....................................................................................................... 46

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

*Claim of Revlon, Inc.*, Claim No. CU-2698, Decision No. CU-5940 (FCSC Nov. 4, 1970).......... 9

Cuban Assets Control Regulations, 31 C.F.R. §§ 515.201, 515.302, 515.306............................. 27

Department of State, *Foreign Relations of the United States, Vol. IX, The American Republics* (1969), Doc. No. 223 ........................................................................................................ 31

Exec. Order No. 9193, 7 Fed. Reg. 5205 (July 9, 1942)........................................................ 30

REPORT OF THE OFFICE OF ALIEN PROPERTY (1951) ...................................................... 29

**LEGISLATIVE MATERIALS**

*Emergency Controls on International Economic Transactions: Hearings Before the Subcomm. on International Economic Policy & Trade of the House Comm. on International Relations*, 95th Cong., 1st Sess. 4–8, 16–19, 35–39 (1977) .............................. 27

Statement of Kenneth S. Carlson, *Return of Confiscated Property,  Hearings Before a Subcommittee of the Committee on the Judiciary*, 84th Cong., Sess. 1 & 2, on S. 854, et al. to Amend the TWEA 381 (Nov. 29 & 30, 1955)............................................................. 30

Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, P.L. 104-114; 22 U.S.C. § 6021 *et seq.*

H.R. 927, 104th Cong. (as introduced in the House, Feb. 14, 1995) .................................. 35, 44

*Markup Before the Subcomm. on the Western Hemisphere of the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 1st Sess. 57–58 (March 22, 1995) .................................................... 44

*Markup Before the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 1st Sess. 172, 232–33 (June 30 and July 13, 1995)............................................................................................. 44

S. 381, 104th Cong. (as introduced in the Senate, Feb. 9, 1995) ............................................ 44

141 CONG. REC. S15106 (daily ed. Sept. 20, 1995) ................................................................ 59

141 CONG. REC. S15217 (daily ed. Oct. 17, 1995) .................................................................. 44

141 CONG. REC. S15277-78, 82 (daily ed. Oct. 18, 1995) ....................................................... 44

H.R. REP. NO. 104-468, at 35 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 558 .............................................................................................. 44, 45

Foreign Sovereign Immunities Act of 1976, P.L. 94-583; 28 U.S.C. § 1330, 1602 *et seq.*

H.R. REP. No. 94-1487 (1976) ............................................................................................. 20

*Jurisdiction of the U.S. Courts in Suits Against Foreign States, Hearings, Subcomm. On Administrative Law, Comm. On Judiciary, on H.R. 11315* (June 2 and 4, 1976) ............... 6–7

## RECORD MATERIALS

*Africa Growth Corp. v. Rep. of Angola*, No. 17-cv-2469, 2019 WL 3253367
Complaint (D.D.C. July 9, 2019) ............................................................... 6

*Allen v. Russian Fed'n*, No. 05-cv-2007, 522 F. Supp. 2d 167
Amended Complaint (D.D.C. 2007) ............................................................ 6

*GAMI Invs., Inc. v. Mexico*, UNCITRAL,
Submission of the United States of America (June 30, 2003) ..................................... 22

*Garb v. Rep. of Poland*, No. 99-cv-3487, 207 F.Supp.2d 16
Amended Complaint (E.D.N.Y. 2002) ......................................................... 6

*Helmerich & Payne Int'l Drilling Co. v. Venezuela*, No. 13-cv-7169, 2018 WL 2981075, 743 F.
App'x 442, U.S. Supplemental Brief as Amicus Curiae (D.C. Cir. 2018) ................. 22, 23, 24

*Interhandel Case (Switzerland v. U.S.)*, 1959 I.C.J. 6 (Mar. 21), Preliminary Objections
Submitted by the United States of America, Exh. 23 (June 16, 1958) ..................................... 30

*Methanex Corp. v. U.S.A.*, UNCITRAL,
Respondent United States's Memorial on Jurisdiction and Admissibility (Aug. 5, 2005)....... 22

*Nottebohm Case (Liechtenstein v. Guatemala)*, 1955 I.C.J. 4 (April 6)
Liechtenstein Memorial, Annex 14 (May 14, 1952)................................................. 31

## OTHER MATERIALS

Joseph W. Bishop, Jr., *Judicial Construction of the Trading with the Enemy Act*,
62 HARV. L. REV. 721 (1949) ..................................................................... 30

1 SIR WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
(Thomas McIntyre Cooley & James De Witt Andrews eds., 4th ed. 1899)............................. 28

PHILLIP A. BLUMBERG, ET AL., BLUMBERG ON CORPORATE GROUPS (2d ed., 2020 update) ........ 51

Daria Boklan, *The First WTO's Ruling on National Security Exception: Balancing Interests or
Opening Pandora's Box*, 19:1 WORLD TRADE REV. (2020) ..................................... 43

DEREK BOWETT, SELF DEFENSE IN INTERNATIONAL LAW (2009)................................... 29

Derek Bowett, *State Contracts with Aliens: Contemporary Developments on
Compensation for Termination or Breach*, 59 BRIT. Y.B. INT'L L. 49 (1988)................... 37, 38

IAN BROWNLIE, INTERNATIONAL LAW AND THE USE OF FORCE BY STATES (1963) ................... 29

William Burke-White and Andreas von Staden, *Investment Protection in Extraordinary Times: The Interpretation and Application of Non-Precluded Measures Provisions in Bilateral Investment Treaties*, 48 VA. J. INT'L L. 307 (2008) ................................................................. 42

Martin Calhoun and Julia Collison, *Recent Supreme Court's Personal Jurisdiction Ruling (Bristol-Myers Squibb) Limits Plaintiffs' Forum-Shopping Options*, IN-HOUSE DEF. Q. (2017) ......................................................................................... 58

Louis Capozzi, *Relationship Problems: Pendent Personal Jurisdiction After Bristol-Myers Squibb*, 11 DREXEL L. REV. 215 (2018) ................................................................... 58

Mitchell Carroll, *Legislation on Treatment of Enemy Property*, 37 AM. J. INT'L L. 4 (1943) ..... 31

ANTONIO CASSESE, INTERNATIONAL LAW (2d Ed., 2005) ........................................... 29

BIN CHENG, GENERAL PRINCIPLES OF LAW AS APPLIED BY INTERNATIONAL COURTS AND TRIBUNALS (1953) ............................................................................ 29

JAMES CRAWFORD, BROWNLIE'S PRINCIPLES OF PUBLIC INTERNATIONAL LAW (8th ed. 2012) ................................................................................................ 26, 29

DEP'T OF JUSTICE, ACQUISITION OF PROPERTY FOR WAR PURPOSES (1944)............................... 29

Scott Dodson, *Personal Jurisdiction and Aggregation*, 113 NW. U. L. REV. 1 (2018) ............... 58

Martin Domke, *Western Hemisphere Control Over Enemy Property: A Comparative Survey*, 11 L. & CONTEMP. PROBS. 1 (1945) ........................................................................... 29

MAX PAUL FRIEDMAN, NAZIS AND GOOD NEIGHBORS: THE UNITED STATES CAMPAIGN AGAINST THE GERMANS OF LATIN AMERICA IN WORLD WAR II (2005).................................. 31

F. V. GARCÍA AMADOR, LOUIS BRUNO SOHN, RICHARD R. BAXTER, RECENT CODIFICATION OF THE LAW OF STATE RESPONSIBILITY FOR INJURIES TO ALIENS (1974)....................................... 31

International Law Commission, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, ILC Y.B., Vol. II, Pt. II (2001).................................................... 39, 40

International Law Commission, Draft Articles on Diplomatic Protection with Commentaries, ILC Y.B., Vol. II, Pt. II (2006)................................................................................ 22

International Law Commission, Draft Conclusions on Identification of Customary International Law with Commentaries, ILC Y.B., Vol. II, Pt. II (2018) .................................................. 21, 32

International Law Commission, Report of the Commission to the General Assembly on the work of its fifty-third session, A/CN.4/444 & Add. 1–3, ILC Y.B., Vol. II, Pt. 1 (1992) ............... 40

RICHARD LILLICH AND BURNS WESTON, INTERNATIONAL CLAIMS: THEIR SETTLEMENT BY LUMP SUM AGREEMENTS, PART I: THE COMMENTARY (1975) ............................................................. 35

IRMGARD MARBOE, CALCULATION OF COMPENSATION AND DAMAGES IN INTERNATIONAL INVESTMENT LAW (2009) .............................................................. 38

Note, *Return of Property Seized During World War II: Judicial and Administrative Proceedings Under the Trading with the Enemy Act*, 62 YALE L.J. 1210 (1953) ........................................ 30

ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, GUIDELINES ON CORPORATE GOVERNANCE OF STATE-OWNED ENTERPRISES (2015) ........................................... 51

C. Todd Piczak, *The Helms-Burton Act: U.S. Foreign Policy Toward Cuba, The National Security Exception to the GATT and the Political Question Doctrine*, 61 U. PITT. L. REV. 287 (1999)................................................................. 42

Rex M. Potterf, *Treatment of Alien Enemy Property in War Time and After by the United States*, 2(6) INDIANA L.J. 453 (1927)............................................................. 30

EDWARD RE, FOREIGN CONFISCATIONS (1951) ................................................................. 29

Restatement (Fourth), Foreign Relations Law of the United States (2018) .................................. 6

BURLEIGH CUSHING RODICK, THE DOCTRINE OF NECESSITY IN PUBLIC INTERNATIONAL LAW (1958)............................................................. 29

Martin A. Rogoff, *On the Obligation to Negotiate in International Law: Rules & Realities*, 16 MICH. J. INT'L L. 141 (1994). ............................................................. 37

OSCAR SCHACHTER, INTERNATIONAL LAW IN THEORY AND PRACTICE (1991)............................ 37

K.R. Simmonds, *The* Interhandel *Case*, 10 INT'L & COMP. L. Q. 3 (1961) .................................. 30

M. SORNARAJAH, THE SETTLEMENT OF FOREIGN INVESTMENT DISPUTES (2000)........................ 37

J.G. STARKE, AN INTRODUCTION TO INTERNATIONAL LAW (4th ed., 1958)................................ 29

U.K. Foreign and Commonwealth Office, *Rules Applying to International Claims*, 37 INT'L & COMP. L.Q. 1006 (Oct. 1988) .............................................................. 23

Jorge Viñuales, *Customary Law in Investment Regulation*, 23 ITALIAN Y.B. INT'L L. 23 (2013)............................................................. 26

GILLIAN WHITE, NATIONALISATION OF FOREIGN PROPERTY (1961)............................................ 26

B.A. WORTLEY, EXPROPRIATION IN PUBLIC INTERNATIONAL LAW (1959) .................................. 26

Defendants—two corporations organized under Cuban law, Corporación Cimex, S.A. and

Unión Cuba-Petróleo, and a corporation organized under Panamanian law, also named

Corporación Cimex, S.A.—respectfully submit this Memorandum of Points and Authorities in

support of their motion, pursuant to Fed. R. Civ. P. 12(b)(1) and (2), to dismiss this action with

prejudice for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act

("FSIA"), invoked by Plaintiff, or the additional grounds for jurisdiction asserted by Plaintiff, and

to stay proceedings on personal jurisdiction pending final determination of subject-matter

jurisdiction or, alternatively, to dismiss the action for lack of personal jurisdiction.  Unless moot,

Defendants also move, pursuant to Fed. R. Civ. P. 12(e), for a more definite statement.

## STATEMENT OF THE CASE

1.      In its Second Amended Complaint, Plaintiff sues three foreign corporations for

their possessing and using property located in Cuba in connection with their commercial activities

outside of the United States. Defendants maintain that the nexus with U.S. territory required by

the FSIA's commercial activity and expropriation exceptions from immunity, asserted by Plaintiff

for subject-matter jurisdiction, are lacking, as are the contacts required for specific personal

jurisdiction by the Due Process Clause.

The property—an oil refinery and related facilities, and land on which gas service stations

now stand—had been owned by a Panamanian company, Esso Standard Oil, S.A. ("Essosa"), a

subsidiary of Plaintiff.  It was expropriated on July 1, 1960 for Essosa's refusal to refine the

Cuban State's crude oil in violation of long-standing Cuban law. Plaintiff's testimony elsewhere

and declassified State Department documents show that Plaintiff instructed Essosa to refuse to

refine the oil at the request of President Eisenhower, as part of the U.S. plan to overthrow the

Cuban Government by armed force that culminated in the Bay of Pigs invasion. Defendants

maintain that Plaintiff cannot satisfy the FSIA expropriation exception's requirement that the action puts in issue rights in property taken in a violation of international law, including because it was not the property of Plaintiff but of its third-country subsidiary that was expropriated, and because of the circumstances particular to the Essosa expropriation.

For these and additional reasons, Defendants seek dismissal of this action with prejudice.

2.       Plaintiff claims Defendants are liable under Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104-114, §§ 301–06 (1996), 22 U.S.C. §§ 6081–6085 ("Title III"), which provides that "any person that . . . traffics in property which was confiscated by the Cuban Government . . . shall be liable to any United States national who owns the claim to such property." Title III, § 302(a)(1)(A); 22 U.S.C. § 6082(a)(1)(A). Plaintiff demands damages in a sum treble that of the claimed value of the property at the time of the expropriation (treble $71,611,002.90), plus pre-judgment interest from 1960.

"Traffics" is defined to include "receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property," or "engages in a commercial activity using or otherwise benefitting from confiscated property," "without the authorization" of the U.S. national "who holds a claim to the property."  "Confiscated" refers to the "nationalization, expropriation, or other seizure" without "adequate and effective compensation" having been provided.  LIBERTAD Act, § 4(4)(A)(i); 22 U.S.C. § 6023(4)(A)(i), and § 4(13)(A)(i)–(ii); 22 U.S.C. § 6023(13)(A)(i)–(ii).

The LIBERTAD Act was enacted in 1996, but every President exercised statutory authority to suspend the right to bring a Title III action, Title III, § 306(c)(1); 22 U.S.C. § 6085(c)(1), until President Trump let the suspension lapse, effective May 2, 2019.

3.       Plaintiff alleges that the Defendants are "agencies or instrumentalities" within the

meaning of the FSIA, 28 U.S.C. § 1603. Second Amended Complaint ("SAC") ¶ 9. CUPET, "the Cuban state-owned oil company," with its principal place of business in Cuba, *id.* ¶ 21, is alleged to be liable for trafficking in the refinery and related facilities that had been owned by Essosa, Plaintiff's Panamanian subsidiary, *id.* ¶¶ 8, 36, 92, and also trafficking by its operation with CIMEX of gas service stations on land in which Essosa had an interest. *Id.* ¶ 106. The Cuban CIMEX corporation ("CIMEX (Cuba)"), a "commercial conglomerate" "owned by the government of Cuba," with its principal place of business in Cuba, *id.* ¶¶ 17, 105, is alleged to be trafficking because, among the gas service stations it operates, "some . . . are built on or maintained" on land formerly owned or encumbered with mortgages by Essosa. *Id.* ¶¶ 31, 107. Plaintiff alleges that CIMEX (Panama) is the "alter ego" of CIMEX (Cuba). *Id.* ¶ 3.

Plaintiff asserts jurisdiction under both the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), and "expropriation" exception, 28 U.S.C. § 1605(a)(3), but Defendants maintain that only the expropriation exception applies. Defendants further maintain that Plaintiff fails to satisfy the commercial activity exception's nexus requirement: that the act upon which the action is based "causes a direct effect in the United States."

The expropriation exception applies to actions "in which rights in property taken in violation of international law are in issue." Defendants maintain that the nexus requirement applicable here is that the expropriated property be present in the United States, which concededly is not the case, and that the alternative is not satisfied in any event, that the defendant "is engaged in a commercial activity in the United States."

Defendants further maintain that Plaintiff cannot establish the exception's international law requirement. The expropriated property was owned by Essosa; as recognized by the D.C. Circuit and the International Court of Justice, a parent's rights are not "in issue" under

3

international law when its third-country subsidiary's property is taken.

If the Court finds the expropriation exception's nexus requirement satisfied and the parent-subsidiary distinction not dispositive, the question of whether the expropriation violated customary international law would come to the fore. Defendants maintain that, under well-established customary international law, no violation can be shown here, both because the expropriation was for violation of Cuban law and because it was in defense against grave external threat. They further maintain that, even apart from the unique circumstances of this expropriation, Plaintiff cannot show a violation of international law.

Finally, Defendants maintain that Plaintiff cannot meet its burden under the expropriation exception because, for it to prevail on at least several of the international law issues, it must ask the Court to make adjudications barred by the "political question" doctrine.

Plaintiff asserts that Title III implicitly overrides FSIA immunity and establishes a new head of jurisdiction, SAC ¶ 9, but, Defendants show, express provisions are required. Plaintiff's final ground for jurisdiction, 28 U.S.C. § 1331, is inapplicable, as the FSIA is the exclusive source of jurisdiction when agencies are sued.

4.     Defendants maintain that the action fails to satisfy the Due Process requirements for personal jurisdiction, applicable here because of the presumption, not overcome by Plaintiff, that an agency is to be treated as separate from the foreign state. However, Defendants seek a stay of proceedings on personal jurisdiction until final resolution of FSIA immunity, which protects against the entanglements, intrusions and burdens of suit.

5.      This action was commenced on May 2, 2019 by Plaintiff's filing a Complaint against two of the three current Defendants. ECF No. 1. After resolution of service issues, those Defendants moved to dismiss the action for lack of subject-matter and personal jurisdiction on

October 8, 2019.  ECF No. 23.  Instead of opposing the motion, Plaintiff filed its First Amended

Complaint on November 12, 2019, ECF No. 28, and then a consent motion, granted on March 6,

2020, ECF No. 32, for leave to file a Second Amended Complaint and to set June 16, 2020 as the

date for response. The Second Amended Complaint was filed on March 6, 2020.  ECF No. 33.

ARGUMENT

I.     **The Foreign Sovereign Immunities Act Does Not Provide Subject-Matter
       Jurisdiction**

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state[,]"

*Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989), including its

agencies. They are "presumptively immune from . . . jurisdiction." *Saudi Arabia v. Nelson*, 507

U.S. 349, 355 (1993). "If no exception [to immunity] applies," the court "lacks subject matter

jurisdiction," *Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

A.  **The Commercial Activity Exception**

1.  **The FSIA's Expropriation Exception Alone Controls**

Plaintiff invokes the commercial activity exception, 28 U.S.C. § 1605(a)(2), but the

expropriation exception, 28 U.S.C. § 1605(a)(3), alone controls. The courts of this District and the

Second Circuit have so held in dismissing claims indistinguishable from Plaintiff's: as here, the

plaintiffs sued for the commercial use of expropriated property under the commercial activity

exception. *See Africa Growth Corp. v. Rep. of Angola,* No. 17-cv-2469, 2019 WL 3253367

(D.D.C. July 9, 2019) (Howell, C.J.); *Allen v. Russian Fed'n,* 522 F. Supp. 2d 167 (D.D.C. 2007)

(Kollar-Kotelly, J.); *Garb v. Rep. of Poland*, 440 F.3d 579 (2d Cir. 2006). *See also Sequeira v.*

*Rep. of Nicaragua*, No. 19-cv-11656, 2020 WL 2499808 (11th Cir. May 14, 2020) (Nicaragua's

export of products from expropriated farm does not make commercial activity exception

5

applicable).[1]

*Rong v. Liaoning Province Gov't*, 452 F.3d 883, 890 (D.C. Cir. 2006), requires this result, as the courts in *Africa Growth*, at *5, and *Allen*, at 188, recognized. In rejecting the commercial activity exception, the Circuit explained that, as commercial use almost always follows expropriation, allowing suit on that commercial use under the commercial activity exception would eviscerate the distinct limitations of the expropriation exception. *Id.* at 891. *See also Garb*, 207 F. Supp. 2d at 32 (as "every expropriation of property has some commercial implications," the commercial activity exception would "subsume" the expropriation exception).

The United States alone allows actions arising from expropriations, Restatement (Fourth), Foreign Relations Law of the United States § 455 note 15 (2018), a "quintessentially sovereign act." *de Csepel v. Rep. of Hungary*, 714 F.3d 591, 600 (D.C. Cir. 2013).  In *Alfred Dunhill of London, Inc. v. Rep. of Cuba*, 425 U.S. 682, 703–04 (1976), extensively noted in the FSIA's legislative history, *see Jurisdiction of the U.S. Courts in Suits Against Foreign States, Hearings, Subcomm. On Administrative Law, Comm. On Judiciary, on H.R. 11315* (June 2 and 4, 1976), at

---

[1] In *Africa Growth*, Angolan officials had taken and were operating plaintiff's real estate properties; the action was "about . . . [o]wnership of real property, and the operation, maintenance and leasing thereof, and generation of revenue." *Africa Growth*, at *5–6. *See also id.* Complaint ¶¶ 69–73, 113–115; Counts V, VI, VII.

In *Allen*, Russia and its agency had expropriated plaintiff's interest in a Russian company, and the agency and its subsidiary operated the company. In addition to expropriation claims, plaintiff asserted claims for unjust enrichment on the basis of defendants "having received and retained, and [their] continu[ing] to receive all profit and economic benefits from the operation" and demanded a share of the profits "stemming from the operation" of the company (Counts XIV and XV). Amended Complaint, *Allen* (No. 05-2007).

In *Garb*, Poland, after World War II ended, had expropriated property of Polish Jews, and "manag[ed], rent[ed], leas[ed], develop[ed], market[ed] and [sold]" the expropriated property. Amended Complaint ¶ 8, *Garb v. Rep. of Poland*, 207 F. Supp. 2d 16 (E.D.N.Y. 2002) (No. 99-cv-3487), Declaration of Susan Bailey ("Bailey Dl.") ¶ 13. Plaintiffs asserted liability for "*trafficking in*, managing, and commercially profiting from the Properties." *Id.* ¶¶ 113, 117 (emphasis added).

37–50, 68–93, the Court emphasized that suits for expropriations, but not for commercial activities, risk "affronting sovereignty" and "touch[ing] on national nerves."

In this sensitive context, Congress cabined claims arising from expropriations with restrictions that would be evaded if the commercial activity exception applied. The expropriation, but not the commercial activity, exception is bounded by international law. The commercial activity exception does not require, unlike expropriation actions against the state, that the expropriated property be present in the United States, or, in an action against an agency, that the agency "is engaged in a commercial activity in the United States," only that acts outside the United States "cause[] a direct effect in the United States."

*OBB Personenverkehr AG v. Sachs,* 136 S.Ct. 390 (2015) requires the same result dictated by *Rong*: that the FSIA exceptions are to be applied according to "the particular conduct that constitutes the gravamen of the suit," "the core of the[] suit," "its foundation," "what the suit turns on"; "[a]ny other approach" would allow the FSIA exceptions' respective "restrictions" to be "evade[d]." *Id.* at 396. Under this test, the Court found the commercial activity exception inapplicable even though its terms were satisfied.

Even were commercial use of the expropriated property necessary to Plaintiff's action (which it is not), this would not make it the gravamen. Sale of the Eurail pass in California was an "essential element" of plaintiff's claim under state law in *Sachs*, but the Court held the gravamen to be the railway's negligence in Austria. *Sachs* requires "more than a myopic focus on whether one element of the claim is based upon a 'commercial activity' … The right approach looks beyond the fact that a single element of the claim might be 'based on' such conduct and instead zeroes in on the core." *Merlin v. Canada*, 926 F.3d 21, 27–28 (1st Cir. 2019).

Just as in *Africa Growth*, at *5, *Allen*, at 189, *Garb*, 440 F.3d at 586–87, and *Sequeira*, at

7

*4, expropriation is the gravamen here. Further, *Sachs*, at 396, stressed that there was "nothing wrongful about the sale of the Eurail pass standing alone." Here, what makes Defendants' conduct allegedly wrongful is the expropriation; there is otherwise "nothing wrongful" about their conduct. *Sachs,* at 397, looked to the "point of contact" producing the injury. *See also Petersen Energia Inversora S.A.U. v. Argentine Rep. and YPF S.A*., 895 F.3d 194, 206 (2d Cir. 2018) ("the [] acts that actually injured"). Here, the expropriation is that point; indeed, Plaintiff demands the value of the property it lost in 1960, plus interest from that date.

### 2.   The Commercial Activity Exception's "Direct Effect" Requirement

#### A.   The Requirement Cannot Be Satisfied Because Plaintiff's Claim Is that of a U.S. Parent for Trafficking in Its Subsidiary's Property

Plaintiff cannot satisfy the commercial activity exception's requirement that the act upon which Plaintiff's action is based "causes a direct effect in the United States" because its claim is for trafficking in its subsidiary's expropriated property.  In *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183 (10th Cir. 2008) (Gorsuch, J.), the Tenth Circuit held that the U.S. parent corporation's substantial "financial injuries" from its British subsidiary's lost investment in China, "while ultimately felt in the United States, are derivative of a financial injury [the subsidiary] suffered in China, and thus are not sufficiently direct." *Id*. at 1191.

In *Carey v. Nat'l Oil Corp.*, 592 F.2d 673 (2d Cir. 1979), the U.S. parent ("NEPCO") of a Bahamian subsidiary ("PETCO") claimed "direct effect" from breach by Libya's National Oil Company ("NOC") of its contracts with PETCO for NOC to supply oil to PETCO outside the United States. The Second Circuit held that, although NOC's breach had an "effect on NEPCO, an American company, that effect can only be deemed indirect, through NEPCO's relations with PETCO," even though Libya's oil embargo, pursuant to which NOC canceled the contracts, "was expressly aimed at affecting the United States." *Id.* at 676–77.

In this Circuit as well, a "direct effect," as required by *Rep. of Argentina v. Weltover, Inc.* 504 U.S. 607 (1992), must have "no intervening element, but, rather, flow[] in a straight line without deviation or interruption." *Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994). As in *Big Sky* and *Carey,* the "intervening element" of a third-country subsidiary, Essosa, owner of the expropriated property, is dispositive.

The Foreign Claims Settlement Commission's 1969 certification, cited by Plaintiff, does not weigh against this conclusion. It was for the "loss of the Cuban assets of . . . Essosa." FCSC Decision at 3, ECF No. 33.1. Charged with determining, *ex parte*, claims against the Government of Cuba for the Secretary of State's possible use in negotiations, 22 U.S.C. § 1643f, the FCSC's mandate extended to claims arising from the loss of property in which claimants held "rights or *interests,*" "directly or *indirectly.*" 22 U.S.C. § 1643b(a) (emphasis added). This included claims by U.S. parent corporations for property losses suffered by their subsidiaries. 22 U.S.C. § 1643d(b). The FCSC certified many such "indirect[]" claims, expressly terming them as such. *See, e.g.*, *Claim of Revlon, Inc.*, Claim No. CU-2698, Decision No. CU-5940, at 2–5 (FCSC Nov. 4, 1970), *available at* justice.gov/fcsc. Although Plaintiff's "indirect" claim fell within the FCSC's statutory mandate, it does not satisfy the FSIA's "direct effect" requirement.[2]

### B.  Financial Harm Does Not Satisfy the Requirement

Even if Plaintiff's suing for trafficking in its subsidiary's property is not dispositive, each of Plaintiff's efforts to satisfy the "direct effect" requirement fails.

Plaintiff asserts financial harm, loss of capital and continued use of the expropriated

---

[2] Contrary to Plaintiff's allegation, the FCSC did not certify, or even mention, a loss involving property owned by the exploration subsidiaries identified in SAC ¶ 24–25, and no such claim was presented to the FCSC. Declaration of Lindsey Frank, Esq. ("Frank Dl.") ¶ 22. Plaintiff's identification of the property at issue in this litigation does not include property of the exploration subsidiaries. SAC ¶¶ 31–32.

property, to satisfy the requirement. SAC ¶ 88. However, the D.C. Circuit held in *Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran,* that the requirement is not satisfied by "financial loss from a foreign tort," 734 F.3d 1175, 1184–86 (D.C. Cir. 2013), there, loss of the "financial . . . rewards" of its intellectual property from use of plaintiff's foreign trade dress. *Id.* at 1184, 1186. *See also Odhiambo v. Rep. of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014). *Bell Helicopter* cited with approval *Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*, 999 F.2d 33 (2d Cir. 1993), which found no "direct effect" from detention abroad of plaintiff's aircraft, its sole asset. *See id.* at 34; *Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*, 948 F.2d 90, 92–93 (2d Cir. 1991).

This action is akin to *Bell Helicopter* and *Antares,* and to the numerous cases applying their construction of "direct effect" to bar claims concerning the plaintiff's foreign-situated property.[3] The cases satisfying the "direct effect" requirement stand in sharp contrast, such as where the defendant causes plaintiff to part with its money in the United States or uses the property abroad at issue to carry out exports to the United States. *See Transamerican S.S. Corp. v. Somali Dem. Rep.*, 767 F.2d 998, 1000, 1004 (D.C. Cir. 1985); *Oceanic Expl. Co. v. ConocoPhillips, Inc.*, No. 05-cv-332, 2006 WL 2711527, at *5 (D.D.C. Sept. 21, 2006).

Similar is *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 348 (D.C. Cir. 2018), where the D.C. Circuit re-affirmed *Bell Helicopter* and *Antares.* It found a "direct effect" because a Brazilian agency had engaged in a scheme "to part [U.S. investors] from [their] money under false pretenses," including by its agents successfully making fraudulent inducements in the U.S. *Id.* at 342, 348. As this Court found, *EIG Energy Fund XIV, L.P. v.*

---

[3] *See, e.g.*, *Allen*, at 174, 177, 189–90 (stock in foreign oil company); *Gulf Res. America v. Rep. of Congo*, 276 F. Supp. 2d 20, 22–24, 27 (D.D.C. 2003), *rev'd and remanded on other grounds*, 370 F.3d 65 (D.C. Cir. 2004) (proceeds from sale of foreign oil); *Soudavar v. Islamic Rep. of Iran*, 67 F. App'x 618, at *1 (D.C. Cir. 2003) (title to property in Iran); *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) (assets in foreign country).

*Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 71–72 (D.D.C. 2017), "the injury to the [plaintiff] Funds occurred at the time [Petrobras] successfully induced them to invest[.]"  The critical elements in *Transamerican, EIG Energy* and their line are absent here.[4]

### C.  CIMEX's Remittance Activities Do Not Satisfy the Requirement

To satisfy the "direct effect" requirement, Plaintiff relies upon the "remittance business" it attributes to "CIMEX," the term it employs to refer to both CIMEX companies collectively. SAC ¶ 3. It is CIMEX (Cuba), not CIMEX (Panama), the majority owner of CIMEX (Cuba), that operates service stations and is engaged in the remittance business. *See* Declaration of Mali Suris Valmaña ("Suris Dl.") ¶¶ 6, 9, 22-23. CIMEX (Panama) does not engage in any U.S.-related business. Suris Dl. ¶¶ 2-4.

Plaintiff alleges that the remittance business "creat[es] demand for remittance services in the United States" and "enable[es] transactions—the export of U.S. dollars—in the United States." SAC ¶ 122.[5] Plaintiff's unstated theory presumably is that there is a "direct effect" because some of the former Essosa parcels of land are the site of gas stations operated by CIMEX, and, at some of those stations, CIMEX also pays out remittances. SAC ¶¶ 115–16.

Only 4–10 of the service stations on land with any connection to Essosa are used for remittances by CIMEX (Cuba). *Id.* ¶¶ 5–6, 12. It pays out remittances there, as well as at far more numerous locations elsewhere, under its contract with the Cuban company Financiera Cimex,

---

[4] *Also contrast Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 103–04, 110–11 (2d Cir. 2016), *cited in EIG Energy* ("marketed [] Notes extensively in the United States," and met investors there) (internal quotations omitted); *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada,* 600 F.3d 661, 664–65 (D.C. Cir. 2010) (foreign actions triggered contractual obligations to perform in the U.S.).

[5] Contrary to Plaintiff' allegations, neither CUPET nor the companies integrated with it has ever had any involvement in the remittance business, or service stations where remittance services were located. *See* Second Declaration of Roberto Suárez Sotolongo ("Suárez Dl.") ¶¶ 5–11.

S.A. ("Fincimex"), which is party to an International Representation Agreement with Western Union ("WU").[6] Neither Cuban company solicits or promotes WU remittances, or has contact with WU's customers. Fincimex is WU's representative in Cuba; contrary to Plaintiff's apparent but unsupported allegation (SAC ¶ 121), WU is not Fincimex's representative in the U.S.; nor does WU have any obligation to Fincimex, whether to generate remittances or otherwise, except to pay Fincimex for services rendered in Cuba. Suris Dl. ¶¶ 5–18.

There are several U.S. remittance providers. Even for WU remittances, service stations operated by CIMEX (Cuba) make up less than fifteen percent (15%) of the over 500 locations where the remittances can be collected, many of which are not operated by CIMEX (Cuba). WU's customer does not specify at which of the over 500 locations the remittance will be collected. The recipient collects the remittance at any location of its choice. *Id*. ¶¶ 12–13, 32, 39.[7]

### 1.   No Legally Significant Acts Take Place in the United States

In analyzing "direct effect," the D.C. Circuit looks to whether "something legally significant actually happened in the United States." *Zedan v. Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988); *see also Bell Helicopter*, 734 F.3d at 1184 (quoting *Zedan*); *Africa Growth*, 2019 WL 3253367 at *6. Using service stations on land once owned by Essosa as remittance locations fails that test. As to liability, Plaintiff's trafficking claim would lie simply for CIMEX

---

[6] Fincimex, majority owned by CIMEX (Cuba), is a *sociedad anónima*, a separate legal entity with its own assets and liabilities, books and records, employees and offices. Suris Dl. ¶ 24, 27; SAC ¶ 84 & n.12. Plaintiff has not alleged any basis for attributing Fincimex's actions related to the WU Agreement to CIMEX (Cuba). Its allegations that CIMEX is to be treated the same as the Cuban State or as an alter-ego of CIMEX (Panama) (themselves inadequate, *infra*) do not justify disregard of Fincimex's separate status.

[7] When the jurisdictional question turns on factual issues, the court looks beyond the Complaint's allegations. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). "Reasonable inferences" in the plaintiff's favor may be made on FSIA issues only when the facts are undisputed. *Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018).

(Cuba)'s "possess[ing], obtain[ing], control[ling]," "manag[ing]," or otherwise "acquir[ing] or hold[ing] an interest" in, the land, Title III, § 4(13); 22 U.S.C. §6023(13), whether or not it provided remittance services there in addition to auto services. As to damages, their measure is unrelated to remittance services: Plaintiff demands the land's value at the time of the 1960 expropriation.

Additionally, when a claim sounds in tort, the D.C. Circuit looks to the "'locus of the tort,'" "'where the last event necessary to make an actor liable for an alleged tort takes place.'" *Nnaka v. Fed. Rep. of Nigeria*, 238 F. Supp. 3d 17, 29 (D.D.C. 2017); *see also Bell Helicopter*, at 1184. Here, the last event took place in Cuba, when CIMEX (Cuba) took possession of the Essosa land. *See Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18-cv-812, 2020 WL 1308357, at *7 (D.D.C. March 19, 2020) (tort's locus where property seized, despite resulting interference with U.S. business relations).

### 2.   The Remittance Activities Do Not Cause an Injury in the United States

CIMEX (Cuba)'s activities do not cause persons in the U.S. to send remittances but, even if they did, that would not satisfy the "direct effect" requirement because sending remittances does not result in any injury in the United States. *See Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*, 784 F.3d 804, 817 (D.C. Cir. 2015), *vacated and remanded on other grounds*, 137 S. Ct. 1312 (2017) (even if foreign commercial act led to contracts with U.S. companies, "no losses, and therefore no 'direct effect,' …in the United States"); *see also Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*, 971 F. Supp. 2d 49, 68 (D.D.C. 2013); *TIFA, Ltd. v. Rep. of Ghana*, No. 88-cv-1513, 1991 WL 179098, at *7 (D.D.C. Aug. 27, 1991) (foreign project involved shipping equipment from U.S., but, "[a]s there is no harm in the United States, there is no direct effect").

### 3.   The Remittance Activities' Alleged "Effects" Are Not "Direct"

"[C]reating demand" for remittances and "enabling" remittances necessarily involve "a host of actors" and "intervening" events that makes them "too attenuated to meet the [*Weltover*] requirement . . . that the effect be 'immediate.'" *Bell Helicopter*, at 1185–86. Persons in the United States must decide to send remittances; they must decide to use WU, not other companies; and the recipients must decide to collect the remittance at one of a handful of locations situated on former Essosa land from among over 500 available WU locations. Suris Dl. ¶¶ 12–13, 32, 39.

*Bell Helicopter* cites *Virtual Countries, Inc. v. Rep. of S. Africa*, 300 F.3d 230, 237 (2d Cir. 2002), where "[a]t a minimum, two independent kinds of actors intervened"—the press had to report on South Africa's press release about plaintiff, and investors in the U.S. had to read and react to those reports. *Id*. Here too, there are at least two intervening, independent actors.

### 4.   The Action Is Not "Based On" the Remittance Activities Assertedly Causing a "Direct Effect"

It is the act upon which Plaintiff's action is "based" that must "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Plaintiff's action is not "based upon" CIMEX (Cuba)'s "remittance business," which is what Plaintiff alleges to cause the "direct effect[]." SAC ¶ 122. This pleading failure is fatal, but, even if overlooked, the action still cannot be considered to be based on acts that "cause[]" the asserted "direct effect." Plaintiff's suit is for *all* trafficking in the former Essosa parcels, not just in those used as remittance locations.

Further, even if use of some parcels as remittance locations satisfies the "direct effect" requirement for trafficking in *those* parcels, it would not satisfy the requirement for trafficking in the other former Essosa parcels. Trafficking is property specific: "any person that . . . traffics in property . . . shall be liable to any United States national who owns the claim to *such property*." Title III, § 302(a)(1)(A); 22 U.S.C. § 6082(a)(1)(A) (emphasis added). A "direct effect" for

trafficking in one parcel cannot satisfy the "direct effect" requirement for a different parcel.

**5. The Claimed "Effect" of Using Some Property for Remittances Is Implausible and Trivial**

The unstated but presumed theory that the remittance services on former Essosa land "creat[e] demand for remittance services in the United States" and "enabl[e] transactions . . . the export of U.S. dollars . . . in the United States," SAC ¶ 122, is implausible, while allegations must be plausible on their face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and any supposed effect would be trivial, but "more than [a] purely trivial" effect is required. *Princz*, 26 F.3d at 1166; *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 167 (D.D.C. 2018), *rev'd*, 926 F.3d 870 (D.C. Cir. 2019). U.S. remittances allegedly total $3.24 billion, SAC ¶ 112; the remittance locations operated by CIMEX (Cuba) on Essosa parcels are only 4–10 of over 500 WU remittance locations; and WU is only one of several U.S. remittance providers. *Supra* at 11–12.

**D. CUPET's Alleged Competition with Plaintiff in the Global Oil Market Does Not Satisfy the Requirement**

Plaintiff's reliance on CUPET's use of the refinery in its alleged "compet[ition] with Plaintiff and other U.S. companies in the global oil market[,]" SAC ¶ 101, fails because Plaintiff's claim is not based on this competition. *See also Allen*, 522 F. Supp. 2d at 189 (shipment of oil into United States by a Russian company is not a "direct effect" because plaintiff's claims not based on the shipments). Further, the allegation is nothing more than a claim of financial harm, which, as shown, is inadequate. *See also Bell Helicopter*, at 1185–86 (financial harm from competition by defendant's use of foreign trade dress for helicopters sold in the world market). The allegation also fails because competition in the global oil market would not be an immediate consequence of CUPET's trafficking; would involve innumerable intervening events and independent decisions by a host of other actors; and is not legally significant to Plaintiff's claim.

15

### E.  A French Bank's Accessing N.Y. Capital Markets to Provide Credit to a Dutch Trader Engaged in Transactions with CUPET Does Not Satisfy the Requirement

Plaintiff recklessly alleges that CUPET "obtain[ed] or attempt[ed] to obtain financing using the New York capital markets" "in support of its trafficking activities," SAC ¶ 102, but the referenced forfeiture action and related proceedings show that a French bank provided credit facilities *to a Dutch commodities trading firm*, not to CUPET, which the Dutch company used to finance *its* purchase of crude oil. The Dutch company had CUPET refine the oil and then sold the refined oil in Cuba. Ex. D & ¶ 14, Bailey D1. There was no charge that CUPET obtained financing from the French bank or U.S. sources. Further, the Dutch firm's use of the French bank did not follow as an immediate consequence of CUPET's trafficking, is not legally significant to the action, and does not cause an injury.

### F.  Alleged Environmental Damage "At or Near the United States-Cuba Maritime Boundary" Does Not Satisfy the Requirement

Plaintiff's charge that CUPET's negligent operation of the refinery caused "polluted waters" to enter Havana Bay and drift to "at or near the United States-Cuba maritime boundary," SAC ¶ 103, fails because the U.S.-Cuba maritime boundary lies well beyond the U.S.'s 12-mile territorial sea, *see* https://perma.cc/M8K7-2Q7V, the end of the "United States" for FSIA purposes. *Amerada Hess*, 488 U.S. at 441. Further, neither negligent operation nor the flow of waters in the open sea is an immediate consequence of CUPET's trafficking, free of intervening events, or legally significant for the action. *See also* Suárez Dl. ¶ 12 (allegation unfounded).

### G.  Congress's Title III "Findings" Do Not Satisfy the Requirement

Plaintiff alleges that all trafficking satisfies the "direct effect" requirement because of Title III's "findings" as to its implications for legislative concerns about property rights, comity of nations, free flow of commerce, foreign policy, return of confiscated property, and protection

against wrongful confiscations. LIBERTAD Act, § 301, 22 U.S.C. § 6021. *See* SAC ¶ 86.  While trafficking may have implications for these legislative concerns, this does not satisfy the "direct effect" requirement of an immediate consequence in the U.S. different than financial injury to U.S. nationals that does not involve intervening events or independent decisions by others.

### B.  The Expropriation Exception

### 1.  Plaintiff Fails to Satisfy the Nexus Requirement for Suits Against States, Applicable Here on Account of Plaintiff's Allegations

The expropriation exception requires, for suits against foreign states, that the expropriated property, or property exchanged for it, be present in the United States, and, for suits against agencies, that the agency "is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

Plaintiff alleges that the Defendants must be treated as one and the same as the Cuban State, presumably to deny them due process limitations on personal jurisdiction (*see infra*). SAC ¶¶ 17–22, 70–85. When the presumption of separate treatment established by *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*) is overcome, the agency "loses its legal identity," *Transamerica Leasing, Inc. v. La Rep. de Venezuela*, 200 F.3d 843, 849, 851 (D.C. Cir. 2000); its "separate juridical boundar[y]" from the state is "erased," *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 606 (D.C. Cir. 2016). The *Bancec* analysis applies to questions of FSIA jurisdiction. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005).

Consequently, as recognized in *Peterson v. Saudi Arabia*, 332 F. Supp. 2d 189, 198 (D.D.C. 2004), *aff'd*, 416 F.3d 83 (D.C. Cir. 2005), if the *Bancec* presumption is overcome, the nexus requirement for suits against the state applies in a suit against an agency. *Peterson* is consistent with *De Letelier v. Rep. of Chile*, where the Second Circuit held that, if an agency's

17

separate status is ignored, that would "mak[e] its property the assets in the United States of a foreign state," protected by the corresponding execution provision. 748 F.2d 790, 793 (2d Cir. 1984); *see also EM Ltd. v. Rep. of Argentina*, 473 F.3d 463, 480 (2d Cir. 2007). The nexus requirement for expropriation actions against a state is therefore applicable here on Plaintiff's own allegations, but concededly is not satisfied.

### 2. Even If Applicable, Plaintiff Fails to Satisfy the Nexus Requirement for Suits Against Agencies

#### A. Plaintiff Alleges Only Past, Discontinued Activity with Respect to CUPET

For CUPET, Plaintiff's nexus allegations are of past, discontinued conduct: that CUPET entered U.S. financial markets, SAC ¶ 102 (ten years prior to suit, Bailey Dl. ¶ 14); operated service stations, SAC ¶¶ 109, 120 (seven years prior to suit, Suárez Dl. ¶ 6); and solicited and/or contracted with U.S. companies, SAC ¶¶ 101, 104 (two years prior to suit, Suárez Dl. ¶¶ 13, 17).

Consequently, these allegations fail. In *Schubarth v. Fed. Rep. of Germany*, 220 F. Supp. 3d 111 (D.D.C. 2016), the court found the nexus requirement's present-tense language ("is engaged . . .") requires "recent or ongoing" activity. *Id.* at 115 (citing cases of ongoing commercial activity); the Circuit endorsed this reasoning. *Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392, 399 n.4 (D.C. Cir. 2018) (reversing on other grounds). *See also Taylor v. Kingdom of Sweden*, No. 18-cv-1133, 2019 WL 3536599, at *5 n.6 (D.D.C. Aug. 2, 2019) (three years too remote); *Sukyas v. Romania*, No. 15-cv-1946, 2017 WL 6550588, at *3 (C.D. Cal. Sept. 21, 2017), *rev'd on other grounds*, 765 F. App'x 179 (9th Cir. 2019) (15 to 20 years too remote).

#### B. Even if Relevant, CUPET'S Alleged Past Activity Would Be Insufficient

Even if relevant, CUPET's alleged past activity would not satisfy the nexus requirement. First, with respect to service stations, SAC ¶¶ 109, 120, a separate company then integrated with CUPET, *Empresa de Servicentros*, operated service stations, and there were neither remittance

18

services nor the sale of U.S.-origin goods there. Suárez Dl. ¶¶ 5–6, 11.

Second, the allegations that CUPET "has attempted to solicit oil exploration partnerships with U.S. companies" and "has solicited and/or contracted with" "oil spill mitigation service companies," SAC ¶¶ 101(e), 104, are unfounded: CUPET has never had a contract with a U.S. company; and has not purchased goods or services from the United States. CUPET has not even engaged in negotiations in the United States. Comercial CUPET S.A., a separate entity integrated with CUPET, but not CUPET, had discussions outside the United States with a U.S. company, for the U.S. company to contract for a potential project in Cuba; the discussions were abandoned in September 2018.  Suárez Dl. ¶¶ 4, 13, 17–18.

Further, commercial discussions would not satisfy the nexus requirement, as they are "merely precursors to commercial transactions," "not themselves commercial transactions." *Zedan*, 849 F.2d at 1513; *see also Odhiambo*, 764 F.3d at 36 ("mere business meetings" not enough for § 1605(a)(2)); *Gerding v. France*, 943 F.2d 521, 527 (4th Cir. 1991). And, as shown *infra* at 20–21, even contracts with a U.S. party, let alone solicitations, would not be sufficient unless there was to be performance by or on behalf of CUPET in the United States.

### C.  CIMEX's Remittance Activities Are Insufficient

Plaintiff's allegation that the "remittance business is a commercial activity that occurs in the United States," SAC ¶ 120, fails at the threshold because it is Fincimex, not CIMEX (Cuba), that contracts with U.S.-based remittance providers. Even if the separation between Fincimex and CIMEX (Cuba) were disregarded, the nexus requirement would not be satisfied: neither carries out any activities in the United States, promotes or solicits remittances in the United States, contracts for services in the United States, has customers in the United States, or has contact with U.S. remittance companies' customers. Suris Dl. ¶¶ 2–11, 13, 15, 17–19, 24–27, 32–35.

19

A contract with a U.S. party, where, as here, there is no accompanying performance or other transaction in the United States by or on behalf of the agency, does not satisfy the nexus requirement. *Idas Res. N.V. v. Empresa Nacional De Diamantes De Angola E.P.*, No. 06-cv-00570, 2006 WL 3060017, at *5–6 (D.D.C. Oct. 26, 2006) (contract with U.S. party not sufficient because the foreign agency never "performed any act within the United States"); *Triple A Int'l, Inc. v. Dem. Rep. Congo*, 721 F.3d 415, 417 (6th Cir. 2013); *Morgan Equip. Co. v. Novokrivorogsky State Ore Min. & Processing Enter.*, 57 F. Supp. 2d 863 (N.D. Cal. 1998). This analysis applies to deny jurisdiction over a foreign bank that receives a funds transfer from a U.S. bank, *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 994 n.18 (10th Cir. 2007), a situation comparable to that here.

Cases satisfying the nexus requirement involve, unlike here, more than an agency's performance abroad under a contract with a U.S. party. The archetypal case involves "go[ing] into the [U.S.] market place[]," *Texas Trading v. Fed. Rep. Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), by buying or selling goods here under a contract with a U.S. party.[8] In contrast, CIMEX (Cuba)'s (and Fincimex's) performance is in Cuba, and neither solicits or promotes the remittances.

Plaintiff's satisfaction *vel non* of the nexus requirement turns entirely on remittances. Contrary to Plaintiff's allegation, SAC ¶¶ 109–10, CIMEX (Cuba) does not purchase goods or services from the United States. Suris Dl. ¶¶ 4, 31.[9] CIMEX (Panama) is not engaged in any U.S.-

---

[8] *See, e.g.*, *Philipp v. Fed. Rep. of Germany*, 248 F. Supp. 3d 59, 74 n.10 (D.D.C. 2017), *aff'd*, 894 F.3d 406 (D.C. Cir. 2018); *Texas Trading*, at 309; *McDonnell Douglas Corp. v. Islamic Rep. of Iran*, 758 F.2d 341, 349 (8th Cir. 1985); *Theo. H. Davies & Co. v. Rep. of Marshall Islands*, 174 F.3d 969, 975 (9th Cir. 1998); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008); *see also* H.R. Rep. No. 94-1487, p. 16 (1976) (providing as example "a contract by a foreign government to buy provisions or equipment in the United States").

[9] The "examples" the Plaintiff gives, SAC ¶ 110, does not even support its allegation, as they only concern U.S.-origin goods, not their purchase by CIMEX from the U.S.

related business. Suris Dl. ¶¶ 2-4.

### 3. Plaintiff Cannot Satisfy the Exception's International Law Requirement

To satisfy the exception's requirement that its action places in issue "rights in property taken in violation of international law," Plaintiff must show that its posited rule of customary international law is established by a "general and consistent practice that states follow out of a sense of legal obligation to the international community," and that the rule was violated. *Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 743 F. App'x 442, 449–50 (D.C. Cir. 2018).

This is an exacting standard. The state practice must be "consistent and settled," *Hamdan v. U.S.*, 696 F.3d 1238, 1250 (D.C. Cir. 2012), "extensive and virtually uniform," "sufficiently widespread and representative, as well as consistent." International Law Commission ("ILC"), Draft Conclusions on Identification of Customary International Law with Commentaries, at 135–36 and n.716, ILC Y.B., Vol. II, Pt. II (2018) ("ILC Conclusions").

### A. The Action Does Not Put in Issue Rights in Property Taken in Violation of International Law Because It Was the Property of Plaintiff's Subsidiary that Was Expropriated

1. The instant action does not put in issue "rights in property taken in violation of international law" because it was Essosa's property that was expropriated. Customary international law, as the International Court of Justice has held, with the D.C. Circuit in accord, recognizes "a firm distinction between the separate entity of the company and that of the shareholder, each with a distinct set of rights. The separation of property rights as between the company and the shareholder is an important manifestation of this distinction." *Barcelona Traction, Light & Power Co. (Belg. v. Spain)*, Judgment, 1970 I.C.J. 3, ¶ 41 (Feb. 5). A shareholder might suffer damage to its "*interests*" as a result of expropriation, but it is *only* the company "whose *rights* have been infringed." *Id.* ¶ 44 (emphasis added). *See also Ahmadou Sadio*

*Diallo (Rep. of Guinea v. Dem. Rep. of the Congo*), Judgment, 2010 I.C.J. 639, ¶ 63 (Nov. 30) (reaffirming *Barcelona Traction*, *id.* ¶¶ 156–57).

The United States recognizes that the ICJ has correctly stated customary international law, acknowledging that, "under customary international law, no claim by or on behalf of a shareholder may be asserted for loss or damage suffered directly by a corporation in which that shareholder holds shares." *GAMI Invs., Inc. v. Mexico*, UNCITRAL, Submission of the United States of America, ¶ 9 (June 30, 2003), *available at* https://perma.cc/G32L-MY4W.  *See also Methanex Corp. v. U.S.A.*, UNCITRAL, Resp't's Memorial on Jurisdiction and Admissibility, 5 (Aug. 5, 2005), *available at* https://perma.cc/3KJG-98B4; *Helmerich*, 743 F. App'x 442, 2018 WL 2981075, U.S. Supplemental Brief as Amicus Curiae, at 2–3 (June 13, 2018) ("U.S. *Helmerich* Amicus") (States owe no "responsibility towards the shareholders" for financial losses they sustain as a result of state acts "directed against and infringing only the company's rights").

Citing *Barcelona Traction* and the U.S. position, the D.C. Circuit has held that "an act directed against and infringing only [a] company's rights does not involve responsibility towards the shareholders, even if their interests are affected," *Helmerich*, 743 F. App'x at 454. *See also Allen*, 522 F. Supp. 2d at 187; *Amorrortu v. Rep. of Peru*, 570 F. Supp. 916, 924 (S.D. Tex. 2008).

The exceptions are limited to when the company owned by the shareholders "has ceased to exist" or "has lost its capacity to take corporate action."  *Barcelona Traction* at ¶ 66. It must have "ceased to exist in the State of Incorporation and not in the State in which the company was injured." ILC, Draft Articles on Diplomatic Protection with Commentaries, at Art. 11, cmt. 6 at 61 (2006) ("ILC Diplomatic Protection"), ILC Y.B., Vol. II, Pt. II (2006).

Even "a precarious financial situation cannot be equated with the demise of the corporate entity . . . the company's status in law is alone relevant, and not its economic condition."

*Barcelona Traction,* at ¶ 66. When the company does not have the nationality of the expropriating

state, as here, "only in the event of the legal demise of the company are the shareholders deprived

of the possibility of a remedy available through the company; it is only if they became deprived of

all such possibility that an independent right of action for them and their government could arise."

*Id.  See also Agrotexim et al. v. Greece*, 330 Eur. Ct. H.R. (ser. A) at ¶ 68 (1995); U.K. Foreign

and Commonwealth Office, *Rules Applying to International Claims*, 37 INT'L & COMP. L.Q.

1006, 1007 (Oct. 1988).

  The exceptions are inapplicable here. Essosa, a third-country company, never went out of

legal existence and never lost its capacity for independent action. It has continued in legal

existence and active business outside of Cuba without interruption, for over five decades under

Plaintiff's ownership and then under the ownership of the company to which Plaintiff sold its

shares. *See* Frank Dl. ¶¶ 2–19, and *infra* at 24.

  2. Shareholders have narrowly circumscribed "direct rights," including "the right to

any declared dividend, the right to attend and vote at general meetings, [and] the right to share in

the residual assets of the company on liquidation." *Barcelona Traction*, at ¶¶ 36, 47; *Helmerich*,

743 F. App'x at 454. In *Helmerich*, the Circuit agreed with the United States that, in addition to

these identified "direct rights," customary international law provides that foreign shareholders'

"direct rights" are taken when a state takes over the "entire enterprise," thereby depriving

shareholders of management and control of the business, "completely destroying the beneficial

and productive value of the shareholders' ownership of their company, leaving the shareholders

with shares that have been rendered useless." U.S. *Helmerich* Amicus, at 8–9, *cited in Helmerich,*

743 F. App'x at 454. Where "expropriation of a corporation's property … does not result in the

expropriation of the entire enterprise," however, there is not an "expropriation of foreign

shareholders' direct rights under customary international law, even if it reduces the value of the shares to zero." U.S. *Helmerich* Amicus, at 10.

Plaintiff does not allege any taking of the shareholders' "direct rights" jointly identified in *Barcelona Traction* and *Helmerich*, and does not allege that Essosa's "entire business" was taken. It thus fails to put in issue "direct rights."

Further, Defendants have shown that no such allegations may be made. Essosa, as Plaintiff acknowledges, operated throughout the Caribbean (SAC ¶ 24). Formed in Panama (SAC ¶ 24), it continued both in legal existence and operation without interruption. As before 1960, the company owned and operated gas service stations in Panama after the expropriation and has continued in that business until today. Both before and after the expropriation, Essosa owned and maintained in Panama, and also at least in Jamaica, the valuable ESSO OVAL trademark, which it used itself in Panama and Jamaica, and also licensed to others. Plaintiff continued to hold its shares in the company until it sold them in 2012, and to exercise its rights as shareholder. Post-expropriation, there have been regular, at least annual, shareholders and board of directors meetings for six decades, with Plaintiff exercising its right to appoint the directors before selling its shares. Essosa pursued litigation in the United States after 1960. Frank Dl. ¶¶ 2–19.[10]

In *Helmerich*, the Circuit refused to dismiss the action because the allegations, stipulated to by Venezuela, made out a taking of "direct rights:" that Venezuela had taken the Venezuelan

---

[10] Although Essosa's assets and operations in Panama preclude any allegation that the "entire enterprise" was taken, it may also be noted that Essosa had assets and operations in 32 countries, with a value of $68 million outside of Cuba. On June 30, 1960, Essosa, with Plaintiff's authorization, executed an agreement to assign its assets in 25 of the 32 countries to another subsidiary ("Essosa Ltd.") that Standard Oil had created in the Bahamas three days earlier. On July 14, 1960, Esso Ltd. issued its stock to Essosa in consideration, which Essosa then endorsed to Standard Oil without any consideration. This assignment could not be, and was not, completed and effectuated with respect to at least Panama, as Panama law prohibited retail fuel sales by non-Panamanian corporations. *See* Frank Dl. ¶¶ 6–10, 20–21.

subsidiary's "entire business," "strip[ping it] of all its productive assets," "no longer possess[ing] any significant tangible property or maintain[ing] any commercial operations in Venezuela [the only country in which it operated]." *Id.* at 455, 445. Dispositively, Plaintiff makes no such allegations. Further, none are possible.

> ### B. Plaintiff Cannot Satisfy the Violation of International Law Requirement Because the Expropriation Was for Essosa's Refusal to Refine the Cuban State's Oil in Violation of Cuban Law, and Because Essosa's Refusal Was at the United States' Request Pursuant to Its Plan to Overthrow the Cuban Government

Plaintiff additionally cannot show a violation of international law because of the circumstances of the Essosa expropriation. The Cuban measures to come before U.S. courts have not presented these or comparable circumstances.

Plaintiff alleges that, "[o]n July 1, 1960, Essosa's property rights were expropriated . . . pursuant to" Cuban resolution, SAC ¶ 28, and that the expropriation violated international law because of Cuba's failure to pay compensation. SAC ¶ 33. The resolution expressly decreed the expropriation for Essosa's refusal to refine the State's crude oil in violation of the Law of Combustible Minerals of May 9, 1938, which provided that "Petroleum refineries already existing or to be established in the Republic must comply with the following provisions: III.---Its facilities shall be obliged to refine petroleum belonging to the State . . . at a price that does not exceed the cost of the operation, plus a reasonable industrial profit." Defendants' Historical Appendix A ¶ 1.

Declassified State Department and CIA documents and Plaintiff's own testimony elsewhere, detailed and provided in Historical Appendix A ("HA-A"), show that less than four months before the expropriation, President Eisenhower approved, on March 17, 1960, the CIA plan to overthrow the Cuban Government by armed force that culminated in the Bay of Pigs invasion in April 1961 by over 1,500 armed forces. To further this plan, President Eisenhower asked Standard Oil and Texaco, and had the UK Prime Minister ask Shell, to have their

25

subsidiaries refuse to refine crude oil Cuba purchased from the Soviet Union. Cuba was dependent on the three refineries for virtually all of its oil supply. *Id.* ¶¶ 4–13, 16–21, 24, 27–28.

Essosa had intended to refine the oil.  However, even though it understood its refusal would lead to expropriation, Standard Oil, as "good citizens" of the United States, acquiesced in President Eisenhower's request. The other two companies also obliged.  *Id.* at ¶¶ 5–6, 13, 27.

When the three refineries refused to refine the oil, Cuba, as the United States knew, had less than four days' supply left. Standard Oil, Texaco and Shell, which dominated all oil supply in the Caribbean, had ended shipments, and Cuba's efforts to develop other Western sources had failed. *Id.* ¶¶ 4–6, 11, 16, 27, 31. As part of its effort, the Administration also covertly attempted, through key industry players and friendly governments, to have the world tanker industry withhold the tankers needed to transport Soviet oil to Cuba. The CIA planned and carried out sabotage against the refineries. *Id.* ¶¶ 22–24, 31–37.

### 1.  The Expropriation Was for Violation of Cuban Law

Plaintiff cannot show a violation of customary international law, as it permits forfeiture for violations of law, here, Cuba's Law of Combustible Minerals of 1938. JAMES CRAWFORD, BROWNLIE'S PRINCIPLES OF PUBLIC INTERNATIONAL LAW 624 (8th ed. 2012) (no compensation required where taking is "exercise of police powers" or "penalty for crimes"); *see also* Jorge Viñuales, *Customary Law in Investment Regulation*, 23 ITALIAN Y.B. INT'L L. 23, 33–34 (2013) (police powers permit taking without compensation); B.A. WORTLEY, EXPROPRIATION IN PUBLIC INTERNATIONAL LAW 42 (1959) (police power permits seizure without compensation for violation of law); GILLIAN WHITE, NATIONALISATION OF FOREIGN PROPERTY 41–42 (1961) (same); *Tecmed v. Mexico*, ICSID Case No. AF/00/2, Award, ¶ 119 (29 May 2003) ("undisputable" that the state's exercise of its police power may cause economic damage to those subject to its powers without

entitling them to any compensation).

This settled principle is supported by and reflected in state practice, including forfeitures, as here, for violations of national security, foreign relations or economic emergency regulations. A prime example is the United States' Trading with the Enemy Act of 1917 ("TWEA"), which authorized the President, upon declaring a "national emergency" concerning the U.S.'s national security, foreign relations or economy, to impose sweeping prohibitions, including against the use of property by persons acting "for the benefit or on behalf of" a designated foreign government.[11] TWEA provided that "any property that is the subject of a violation" of TWEA regulations "shall . . . be forfeited to the United States Government." Ch. 106, § 16(2), 40 Stat. 411 (1917), *as amended*, Pub. L. 73-1, 48 Stat. 1 (1933) (making TWEA applicable to peacetime emergencies). TWEA continues in effect with respect to Cuba and others.  Pub. L. 95-223, § 101(b), 91 Stat. 1625 (1977). Numerous other States likewise have provided for forfeiture for violation of regulations to protect vital national interests.[12]

---

[11] For history of TWEA, *see Regan v. Wald,* 468 U.S. 222, 225–29 (1984); *Emergency Controls on International Economic Transactions: Hearings Before the Subcomm. on International Economic Policy & Trade of the House Comm. on International Relations*, 95th Cong., 1st Sess. 4–8, 16–19, 35–39 (1977) (reviewing TWEA declarations concerning the Great Depression, Egyptian nationalizations in 1956, balance of payments deficits in 1968 and 1971, and threats to economy in 1972 and 1976, as well as for foreign policy and national security reasons). The Cuban TWEA regulations, 31 C.F.R. §§ 515.201(b), 515.302, 515.306, prohibit the exercise of rights with respect to property "for or on behalf of" Cuba by persons, or with respect to property, subject to U.S. jurisdiction.

[12] *See, e.g.*, Criminal Justice (Terrorism and Conspiracy) Act of 1998, ch. 40, § 4 (U.K.); Northern Ireland (Emergency Provisions) Act, 1973, 21 & 22, ch. 53, §§ 11(3), 19(2) (U.K.); Act No. 12 of 1995 as amended, § 94.1 (articles involved in espionage) (Australia); Criminal Code of Canada, R.S.C., c. C-46, § 83.14 (1985) (property owned by or used for a terrorist group).

State practice does not limit forfeiture to emergency measures. *See, e.g.*, 19 U.S.C. §§ 1581 *et seq.* (forfeiture of vessels for customs violations); *United States  v. Ayo-Gonzales*, 536 F.2d 652 (5th Cir. 1976) (forfeiture of foreign vessels for fishing in territorial waters); Criminal Code of Canada, R.S.C., c. C-46, § 490.2 (1985) (forfeiture of "offence-related property" for corruption of foreign public officials); Criminal Justice Act of 1988, ch. 33, § 69 (U.K.); Single

State practice affirming the right to impose forfeiture for violations of law has a long

pedigree that includes Blackstone and the United States' earliest legislation. *See* 1 Sir William

Blackstone, Commentaries on the Laws of England 259 (Thomas McIntyre Cooley &

James De Witt Andrews eds., 4th ed. 1899); Act of July 31, 1789, ch. 5, §§ 12, 36, 1 Stat. 29, 39,

47 (customs violations).  International tribunals and diplomatic practice have repeatedly

recognized this sovereign right,[13] which the Republic of Cuba exercised here.

### 2. Essosa's Refusal to Refine the Cuban State's Oil Posed a Grave External Threat

Separately and in combination with the above, Plaintiff cannot show a violation of

customary international law because of the grave external threat faced by Cuba. Settled customary

international law allows taking, without compensation, the property of a foreign national when its

control or use of the property threatens the state's peace, security, or public order. As explained in

Crawford, Brownlie's Principles, at 624, "measures of defence against external threats" are

---

Convention on Narcotic Drugs, 1961, art. 37, Mar. 30, 1961, 18 U.S.T. 1407, 520 U.N.T.S. 151
(entered into force Dec. 13, 1964) (forfeiture of property used in drug offenses).

[13] *See., e.g.*, *Pelletier's Case*, *in* John Bassett Moore, History And Digest Of The
International Arbitrations To Which The United States Has Been A Party Vol. II  at
1749 (1898) (recognition by United States that Haiti was justified in confiscating, for violation of
law, the ship of a U.S. slaver); *Mary Lowell Case*, *in id.*, Vol. III at 2772–75 (upholding
confiscation by Spain of arms being imported for unlawful purpose); *Robert Wilson Case*, *in id.*,
Vol. IV at 3373–74 (upholding confiscation by Mexico of U.S. citizen's property for
counterfeiting national currency); *Maria Luz*, *in* Marjorie Whiteman, Damages In
International Law 1012 (1962) (upholding confiscation by Japan of Peruvian ship based on
violation of indentured servitude and human trafficking law); *Sedco, Inc. v. Nat'l Iranian Oil Co.*,
9 Iran-U.S. C.T.R. 248, 275 (1985) (recognizing lawfulness of forfeiture for violations); *see also*
*Bischoff Case* (1903), *in* 10 R.I.A.A 420 (1960) (confiscation of carriage lawful because "there
can be no liability for the reasonable exercise of police power"). The European Court of Human
Rights has upheld confiscation, without compensation, of property used in violations of local law
against international law challenges. *See, e.g.*, *Gogitidze et al. v. Georgia*, App. No. 6862/05, Eur.
Ct. H.R. (12 May 2015), *available at* https://perma.cc/DN4G-YC62; *Raimondo v. Italy*, 281 Eur.
Ct. H.R. (ser. A) (1994).

among the exceptions to the requirement of compensation for taking foreign nationals' property.[14] State practice, including forfeiture for violation of national security, foreign policy or economic emergency regulations discussed above, conclusively demonstrates this.

"States [] apply most of the rules governing a war *stricto sensu* to 'non-war' hostilities." J.G. STARKE, AN INTRODUCTION TO INTERNATIONAL LAW 351 (4th ed., 1958).[15] "Traditionally compensation has not been required for loss sustained through . . . exercise of the war power to take … enemy property." DEP'T OF JUSTICE, ACQUISITION OF PROPERTY FOR WAR PURPOSES 81 (1944). The United States has exercised this power to eliminate the threatening influence of enemy-controlled and influenced businesses.  REPORT OF THE OFFICE OF ALIEN PROPERTY 1–2 (1951); *see also* Martin Domke, *Western Hemisphere Control Over Enemy Property: A Comparative Survey*, 11 L. & CONTEMP. PROBS. 1, 14 (1945). The first property taken during W.W. I was a German company's U.S. subsidiary for delaying the delivery of military supplies "on the advice of the German ambassador." Rex M. Potterf, *Treatment of Alien Enemy Property*

---

[14] *See also, e.g.*, DEREK BOWETT, SELF DEFENSE IN INTERNATIONAL LAW 174 (2009); ANTONIO CASSESE, INTERNATIONAL LAW 257 (2d Ed., 2005); BURLEIGH CUSHING RODICK, THE DOCTRINE OF NECESSITY IN PUBLIC INTERNATIONAL LAW 98 (1958); BIN CHENG, GENERAL PRINCIPLES OF LAW AS APPLIED BY INTERNATIONAL COURTS AND TRIBUNALS 30–31 (1953).

[15] *See also, e.g.*, IAN BROWNLIE, INTERNATIONAL LAW AND THE USE OF FORCE BY STATES 26–28 (1963) (laws of war may apply despite lack of formal state of war, in cases of lesser hostilities); EDWARD RE, FOREIGN CONFISCATIONS 12 (1951) (state has "inherent power" "to act in a manner so as to protect and secure the life, health, safety and morals of its citizens, even though the effect of such regulation may be to impair one's rights in property or even its total destruction"); *Mary Lowell Case* (upholding confiscation by Spain of cargo that included arms for use by insurgents in Cuba, despite absence of "war in the international sense"); *Wiener's Case*, JOHN BASSETT MOORE, MOORE'S DIGEST OF INTERNATIONAL LAW, VOL. IV at 82–87 (1906) (United States conceded it was lawful to confiscate U.S. national's business assets because he used his business to counterfeit Haitian currency in order to finance rebels in Jamaica intent on overthrowing the Haitian government). *cf.* U.S.-Mexico Claims Commission, *E. R. Kelley v. United Mexican States*, IV R.I.A.A. 608 (1930) (armed incursion by U.S. troops at Vera Cruz was found to justify Mexico's elimination of U.S. influence from the rail system without compensation).

*in War Time and After by the United States*, 2(6) INDIANA L.J. 453, 467 (1927).

Under the W.W. II Executive Order, property subject to uncompensated vesting included property owned by any business, including U.S. and neutral third-country corporations, "controlled by or acting for or on behalf of (including cloaks for) a designated enemy country or [] person[.]" E.O. 9193, (July 9, 1942). Seizures were made and upheld based on recognition that the "controlling influence" of enemy governments "may spring as readily from advice constantly sought as from command arbitrarily imposed." *AG&E Co. v. SEC*, 134 F.2d 633, 642 (D.C. Cir. 1943). *See also* Joseph W. Bishop, Jr., *Judicial Construction of the Trading with the Enemy Act*, 62 HARV. L. REV. 721, 743 (1949). In the International Court of Justice, the United States maintained that these wartime seizures, and post-war refusal to return the shares of seized companies, were lawful under customary international law. *Interhandel Case (Switzerland v. U.S.)*, 1959 I.C.J. 6 (Mar. 21); *id.* at Ex. 23. *See also* K.R. Simmonds, *The* Interhandel *Case*, 10 INT'L & COMP. L. Q. 3, 495, 496 (1961). (The ICJ did not reach the merits of the controversy.) After the war, Congress prohibited return of property or compensation to former owners when it was not in the "national interest," 60 STAT. 50, 50 U.S.C. App. § 32(a)(5) (1946).[16]

The practice of other States has paralleled that of the United States. *See, e.g.*, TWEA, §§ 1(1)–2, 7, 2 & 3 Geo. 6, Ch. 89 (Sep. 5, 1939)*, amended* (1943) (Eng.); Regulations Respecting Trading with the Enemy, §§ 21–23, 62–63, Order in Council P.C. 3959 (Aug. 21, 1940) (Can.); TWEA, No. 14 of 1939, § 5, *amended* (Sept. 9, 1939) (Aust.); *Final Act of the*

---

[16] *Return of Property Seized During World War II: Judicial and Administrative Proceedings Under the Trading with the Enemy Act*, 62 YALE L.J. 1210 (1953) (hereafter *Return of Property Seized*); Statement of Kenneth S. Carlson, RETURN OF CONFISCATED PROPERTY, HEARINGS BEFORE A SUBCOMMITTEE OF THE COMMITTEE ON THE JUDICIARY, 84th Cong., Sess. 1 & 2, on S. 854, *et al.* to Amend the TWEA 381 (Nov. 29 & 30, 1955).

*Inter-American Conference on Systems of Economic and Financial Control*, Washington, D.C., July 10, 1942, § VII, Art. 1(a); F. V. GARCÍA AMADOR ET AL., RECENT CODIFICATION OF THE LAW OF STATE RESPONSIBILITY FOR INJURIES TO ALIENS 56 (1974) (European practice).[17]

### C. Even Apart from the Circumstances of the Essosa Expropriation, Cuba was Not Under Any Obligation to Provide Compensation

Even apart from the circumstances of the Essosa expropriation, Cuba was not under any obligation to provide compensation. The Supreme Court's assessment of the state of customary international law in 1960 precludes Plaintiff from meeting its burden to establish that such an obligation for nationalizations was imposed by a "general and consistent practice that states follow out of a sense of legal obligation to the international community," *Helmerich*, 743 F. App'x at 449–50.

In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428–30 (1964), the Court, surveying state practice and opinion, found that "[t]here are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens . . . . Th[is] disagreement . . . reflects an even more basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system." *See also Banco Nacional de*

---

[17] The 1942 Conference of American States urged measures to eliminate the threat posed by Axis influence over corporations within their borders. Implementing legislation included uncompensated takings. *See*, *e.g.*, Guatemala (Liechtenstein Memorial, Annex 14 at 136, *Nottebohm Case (Liechtenstein v. Guatemala)*, 1955 I.C.J. 4 (April 6); Leg. Decree 630 of 25 May 1949, Art. 8); Haiti (Department of State, *Foreign Relations of the United States, Vol. IX, The American Republics* (1969), Doc. No. 223); MAX PAUL FRIEDMAN, NAZIS AND GOOD NEIGHBORS: THE UNITED STATES CAMPAIGN AGAINST THE GERMANS OF LATIN AMERICA IN WORLD WAR II (2005); Mitchell Carroll, *Legislation on Treatment of Enemy Property*, 37 AM. J. INT'L L. 4, 611, 613 (1943).

*Cuba v. Sabbatino*, 307 F.2d 845, 864 (2d Cir. 1962) ("Many countries have acted upon the principle that, in order to carry out desired economic and social reforms of vast magnitude, they must have the right to seize private property without providing compensation").

Any argument that there nonetheless was a contemporaneous rule of customary international law requiring compensation invites "stumbl[ing]" into the "pitfall" of identifying as "a fundamental principle of international law some principle which in truth is only an aspect of the public policy of our own nation," *Sabbatino*, 307 F.2d at 861, or which reflects only the views and interests of "capital exporting" nations or those "that adhere to a free enterprise system." *Sabbatino*, 376 U.S. at 434–35. There can be no serious contention that a compensation requirement was contemporaneously supported by "a settled practice," "both extensive and virtually uniform," "widespread . . . as well as consistent," and "representative [of] the various interests at stake and/or the various geographical regions." ILC Conclusions at 136 and n.716.

In *Sabbatino*, the Second Circuit found international law too inconclusive to rest its decision on an obligation of compensation; two decades later, it concluded, albeit arguably in *dictum*, that customary international law had imposed this obligation. *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 887–93 (2d Cir. 1981). Its later conclusion does not withstand scrutiny. The court did not cite to evidence of a "general and consistent" state practice followed out of a sense of legal obligation, or purport to apply that standard, contrary to *Helmerich*, 743 F. App'x at 449. It simply found that "the prevalent view" would require compensation, a standard that does not focus upon state practice and falls far short of the required breadth of acceptance by states. Even the court's assertion as to the "prevalent view" was unsupported.[18]

_____

[18] In *Sabbatino*, the Second Circuit was willing to go only so far as to find that a discriminatory

**D.  Assuming *Arguendo* an Obligation of Compensation, Plaintiff Cannot Show that Cuba Failed to Satisfy Its Obligations**

Essosa's property was subject to Law No. 851 of July 6, 1960. HA-A ¶¶ 30, 51. Its compensation provisions, if accepted by the United States, would have provided substantial compensation, and were well within the range of state practice. For each of these reasons, Plaintiff cannot show Cuba's violation of its obligations, even assuming there was an obligation of compensation, whether in the circumstances particular to the Essosa expropriation or apart from them. Plaintiff would need to demonstrate that customary international law required prompt and full compensation in all circumstances, but this was not the case, as shown above and as recognized in *Chase*, 658 F.2d at 892.

**1.  Law No. 851 Would Have Provided Substantial Compensation and Its Provisions Were Well Within the Range of State Practice**

Law No. 851 provided that "payment for the expropriated property shall be made, after the due appraisal thereof" in bonds with "at least" 2% annual interest, to be "amortized in a period of not less than thirty (30) years." A sinking fund would be established "for the amortization of said bonds, and by way of security therefor." The Second Circuit found it "unclear whether the bonds would be paid at maturity if the fund were insufficient to cover payment." *Sabbatino*, 307 F.2d at 862.

On July 6, 1960, President Eisenhower exercised newly-granted statutory authority to reduce or eliminate Cuba's annual participation in global sugar imports by reducing Cuba's quota for 1960 to essentially what had already been imported.  HA-A ¶ 29.  Law No. 851 provided that

---

and retaliatory taking without compensation violated international law. *Id*. at 862–68. The Supreme Court reversed on the basis of the Act of State doctrine. Plaintiff only alleges failure to pay compensation, SAC ¶ 33; it makes no allegation that the expropriation was discriminatory or retaliatory, apparently recognizing that the allegation would be baseless: Cuba expropriated all three of Cuba's refineries for violation of Cuban law, and one was British-owned.

the sinking fund would be funded from resumed, annual sugar sales to the United States above a certain volume and price. Interest would be paid only out of the sinking fund; if the fund was insufficient for any year, the interest obligation for that year would be extinguished.

1.      Even assuming that payment of the bonds on maturity depended on the sinking fund, Law No. 851 would have provided substantial compensation. Had the United States restored Cuban sugar sales, the fund would have reached approximately $1,533,000,000 by 1990 (less interest payments), assuming the same Cuban share of U.S. global sugar imports as in 1959 and investment in one-year U.S. Baa corporate bonds. *See* Declarations of Ofelia Perera Ibañez and Gary Phillips. In 1962, the Second Circuit found that the volume and price levels set by Law No. 851 for the sinking fund made its commitment to compensation "illusory," *Sabbatino*, 307 F.2d at 862, but the subsequent empirical evidence shows that it was wrong.

The conservative estimate of $1.533 billion would have come close to the $1.851 billion value certified by the FCSC (https://www.justice.gov/fcsc); further, the FCSC's figure was grossly inflated. In *Chase*, at 893, the Second Circuit found that the FCSC's methodology had been fundamentally flawed, and its valuation substantially overstated, because the FCSC used 1955–59 values and performance, ignoring the profound post-1959 changes resulting in deteriorating values and prospects.  The FCSC consistently based its decisions on appraisals that valued property according to pre-1960 performance and values. *See* Parajon Appraisal in *Claim of Francisco Sugar Company*, CU-2500 (1971) (Declaration of Michael Krinsky, Esq., ¶ 3); the FCSC cited Parajon in over 700 decisions. Bailey Dl. ¶ 2. Moreover, many of the certified claims had no basis in international law at all (*e.g.*, losses resulting from foreign exchange controls).  The FCSC awarded simple interest (at 6%), but, as shown *infra*, there was insufficient state practice to require the payment of interest as a norm of customary international law.

2.    Law No. 851's terms easily fit within the range of contemporaneous state practice, as shown by Lillich and Weston's study of 139 bilateral, "lump sum" settlement agreements, the paramount post-War state practice, that involved 38 states, in the 1946–1975 period. INTERNATIONAL CLAIMS: THEIR SETTLEMENT BY LUMP SUM AGREEMENTS, PART I: THE COMMENTARY (1975). (Under these agreements, the respondent State provided a lump sum to the claimant state, which released it and its nationals' claims.)

(a)    Law No. 851 contemplated 30-year bonds. The median from taking to agreement was 15 years, with 18 settlements at 20–25 years, and 8 longer. The median from taking to end of payments was 20 years, and longer than 30 years in many instances. *Id*. at 211–12.

(b)    Law No. 851 provided for interest. None of the 139 settlements but one (at 1%) provided interest. *Id*. at 239.

(c)    Law No. 851 did not unambiguously condition compensation on sugar exports to the United States, but, in any event, trade agreements, "generally the respondent State's principal source of foreign exchange to meet compensation payments," were "common," and "frequently regarded by respondent States as the *sine qua non*," *id*. 233–34. Provisions that compensation was to be funded exclusively from exports to the claimant state "also [were] common," and some restricted compensation to these export earnings in excess of a fixed sum.  *Id*. at 234–35.

(d)    The sinking fund would have provided more than the typically "partial" compensation for the value of the property taken. *Id*. at 218.

Further, Law No. 851's terms must be viewed in the context of Cuba's financial capacity, which, as Cuba repeatedly informed the State Department, was extremely limited. Historical Appendix B ("HA-B") ¶¶ 5, 8–9, 13, 16, 22. Recognizing this, the State Department concluded that only *return* of most of the nationalized property would leave Cuba in a position to provide

what the U.S. considered to be adequate compensation for the remaining property. *Id.* ¶¶ 1–4, 15. As noted in *Sabbatino*, the contemporaneous position of the "capital-importing" states was that the obligation of compensation, if any, must yield to or be calibrated according to financial capacity, in order to preserve the recognized sovereign right of nationalization, not *vice versa*. The "appropriate" compensation standard discerned in *Chase* also takes financial capacity into account. The State Department plans that did not include the return of nationalized property envisioned compensation from sugar sales to the United States, which is what Law No.851 provided, but which the United States cut off. *Id.* ¶¶ 11–12, 19–20.

### 2. The United States Decided Against Negotiations in Favor of Dealing with the "Successor" Government to Follow from the Bay of Pigs Invasion

In September 1960, the State Department decided against negotiations over compensation, concluding that "our best bet is to wait for a successor regime." The Assistant Secretary of State for Inter-American Affairs set out the approach that the State Department would incorporate in its plan, finalized just before the Bay of Pigs, for the "successor regime:" "return of the industrial properties to their owners and for at least the return of a part of the sugar and cattle properties," and "adequate compensation" for the properties which remain expropriated. HA-B ¶¶ 1–4.

In June 1963, the State Department noted that "Castro has indicated a willingness to negotiate concessions for expropriated properties, though his opening position is a rather onerous one, involving the use of Cuban receipts from the sale of sugar to the United States," and that "it may be presumed that Cuba might agree to . . . [n]egotiate agreement for some compensation for seized properties, presumably tied to the level of earnings from sale of sugar to the United States." The State Department decided, however, not to negotiate.  HA-B ¶¶ 24–27. Cuba had repeatedly offered to negotiate compensation.  *Id.* ¶¶ 17–18, 21, 24, 26.

The United States' decision not to negotiate but seek terms from the "successor regime,"

36

and its subsequent decision not to negotiate when the "successor regime" did not materialize, precludes Plaintiff from showing a violation of international law.  "[T]he obligation to negotiate . . . underlies all international relations." *North Sea Continental Shelf (F.R.G. v. Den. & Neth.)*, 1969 I.C.J. 3, ¶¶ 85–86 (Feb. 20).  It "flows from the very nature of the respective rights of the Parties" when those rights must be defined in relation to each other. *Fisheries Jurisdiction Case (U.K. & N. Ireland v. Iceland)*, 1974 I.C.J. 3, ¶¶ 73–75 (July 25); Martin A. Rogoff, *On the Obligation to Negotiate in International Law: Rules & Realities*, 16 MICH. J. INT'L L. 141 (1994). Such is the case here: providing compensation on terms more favorable to the United States would mean on terms less favorable to Cuba.

Further, obligations, such as an assumed obligation of compensation, that "are, by definition, general [] have to be transformed into specific obligations through a process of consultation and negotiation," *Case Concerning Gabčíkovo-Nagymaros Project (Hung. v. Slov.)*, 1997 I.C.J. Rep. 7, ¶ 112 (Sept. 25); that did not happen here because of the U.S. decision not to negotiate. Even "[t]he standard of 'appropriate' compensation or its near-equivalents 'just' and 'equitable' compensation leaves considerable latitude to the parties in negotiation[.]" OSCAR SCHACHTER, INTERNATIONAL LAW IN THEORY AND PRACTICE 324 (1991). "[T]his [duty to negotiate] may be regarded as a general duty . . . . But, the rule also has specific authority in the sphere of investment disputes." M. SORNARAJAH, THE SETTLEMENT OF FOREIGN INVESTMENT DISPUTES 126 (2000); *see also* SCHACHTER, at 213. The widespread, consistent and settled state practice of resolving nationalization disputes through negotiations (absent a treaty) shown by Lillich and Weston reflects and supports this obligation to negotiate.

Only Cuba's "virtual rejection of" the prospect of compensation, Derek Bowett, *State Contracts with Aliens: Contemporary Developments on Compensation for Termination or*

*Breach*, 59 B<small>RIT.</small> Y.B. I<small>NT'L</small> L. 49, 70 (1988), may have relieved the United States of its

obligation to negotiate.[19]  However,  this was not the case, as the United States understood.

### E.  The Expropriation Was a Permissible Countermeasure

Even if the taking of Essosa property and 25 other U.S.-related holdings under Resolution

No. 1, pursuant to Law No. 851, HA-A ¶¶ 30, 51, was otherwise to be considered a violation of

international law, it would be a permissible countermeasure. The declassified State Department

documents establish that the decision to bar Cuban sugar was part of the U.S. effort to overthrow

the Cuban Government through a combination of armed force and "economic pressures."  HA-A

¶ 8. For "economic pressure," barring Cuban sugar was "the only weapon we had against Cuba,"

"the one real weapon we have against Cuba," a "straight political weapon."  Cuba's extreme

dependence on sugar exports to the United States was well-understood.  *See* HA-A ¶¶ 10, 14, 15,

23, 26, 29.

The elimination of sugar imports as part of the plan to overthrow the Cuban Government

violated Articles 15 and 16 of the Charter of the Organization of American States, 2 U.S.T. 2394,

T.I.A.S. 2361, 119 U.N.T.S. 3 (April 10, 1948):

> Article 15: No State or group of States has the right to intervene, directly or indirectly, for
> any reason whatever, in the internal or external affairs of any other State.  The foregoing
> principle prohibits not only armed force but also any other form of interference or attempted
> threat against the personality of the State or against its political, economic, and cultural
> elements.

---

[19] *See, e.g.*, *LIAMCO v. Libya*, Award of 12 April 1977, 62 I.L.R. 141, 195–99 (1982) (decrees
provided only for a committee to decide on compensation); *Aminoil v. Kuwait*, Award of 24
March 1982, 21 I.L.M. 976 (1982) (same); *Burlington v. Ecuador*, ICSID Case No. ARB/08/5,
¶¶ 443–45 (2012) (offer to compensate made at the time of expropriation); *Antoine Goetz et al. v.
République du Burundi*, ICSID Case No. ARB/95/3, ¶¶ 130–31 (1999) (same); I<small>RMGARD</small>
M<small>ARBOE,</small> C<small>ALCULATION OF</small> C<small>OMPENSATION AND</small> D<small>AMAGES IN</small> I<small>NTERNATIONAL</small> I<small>NVESTMENT</small> L<small>AW,</small>
§§ 3.46, 3.48 (2009) ("consensus that it is sufficient, if a State, at the time of the expropriation,
offers compensation or provides for the determination of compensation"); *see also Tidewater Inc.
v. Bolivarian Rep. of Venezuela*, ICSID Case No. ARB/10/5, Award at § 141 (2015) ("An
expropriation only wanting fair compensation has to be considered as a provisionally lawful").

> Article 16: No State may use or encourage the use of coercive measures of an economic or political character in order to force the sovereign will of another State and obtain from it advantages of any kind.

As the ban on Cuban sugar quota was part of the U.S. plan to overthrow the Cuban Government by armed force, it also violated the U.S. Charter's prohibition against the use of force. Article 2 of the United Nations Charter, 1 U.N.T.S. XVI.

In *Sabbatino,* 307 F.2d at 866, the Second Circuit found Cuba's response not to be a permissible countermeasure because "the United States did not breach a rule of international law in deciding, for whatever reason she deemed sufficient, the sources from which she would buy her sugar." However, the evidence here, declassified years later, was not before the court, and its *ex cathedra* pronouncement, made without reference to the OAS Charter, that the United States could bar Cuban sugar "for whatever reason she deemed sufficient," was clearly wrong.

A state may respond to the wrongful act of another state with a measure that would otherwise be wrongful, provided the countermeasure is proportionate (that is, commensurate with the injury suffered, taking into account the gravity of the internationally wrongful act and the rights in question); and it is meant to induce discontinuance of the wrongful act or obtain reparations. It normally must first call upon the other state to discontinue its wrongful act. *Gabcikovo-Nagymaros*, at ¶¶ 83–87. *See also* ILC, Draft Articles on the Responsibility of States for Internationally Wrongful Acts*,* Arts. 22, 49–53, ILC Y.B., Vol. II, Pt. II (2001).

The Cuban measure met these standards. Cuba linked compensation to cessation of the wrongful conduct, resumption of sugar imports. The U.S. plan to overthrow the Cuban Government was a wrongful act of the greatest gravity; Cuba's right to defend itself of the highest

order. Cuba had called for the United States not to take or continue its wrongful act.[20]  Customary

international law prohibits certain countermeasures, but expropriation is not among them.  ILC

Draft Articles on the Responsibility of States, Art. 50.

### F.  Plaintiff Cannot Meet Its Burden Because of the Political Question Doctrine

To establish jurisdiction, Plaintiff must prevail on each of the above international law

issues, but, with respect to at least several of them, it cannot prevail without raising non-

justiciable political question. This precludes Plaintiff from meeting its burden.

"[P]rimarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210

(1962), the political question doctrine bars judicial review of issues that "call into question the

prudence of the political branches in matters of foreign policy or national security constitutionally

committed to their discretion." *El-Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836, 842 (D.C. Cir.

2010) (*en banc*); *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019). "Matters intimately

related to foreign policy and national security are rarely proper subjects for judicial intervention."

*Haig v. Agee*, 453 U.S. 280, 292 (1981); *El-Shifa*, 607 F.3d at 841 ("Disputes involving foreign

relations . . . are quintessential sources of political question[]") (internal quotations omitted). The

court's "discriminating analysis of the particular question posed," *id.* at 842, must include all the

issues the parties will raise, not just those presented in the Complaint.  *Taylor v. KBR Servs., Inc.*,

658 F.3d 402, 409 (4th Cir. 2011). The doctrine is jurisdictional.  *Schlesinger v. Reservists Comm.

to Stop the War*, 418 U.S. 208, 215 (1974).

Dispositively, the issues which Plaintiff must raise are comparable to those found to be

---

[20] Law No. 851 authorized the Cuban Government to take action only in the event that the U.S. eliminated Cuba's sugar quota. Further, as the ILC's Special Rappporteur observed, the Cuban measures "were resorted to within the context of an actual, open dispute in the course of which the States involved had already exchanged charges and arguments," making any formal demand for rescission "superfluous." Report, A/CN.4/444 & Add. 1–3, 12 ILC Y.B., Vol. II, Pt. 1 (1992).

political questions by this Circuit. In *Schneider v. Kissinger*, 412 F.3d 190, 196–97 (D.C. Cir. 2005), the court found the doctrine barred a wrongful death action for the assassination of a Chilean general because "for a court to adjudicate this case would be for that court to undertake the determination of whether, 35 years ago, at the height of the Cold War between the United States and the western powers on the one hand and the expanding communist empire on the other, it was proper for an Executive Branch official . . . to support covert actions against a committed Marxist who was set to take power in a Latin American country." *Id.* at 196.

In *El-Shifa*, the Circuit found the doctrine barred a claim that international law required compensation for the destruction of property in Sudan because it would require determining whether the U.S. attack was "justified," an assessment committed to the Executive. *Id.* at 844–45. In *People's MoJahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999), the Circuit found it "beyond the judicial function" to determine whether a foreign organization's terrorist attacks threatened U.S. national security. In *Hwang Geum Joo v. Japan*, 413 F.3d 45, 53 (D.C. Cir. 2005), it refused to interpret treaties involving foreign states because it might adversely affect U.S. foreign relations.

If the doctrine barred examination of the Executive's conduct of foreign affairs at issue in these cases, so too does it bar Plaintiff from asking the Court to pass upon justifications for the United States having the refineries refuse to refine the Cuban State's Soviet oil and the plan to overthrow the Cuban Government pursuant to which that request was made. Yet, to overcome the customary international law that a state may expropriate alien property without compensation in response to grave threats, Plaintiff must ask the Court to do just that.

Likewise, to avoid the doctrine of countermeasures, Plaintiff must ask the Court to pass on whether the United States' program of economic pressure against Cuba violated the OAS

Charter's prohibition against economic coercion and the UN Charter's prohibition against the use of armed force, and whether it was justified.

As part of these inquiries, the Court would need to assess the national security and other vital interests that were at stake for both States, and whether the measures each took were proportionate and necessary. The Circuit authority bars such an undertaking.

This Court "need only conclude that one [*Baker*] factor is present, not all." *Schneider*, 412 F.3d at 194.[21] Most, if not all, apply here, but the Court need not look beyond the first: there is a textually demonstrable commitment to the Executive to determine the appropriate means of dealing with the Cuban Government and with the Cuban response to U.S. policies and actions. These are quintessential "political judgments" not for the judiciary to make. *People's MoJahedin*, 182 F.3d at 23. Indeed, the United States has itself consistently maintained that questions raised by measures to protect national security are not appropriate for resolution even by international bodies, let alone national courts.[22]  Federal courts have consistently refused to determine whether

---

[21] "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.

[22] Without commenting on the justiciability of the instant issues when presented to international bodies, where the constitutional "separation of powers" upon which the political question doctrine rests are not present, Defendants stress that adjudication here would contradict the United States' position. *See* William Burke-White and Andreas von Staden, *Investment Protection in Extraordinary Times: The Interpretation and Application of Non-Precluded Measures Provisions in Bilateral Investment Treaties*, 48 VA. J. INT'L L. 307, 481–85 (2008) (both the Executive and Senate have consistently asserted that a nation's actions taken to protect national security is self-judging, and non-justiciable before international tribunals); C. Todd Piczak, *The Helms-Burton Act: U.S. Foreign Policy Toward Cuba, The National Security Exception to the GATT and the Political Question Doctrine*, 61 U. PITT. L. REV. 287 (1999) (United States has argued that the

Executive policies or actions are justified under emergency, national security or necessity rationales in the foreign affairs context. *People's MoJahedin*, at 23.[23] The complex and fraught U.S.-Cuba relationship make the *Baker* factors particularly compelling here.

## II.     Title III Does Not Provide a New Grant of Subject-Matter Jurisdiction

Contrary to Plaintiff's position, Title III neither overrides the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign state," *Sachs*, 136 S.Ct. at 393, nor adds a new grant of subject-matter jurisdiction. *See* SAC ¶ 9. As there are no such express provisions, Plaintiff must overcome the strong presumption against enactments by implication, *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1624 (2018); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988), particularly weighty as to jurisdictional issues. *Palmore v. Sup. Crt*, 515 F.2d 1294, 1307 (D.C. Cir. 1975), *vacated on other grounds*, 429 U.S. 915 (1976).

Plaintiff asserts that Title III mandates that the provisions of Title III "control over the provisions of Title 28," SAC ¶ 9, citing the provisions (§§ 4(13), 302; 22 U.S.C. §§ 6023(11),

---

WTO is not competent to rule on U.S. foreign policy and national security concerns); Daria Boklan, *The First WTO's Ruling on National Security Exception: Balancing Interests or Opening Pandora's Box*, 19:1 WORLD TRADE REV. 123–26 (2020) (United States supported Russia's position in its dispute with Ukraine, arguing "that national security issues are purely political in nature and thus not appropriate to be considered by the WTO dispute settlement system"); Panel Report, *Russia–Measures Concerning Traffic in Transit*, WT/DS512/R, ¶ 7.52 (5 April 2019) (United States response to Panel question 1, 18 and 22).

[23] *See also Schneider*, at 197; *El-Shifa*, 607 F.3d at 845; *Jaber v. U.S.*, 861 F.3d 241, 248 (D.C. Cir. 2017); *Reno v. Am.-Arab Anti-Discrim. Comm*. 525 U.S. 471, 490–91 (1999) (courts not "to assess the[] adequacy" of "reasons for deeming [foreign] nationals . . . a special threat"); *Mobarez v. Kerry,* 187 F. Supp. 3d 85, 98 (D.D.C 2016) (what makes an evacuation "necessary" in the foreign policy context is not subject to judicially manageable standards available to federal court); *Spectrum Stores, Inc. v. Citgo Corp.*, 632 F.3d 938, 952 (5th Cir. 2011) ("Sherman and Clayton Acts are decidedly inadequate to provide judicially manageable standards for resolving such momentous foreign policy questions"); *U.S. v. Spawr Optical Res.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (Presidential determination of emergency presents political question because "[s]tatute contained no standard by which to determine whether a national emergency existed or continued.").

6082) that establish the "[l]iability" of "any person" including agencies, for trafficking. However, "[t]here is a clearly settled distinction in federal law between statutory provisions that waive sovereign immunity and those that create a cause of action." *Cicippio-Puleo v. Islamic Rep. of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). Plaintiff fatally "conflates [these] two[.]" *F.D.I.C. v. Meyer*, 510 U.S. 471, 484 (1994).

The legislative history is also dispositive, as Congress deliberately chose to leave the FSIA immunity regime and Title 28 jurisdictional grants unchanged. The bill ultimately enacted as the LIBERTAD Act would have amended the FSIA to add a new exception to immunity for Title III actions, H.R. 927, 104th Cong. § 302(c) (as introduced in the House, Feb. 14, 1995), and would have added a new section to Title 28 providing exclusive federal jurisdiction over Title III actions. *Id.* at § 302(b). The former was withdrawn when the bill reached the House Committee on International Relations, and the latter was stricken at the House-Senate Conference.[24] "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded[.]" *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (internal quotations omitted).

Moreover, Title III expressly amends the FSIA execution provision, § 302(e); 22 U.S.C. § 6082(e), but not the provision concerning immunity from suit. That Congress has demonstrated it knows how to implement its intentions with clear, express provisions weighs heavily against

---

[24] *See Markup Before the Subcomm. on the Western Hemisphere of the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 57-58 (March 22, 1995) (Appendix: An Amendment in the Nature of a Substitute to H.R. 927 Offered by Rep. Burton); *Markup Before the Comm. on Int'l Relations on H.R. 927*, 104th Cong. 172, 232–33 (June 30 and July 13, 1995) (Appendix: Amendment in the Nature of a Substitute to H.R. 927 Offered by Rep. Burton); H.R. REP. NO. 104-468, at 35 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 558; 141 CONG. REC. S15217 (daily ed. Oct. 17, 1995); 141 CONG. REC. S15277-78, 82 (daily ed. Oct. 18, 1995). Title III of the Senate bill, which contained identical provisions, *see* S. 381, 104th Cong. § 302(c), (b) (as introduced in the Senate, Feb. 9, 1995), never reached conference.

finding an intended but unspoken result. *See Omni Capital Int'l v. Rudolf Wolff*, 484 U.S. 97, 106 (1987); *I.A.M. Nat'l Pension Fund v. Stockton TRI Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984).

Plaintiff presumably refers only to the provision in section 302 establishing liability; section 302(c), headed "Procedural Requirements," would contradict Plaintiff's assertion that Title III "controls over Title 28," SAC ¶ 9: it provides that Title 28 "appl[ies]." Title III, § 302(c)(1); 22 U.S.C. § 6082(c)(1). In any event, the same presumption, legislative history and drafting practices noted above preclude reliance on the "Procedural Requirements" provision.

Additionally, the provision's text does not speak to FSIA immunity or jurisdictional grants.[25] Instead, it establishes a consistent procedural framework for actions within concurrent state and federal jurisdiction, as do similar provisions. *See, e.g.*, 39 U.S.C. § 409. The "Procedural Requirements" provision was added only when the Conference opened the way for state court Title III actions. *See* H.R. Rep. No. 104-468, at 35 (1996) (Conf. Rep.). Finally, the provision's heading would preclude reliance even if any doubt remained.[26]

### III.     28 U.S.C. § 1331 Does Not Provide Subject-Matter Jurisdiction

Plaintiff cannot rely on 28 U.S.C. § 1331: the FSIA alone provides jurisdiction for actions against agencies. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983).

### IV.     There Is No Subject-Matter Jurisdiction for Lack of Article III Standing

An Article III "injury must be *de facto*; that is, it must actually exist." *Spokeo v. Robins*,

---

[25] "Procedural Requirements - Except as provided in this title, the provisions of title 28, United States Code, and the rules of the courts of the United States shall apply to actions under this section to the same extent as such provisions and rules apply to any other action under section 1331 of title 28, United States Code." Title III, § 302(c)(1); 22 U.S.C. § 6082(c)(1).

[26] A provision's heading is "a useful aid in resolving an ambiguity," *F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959). The phrase "procedural requirements" (or a close variation thereof) appears dozens of times in Title 28 and elsewhere in the U.S. Code, but it is never used to refer to a court's jurisdiction, making applicable the "obligation to maintain the consistent meaning of words in statutory text[.]" *U.S. v. Santos*, 553 U.S. 507, 523 (2008).

136 S.Ct. 1540, 1548 (2016). The requirement is not "automatically satisfie[d]" whenever a statute grants a statutory right and authorizes suit because "Article III requires a concrete injury even in the context of a statutory violation." *Id.* at 1549. Plaintiff alleges no concrete injury from trafficking. Its injury, if any, is Essosa's loss of Cuban property under the expropriation, for which Plaintiff seeks damages measured by the value of that property in 1960.

Further, the injury is not, as Article III also requires, "fairly traceable to the challenged action," *Allen v. Wright*, 468 U.S. 737, 751 (1984). There is no "causal connection between the assertedly unlawful conduct [trafficking] and the alleged injury [loss of Essosa's property]," *id.* at 753 n.19; *see also Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 100 (D.C. Cir. 1995).

## V.   Litigation of Personal Jurisdiction Should Await Final Determination of FSIA Immunity

Defendants have moved to dismiss for lack of personal jurisdiction to avoid waiver under Fed. R. Civ. P. 12(h), but seek a stay of proceedings on that issue until final determination of FSIA subject-matter jurisdiction. "At the *threshold* of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the exceptions [to immunity] applies[.]" *Verlinden*, 461 U.S. at 493–94 (emphasis added).

This Circuit has stressed that FSIA immunity is immunity from the entanglements, burdens and intrusions of litigation in a foreign court, not just immunity from judgment. For that reason, it recognizes an interlocutory appeal of right from denial of FSIA immunity. *See Kilburn v. Libya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004); *see also Helmerich*, 137 S.Ct. at 1321 (a "basic objective" of the FSIA is to avoid "embroil[ing] the foreign sovereign in an American lawsuit"). It would be incongruous to require litigation of personal jurisdiction before final resolution of FSIA immunity. Additionally, unlike in many actions, litigation of the *Bancec* issue, *infra*, would be required. The Court would thus risk needlessly making a decision with implications for the

46

important *Bancec* concerns of "comity between nations," "[d]ue respect for the actions taken by foreign governments," and the imperatives of international trade and finance. *Bancec,* at 624–28.

## VI. Personal Jurisdiction Is Lacking

### A. Defendants Are Entitled to Due Process Limitations on Personal Jurisdiction

Defendants are entitled to Due Process protections unless Plaintiff overcomes the *Bancec* presumption. *GSS Grp.*, 822 F.3d at 603. Contrary to Plaintiff's effort to overcome the presumption, the courts have respected the separate status of Cuban entities on multiple occasions, including a court of this District.[27]

Plaintiff must show either that the Cuban State so "extensively control[s]" Defendants that there is "complete domination," and the two are not "meaningfully distinct entities," or that the entity is the State's agent in the matter at issue "under ordinary agency principles," *Transamerica*, 200 F.3d at 848. There is no warrant to disregard separate juridical status in order to advance perceived Congressional policy. *See Alejandre*, 183 F.3d at 1287–88 (separate status of Cuban telecommunications company cannot be disregarded to further state sponsor of terrorism law; Congress's "clear expression" required).

Contrary to the thrust of Plaintiff's allegations, the "complete domination" standard is not met because the state owns the entity, has a right to profits, determines whether profits are to be distributed, appoints the governing board and executives, assigns property, provides capital,

---

[27] *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011) (exporter); *Alejandre v. Telefonica Larga Distancia de Puerto Rico*, 183 F.3d 1277 (11th Cir. 1999) (telecom company); *Banco Nacional de Cuba v. Chem. Bank New York Tr. Co.*, 658 F.2d 903 (2d Cir. 1981) and 782 F.2d 377 (2d Cir. 1986) (bank); *Banco Para el Comercio Exterior de Cuba v. First Nat. City Bank*, 658 F.2d 913 (2d Cir. 1981), *rev'd on other grounds*, 462 U.S. 611 (1983) (bank); *Cosmos Trading Corp. of Panama v. Banco Nacional de Cuba*, No. 07-20008-MC, 2007 WL 9706399 (S.D. Fla. Feb. 16, 2007), *report and recommendation adopted*, No. 07-20008-MC, 2007 WL 9706400 (S.D. Fla. Mar. 28, 2007) (importer).

authorizes major decisions, ensures compliance with state policies and objectives, or exercises its power as a regulator, alone or in combination. These, indeed, are common attributes of state enterprises. *Bancec*, at 624; *Transamerica*, at 848–51; *GSS Grp.*, at 606–08; *infra*.

Rather, the D.C. Circuit requires that the state exercises control over "day-to-day" operations. *Transamerica*, at 851 (no domination because state control of restructuring is not "running day-to-day operations"); *see also DRC, Inc. v. Honduras*, 71 F. Supp. 3d 201, 215 (D.D.C. 2014) (no domination because no day-to-day control by state); *Cont'l Transfer Technique, Ltd. v. Nigeria*, No. 08-cv-2026, 2019 WL 3562069, at *17 (D.D.C. Aug. 6, 2019), *appeal dismissed*, No. 19-7107, 2020 WL 1268963 (D.C. Cir. Mar. 4, 2020) (rejecting "attempt to claim the advantage of the *Bancec* alter-ego exception . . . without establishing that [the state] exercises day-to-day control"); *Gibbons v. Rep. of Ireland*, 532 F. Supp. 668, 670 (D.D.C. 1982) ("Although the Republic . . . exercises general supervisory control over [agencies], it is not involved in the day-to-day operations[.]").[28]

Despite this clear authority, Plaintiff does not allege day-to-day control; its pleading is thus facially deficient. *Doe v. Holy See*, 557 F.3d 1066, 1079–80 (9th Cir. 2009). Plaintiff alleges that the State "dictates all aspects of [Defendants'] operations," SAC ¶ 67, and makes similar allegations, SAC ¶¶ 18, 20, 70, but, in addition to not alleging day-to-day control, the "example[s]" clarifying these conclusory allegations show that they fall far short. Plaintiff alleges that Cuba "created CUPET" and "permitted it to operate" the expropriated property (SAC ¶ 68), inadvertently conceding that Defendants, not the State, control day-to-day operations. Plaintiff's

---

[28] *See also, e.g.*, *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 197 (2d Cir. 2019) ("touchstone inquiry" is "exercise[] significant and repeated control over . . . day-to-day operations"); *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 91 n.59 (2d Cir. 2015) (citing cases); *Flatow v. Rep. of Iran*, 308 F.3d 1065, 1073 (9th Cir. 2002) (affirming dismissal because no day-to-day control); *Walter Fuller Aircraft Sales v. Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992).

allegations that the Cuban State "decided to transfer Plaintiff's Confiscated Property from CUPET to CIMEX," and "ordered the transfer of confiscated services stations to CIMEX" as part of broader economic reorganization, *id.* ¶ 68, are akin to those found insufficient by the D.C. Circuit and other courts, which have unequivocally held that capitalization and state control of major decisions do not overcome *Bancec*. *See Transamerica*, at 851–52.[29]

Plaintiff further alleges as to CIMEX that it is a "*de facto* branch of the Cuban military," "owned, operated, and controlled" by the Defense Ministry. SAC ¶ 71. Plaintiff fatally elucidates its allegation only by claiming that CIMEX profits its alleged shareholder, the military, and that current or former military officers hold leadership positions. *Id.* ¶¶ 71, 76. That the government reaps an agency's profits is no reason to disregard separate status, *Bancec*, at 616 n.3; that the military is allegedly the concerned government department makes no difference. *See, e.g.*, *Transamerica*, at 850–53 (reversing finding that *Bancec* presumption overcome without considering relevant that the Defense Ministry was a shareholder and Navy officers held key positions). Indeed, *Bancec* otherwise would not apply to the many military governments.

Plaintiff adds as to CIMEX that "all shareholders are usually present at shareholder meetings," which "shows that the company is actually controlled by a small group of government officials[.]" SAC ¶ 73. Active shareholder involvement does not support overcoming the *Bancec* presumption. *Gen. Star Nat. Ins. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 277–84 (S.D.N.Y. 2010); *Minpeco*, 686 F. Supp. at 435 (same).[30]

---

[29] *See also, e.g.*, *First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 858 F. Supp. 2d 658, 676–79 (E.D. La. 2012), *aff'd*, 703 F.3d 742 (5th Cir. 2012); *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 128–30 (2d Cir. 2016); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 435 (S.D.N.Y. 1988).

[30] Plaintiff's "information and belief" allegation about failure to observe corporate formalities (SAC ¶¶ 3, 19) is unfounded. *See* Suris Dl. ¶¶ 23, 54.

As to CUPET, Plaintiff likewise makes additional but insufficient allegations and fails to come to terms with the Declarations presented with the first motion to dismiss. They detail ample, independent powers exercised by CUPET, showing that the State does not control its day-to-day operations. CUPET's director, not the State, has the "authority" to "govern, manage and operate" CUPET. It has its own employees. The State approves CUPET's annual business plans, but CUPET, and the *empresas* and *sociedades anonimas* integrated with it, undertake commercial activities, including production, contracting and sales, without State approval. The Ministry has issued only one "specific directive" to CUPET in the past two years, concerning production goals. ECF No. 23-3 at ¶¶ 4(e), 4(k), 4(l), 4(u) 4 (v)–(w), and *passim*; ECF No. 23-4 at ¶¶ 2–3.

In response, Plaintiff focuses on appointment of CUPET's director (CUPET has no board of directors), even though the appointment of high-level officials does not equate with day-to-day control, and is regularly found to be insufficient. *First Inv. Corp.*, 703 F.3d at 753; *Transamerica*, at 851; *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 294–97 (S.D.N.Y. 1987) (appointing head of bank who regularly reports to the State).

Otherwise, Plaintiff's allegations with respect to CUPET fall into three categories. First, many relate to requiring or ensuring compliance with State policies, SAC ¶¶ 81(a), (c)–(d), 82(a), (c), (f), which is insufficient to show day-to-day control or otherwise overcome the presumption. In addition to the authority specifically concerning Cuba discussed *infra*, *see GSS Group*, at 606–08 (state ordered its agency to cancel a contract because conflicted with national policy and required a replacement contract); *Transamerica*, at 851 (review of contracts to ensure they conform to general policy); *DRC, Inc.*, 71 F. Supp. at 211 (budget oversight).[31]

---

[31] Allegations within this category include that the State "[e]valuat[es]" "socio-economic result" against "indicators," SAC ¶ 81(a), ensures "implementation of . . . Economic and Social Policy Guidelines," *id.* ¶ 81(c), "ensur[es] compliance with government directives," *id.* ¶ 82(a); *see also*

Second, there are numerous allegations of state involvement in major decisions such as those on foreign investment and trade, SAC ¶¶ 81(b), (d), (e), (f), 82(e), the annual business plan, and production goals, SAC ¶¶ 81(g), 82(b), (d), all insufficient. *See Minpeco*, 686 F. Supp. at 434 (approval of "goals, objectives and budget"); *Cortez Byrd v. Corporacion Forestal*, 974 F. Supp. 2d 264, 270–72 (S.D.N.Y. 2013), *aff'd sub nom. Byrd v. Rep. of Honduras*, 613 F. App'x 31 (2d Cir. 2015) (state control of foreign investments); *Baglab*, at 296 (close supervision during crisis period); OECD, GUIDELINES ON CORPORATE GOVERNANCE OF STATE-OWNED ENTERPRISES 37 (2015) (approving state involvement in "significant transactions," such as investments).

Third, Plaintiff alleges supervision and evaluation of CUPET's director, SAC ¶¶ 81–83, but that does not amount to exercising day-to-day control. To the contrary, supervision and evaluation are best practices for state-owned enterprises. OECD, GUIDELINES at 43 (2015) (state "should . . . monitor [state-owned enterprises'] activity and performance on a continuous basis"); *id*. at 40 (state should give "performance objectives"). The case law is devoid of rulings that they overcome the *Bancec* presumption. Even for non-governmental corporations, supervision of officers does not support disregarding separate status.[32]

Absent are the hallmarks of cases finding the *Bancec* presumption overcome. Plaintiff

---

*id.* ¶ 82(c) ("control[s] [] compliance"), and "execut[es] and control[s] compliance with [sustainable development] policy" pertaining to oil and gas. *Id.* ¶ 82(e).

[32] *See, e.g.*, *Richard v. Bell Atl. Corp.*, 946 F. Supp. 54, 62 (D.D.C. 1996) ("supervisors of the subsidiary [] report[ing] to officers in the parent company" is "of low or no probative value to [veil-piercing] inquiry"); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073–75 (9th Cir. 2015) (parent company exercising oversight, including by having high-level employees of subsidiary "report to [parent company] supervisors on a 'dotted-line' basis," does not show that parent "directs [] routine day-to-day operations"); *Quarles v. Fuqua Indus.*, 504 F.2d 1358, 1363–64 (10th Cir. 1974) (no basis to disregard separateness where parent "consult[s] with [subsidiary's] officers, offer[s] advice and even object[s] to proposals" in order to exercise "supervision, coordination and financial control" of subsidiary); PHILLIP A. BLUMBERG, BLUMBERG ON CORPORATE GROUPS § 26.04 (2d ed., 2020 update) (courts dismiss "extensive monitoring and oversight activities").

does not allege lack of authority over assets needed to operate independently, *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 419–20 (5th Cir. 2006), that the state commandeers ordinary transactions such as by approving individual invoices, *Kalamazoo Spice Extraction Co. v. Provisional Mil. Gov't of Socialist Ethiopia*, 616 F. Supp. 660, 666 (W.D. Mich. 1985), or that it requires use of assets for goals unrelated to corporate purpose, *Crystallex v. Venezuela*, 932 F.3d 126, 135 (3d Cir. 2019); *Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F. Supp. 3d 304, 316 (S.D.N.Y. 2019).  Further, the submitted Declarations show that none of the above is the case. (Plaintiff cites a fake, unauthorized LinkedIn page for CUPET, SAC ¶ 83. Suárez Dl. ¶¶ 21–22.)

Plaintiff places its greatest reliance on the structure of the Cuban economy, SAC ¶¶ 61–69, alleging that the Government has "total control over the planned direction of the economy" and "frequently alters" "corporate structures," *Id.* ¶¶ 62–63, such that Defendants are mere "administrators" of State property. *Id.* ¶ 67. Not only does this fail to address day-to-day control, but it conflicts with the repeated decisions rejecting efforts to overcome the *Bancec* presumption for Cuban entities, notwithstanding the structure of Cuba's economy. *Supra* at 47 n.27. In *Empresa Cubana Exportadora*, 606 F.Supp.2d at 76–78, a court of this District rejected the argument that Cubaexport's separate status should be disregarded because it was established and "must operate in accordance with the instructions issued to it by the Ministry of Foreign Trade by virtue of the State plans for foreign trade."

To the same effect is the Circuit's decision in *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), where the Circuit did not even mention that the state not only owned the oil company but also the natural resources it exploited and additionally fixed prices and export levels, as the record made clear. *Id.* at 302. Other Circuits similarly treat as inconsequential state ownership of natural resources and control of price, production, and exports

in the relevant sector. *Bridas*, 447 F.3d at 420; *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 177 (5th Cir. 1989); *Kalamazoo Spice*, 616 F. Supp. at 666; *Potash Antitrust Litig.*, 686 F. Supp. 2d 816, 822 (N.D. Ill. 2010).

The Cuban State normally retains title to real property (and limited moveable property), just as socialist countries have done historically and numerous other countries retain title to natural resources and other key properties. This does not speak to day-to-day control. To the contrary, the Defendants' legal "right of administration and use" of property to which the State retains title provides day-to-day control, as well as other substantive rights and authority, over the property.  *See* Second Declaration of Dr. Marta Milagro Moreno Cruz.

Plaintiff's reliance on state planning and regulation of the economy, and the state's retention of title to real property and certain other property, ignores all this authority, both general and specific to Cuba, and strikes at the heart of *Bancec*. In explaining the presumption it established, the Court recognized that "governments *throughout the world* have established separately constituted legal entities to perform a variety of tasks," *Bancec*, at 624, 626 n.18 (emphasis supplied), noting, *inter alia,* the planned economies of the Soviet Union and other socialist countries. *Id.* at 624 n.13. Plaintiff would severely truncate the reach intended by the Court for its decision out of concern for "comity between nations," "due respect for the actions taken by foreign sovereigns[,]" and the requirements of international trade and finance.

Finally, the Defendants' separate status cannot be disregarded under "ordinary agency principles" because of the alleged State control, or the State benefiting from their operations. *GSS Grp.*, at 605; *Transamerica*, at 849. "Ordinary agency principles" are an alternative to "complete domination" and require distinct allegations, which are absent here. *Compare, e.g.*, *S & Davis Int'l v. Rep. of Yemen*, 218 F.3d 1292, 1299 (11th Cir. 2000) (state corporation acts on behalf of state

in particular transaction with plaintiff at issue by cancelling contract on State's order); *Helmerich & Payne Int'l Drilling Co. v. Rep. of Venezuela*, 185 F. Supp. 3d 233, 245 (D.D.C. 2016) (commingling of funds and the subsidiary inviting bids "on behalf of" the parent could support principal-agent relationship); *Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Rep.*, No. 18-cv-2228, 2020 WL 1935554, at *7 (D.D.C. Apr. 22, 2020) (agency communicated to plaintiff that it acted on behalf of and represented the state). In *Transamerica*, at 850, the Circuit indicated that agency principles do not apply when, as here, the state agency engages in transactions for its own account. Plaintiff has alleged nothing to make "ordinary agency principles" relevant, and no such allegations are possible.

### B. Defendants Lack Due Process Contacts with the United States

Plaintiff does not allege general jurisdiction. To establish specific jurisdiction satisfying the Due Process Clause, it must show that: (1) defendant "purposefully avail[ed] itself of the privilege of conducting activities within" the United States, *Asahi Metal Indus. v. Sup. Crt*, 480 U.S. 102, 109 (1987); *and* (2) the claims "arise out of or relate to defendant's contacts" with the United States. *Bristol-Myers Squibb Co. v. Sup. Crt*, 137 S.Ct. 1773, 1780 (2017).

### 1. CUPET Is Not Subject to Specific Jurisdiction

Plaintiff's claim against CUPET for possessing and using the refinery and related property in Cuba manifestly does not arise from CUPET's alleged contacts with the United States: that CUPET solicited oil exploration partnerships with U.S. companies and solicited and/or contracted with U.S. oil spill mitigation companies (SAC ¶¶ 101(e), 104); obtained or attempted to obtain financing using N.Y. capital markets (SAC ¶ 102); and caused polluted waters to reach at or near the U.S.-Cuba maritime boundary through negligence (SAC ¶ 103). (CUPET's alleged participation in the global oil market (SAC ¶¶ 91, 98–101) only concerns activities outside the

U.S. with non-U.S. entities.) This is dispositive.

These allegations fail for additional reasons. CUPET has never entered into a contract with a U.S. company, *supra* at 19; and, in any event, contracting with a forum-based company to provide services outside the forum, let alone soliciting such contracts, is not purposeful availment. *See supra* at 19–20; *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1194 (D.C. Cir. 2013); *Health Commc'n, Inc. v. Mariner Corp.*, 860 F.2d 460, 465 (D.C. Cir. 1988).[33]

The allegation about N.Y. capital markets concerns a French bank used by a Dutch commodities trading company, not CUPET. Because CUPET was not a party to any alleged banking transaction in the U.S., *supra* at 16, the transactions have no jurisdictional significance. *Ofisi v. Al Shamal Islamic Bank*, No. 15-cv-2010, 2019 WL 1255096, at *5 (D.D.C. Mar. 19, 2019) (rejecting similar attempt to exercise jurisdiction based on transactions processed through U.S. banks in violation of OFAC sanctions programs because defendant was not a party to any of the transactions); *Patel v. Patel*, No. 16-cv-02411, 2017 WL 4217098, at *2 (D.D.C. Sept. 19, 2017); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726–27 (S.D.N.Y. 2010).

CUPET's alleged negligence does not even pertain to conduct that creates a U.S. contact, as the maritime boundary lies well beyond U.S. territorial waters. *See supra* at 16. Further, intentional conduct directed at the United States, not negligence, is required. *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014).

## 2. CIMEX (Cuba) Is Not Subject to Specific Jurisdiction

Plaintiff's claim against CIMEX (Cuba) for possessing and using former Essosa land in

---

[33] The court "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts," and does not assume the truth of plaintiff's allegations. *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003); *see also Gregorio v. Gordon*, 215 F. Supp. 3d 1, 4 (D.D.C. 2015).

Cuba does not arise from any alleged contacts by CIMEX (Cuba) with the U.S, because "all the conduct giving rise to [plaintiffs'] claims occurred elsewhere." *Bristol-Myers*, 137 S.Ct. at 1782; *see also Walden*, 571 U.S. at 291; *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 295 (1980); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 124–25 (D.D.C. 2018), *aff'd on other grounds*, 952 F.3d 293 (D.C. Cir. 2020). None of Plaintiff's allegations alter this conclusion.

### A.  Alleged Sale of U.S.-Origin Goods to Cuban Consumers

CIMEX (Cuba) would purchase any U.S.-origin goods for sale at its service stations from Alimport, the Cuban importer, not, as alleged (SAC ¶ 109), from U.S. suppliers. Suris D1. ¶ 31. The contacts of a third party are irrelevant. *Walden*, at 291. Further, purchasing goods from a forum-based company to sell outside the forum would not support jurisdiction over a claim that does not arise from those purchases. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 417–18 (1984); *Consolidated Dev. v. Sherritt*, 216 F.3d 1286, 1292 (11th Cir. 2000).

### B.  Service Stations Where Remittances are Paid

CIMEX (Cuba)'s use of service stations on former Essosa land as remittance locations does not provide specific jurisdiction, which requires that the claim "must arise out of contacts that the 'defendant *himself*' creates with the forum," not "contacts between . . . third parties and the forum." *Walden*, at 284–85. It is Fincimex that has remittance contacts with the United States. Further, even its contacts are insufficient. Courts routinely hold that money transfers to a non-resident bank do not establish jurisdiction over the bank. *See, e.g.*, *Monkton Ins. Serv., Ltd. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014); *Harris v. Lloyds TSB Bank, PLC*, 281 F. App'x.489, 495 (6th Cir. 2008). As in those cases, the contact here is created by the U.S. remitters and Western Union, not the equivalent of the receiving bank in Cuba. *See supra*, at 11–13.

56

Moreover, Plaintiff is neither a party to, nor suing on, Fincimex's contract with Western Union, but a third party suing for an independent statutory tort. "[A]n injury sounding in tort does not 'arise from' a contract for services for the purpose of specific jurisdiction." *Okolie v. Future Serv. Gen. Trading & Contracting Co.*, 102 F. Supp. 3d 172, 177 (D.D.C. 2015); s*ee also Naegele v. Albers*, 110 F. Supp. 3d 126, 154 (D.D.C. 2015).

The D.C. Circuit has consistently rejected jurisdiction in cases with far closer contract-related forum contacts than here, where neither CIMEX (Cuba) nor Fincimex negotiated or executed contracts or performed services in the U.S. or promoted or solicited remittances from the U.S. *See supra* at 19–20; *Thompson*, 734 F.3d at 1189–94; *Creighton v. Qatar*, 181 F.3d 118, 127–28 (D.C. Cir. 1999); *Health Commc'n*, 860 F.2d at 465.

Finally, Plaintiff's trafficking claim does not "arise out of or relate to" CIMEX (Cuba)'s (or Fincimex's) remittance services, because they were neither the proximate nor but-for cause of Plaintiff's action, as required. *See Cockrum v. Donald J. Trump for President, Inc*., 319 F. Supp. 3d 158, 176–77 (D.D.C. 2018).  Liability under Title III attaches simply if defendant "leases, receives, possesses, obtains, controls, manages, uses, or otherwise acquires or holds an interest in confiscated property." LIBERTAD Act, § 4(13)(A)(i); 22 U.S.C. § 6023(13)(A)(i). Plaintiff's trafficking claim arises from and is complete simply from CIMEX (Cuba)'s possession of the former Essosa land, whether or not, in addition to using them as gas service stations, it pays out remittances there. Damages are also independent of remittances: Plaintiff demands the 1960 value of the land on which the stations sit.

*Africa Growth* is analogous: the court found it lacked personal jurisdiction over the individual defendants because plaintiff's claim arose out of seizure of its property in Angola, even though defendants marketed the properties to U.S. customers. 2019 WL 3253367, at *9; *see also*

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 26–28 (D.D.C. 2017) (Chinese internet company's display of English language ads for U.S. audiences did not provide jurisdiction over copyright infringement claim because plaintiff would have the same claim "even if [defendant's] websites featured only Chinese-language ads for Chinese products aimed at Chinese consumers— or if they featured no advertisements at all").

### C.  The Other, More Numerous Service Stations

"Because specific jurisdiction is based on the relationship between defendants' contacts and each particular claim, plaintiff's claims must be analyzed separately." *Kroger v. Legalbill.com LLC*, No. 04-cv-2189, 2005 WL 4908968, at *7 n.6 (D.D.C. Apr. 7, 2005); *see also Helmer v. Doletskaya*, 393 F.3d 201, 203 (D.C. Cir. 2004). As explained *supra*, at 14, liability for trafficking is property specific. Thus, even if jurisdiction is found as to a specific property because it is a remittance location, this does not provide jurisdiction over claims as to other property. *See Kroger Co. v. Malease Foods Corp.*, 2006 WL 8432084, at *4 (W.D. Tex. Aug. 7, 2006) (court "must conduct the minimum contacts analysis separately" for each separate real property), *report and recomm. approved*, 2006 WL 8432652 (W.D. Tex. Dec. 19, 2006).

Pendent personal jurisdiction cannot rescue Plaintiff's claims for trafficking in property without remittance operations. First, the doctrine is no longer good law. It cannot be reconciled with *Bristol-Myers*, as scholarly authority has explained and Justice Sotomayor warned: "you're destroying pendent jurisdiction by requiring a causal link between the forum contacts and the action," Tr. of Oral Argument at 5, *Bristol-Myers Squibb*, 137 S.Ct. 1773 (April 25, 2017).[34]

---

[34] *See* Louis Capozzi, *Relationship Problems: Pendent Personal Jurisdiction After Bristol-Myers Squibb*, 11 DREXEL L. REV. 215 (2018); Scott Dodson, *Personal Jurisdiction and Aggregation*, 113 NW. U. L. REV. 1, 29 (2018); Martin Calhoun and Julia Collison, *Recent Supreme Court's Personal Jurisdiction Ruling (Bristol-Myers Squibb) Limits Plaintiffs' Forum-Shopping Options*, IN-HOUSE DEF. Q., at 13 (2017).  No authority requires continued recognition of the doctrine, as

Second, the trafficking claims for property without remittance locations do not, as the doctrine required, arise out of "the same core of operative fact" as the claims providing jurisdiction. *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4–5 (D.C. Cir. 1977). It is necessary to determine for each parcel whether it was owned by Essosa, whether it is being used by CIMEX (Cuba), whether CIMEX (Cuba) trafficked in it within two years prior to suit (Title III, § 305; 22 U.S.C. § 6084), and its 1960 value. Courts in this District have only applied the doctrine when, unlike here, different legal claims are based on the same facts.[35]

In any event, the Court should decline to exercise its discretion under the doctrine. *Oetiker*, 556 F.2d at 5. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field," *Asahi*, 480 U.S. at 115. Further, importantly, this action presents sensitive foreign affairs issues, which led the Circuit in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207–08 (D.C. Cir. 1985), to decline discretionary jurisdiction, and the unique circumstance of the State Department having maintained that it would violate international law to adjudicate trafficking claims "as to which there is no United States connection other than the . . . nationality of the owner of a claim to the property," 141 Cong. Rec. 15106 (1995), which would be the case with the pendent claims. Additionally, there would be far more pendent than other claims, a case of the tail wagging the dog.

### 3. CIMEX (Panama) Is Not Subject to Specific Jurisdiction

CIMEX (Panama) has no contacts with the United States. Suris Dl. ¶¶ 2–4, 9, 22. As

---

the Circuit's endorsement of it was pre-*Bristol-Myers* and *dicta. Oetiker,* 556 F.2d at 5; *Helmer*, 393 F.3d at 203.

[35] *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 48 n.2 (D.D.C. 2018); *Bazarian Int'l Fin. Assoc. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 12 n.6 (D.D.C. 2016); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 36 (D.D.C. 2010); *Poling v. Farrah*, 131 F. Supp. 2d 191, 194 (D.D.C. 2001); *Eacho v. N D Res., Inc.*, 1984 WL 2398, at *5 (D.D.C. Feb. 2, 1984).

CIMEX (Cuba) lacks Due Process contacts with the United States, there is no need to consider whether Plaintiff can establish personal jurisdiction over CIMEX (Panama) on the basis of attribution. In any event, attribution cannot be sustained on Plaintiff's allegations (SAC ¶¶ 3, 19). Its "information and belief" that corporate formalities are not followed is unfounded. Suris Dl. ¶¶ 23, 54. CIMEX (Panama) owns assets in addition to its stock in CIMEX (Cuba). *Id.* ¶ 23. The alleged identity of officers, directors, offices and "ultimate" ownership and control is insufficient, as is the allegation of unspecified fraud on unidentified third-parties. *See U.S. ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 37 (D.D.C. 2016); *Mazza v. Verizon Washington DC*, 852 F. Supp. 2d 28, 41 (D.D.C. 2012); *see also* Declaration of Juan Pablo Fabrega (explaining separate status of Panamanian *sociedades anónimas*).

## VII.   A More Definite Statement of Plaintiff's Service Station Allegations Is Required

Unless moot, Plaintiff's identification of the parcels of land subject to its CIMEX claims is necessary, as notice is otherwise lacking and defense is impossible.

## CONCLUSION

For the foregoing reasons, the action should be dismissed with prejudice for lack of subject-matter jurisdiction; proceedings on personal jurisdiction should be stayed pending final adjudication of subject-matter jurisdiction or the action dismissed with prejudice for lack of personal jurisdiction; and, unless moot, a more definite statement should be required.

Dated: June 16, 2020                    Respectfully submitted,

*On the Brief*:                         /s/  Michael Krinsky
Adam Belsky                             Michael Krinsky (USDC, DC #NY0302)
Jules Lobel                             Lindsey Frank (USDC, DC #NY0301)
Nathan Yaffe                            Rabinowitz, Boudin, Standard, Krinsky &
                                        Lieberman, P.C.

                                        *Attorneys for Defendants*