UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXXON MOBIL CORPORATION

                    Plaintiff,

v.

CORPORACIÓN CIMEX S.A., et al.

                    Defendants.

Case No. 19-cv-1277 (APM)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION TO DISMISS THE ACTION AND FOR A PARTIAL STAY**

STEPTOE & JOHNSON LLP

Steven K. Davidson (DC Bar #407137)
Michael J. Baratz (DC Bar #480607)
Jared R. Butcher (DC Bar #986287)
1330 Connecticut Ave., NW
Washington, DC 20036
Telephone:  202-429-3000
Facsimile:  202-429-3902

*Counsel for Plaintiff*

# TABLE OF CONTENTS

BACKGROUND .............................................................................................................. 3

I.      Plaintiff's Certified Award for Cuba's Expropriation of Its Investment .......................... 3

II.     Congress's Authorization of Private Civil Actions to Enforce Awards Against Cuba ...... 4

III.    Defendants' Trafficking in the Confiscated Property ........................................................ 5

        A.      Defendants' Trafficking in the Confiscated Refinery and Processing Facilities .... 5

        B.      Defendants' Trafficking in the Confiscated Service Stations ................................ 6

        C.      Defendants' Other Commercial Activities in the United States ............................. 9

ARGUMENT ................................................................................................................... 9

I.      Plaintiff Has Standing Under Title III ............................................................................... 9

        A.      Plaintiff Has Suffered Injury-in-Fact Due to Defendants' Trafficking ................. 9

        B.      Plaintiff's Injury Is Directly Traceable to Defendants ........................................ 11

II.     This Court Has Subject Matter Jurisdiction Under Title III ............................................ 12

III.    This Court Also Has Subject Matter Jurisdiction Under the FSIA .................................. 15

        A.      Defendants' Commercial Activities Cause Direct Effects in the United States .... 17

                1.      Defendants' Trafficking in the Confiscated Service Stations ................... 17

                        a.      Using the confiscated service stations to process remittances ...... 17

                        b.      Purchasing of consumer goods from the United States ............... 21

                2.      Defendants' Trafficking in the Refinery and Processing Facilities .......... 22

                        a.      Using the Confiscated Property without authorization ................ 23

                        b.      Facilitating unfair competition ..................................................... 25

                        c.      Causing direct environmental-related effects .............................. 27

                3.      Defendants' Remaining Arguments Are Unavailing ................................ 28

                        a.      Defendants are liable for the actions of their divisions ................ 28

                        b.      Plaintiff is entitled to assert its claim for unlawful trafficking ..... 30

                        c.      The expropriation exception does not preclude the commercial
                                activities exception ....................................................................... 31

                4.      If Necessary, Discovery Should Be Granted .......................................... 33

        B.      Defendants Also Lack Immunity Because They Operate Confiscated Property and
                Conduct Commercial Activities in the United States ........................................... 34

                1.      Defendants Are "Agencies or Instrumentalities" and Thus the Nexus
                        Requirement for Agencies and Instrumentalities Applies ....................... 35

                2.      The Nexus Requirement for Agencies or Instrumentalities is Satisfied ... 37

                        a.      Defendants "own or operate" the Confiscated Property .............. 37

|  |  | b. | Defendants engage in commercial activity in the United States... 38 |
|---|---|---|---|
|  | 3. |  | Rights in Property Were Taken in Violation of International Law ......... 39 |
|  |  | a. | Plaintiff's property was "taken in violation of international law" 40 |
|  |  | b. | U.S. law governs the expropriation exception ............................. 42 |
|  |  | c. | Plaintiff's expropriation claim relates directly to its rights in property taken in violation of international law........................... 42 |
|  |  | (1) | Plaintiff need not demonstrate that Essosa dissolved ....... 42 |
|  |  | (2) | Cuba was obligated to compensate Plaintiff.................... 45 |
|  |  | (3) | The expropriation was not a lawful countermeasure ........ 48 |
|  |  | (4) | The "police powers" exception does not apply................ 49 |
|  |  | (5) | The "war powers" exception does not apply ................... 52 |
|  |  | (6) | Compensation has not been provided ............................. 53 |
|  | 4. |  | Defendants' Political Question Argument Should Be Rejected ............. 54 |
| IV. | This Court Has Personal Jurisdiction Over Defendants .................................... 55 |
| | A. | Defendants Are Not Entitled to Due Process Protection ....................................... 55 |
| | | 1. | Cuba Has *De Jure* Control over Defendants under Cuban Law.............. 55 |
| | | 2. | Cuba Has *De Facto* Control over Defendants ........................................... 56 |
| | B. | Any Juridical Separateness Should Be Disregarded to Prevent Injustice............ 58 |
| | C. | Regardless, Defendants Have Minimum Contacts with the United States........... 59 |
| V. | Defendants' Motion for a More Definite Statement Should Be Denied.......................... 60 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Properties*,
  881 F. Supp. 2d 533 (S.D.N.Y. 2012)......................................................................58

*Adler v. Fed. Rep. of Nigeria*,
  219 F.3d 869 (9th Cir. 2000) ................................................................................30

*Africa Growth Corp. v. Rep. of Angola*,
  No. 17-2469 (BAH), 2019 WL 3253367 (D.D.C. July 19, 2019), *appeal
  dismissed*, No. 19-7090, 2019 WL 6218805 (D.C. Cir. Oct. 23, 2019) ................................31

\* *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
  528 F.3d 934 (D.C. Cir. 2008).............................................................................16

\* *Agurcia v. Republica de Honduras*,
  No. 8:19-cv-38-TPB-SPF (M.D. Fla. May 22, 2020).................................................33

*Alfred Dunhill of London, Inc. v. Rep. of Cuba*,
  425 U.S. 682 (1976)...........................................................................................32

\* *Allen v. Russian Fed'n*,
  522 F. Supp. 2d 167 (D.D.C. 2007).......................................................................31

*Am. Bonded Warehouse Corp. v. Compagnie Nationale Air France*,
  653 F. Supp. 861 (N.D. Ill. 1987)........................................................................27

*Am. Online, Inc. v. Aol.Org*,
  259 F. Supp. 2d 449 (E.D. Va. 2003) ......................................................................8

*Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*,
  999 F.2d 33 (2d Cir. 1993)..................................................................................25

*Argentine Rep. v. Amerada Hess Shipping Corporation*,
  488 U.S. 428 (1989)...........................................................................................14

\* *Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015)...........................................................................9, 11

*Baker v. Carr*,
  369 U.S. 186 (1962)...........................................................................................54

\* *Banco Nacional de Cuba v. Chase Manhattan Bank*,
  658 F.2d 875 (2d Cir. 1981)................................................................................47

\*    *Banco Nacional de Cuba v. Sabbatino*,
     307 F.2d 845 (2d Cir. 1962)..................................................................52

*Banco Nacional de Cuba v. Sabbatino*,
     376 U.S. 398 (1964)..........................................................45, 48, 49, 52

*Bank of Am. Corp. v. Lemgruber*,
     385 F. Supp. 2d 200 (S.D.N.Y. 2005).................................................36

*Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran*,
     734 F.3d 1175 (D.C. Cir. 2013)....................................................24, 25

*Bell v. Hood*,
     327 U.S. 678 (1946).............................................................................16

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*,
     533 F.3d 1183 (10th Cir. 2008) ..........................................................30

*Biton v. Palestinian Interim Self-Gov't Auth.*,
     310 F. Supp. 2d 172 (D.D.C. 2004)....................................................55

\*    *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
     137 S. Ct. 1312 (2017)..........................................16, 39, 41, 42

*Bross Utils. Serv. Corp. v. Aboubshait*,
     618 F. Supp. 1442 (S.D.N.Y. 1985)...................................................36

*Cardenas v. Smith*,
     733 F.2d 909 (D.C. Cir. 1984) ...........................................................12

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
     148 F.3d 1080 (D.C. Cir. 1998) .........................................................60

*Colin v. Altman*,
     333 N.Y.S. 2d 432 (1st Dep't 1972) ..................................................36

*Committee of U.S. Citizens Living in Nicaragua v. Reagan*,
     859 F.2d 929 (D.C. Cir. 1988) ...........................................................42

*Cont'l Transfert Technique, Ltd. v. Nigeria*,
     No. 08-cv-2026 (PLF), 2019 WL 3562069 (Aug. 6, 2019)................56

*Crawford Fitting Co. v. J. T. Gibbons, Inc.*,
     482 U.S. 437 (1987).............................................................................14

*Crist v. Rep. of Turkey*,
     995 F. Supp. 5 (D.D.C. 1998) .............................................................33

*Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada,*
  600 F.3d 661 (D.C. Cir. 2020) .............................................................................19, 24, 25, 30

\* *Crystallex International Corp. v. Bolivarian Rep. of Venezuela,*
  932 F.3d 126 (3d Cir. 2019) ..........................................................................................56

*CYBERsitter, LLC v. People's Rep. of China,*
  805 F. Supp. 2d 958 (C.D. Cal. 2011) ...........................................................................23

*Daventree Ltd. v. Rep. of Azerbaijan,*
  349 F. Supp. 2d 736 (S.D.N.Y. 2005)............................................................................22

\* *De Csepel v. Rep. of Hungary,*
  859 F.3d 1094 (D.C. Cir. 2017) ...............................................................................32, 36

*De Csepel v. Repubic of Hungary,*
  No. 1:10-CV-01261 (ESH), 2020 WL 2343405 (D.D.C. May 11, 2020) ..........................36

*De Letelier v. Rep. of Chile,*
  748 F.2d 790 (2d Cir. 1984)............................................................................................37

*Detweiler v. Pena,*
  38 F.3d 591 (D.C. Cir. 1994) ..........................................................................................14

*Diamond Chem. Co. v. Atofina Chemicals, Inc.,*
  268 F. Supp. 2d 1 (D.D.C. 2003) ....................................................................................60

*DRC, Inc. v. Rep. of Honduras,*
  71 F. Supp. 3d 201 (D.D.C. 2014) .............................................................................56, 58

\* *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,*
  894 F.3d 339 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 1324 (2019) ...........................*passim*

*EM Ltd. v. Rep. of Argentina,*
  473 F.3d 463 (2d Cir. 2007)............................................................................................37

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.,*
  397 F. Supp. 3d 323 (S.D.N.Y. 2019).............................................................................58

*Estates of Ungar v. Palestinian Authority,*
  315 F. Supp. 2d 164 (D.R.I. 2004)..................................................................................13

*Exxon Corp. v. United States,*
  7 Cl. Ct. 347 (1985), *rev'd on other grounds*, 785 F.2d 277 (Fed. Cir. 1986) ......................50

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).........................................................................................................14

*Feldman v. C.I.A.*,
  797 F. Supp. 2d 29 (D.D.C. 2011) ...................................................................................60

*Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Rep. of Peru*,
  655 F. Supp. 2d 361 (S.D.N.Y. 2009) .............................................................................58

\* *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) .............................................................................................. *passim*

\* *Foremost-McKesson Inc. v. Islamic Rep. of Iran*,
  759 F. Supp. 855 (D.D.C. 1991) .........................................................................24, 25, 30

\* *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ............................................................................... *passim*

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
  No. 13 Civ.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) ...................................58

*Gabayzadeh v. Glob. Equip. & Mach. Sales Inc.*,
  18 Civ. 3851 (LGS), 2019 WL 5880639 (S.D.N.Y. Jan. 28, 2019) .......................................35

*Garb v. Rep. of Poland*,
  440 F.3d 579 (2d Cir. 2006)...........................................................................................32, 36

*\*Garcia-Bengochea v. Carnival Corp.*,
  407 F. Supp. 3d 1281 (S.D. Fla. 2019) ..........................................................................41

*Gibbons v. Rep. of Ireland*,
  532 F.Supp. 668 (D.D.C. 1982).......................................................................................56

*Glen v. American Airlines*,
  No. 4:20-CV-482-A, 2020 WL 4464665 (N.D. Tx. Aug. 3, 2020) .......................................11

*Glob. Index, Inc. v. Mkapa*,
  290 F. Supp. 2d 108 (D.D.C. 2003) ...........................................................................19, 24

*Gould, Inc. v. Pechiney Ugine Kuhlmann*,
  853 F.2d 445 (6th Cir. 1988) ........................................................................................23

*GSS Group Ltd. v. Nat'l Port Authority*,
  680 F.3d 805 (D.C. Cir. 2012).........................................................................................55

*Hanil Bank v. PT. Bank Negara Indonesia (Persero)*,
  148 F.3d 127 (2d Cir. 1998)......................................................................................20, 24

*\*Havana Docks Corp. v. Carnival Corp.*,
  19-cv-21724-BLOOM, ECF No. 124 (S.D. Fla. Sept. 14, 2020) ...........................................11

\*  *Havana Docks Corp. v. MSC Cruises Sa Co.*,
   2020 WL 5367318 (S.D. Fla. Sept. 8, 2020) ..........................................................11

\*  *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*,
   No. 19-cv-23591, 2020 WL 5217218 (S.D. Fla. Sept. 1, 2020) ...............................1, 2, 11, 12

\*  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*,
   185 F. Supp. 3d 233 (D.D.C. 2016).................................................................16, 33

\*  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*,
   743 F. App'x. 442 (D.C. Cir. 2018)................................................................41, 42

\*  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*,
   784 F.3d 804 (D.C. Cir. 2015), *vacated on other grounds and remanded*, 137
   S. Ct. 1312 (2017).......................................................................................39, 41

   *Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)...............................................................................................23

   *Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999)...........................................................................................31

   *Iglesias v. Pernod Ricard*,
   Order, ECF No. 55 at 16-18, 20-cv-20157-KMW (S.D. Fla Aug. 17, 2020) .........11

   *Island Two LLC v. Island One, Inc.*,
   No. 13 Civ. 02121 (LGS), 2013 WL 5380216 (S.D.N.Y. Sept. 26, 2013).............36

   *Jam v. Int'l Fin. Corp.*,
   442 F. Supp. 3d 162 (D.D.C. 2020)....................................................................20

   *Janko v. Gates*,
   741 F.3d 136 (D.C. Cir. 2014)...........................................................................13

   *Japan Whaling Association v. American Cetacean Society*,
   478 U.S. 221 (1986)...........................................................................................54

   *Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004)..........................................................................16

   *Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................................10

   *Malewicz v. City of Amsterdam*,
   517 F. Supp. 2d 322 (D.D.C. 2007)....................................................................22

\*  *McKesson Corp. v. Islamic Rep. of Iran*,
   52 F.3d 346 (D.C. Cir. 1995)..............................................................................58

*Ministry of Supply, Cairo v. Universe Tankships, Inc.*,
   708 F.2d 80 (2d Cir. 1983)..........................................................................22

\*   *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) .................................................59, 60

*Naartex Consulting Corp. v. Watt*,
   722 F.2d 779 (D.C. Cir. 1983) ..................................................................60

*Nemariam v. Fed. Democratic Rep. of Ethiopia*,
   491 F.3d 470 (D.C. Cir. 2007) ..................................................................41

*Nnaka v. Fed. Rep. of Nigeria*,
   238 F. Supp. 3d 17 (D.D.C. 2017) .........................................................27, 28

*OBB Personenverkehr AG v. Sachs*,
   136 S. Ct. 390 (2015) ..............................................................................32

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
   No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006).......................20

*Peterson v. Royal Kingdom of Saudi Arabia*,
   332 F. Supp. 2d 189 (D.D.C. 2004), *aff'd*, 416 F.3d 83 (D.C. Cir. 2005)............36

*Petit v. U.S. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ..................................................................13

*Phoenix Consulting v. Rep. of Angola*,
   216 F.3d 36 (D.C. Cir. 2000) ....................................................................15

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ................................................................................36

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ....................................................................15

*Princz v. Fed. Repub. of Germany*,
   26 F.3d 1166 (D.C. Cir. 1994) ..................................................................42

\*   *Rep. of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ......................................................................... *passim*

*Rong v. Liaoning Province Gov't*,
   452 F.3d 883 (D.C. Cir. 2006) ..............................................................31, 32

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ................................................................................17

*Schenley Distillers Corp. v. United States*,
   326 U.S. 432 (1946) ................................................................................35

\*    *Schubarth v. Fed. Rep. of Germany*,
     891 F.3d 392 (D.C. Cir. 2018) ................................................................. 16, 38, 42

*Sequeira v. Rep.of Nicaragua*,
     No. 19-11656, 815 F. App'x. 345 (11th Cir. 2020) ................................................ 32

*Siderman de Blake v. Rep. of Argentina*,
     965 F.2d 699 (9th Cir. 1992) ................................................................. 22

*Simon v. Rep. of Hungary*,
     812 F.3d 127 (D.C. Cir. 2016) ................................................................. 15

*Spokeo, Inc. v. Robins*,
     136 S. Ct. 1540 (2016) ................................................................. 9, 10

*Steele v. Isikoff*,
     130 F. Supp. 2d 23 (D.D.C. 2000) ................................................................. 36

*Taylor v. Kingdom of Sweden*,
     No. 18-1133 (RJL), 2019 WL 3536599 (D.D.C. Aug. 2, 2019) ........................................ 36, 37

\*    *TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
     411 F.3d 296 (D.C. Cir. 2005) ................................................................. 55

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
     30 F.3d 148 (D.C. Cir. 1994) ................................................................. 37

*Transamerica Leasing v. La Republica de Venezuela*,
     200 F.3d 843 (D.C. Cir. 2000) ................................................................. 56

*Turner Broad. Sys., Inc. v. F.C.C.*,
     520 U.S. 180 (1997) ................................................................. 23

*In re U.S. Office of Personnel Mgmt. Data Security Breach Litigation*,
     928 F.3d 42 (D.C. Cir. 2019) ................................................................. 11

*Wood ex rel. U.S. v. American Institute in Taiwan*,
     286 F.3d 526 (D.C. Cir. 2002) ................................................................. 16

*Ungar v. Palestine Liberation Org.*,
     402 F.3d 274 (1st Cir. 2005) ................................................................. 55

*United States v. Emor*,
     850 F. Supp. 2d 176 (D.D.C. 2012) ................................................................. 57

*United States v. Yunis*,
     924 F.2d 1086 (D.C. Cir. 1991) ................................................................. 42

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
821 F. Supp. 1405 (D. Colo. 1993), *aff'd*, 33 F.3d 1232 (10th Cir. 1994) ............................19

*Virtual Def. & Dev. Int'l, Inc. v. Rep. of Moldova*,
133 F. Supp. 2d 1 (D.D.C. 1999) ...................................................................22, 27

*WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*,
960 F. Supp. 734 (S.D.N.Y. 1997) ...................................................................27, 31

*Zedan v. Kingdom of Saudi Arabia*,
849 F.2d 1511 (D.C. Cir. 1988) ...................................................................19, 20

**Statutes**

18 U.S.C. § 2337(2) ...................................................................................13

22 U.S.C. § 1643b(a) ...................................................................................40

22 U.S.C. § 2370(e) ...................................................................................47

22 U.S.C. § 6023(1) ...................................................................................2, 4

22 U.S.C. § 6023(11) ...................................................................................2, 4, 12, 29

22 U.S.C. § 6023(13) ...................................................................................4, 32

22 U.S.C. § 6023(13)(A) ...................................................................................10

22 U.S.C. § 6023(13)(A)(ii) ...................................................................................59

22 U.S.C. § 6023(13)(A)(iii) ...................................................................................23, 29

22 U.S.C. § 6081 ...................................................................................2, 4, 59

22 U.S.C. § 6081(1) ...................................................................................23

22 U.S.C. § 6081(2) ...................................................................................1, 23, 26

22 U.S.C. § 6081(3) ...................................................................................1

22 U.S.C. § 6081(5) ...................................................................................26

22 U.S.C. § 6081(6) ...................................................................................18, 26

22 U.S.C. § 6081(8) ...................................................................................11, 12, 32

22 U.S.C. § 6081(9) ...................................................................................23

22 U.S.C. § 6081(10) ...................................................................................12, 40

22 U.S.C. § 6081(11) ...................................................................................12, 27, 32, 59

22 U.S.C. § 6082(a) ...................................................................................................13

22 U.S.C. § 6082(a)(1) .................................................................................4, 12, 32, 33

22 U.S.C. § 6082(a)(2) ...............................................................................................12

22 U.S.C. § 6082(a)(3) ...............................................................................................12

22 U.S.C. § 6082(c) ...................................................................................................13

22 U.S.C. § 6082(c)(1) .....................................................................................2, 13, 14

22 U.S.C. § 6082(d) ...................................................................................................12

22 U.S.C. § 6082(e) ...................................................................................................14

22 U.S.C. § 6083(a)(1) ........................................................................................10, 41

28 U.S.C. § 1330(b) ...................................................................................................13

28 U.S.C. § 1331 .......................................................................................................14

28 U.S.C. § 1605 .......................................................................................................14

28 U.S.C. § 1605(a)(2) .......................................................................................*passim*

28 U.S.C. § 1605(a)(3) .....................................................................................3, 16, 34

28 U.S.C. § 1606 .......................................................................................................36

28 U.S.C. § 1610 ..................................................................................................36, 37

28 U.S.C. § 1611 .......................................................................................................14

22 U.S.C. § 6081(2) ...................................................................................................13

22 U.S.C. § 6081(6) ...................................................................................................13

U.S. Trading with the Enemy Act of 1917, 40 Stat. 411 Ch. 106, § 16(2) (1917) .......................51

**Federal Regulations and Rules**

31 C.F.R. § 501.701(a)(2) ...........................................................................................51

Fed R. Civ. P. 4(k)(2)(B) ...........................................................................................59

**Legislative Materials**

141 Cong. Rec. S15277-78 (daily ed. Oct. 18, 1995) .................................................15

142 Cong. Rec. S1481 (daily ed. Mar. 5, 1996) .......................................................10

H.R. Rep. No. 94-1487 (1976).................................................................................40

Markup before the H. Comm. on Int'l Rel., H.R. Rep. 93-060 (June 30, 1995) ...................10, 12

Statement of President Clinton on the Helms-Burton Act (July 16, 1996), 1996
    WL 396122 .....................................................................................................10

**International Authorities**

**Treatises and Other International Agreements**

American Convention on Human Rights art. 21, Nov. 22, 1969, 1144 U.N.T.S.
    123..................................................................................................................49

G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948) .........................49

G.A. Res. 1803 (XVII) (Dec. 14, 1962)....................................................................46

Geneva Convention Relative to the Protection of Civilian Persons in Time of War
    (Fourth Geneva Convention) art. 38, Aug. 12, 1949, 6 U.S.T. 3516, 75
    U.N.T.S. 287 ...................................................................................................53

First Protocol to the European Convention on Human Rights art. 1, Mar. 20, 1952,
    E.T.S. No. 9.....................................................................................................49

Economic Agreement of Bogotá, O.A.S.T.S. No. 21 (1948) ..........................................47

**International Cases, Tribunals, and other Arbitral Panels**

*Barcelona Traction, Light & Power Co.* (*Belg. v. Spain*), Judgment, 1970 I.C.J.
    Rep. 3 (Feb. 5) ................................................................................................44

*Case Concerning the Factory at Chorzów* (Claim for Indemnity) (Merits) (Ger. v.
    Po.), Judgment, 1928 P.C.I.J. (ser. A) No. 17 (Sept. 13).........................................46

*Case Concerning Gabcikovo-Nagymaros Project (Hung. v. Slov.)*, Judgment,
    1997 I.C.J. Rep. 7 (Sept. 25)........................................................................49, 54

*Fisheries Jurisdiction Case (U.K. & N. Ireland v. Iceland)*, 1974 I.C.J. Rep. 3
    (July 25) ..........................................................................................................54

*North Sea Continental Shelf (F.R.G. v. Den. & Neth.)*, 1969 I.C.J. Rep. 3,
    Judgment (Feb. 20) ..........................................................................................54

*ADC Affiliate Ltd. & ADC & ADMC Management Ltd. v. Rep. of Hungary*, ICSID
    Case No. ARB/03/16, Award (Oct. 2, 2006) ........................................................51

*Ahmadou Sadio Diallo (Rep. of Guinea v. Dem. Rep. of the Congo)*, Judgment,
    2010 I.C.J. Rep. 639 (Nov. 30) .........................................................................45

*Amoco Int'l Fin. Corp. v. the Govt. of Iran and Others*, Iran Award 310-56-3, 15
    Iran-U.S. Cl. Trib. Rep. 189, 1987 WL 503881 (July 14, 1987) ...........................43

*Bernhard von Pezold and Others v. Rep. of Zimbabwe*, ICSID Case No.
    ARB/10/15, Award (July 28, 2015) .....................................................................44

*Bischoff Case* (*Ger. v. Venez.*), 10 R.I.A.A. 420 (1903) .................................................51

*E.R. Kelley v. United Mexican States*,
    4 R.I.A.A. 608 (U.S.-Mexico Claims Commission 1930) ..............................52, 53

*Ebrahimi v. The Gov't of the Islamic Rep. of Iran*,
    30 Iran-U.S. Cl. Trib. Rep. 170, No. 560-44/46/47-3, Separate Opinion of
    Richard C. Allison (Oct. 12, 1994) .....................................................................46

*Gogitidze et al. v. Georgia*, App. No. 36862/05, Judgment, Eur. Ct. H.R. (May 12,
    2015) .............................................................................................................51

*Goldenberg Case* (Ger./Rom.), 2 R.I.A.A. 901 (Sole Arbitrator Sept. 27, 1928) .........46

*Ioannis Kardassopoulos and Ron Fuchs v. Rep. of Georgia*, ICSID Case Nos.
    ARB/05/18 and ARB/07/15, Award (Mar. 3, 2010) ..............................................51

*Marguerite de Joly de Sabla* (*U.S. v. Pan.*) 6 R.I.A.A. 358 (General Claims
    Commission June 29, 1933) ...............................................................................46

*Mohamed Abdel Raouf Bahgat v. Egypt*, PCA Case No. 2012-07, Final Award
    (Perm. Ct. Arb. Dec. 23, 2019) ...........................................................................51

*Sea-Land v. Islamic Rep. of Iran*, Iran Award 135-33-1, 6 Iran-U.S. Cl. Trib. Rep.
    149, 1984 WL 301304, at *14 (June 22, 1984); .................................................43

*Sedco, Inc. v. Nat'l Iranian Oil Co.*, Iran Award 59-129-3, 10 Iran-U.S. Cl. Trib.
    Rep. 180, 1986 WL 424318 (Mar. 27, 1986) .......................................................46

*Sedco Inc. v. Nat'l Iranian Oil Co. and Iran*, Iran Award 55-129-39, 9 Iran-U.S.
    Cl. Trib. Rep. 248, 1985 WL 324069 (Oct. 28, 1985) ...............................43, 51, 52

*Sedco Inc. v. National Iranian Oil Co. and the Islamic Republic of Iran*, Iran
    Award 309-129-3, 15 Iran-U.S. Cl. Trib. Rep. 23, 1987 WL 503885 (July 7,
    1987) .............................................................................................................43

*Sedelmayer v. Russia*, SCC Case No. 106/1998, Award (July 7, 1998) ........................44

*Starrett Housing Corp. and Others v. the Govt. of Iran and Others*, Iran Award
    314-24-1, 1987 WL 503823, at *61 (Aug. 14, 1987) .............................................44

*Tecnicas Medioambientales Tecmed S.A. Tecmed v. The United Mexican States*,
    ICSID Case No. ARB (AF)/00/2, Award (May 29, 2003) .......................................51

*Texaco Overseas Petroleum v. Libya*, 17 I.L.M. 1, Translation of the Award on
    the Merits (1978)....................................................................................................46

*Total S.A. v. The Argentine Republic*, ICSID Case No. ARB/04/01, Decision on
    Objections to Jurisdiction (Aug. 25, 2006)............................................................44

*Upton Case*, (U.S. v. Venez.), 9 R.I.A.A. 234 (US-Venezuela Mixed Claims
    Commission 1903) .................................................................................................46

**Secondary International Materials**

Fourth Rep. on State Resp., U.N. Doc. A/CN.4/119, ¶ 89 (Feb. 26, 1959)...................................46

ILC Draft Articles on Diplomatic Protection, Art. 1, Cmt (1)........................................................44

ILC Draft Articles on the Responsibility of States for Internationally Wrongful
    Acts, Art. 33 ..........................................................................................................44

ILC Draft Articles on the Responsibility of States for Internationally Wrongful
    Acts, Art. 36 ..........................................................................................................44

ILC, Draft Conclusions on Identification of Customary International Law, with
    Commentaries (2018), in U.N. Doc A/73/10, 135 .................................................45

Int'l Law Comm'n Rep. on the Work of Its Fifty-Third Session, U.N. Doc.
    A/56/10 (2001).................................................................................................48, 49

**Other Authorities**

**Restatements**

Restatement (Fourth) of Foreign Relations Law of the United States § 452,
    Reporters' Note 4 (Am. Law Inst. 2018) ...............................................................37

Restatement (Third) of Foreign Relations Law of the United States § 712 (Am.
    Law Inst. 1987) .....................................................................................................40

**Books**

3 J.B. Moore, *Moore's Digest of International Law* (1989)........................................................52

4 J.B. Moore, *Moore's Digest of International Law* (1906)........................................................52

Federal Judicial Center, *The Foreign Sovereign Immunities Act: A Guide For Judges* (2018) ...................................................................................................36

JG Starke, *An Introduction to International Law* (Butterworths 4th ed. 1958) ...........................52

U.S. Department of Justice, *Acquisition of Property for War Purposes* 28 (U.S. Government Printing Office 1944) ........................................................................53

**Journals**

Ignacio E. Sánchez, *Cuban Property Rights and the 1940 Constitution*, 3 J. Transnat'l L. & Pol'y 135 (1994) ...................................................................47, 49

Jorge E. Viñuales, *Customary Law in Investment Regulation*, 23 Italian Y.B. Int'l Law 23 (2013) ..........................................................................................51

Michael W. Gordon, The Settlement of Claims for Expropriated Private Property Between Cuba and Foreign Nations Other than the United States, 5 U. Miami Inter-Am. L. Rev. 457 (1973) ........................................................................48

Rex M. Potterf, *Treatment of Alien Enemy Property in War Time and After by the United States*, 2(6) Ind. L. J. 453 (1927) ..............................................53

Robert L. Muse, *A Public International Law Critique of the Extraterritorial Jurisdiction of the Helms-Burton Act (Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996)*, 30 Geo. Wash. J. Int'l L. & Econ. 207 (1996). ................................................................................................................15

Plaintiff Exxon Mobil Corporation's action fits squarely within the Cuban Liberty and Democratic Solidarity Act ("LIBERTAD")—also known as the Helms Burton Act. LIBERTAD was essentially designed to remedy the wrongs set forth in Plaintiff's complaint. Defendants' efforts to deny liability are nothing more than lawyerly ploys to avoid the obvious—Defendants continue to use and enjoy Plaintiff's confiscated property without any compensation to (or authorization from) Plaintiff for over half a century.

Plaintiff filed this action to obtain compensation for an unsatisfied award in its favor rendered by the Foreign Claims Settlement Commission ("FCSC") in 1969, arising from the Castro regime's expropriation of property—including a refinery, product terminals and plants, and service stations (the "Confiscated Property"). That Plaintiff was forced to resort to litigation to satisfy its claim should not come as a surprise. "Since Fidel Castro seized power in Cuba in 1959, Cuba has been plagued by 'communist tyranny and economic mismanagement,' that has substantially deteriorated the welfare and health of the Cuban people," including through the Cuban Government's long "history of confiscating property of Cuban citizens and U.S. nationals." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, 2020 WL 5217218, at *1 (S.D. Fla. Sept. 1, 2020).

In 1996, Congress authorized in Title III of the Act private civil actions in federal courts against anyone—including state-owned entities—that uses or benefits from confiscated property without compensating the claim holder. As Congress found when it enacted LIBERTAD, "[t]he wrongful confiscation or taking of property belonging to U.S. nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2), (3). It was the "lack of effective international remedies for the wrongful confiscation of

property and for unjust enrichment from the use of that property by foreign governments at the expense of the rightful owners" that motivated Congress to authorize private civil actions. *Havana Docks Corp.*, 2020 WL 5217218, at *2 (quoting 22 U.S.C. § 6081(10)).

Defendants admit they are trafficking in the Confiscated Property. They admit that they use and benefit from the Confiscated Property through various commercial activities that supply Cuba's domestic market for energy and petroleum products and that procure U.S. dollars and acquire U.S. products to sustain the Cuban economy. Measured in dollars, these commercial activities amount to billions in transactions annually. It is clear just from this introductory summary that Plaintiff has standing to bring these claims.

Defendants' attempts to avoid liability fall flat. Their premise is that, notwithstanding sixty years of communist tyranny, Cuban entities operate independently; this is preposterous. Facing clear liability, Defendants argue sovereign immunity. But it is unavailable here for three reasons.

First, Title III expressly authorizes private civil suits in federal courts against "any person" including "any agency or instrumentality of a foreign state." *See* 22 U.S.C. §§ 6023(1), (11). Title III's exception to sovereign immunity for trafficking by state-owned entities is well founded in Congress's findings that trafficking has direct effects on U.S. nationals in the U.S. *See id.* § 6081. Moreover, Congress mandated that Title III must be given priority over any potentially conflicting provisions, including the Foreign Sovereign Immunities Act ("FSIA"). *See id*. § 6082(c)(1).

Second, even if Title III did not include an express exception to immunity (which it does), the direct effects of trafficking would satisfy the commercial activity exception under the FSIA for activities that "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). It is undisputed that the confiscated refinery and processing facilities are used for oil exploration and production of refined products that are then sold via a network of service stations in Cuba, which

includes confiscated service stations operated by CIMEX and CUPET.  Additionally, CUPET uses the Confiscated Property in oil exploration joint ventures with energy companies that compete directly with Plaintiff and other U.S. companies, and CUPET admits it has travelled to the U.S. to engage in lobbying and other activities to promote and facilitate its oil exploration work.

Third, because some of Defendants' commercial activities are conducted in the U.S., the FSIA's expropriation exception is also satisfied.  *See id.* § 1605(a)(3).  The first requirement—that Plaintiff's claim relates to "rights in property taken in violation of international law"—is met because Plaintiff's claim is based on Defendants' trafficking in property that was unlawfully expropriated.  The second requirement is satisfied because that property "is owned or operated by an agency or instrumentality"—here the Defendants.  And the third requirement is also satisfied because "that agency or instrumentality [the Defendants] is engaged in a commercial activity in the United States" as explained in detail below.  Accordingly, Defendants' motion to dismiss should be denied, or if necessary, jurisdictional discovery should be conducted.[1]

## BACKGROUND

### I.    Plaintiff's Certified Award for Cuba's Expropriation of Its Investment

Plaintiff is a U.S. national and formerly was an investor in Cuba's oil and gas industry until 1960, when its investment—a refinery, product terminals and plants, and service stations (the "Confiscated Property")—was expropriated by Cuba after Fidel Castro came to power.  Dkt. 33, Second Am. Compl. ¶¶ 25-33 (hereinafter "SAC").  Plaintiff subsequently filed a claim under Title V of the International Claims Settlement Act of 1949, as amended, 78 Stat. 1110 (1964), 22 U.S.C. §§ 1643-1643k (1964), as amended, 79 Stat. 988 (1965), with the FCSC, and on September 3,

---

[1] The request for a more definite statement is baseless and should be denied too.

1969, the FCSC awarded Plaintiff[2] a certified claim in the amount of $71,611,002.90 plus interest. SAC ¶¶ 34, 43; Dkt. 1-1 (Award).  The claim remains outstanding and unpaid.  SAC ¶¶ 33, 43.

## II.    Congress's Authorization of Private Civil Actions to Enforce Awards Against Cuba

In 1996, Congress passed LIBERTAD.  Title III authorizes private civil actions in federal courts against "any person" that traffics in the confiscated property:

> (1) Liability for trafficking.--(A) Except as otherwise provided in this section, any person that … traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . .

22 U.S.C. § 6082(a)(1).  The term "person" is defined to include "any agency or instrumentality of a foreign state" as defined by the FSIA, 28 U.S.C. § 1603(b).  *See* 22 U.S.C. §§ 6023(1), (11). Although private claims were suspended initially, the State Department authorized claims as of May 2, 2019.  SAC ¶ 49.

Title III broadly defines the prohibited trafficking activities to include direct use of, and/or benefits from, the confiscated property, including any activity that "causes, directs, participates in, or profits from, trafficking . . . by another person."  22 U.S.C. § 6023(13).  Defendants' motion and supporting declarations confirm that they not only traffic in the Confiscated Property directly in violation of Title III but also that they benefit from, participate in, and profit from trafficking activities conducted by their divisions, including various sub-entities called "empresas" that are integrated with CUPET.  This permits Defendants to unjustly enrich themselves at Plaintiff's expense and has other direct effects in the U.S., including "undermin[ing] the comity of nations, the free flow of commerce, and economic development," "undermin[ing] the foreign policy of the United States," and failing to "protect the claims of United States nationals."  *Id*. § 6081.

---

[2] In 1969, Plaintiff was Standard Oil, the claimant on the Award; Plaintiff changed its name to Exxon Mobil Corporation in 1999.  SAC ¶ 42.

### III.   Defendants' Trafficking in the Confiscated Property

Defendants' unlawful trafficking falls into two categories:  (i) use of the confiscated refinery and petroleum processing facilities to participate in the global oil market and supply the service stations with gasoline and other refined petroleum products (SAC ¶¶ 99-104), and (ii) use of the confiscated service stations to conduct commercial activities including processing remittances from U.S. persons and selling consumer goods obtained from U.S. companies (SAC ¶¶ 112-122).  Defendants do not dispute that all of these trafficking activities have occurred without compensating Plaintiff and "without the authorization of" Plaintiff.  *See* SAC ¶ 134.

### A.   Defendants' Trafficking in the Confiscated Refinery and Processing Facilities

CUPET admits trafficking in the confiscated refinery and processing facilities.  It operates through divisions—called *empresas* and mercantile societies—that, by its own admission, "are integrated with it."  Sotolongo Decl. 2d ¶¶ 2, 3, 4, 7, 9, 10, 12, 13, 15, 16, 19, 25.  On the English version of its website, CUPET states that it "is the organization that will effectively satisfy the supply of fuel and lubricant to the national market" and that this includes all aspects of upstream and downstream activities, including exploration, production, refining, trade and supply. Declaration of Jared R. Butcher ¶ 15.1 ("Butcher"); *see also* SAC ¶¶ 97-99.  CUPET advertises its use of the confiscated refinery—the Ñico López refinery—on its homepage (Butcher ¶ 9.1), and its Deputy Director admits that two of CUPET's integrated *empresas* "operate and use property identified in Paragraph 31 [of the Amended Complaint]."  Sotolongo Decl. 2d ¶ 25.

Although CUPET attempts to disavow connections with the service stations, it admits that it supplies those stations—including Servi-Cupet stations jointly operated with CIMEX—with gas and refined products.  Sotolongo Decl. 2d ¶ 7; SAC ¶¶ 93, 106-109.  CUPET and CIMEX collaborate in the sale and distribution of gasoline, lubricants, and diesel through a network of over 600 service stations that they control.  Butcher ¶ 18.  As CUPET's website confirms, there is no

other supplier of these items in Cuba.[3]  Butcher ¶ 15.1.  Prices are set by the Cuban State, which uses CUPET to subsidize operations of other state-owned entities. Sotolongo Decl. 2d ¶ 8; SAC ¶ 84.

As a participant in the global oil market, CUPET's commercial activities, including its trafficking in Confiscated Property, have direct effects in the U.S.  SAC ¶¶ 91, 101.  CUPET competes against Plaintiff through its foreign partnerships with Plaintiff's competitors around the globe.  SAC ¶ 101 (identifying competitors); Butcher ¶ 17.  Over the past decade, CUPET has pursued opportunities with more than a hundred energy companies—including by soliciting foreign investment and hosting conferences in Havana—and at least Canadian-based Sherritt International Corp. has entered into a joint venture for energy production in Cuba.  SAC ¶ 101(b); Butcher ¶ 17.4.  Moreover, CUPET's activities have included conduct in the U.S. by soliciting foreign investment, attending industry conferences, and lobbying the U.S. government regarding environmental issues.  SAC ¶¶ 102-04; Butcher ¶ 17.  On the financing side, CUPET has unlawfully obtained financing from the U.S. capital markets (SAC ¶ 102) and more recently, has solicited investments from companies throughout North America, including U.S. companies. Butcher ¶ 17.  CUPET admits that it has lobbied the U.S. government on environmental issues and that it has sent delegations to attend conferences in Florida, Texas, and Washington, DC, to meet with the State Department to discuss the U.S.-Cuba Oil Spill Cooperation Agreement, and to attend industry events.  Sotolongo Decl. 2d ¶¶ 12, 16; *see also* Butcher ¶ 17.

**B.     Defendants' Trafficking in the Confiscated Service Stations**

Defendants jointly operate service stations, including confiscated stations, under the brand

---

[3] This explains why Servi-Cupet is allegedly not a registered trademark.  Sotolongo Decl. 2d ¶ 9.

name "Servi-Cupet."  SAC ¶ 106-07, 116; Declaration of Mali Suris Valmaña, Dkt. 42-4, ¶¶ 5-6, 12 ("Valmaña"); Sotolongo Decl. 2d ¶ 7.[4]  The stations are used, among other services, to disburse remittances from U.S. persons to Cuban residents; to sell consumer goods obtained from U.S. companies; and, to sell gasoline and other petroleum products produced by CUPET using the confiscated refinery and processing facilities.  SAC ¶¶ 108-22.

Remittances are a much-needed source of hard currency for the Cuban economy and the process is tightly controlled by the Cuban government through CIMEX.  SAC ¶¶ 111-13, 117. Each year, U.S. persons send billions of U.S. dollars from Western Union locations throughout the U.S. to service stations (and other locations).  SAC ¶ 112; *see also* Butcher ¶ 18.2.  The recipients in Cuba can retrieve the remittances at one of the stations and receive Cuban Convertible Pesos ("CUCs").  SAC ¶¶ 117-18; *compare* Valmaña ¶ 13(b) *with* ¶ 13(i).  The U.S. dollars end up in Cuban bank accounts.  Valmaña ¶ 13(l).  The process is dictated by the terms of a contract between CIMEX's financial services division (FINCIMEX)[5] and Western Union, which terms include requirements of compliance with U.S. regulations.  Valmaña ¶¶ 6, 13(a), 14-15.

Defendants do not dispute that they participate in and derive benefits and/or profits from these remittance activities; in fact, Western Union lists one hundred twenty-four agent locations in Cuba operated by CIMEX, of which seventeen are Servi-Cupet stations co-operated with CUPET.  Butcher ¶ 20.  Nor do Defendants dispute that the end result is the transfer of billions of U.S. dollars to Cuba, which has limited access to hard currency.  SAC ¶¶ 121-22; *see* Valmaña ¶ 13(l) (dollars transferred to Cuban bank, but paid to recipient in CUCs).  No advertising or

---

[4] The extent of Defendants' current use of the confiscated service stations is reflected in records in Defendants' possession.  Valmaña ¶ 12 (4-10 of the agent locations are Confiscated Property).

[5] FINCIMEX is not independent of CIMEX, (Valmaña ¶ 24) (same President), and both are on the State Department's Cuba Restricted list as dominated by the Cuban military.  Butcher ¶¶ 13, 13.7. FINCIMEX is CIMEX's exclusive agent in the remittance business.  Butcher ¶ 21.5.

marketing is needed because CIMEX offers "the only conduit for persons residing in the United States to transfer U.S. dollars to support family and friends in Cuba."  SAC ¶ 122.

Defendants admit that they use a website (www.aisremesascuba.com) to process remittances (Valmaña ¶¶ 35-36); the website's ".COM" domain name is owned by CIMEX (*id*. ¶ 36) and is registered with a top-level domain registry operator, Verisign, located in Reston, Virginia.  Butcher ¶ 19 Ex. 61.  The website is used to actively solicit transactions from U.S. persons and CIMEX uses other U.S.-based social media platforms to promote the website and its remittance services., including through social media platforms such as Facebook and YouTube, and it facilitates transactions using AIS-branded cards.  Butcher ¶¶ 13.1, 21.8.[6]

In addition, Defendants use the confiscated service stations as convenience stores to sell a variety of petroleum products (SAC ¶¶ 107-08; Sotolongo Decl. 2d ¶ 7) as well as U.S. consumer goods.  SAC ¶ 109.  CIMEX, with assistance from its food import division ALIMPORT,[7] imports hundreds of U.S. products.  Valmaña ¶ 31.  Beginning in 2002, the company re-introduced "processed foods and branded foods *from the United States*" into Cuba.  Butcher ¶ 28 Ex. 207 (emphasis added); *id*. ¶ 26 Ex. 205 (export license listing CIMEX as approved end user).  In 2018, Cuba imported a significant amount in food and agricultural products from the U.S., many of which are sold in confiscated service stations.  Butcher ¶¶ 22-24; 28.

---

[6] *Cf. Am. Online, Inc. v. Aol.Org*, 259 F. Supp. 2d 449, 457 (E.D. Va. 2003) ("By choosing to register a domain name in the popular ".org" top-level domain, these foreign registrants deliberately chose to use a top-level domain controlled by a U.S. registry. They chose, in effect, to play Internet ball in American cyberspace. Had they wished to avoid an American ACPA suit and transfer order and American jurisdiction altogether, they might have chosen to register the infringing domain name in top-level domains with solely foreign registries and registrars, [such as '.CU.']").

[7] There is no evidence to support the assertion that ALIMPORT is independent from CIMEX. *See* Valmaña ¶ 31.  ALIMPORT acts as CIMEX's exclusive agent for procuring consumer goods from U.S. companies.  Butcher ¶ 30.1.

## C.     Defendants' Other Commercial Activities in the United States

CIMEX and CUPET deny engaging in other commercial activities in the U.S., but there is substantial evidence to the contrary.  CIMEX operates a large shipping and distribution business through a division called Cubapack (Valmaña ¶ 42), generating millions of dollars by facilitating the shipments of merchandise each month from the U.S. to Cuba, which involves U.S. companies based in Florida and elsewhere in the U.S.  Butcher ¶ 30.  According to its website, Cubapack was "created within CIMEX S.A. corporation in order to deal with the reception, control and distribution of parcels and correspondence mainly from the [U.S.]."  Butcher ¶ 30.3.  CIMEX also owns the trademark "Cubita"—a coffee brand registered with the USPTO (Butcher ¶ 29.1 Ex. 209)—which CIMEX successfully defended in a trademark dispute that the USPTO resolved in its favor.  Butcher ¶¶ 29.1-29.2

Similarly, CUPET advertises its services in the U.S. (Butcher ¶ 17.4), and it admits having at least some contract negotiations with U.S. companies.  Sotolongo Decl. 2d ¶ 17.  There is also evidence that CUPET has sold fuel to U.S. companies that operate charter flights from the U.S. to Cuba.  Butcher ¶¶ 17.18-17.19.  This evidence has been uncovered without any discovery.

### ARGUMENT

## I.     Plaintiff Has Standing Under Title III

Defendants' challenge to Plaintiff's standing is meritless.  Defs.' Mem. in Supp. of Mot. to Dismiss, Dkt. 42-3, at 45-46 ("Mot.").  As the rightful holder of a certified (and unpaid) claim, Plaintiff has (i) suffered an injury-in-fact, (ii) that is fairly traceable to the challenged conduct of the Defendants, and (iii) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

### A.     Plaintiff Has Suffered Injury-in-Fact Due to Defendants' Trafficking

Defendants are trafficking in the Confiscated Property, through their own use and by

benefitting from uses by other state-owned entities.  *See supra* at 5-9.  This satisfies the injury-in-fact requirement.  Plaintiff has suffered, and continues to suffer, "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent,'" *Spokeo*, 136 S. Ct. at 1548, due to the undisputed fact that Defendants have not compensated Plaintiff or obtained Plaintiff's authorization for use of the Confiscated Property, as Congress required.  22 U.S.C. § 6023(13)(A).

That is exactly what Congress sought to address when it enacted Title III, which grants Plaintiff the private right to bring an action to enforce its award.  Defendants do not contest that Plaintiff owns the award to the Confiscated Property or that Congress authorized owners of awards to bring claims in federal courts against "any person" who traffics without paying compensation or obtaining authorization.  *Id*. § 6083(a)(1); SAC ¶¶ 56-60.  This should end the standing debate, since Plaintiff is not required to "assert an actual injury beyond the violation of his personal or legal rights to satisfy the 'injury-in-fact' requirement."  *Spokeo*, 136 S. Ct. at 1552 (Thomas, J., concurring); *id.* at 1549 (explaining that the "judgment of Congress" plays an important role in identifying a concrete injury as "Congress is well positioned to identify intangible harms that meet minimum Article III requirements"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring) ("Congress has the power to define injuries . . . .").

Plaintiff is the prototypical Title III claimant that Congress contemplated when it authorized private actions.  *See* Markup before the H. Comm. on Int'l Rel. at 4, H.R. Rep. 93-060 (June 30, 1995) (Rep. Burton: "Title III protects the property rights of U.S. citizens."); 142 Cong. Rec. S1481 (daily ed. Mar. 5, 1996) (Statement of Senator Coverdell: "[Title III] puts [traffickers] on notice that, if they enrich themselves with stolen property, they will be held liable to the legitimate U.S. owners."); Statement of President Clinton on the Helms-Burton Act, 1996 WL 396122 (White House), at *1 (July 16, 1996) (the Act is an immediate step "to protect[] the

interests of American citizens whose property was expropriated by the Cuban regime"). Congress intended for claimants like Plaintiff to remedy the "unjust enrichment from the use of [their] wrongfully confiscated property." 22 U.S.C. § 6081(8).

Other federal courts have found that Title III claim holders are injured in fact by a defendant's trafficking in confiscated property without paying rightful compensation or obtaining necessary authorization. *Iglesias v. Pernod Ricard*, Order, ECF No. 55 at 16-18, 20-cv-20157-KMW (S.D. Fla Aug. 17, 2020) (holding that Plaintiff has standing to bring a claim under the Act and explaining that the court's inquiry is focused on the *trafficking* rather than expropriation); *see also Havana Docks Corp.*, 2020 WL 5217218 (S.D. Fla. Sept. 1, 2020) (order finding standing for certified claim holder to pursue trafficking claim); *Havana Docks Corp. v. MSC Cruises Sa Co.*, 2020 WL 5367318 (S.D. Fla. Sept. 8, 2020) (order finding same); *Havana Docks Corp. v. Carnival Corp.*, 19-cv-21724-BLOOM, ECF No. 124 (S.D. Fla. Sept. 14, 2020) (order finding same).[8]

### B.      Plaintiff's Injury Is Directly Traceable to Defendants

The SAC alleges numerous instances in which the Defendants directly engaged in trafficking activities without receiving Plaintiff's authorization or providing any compensation. SAC ¶¶ 33, 86-126; *see also Arpaio*, 797 F.3d at 19; *In re U.S. Office of Personnel Mgmt. Data Security Breach Litigation*, 928 F.3d 42, 54 (D.C. Cir. 2019) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) ("Article III standing does not require that the defendant be the

---

[8] *Glen v. American Airlines*, No. 4:20-CV-482-A, 2020 WL 4464665 (N.D. Tx. Aug. 3, 2020) failed to address Congress's findings of the harm caused by trafficking and unlike in this case, the plaintiff stated that operation of the confiscated property did not constitute injury in fact. *See MSC Cruises Sa Co.*, 2020 WL 5367318, at *7 ("Contrary to the conclusion in *Glen v. American Airlines* that the plaintiff had no standing because there was no allegation of concrete harm, the Court finds that the allegations of profiting from the use of property that was expropriated without obtaining consent or paying adequate compensation to the original owner is sufficient concrete harm for standing purposes.").

most immediate cause, or even a proximate cause, of the plaintiffs' injuries.")).

Defendants' argument to the contrary is based on a misrepresentation of Plaintiff's claim as one for "loss of Essosa's property."  Mot. at 46; *see also Havana Docks Corp.*, 2020 WL 5217218 (S.D. Fla. Sept. 1, 2020) (affirming that an injury in a Title III suit is traceable to Defendants' trafficking).  Title III is clear that a trafficking claim accrues to the owner of the certified claim, and Plaintiff is the owner of the award, which the Court must presume is conclusive proof.[9]  22 U.S.C. § 6082(a)(2) (creating presumption in favor of certified claims).

## II.    This Court Has Subject Matter Jurisdiction Under Title III

Title III unambiguously allows claimants to sue an "agency or instrumentality of a foreign state," including the Defendants, irrespective of the FSIA, to ensure that victims of confiscations are "endowed with a judicial remedy in the courts of the United States."  *See* 22 U.S.C. §§ 6023(11), 6081(11), 6082(a)(1); *see also* Markup before the H. Comm. on Int'l Rel. at 28, H.R. Rep. 93-060 (June 30, 1995) (statement of Senator Robert Menendez) ("[Title III] is about giving a cause of action in the federal courts to an American citizen or an American company").

A private judicial remedy was deemed necessary "to provide protection against wrongful confiscations by foreign nations" and to address the absence of "fully effective remedies for the wrongful confiscation of property and . . . unjust enrichment from the use of wrongful confiscated property by governments . . . ."  22 U.S.C §§ 6081(8), (10).  Section 6082(d) specifically contemplates that judgments will be obtained against Cuban state-owned entities when it provides for an avenue of potential relief—*i.e.*, that "an agency or instrumentality of the Cuban Government shall not be enforceable against" a transitory or democratic Cuban government.  *Id*. § 6082(d).

---

[9] Statutory damages claims, like Plaintiff's claim here, present redressable injuries.  *See* SAC ¶ 34; 22 U.S.C. § 6082(a)(3); *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984).

This interpretation accords with the State Department's phased approach to ending the suspension of Title III, which began by permitting private suits only against entities on the Cuba Restricted List, which would have been a toothless gesture if those entities enjoyed immunity.[10]

Congress did not intend Plaintiff's claims to be barred by the FSIA.  Section 302(c) of Title III states, "*[e]xcept as provided in this chapter*, provisions of Title 28 [which includes the FSIA] and the rules of the courts of the United States apply to actions under this section to the same extent as such provisions and rules apply to any other action brought under Section 1331 of title 28." 22 U.S.C. § 6082(c)(1) (emphasis added).[11]  Thus, the FSIA applies only so long as it does not conflict with Title III, in which case Title III must control as Congress directed.[12]  *Janko v. Gates*, 741 F.3d 136, 139-40 (D.C. Cir. 2014).  This conclusion accords with Congress's finding that trafficking has direct effects in the U.S., 22 U.S.C. §§ 6081(2), (6), which satisfies the requirements for subject matter jurisdiction under the FSIA and the personal jurisdiction requirements of this Court.  28 U.S.C. §§ 1330(b), 1605(a)(2).  Moreover, Title III's contemplation of suits brought against Cuban agencies and instrumentalities, which at the time of Title III's passage had restricted

---

[10] U.S. State Department, Transcript: Senior State Department Official on Title III of the LIBERTAD Act (Mar. 4, 2019), Butcher ¶ 13 Ex. 223 ("U.S. nationals will have the right to bring action against Cuban entities . . . on the Cuba Restricted List . . . with this decision the U.S. is holding the Cuban regime accountable and opening a path of redress for U.S. claimants").

[11] Defendants place too much weight on the heading for § 6082(c)(1).  Headings "cannot undo or limit that which the text makes plain." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 784-85 (D.C. Cir. 2012).  Defendants also incorrectly argue that Plaintiff conflates this provision with a "cause of action." *Compare* § 6082(a) (cause of action) *with* § 6082(c) (subject matter jurisdiction).

[12] This provision stands in contrast with the Antiterrorism Act, which while providing a cause of action for U.S. nationals, expressly provided that foreign sovereigns and their agencies "acting in their official capacity or under the color of legal authority" are immune from suit.  18 U.S.C. § 2337(2); *E.g.*, *Estates of Ungar v. Palestinian Authority*, 315 F. Supp. 2d 164, 175 (D.R.I. 2004). No such limitation is in the Helms-Burton Act, which specifically mentions lawsuits against agencies or instrumentalities of the Cuban Government—indeed, the very purpose of the law.

access to U.S. markets because of the embargo, would make no sense if Congress intended claimants to be restricted by the FSIA.[13]

Defendants cast Plaintiff's reading of the Act and legislative history as requiring Congress to have swept aside the FSIA.  But Congress resolved this issue when it chose to authorize lawsuits against state-owned entities that traffic in confiscated property.  22 U.S.C. § 6082(c)(1).

Even if there were an "irreconcilable conflict" between the FSIA and Title III, statutory interpretation principles require giving effect to the later-enacted, more specific Title III. *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994) ( "recent enactments should be favored over older ones; and specific statutory provisions should prevail over general ones" when there is an irreconcilable conflict between statutes); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand"); *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) ("where there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one") (original emphasis).[14]

Defendants next invoke legislative history to argue that the deletion of provisions modifying 28 U.S.C. § 1605 and § 1331 from the draft of Title III's precursor legislation shows that Title III does not create an immunity exception.  Mot. at 44.  But Defendants offer no evidence

---

[13] Defendants argue that Title III's amendment of 28 U.S.C. § 1611 to preclude recovery against diplomatic properties is evidence that Congress did not intend to grant subject matter jurisdiction through the Act.  But this provision, 22 U.S.C. § 6082(e), simply shows that Congress was careful to recognize when Title III would override provisions of Title 28 it sought to preserve.

[14] Cases such as *Argentine Rep. v. Amerada Hess Shipping Corporation*, which had suggested that FSIA is the "sole basis for obtaining jurisdiction over a foreign state" are inapposite.  488 U.S. 428, 438 (1989).  In *Amerada Hess*, the Supreme Court considered whether the FSIA controlled over an earlier-in-time treaty, whereas here, Title III came after the FSIA and explicitly indicated that it should control irrespective of the provisions of the FSIA.

of *why* the drafters deleted these provisions, which were replaced by Congress's explicit grant of jurisdiction and authorization of private civil suits in 22 U.S.C. § 6082(c).   The precursor legislation cited by Defendants is of no moment, since it even dropped Title III in its entirety at one point. *See* 141 Cong. Rec. S15277-78, 82 (daily ed. Oct. 18, 1995).   Regardless, Title III permits suits in the federal courts against "any person," including agencies and instrumentalities.[15]

## III.    This Court Also Has Subject Matter Jurisdiction Under the FSIA

Even if the FSIA applies, Defendants are not immune from this Court's jurisdiction.   When a defendant moves to dismiss a complaint based on sovereign immunity, it bears the burden of proving that "the plaintiff's allegations do not bring its case within a statutory exemption to immunity." *Phoenix Consulting v. Rep. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).   Plaintiff's "unchallenged factual allegations" are assumed to be true.   *Price v. Socialist People's Libyan Arba Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002); *see also Simon v. Rep. of Hungary*, 812 F.3d 127, 135 (D.C. Cir. 2016) (same).   "Thus, where the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price*, 294 F.3d at 93.   To the extent that a defendant also challenges "the factual basis of the court's jurisdiction," the Court should "resolve any disputed

---

[15] To the extent that the Court relies on the legislative history from the Act's predecessor, the Court should focus on Senator Helms's original formulation of Section 302, which provided U.S. nationals with a cause of action against "any agency or instrumentality of a foreign state . . . in *the conduct of commercial activity*" that engages in trafficking.   Robert L. Muse, *A Public International Law Critique of the Extraterritorial Jurisdiction of the Helms-Burton Act (Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996)*, 30 Geo. Wash. J. Int'l L. & Econ. 207, 215 (1996).   This shows that Congress did not intend the Helms-Burton Act to be read *in pari materia* with the FSIA.   As Professor Muse explains, there can be no other explanation for this deletion than to render Cuban agencies and instrumentalities subject to suit for trafficking in confiscated properties "regardless of whether its activities with respect to those properties are commercial or not." *Id.* at 215 n.25.

issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004)

"In the context of foreign sovereign immunity claims . . . district courts must afford plaintiffs 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Wood ex rel. U.S. v. American Institute in Taiwan*, 286 F.3d 526, 534 (D.C. Cir. 2002) (quoting *Phoenix Consulting*, 215 F.3d at 40). In resolving any disputed issues of fact, the Court "may take evidence and resolve relevant factual disputes." *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017); *Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392, 399 (D.C. Cir. 2018). "Jurisdictional discovery is frequently the key to obtaining this evidence." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*, 185 F. Supp. 3d 233, 239 (D.D.C. 2016). Importantly, the standard for a plaintiff's allegations at this stage "is obviously far less demanding than what would be required for the plaintiff's case to survive a summary judgment motion" or a trial on the merits. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008). A defendant cannot defeat jurisdiction by arguing "that the averments [in a complaint] might fail to state a cause of action on which [plaintiffs] could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946).

Defendants' trafficking in the Confiscated Property and other commercial activities are sufficient to satisfy two exceptions to sovereign immunity: (i) the commercial activity exception for activities that "cause[] a direct effect in the United States," (28 U.S.C. § 1605(a)(2)) and (ii) the expropriation exception for state-owned entities that operate wrongfully confiscated property and that "engage[] in a commercial activity in the United States." *Id.* § 1605(a)(3). Defendants' efforts to obscure the facts by introducing thousands of pages of documents into the record should be rejected, or at the very least, they should be the subject of discovery.

16

### A.       Defendants' Commercial Activities Cause Direct Effects in the United States

Defendants do not dispute that their trafficking—*i.e.*, use of the refinery, petroleum processing facilities, and service stations—is commercial activity.  *See Rep. of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Saudi Arabia v. Nelson*, 507 U.S. 349, 350 (1993). Although they argue that these activities have no "direct effect" in the U.S., there is ample evidence that direct effects do "follow[] as an immediate consequence of" Defendants' trafficking activities. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 1324 (2019).  Although primarily conducted outside the U.S., these commercial activities "cause a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

### 1.       Defendants' Trafficking in the Confiscated Service Stations

Defendants admit that they currently operate confiscated service stations and that those stations are used to obtain billions of U.S. dollars annually to supply the Cuban financial system; purchase millions of dollars' worth of U.S. consumer goods to sustain the Cuban economy; and sell gasoline and other petroleum products produced by CUPET in the confiscated refinery.

### a.       Using the confiscated service stations to process remittances

"Remittances from the United States . . .  play an important role in Cuba's state-controlled economy"[16]—infusing much-needed, hard currency and causing direct effects in the U.S.[17]  In 2018, Cuba received approximately $3.6 billion from remittances and 90% of those funds came

---

[16] U.S. Dept. of State, U.S.-Cuba Relations, *available at* https://www.state.gov/u-s-relations-with-cuba/.  *See* Butcher ¶ 22.

[17] Remittances are not the only way that Cuba seeks much needed capital through the U.S. markets. Société Générale admitted that it criminally engaged in transactions to facilitate funds to Cuba, including CUPET, through the U.S. financial system.  *See* Butcher ¶ 21.7. Defendants' assertion that there "was no charge that CUPET obtained financing from . . . U.S. sources" (Mot. at 16) is contrary to the DPA.

from the United States.  SAC ¶ 112; Butcher ¶ 21.1.  Until July 2020, the Cuban government levied a 10% tax on the use of the U.S. dollar to infuse even more hard currency into its financial system.  *See* Butcher ¶ 21.6.  As the Washington Post reported, "[w]hen anyone exchanged 10 dollars for CUC[18] in the local market, they only received nine CUC."  *Id.* Cuba's new "dollarization" policy was a result of a decrease in remittances in 2020 and is intended to incentivize Cubans in possession of U.S. dollars—*i.e.* those who receive remittances from the U.S.—to spend them on food and other retail goods.  Thus, local markets, including the confiscated service stations, play a vital role in the infusion of U.S. dollars into the Cuban economy.

Defendants do not have access to the U.S. capital markets due to the U.S. embargo.  This has not stopped them (and other Cuban entities) from trying to obtain financing from U.S. markets.  *See* SAC ¶ 102.  However, the most effective source of dollars has been remittances.  Defendants use their network of service stations as the channels through which billions of dollars of remittances flow annually from the U.S. into Cuba.  *Supra* at 6-9; *see also* 22 U.S.C. § 6081(6) (trafficking gives the Cuban government "badly needed financial benefit, including hard currency").  The "immediate consequence" of opening these channels is that they create a market for remittances to flow from the U.S. to Cuba and enable these transactions to occur.  SAC ¶¶ 120-122.  Defendants admit that at least some confiscated service stations are used in this process, which accrues U.S. dollars in Cuban bank accounts, while the recipients in Cuba are paid in local currency instead.  *Supra* at 7-8.  This is analogous to the well-established commercial activity exception of accessing U.S. capital markets.  *See Weltover*, 504 U.S. at 607 (Argentina issued bonds to raise funds from the New York capital market); *EIG Energy Fund XIV, L.P.*, 894 F.3d at

---

[18] "CUC" is the convertible Cuban peso, an alternative currency in Cuba pegged to the U.S. dollar. All remittances are paid in CUCs and were subject to the 10% tax.

345 (Brazilian state-owned oil company obtained investment from U.S. fund).

Defendants' conduct indisputably is aimed directly at the U.S.  As the exclusive agent in Cuba of Western Union, CIMEX facilitates the transmission of remittances from all fifty states, the District of Columbia, and online.  SAC ¶ 114.  In doing so, (1) CIMEX structured its arrangement with Western Union to specifically comply with U.S. restrictions (Valmaña ¶ 14); (2) CIMEX registered its remittance website in the U.S. (Valmaña ¶ 36; Butcher ¶ 19); (3) CIMEX, through Western Union, charges a transaction fee to Americans that is paid in U.S. dollars and shared by CIMEX and the location processing the remittance (Valmaña ¶¶ 13(b), 13(1)); (4) CIMEX and CUPET charge a 240% mark-up on retail goods purchased with pre-paid cards that contain remittances in order to infuse more U.S. dollars into Cuba's economy (SAC ¶ 119); and (5) CIMEX and CUPET implement Cuba's "dollarization" policies intended to attract the spending of U.S. dollars in stores like Servi-Cupet.  Butcher ¶ 21.6  Simply put, anything that causes several billion dollars' worth of transactions to be conducted by U.S. residents across the country, through a U.S. company, must constitute a direct effect in the U.S.

Defendants' arguments to the contrary miss the mark.  As an initial matter, Defendants misstate the test for direct effects; the D.C. Circuit has not adopted the "legally significant" test. *See Glob. Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 113 (D.D.C. 2003).  Rather, as explained in *Weltover*, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618.[19]  Nor is "'substantiality' or 'foreseeability'" required. *Id.;*

---

[19] Some circuits have found that *Weltover* abrogated the "legally significant" test. *See Glob. Index, Inc.*, 290 F. Supp. 2d at 113; *see also United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 821 F. Supp. 1405, 1408 (D. Colo. 1993), *aff'd*, 33 F.3d 1232 (10th Cir. 1994) (observing that *Zedan* was abrogated by *Weltover*).  Furthermore, in *Zedan*, the plaintiff's U.S. citizenship was the only connection to the U.S. *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of*

*see also Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 133 (2d Cir. 1998) (noting that the U.S. "need not be the location where the most direct effect is felt, simply a direct effect"). Here, Defendants' trafficking is intended to, and does, create demand in the U.S. for remittances and consumer goods.[20] Defendants argue that Plaintiff cannot rely on *these* trafficking activities because it may be able to base its claim on *other* trafficking activities, but this improperly ignores the direct effects in the U.S. caused by Defendants' trafficking in the confiscated service stations. Mot. at 12-15.

Next, Defendant argues that the "*locus* of the tort" occurred outside the U.S. and the remittance activities do not otherwise cause injury in the U.S. Mot. at 13. But this conflates the *locus* of the trafficking with its direct effects. In this Circuit, "the third clause of the commercial activity exception turns on the requisite site of the direct effects of the defendant's alleged tort, not its 'locus' as a matter of tort law." *EIG Energy Fund XIV, L.P.*, 894 F.3d at 347. Similarly, the third clause does not require that Defendants' trafficking to cause injury in the U.S. (which it does). *See Weltover*, 504 U.S. at 609-10 (effect in New York even though injury suffered by investors abroad); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527, at *4-5 (D.D.C. Sept. 21, 2006); *Jam v. Int'l Fin. Corp.*, 442 F. Supp. 3d 162, 173 (D.D.C. 2020)("[R]igid 'place of injury' or 'last act'" [do not] identify the *gravamen* of a suit.").[21]

Finally, Defendants argue that "intervening events" like whether an individual sends a

_____

*Canada*, 600 F.3d 661, 665 (D.C. Cir. 2020) (discussing *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C. Cir. 1988)).

[20] Defendants' argument that any effect is purely trivial is unsupported and should be rejected, particularly at this stage in the proceedings. Mot. at 15. Defendants point only to Ms. Valmaña's (a CIMEX employee) suggestion that "only" 4-10 of the confiscated service stations process remittances. Mot. at 15. This says nothing definitive of the impact on the U.S. remittance market.

[21] Defendants' suggestion that "trafficking is property specific" is found nowhere in Title III.

remittance or whether it is received at the Confiscated Property render any effect not "direct." Mot at 14. But Defendants concede that some of the confiscated service stations process remittances, so their speculation about "intervening events" is unavailing. *See* Valmaña ¶ 12.

### b.    Purchasing of consumer goods from the United States

Each year CIMEX imports hundreds of millions of dollars' worth of food and consumer goods from the U.S., which "is the largest provider of food and agricultural products to Cuba."[22] CIMEX is the exclusive purchaser of American food products in Cuba (Valmaña ¶ 31)— purchasing over $6 billion in American food between 2001 and 2019. Butcher ¶¶ 22-25. CIMEX "decides who to do business with, what quantity to buy based on end customers' needs, and negotiates and fixes prices." Butcher ¶ 23. Once imported, CIMEX sells these products at Servi-Cupet stations—including the confiscated service stations. *Id.*

Surprisingly, given the ease with which U.S. companies can ship products to Cuba, CIMEX imports products at lower costs and with more efficient distribution from the U.S. than imports from other countries. *See* Butcher ¶ 27. As such, CIMEX actively solicits business from U.S. companies. For example, at one conference, CIMEX hosted 291 U.S. companies and state delegations. Butcher ¶ 24. These sales lead directly to a flow of a capital into, and a flow of goods from, the U.S. SAC ¶ 122. But the nexus does not end there. "[A] large proportion of [the] remittance dollars" from the U.S. are spent by Cubans on U.S. products.[23] And since Cuba cannot access foreign exchanges, CIMEX uses the dollars to buy more products from the U.S.[24]

---

[22] U.S. Dept. of State, U.S.-Cuba Relations, *available at* https://www.state.gov/u-s-relations-with-cuba/. *See* Butcher ¶ 22.

[23] *See* Butcher ¶¶ 21, 27 (noting that that these dollars are, in particular, spent on American agricultural products).

[24] *See* Butcher ¶ 27 at 2-6, 2-7 (Cuba's inability to access foreign exchange limits its ability to import U.S. products and "underscores the importance of Cuban-American family travel and

At a minimum, obtaining U.S. products from U.S. companies constitutes commercial activity that has a direct effect here. *Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983) (sufficient nexus where sovereign engaged in "entire course of [commercial] activity in the United States," which included making purchases of commodities in the U.S. and arranging for the transportation of the goods from the U.S.); *Siderman de Blake v. Rep. of Argentina*, 965 F.2d 699, 709 (9th Cir. 1992) (direct effect in the U.S. where Argentina received "profits and benefits that rightfully belong to the [plaintiffs]—including those derived from U.S. sources."); *Daventree Ltd. v. Rep. of Azerbaijan*, 349 F. Supp. 2d 736, 751 (S.D.N.Y. 2005) (U.S. investors solicited by sovereign to invest in privatization vouchers for which sovereign received $100 million from the U.S.); *EIG Energy Fund XIV, L.P.*, 894 F.3d at 403 (direct effects where the act serving as the basis of the claim directly targeted American investors).[25]

### 2.     Defendants' Trafficking in the Refinery and Processing Facilities

Defendants also are trafficking in the confiscated refinery and processing facilities, using them to produce gasoline and other petroleum products for sale at confiscated services stations. SAC ¶¶ 91-108.  As the FCSC concluded, Plaintiff's operations in Cuba were "extensive" and generated millions worth of petroleum products on land valued at nearly $50 million.  SAC Ex. 1 at 3, 7.  Defendants' trafficking in this significant infrastructure has a direct effect in the U.S.

---

remittances[.]").  Defendants' use of the service stations to sell U.S. goods also undermines U.S. foreign policy.

[25] These activities also amount to commercial activities "carried on in the United States," as set forth in the first clause of the commercial activities exception.  *See Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983); *Virtual Def. & Dev. Int'l, Inc. v. Rep. of Moldova*, 133 F. Supp. 2d 1, 5 (D.D.C. 1999) ("The mere solicitation of Virtual in the United States may constitute a sufficient nexus with the United States.") (citing *In re Papandreou*, 139 F.3d 247, 253 (D.C. Cir. 1998)); *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 328 (D.D.C. 2007) (engaging in "'import-export transactions involving sales to, or purchase from, concerns in the United States'") (citing examples of "substantial contact" from the FSIA's legislative history).

### a.      Using the Confiscated Property without authorization

Defendants' unauthorized use of, and profit, from the confiscated refinery and processing facilities causes a direct effect on the "rightful owner" of the property.  As Congress provided, trafficking occurs when confiscated property is used "without the authorization of" the claim holder.  22 U.S.C. § 6023(13)(A)(iii).  Defendants' failure to obtain authorization from Plaintiff as a U.S.-based enterprise for the use of Plaintiff's property is a direct effect here.  *See Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 453 (6th Cir. 1988) (utilizing plaintiff's trade secrets without authorization was a direct effect in the U.S. because plaintiff was based here); *CYBERsitter, LLC v. People's Rep. of China,* 805 F. Supp. 2d 958, 977 (C.D. Cal. 2011) ("direct effect" where a Chinese entity distributed U.S. entity's property without consent).

Moreover, Congress has found that trafficking continuously deprives the U.S. claim holder of its fundamental property rights, allowing the trafficker to profit unjustly at a claimant's expense. *See* 22 U.S.C. §§ 6081(1), (2).  Congress's conclusion of this direct effect is entitled to substantial deference.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("It is vital in [the foreign affairs] context" for a court not to "substitute [its] own evaluation of evidence for a reasonable evaluation by the Legislative Branch."); *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 196 (1997) (noting that the judiciary "owe[es] Congress's findings an additional measure of deference . . . ."); *see also* 22 U.S.C. § 6081(9) (a nation may proscribe extraterritorial conduct that "has or is intended to have substantial effect within its territory").

Congress's finding is in lock-step with the law of this Circuit.  The D.C. Circuit found a "direct effect" when a foreign state took over a commercial venture jointly owned with a U.S.

company.  *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438, 451 (D.C. Cir. 1990).[26]
There, Iran's actions cut off the "constant flow of capital, management personnel, engineering
data, machinery, equipment, materials and packaging, between the United States and Iran."  *Id.*
Defendants' trafficking likewise cuts off a flow of capital, personnel, data, equipment, and
materials to the U.S., including compensation that should be made to Plaintiff in the U.S.  *See
Weltover*, 504 U.S. at 619 (inquiry in the "direct effect" analysis is whether money that was
supposed to have been delivered to a U.S. location will not be forthcoming); *Glob. Index, Inc.*, 290
F. Supp. 2d at 113 ("*Weltover* asks merely if payment is 'supposed' to be made in the United States
to determine whether an activity has had a direct effect."); *see also Cruise Connections Charter
Mgmt. 1, LP*, 600 F.3d at 665 (Canadian agency's termination of a contract with American
companies caused a direct effect because "revenues that would otherwise have been generated in
the United States were 'not forthcoming.'"); *Hanil Bank*, 148 F.3d at 132 ("The default itself
necessarily results in the non-appearance of monies intended for deposit at that location and is all
*Weltover* requires to cause a direct effect in this country."); *Glob. Index, Inc.*, 290 F. Supp.2d at
114 n.8 (prior history of payments flowing to the U.S., even without "express designation," "might
have satisfied the direct effect requirement.")

Defendants citations are not to the contrary.  *Bell Helicopter* cited both *Cruise Connections*
and *Foremost-McKesson* with approval—noting that Bell merely failed to offer "analogous
evidence of a 'direct effect.'"  *Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran*, 734 F.3d 1175,
1185 (D.C. Cir. 2013).  In *Bell Helicopter*, plaintiff showed only possible "reputational" harm to

---

[26] Regardless of whether the confiscated oil infrastructure is "used" by CUPET or one of its
"integrated entities," Plaintiff has plausibly alleged that CUPET profits from this use.  *See infra* at
25-26.

its business. *Id.* at 1184.[27]  Similarly, in *Antares Aircraft*, plaintiff offered nothing more than Nigeria's detaining a plane owned by plaintiff in connection with a dispute over the payment of fees. *Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*, 999 F.2d 33, 34 (2d Cir. 1993).  As the D.C. Circuit recognized, these two harms are far more attenuated than the disruption of the flow of capital, equipment, and personnel present in *Foremost-McKesson* and the "not forthcoming" revenue in *Cruise Connections*. *Bell Helicopter*, 734 F.3d at 1185.

*EIG Energy Fund* provides further support.  *See EIG Energy Fund XIV, L.P.*, 894 F.3d 339. As an initial matter, *EIG* flatly contradicts Defendants' reading of *Bell Helicopter* and *Antares* (*see* Mot. at 10), observing that neither case held that "a tort's foreign *locus*, without more, means that it causes no direct effect in the United States." *Id.* at 348.  Rather, the court explained that even if the *locus* of the alleged tort (there, a loss booked by plaintiff's Luxembourg-based investment fund) occurred abroad, the loss would have still flowed into the books of the fund's manager in the U.S. *Id.* at 349.  And that this loss, combined with, *inter alia,* defendant's targeting of U.S. investors, was sufficient to establish a direct effect. *Id.* at 345.  Here, the losses ultimately flowed to Plaintiff.

### b.  Facilitating unfair competition

CUPET's use of Confiscated Property without authorization from or compensation to Plaintiff causes unfair competition with Plaintiff.  CUPET admittedly receives the benefit of the Confiscated Property, without paying for it, and then uses that property to compete in the global oil market without having to bear the costs of investing in the necessary infrastructure.

CUPET has implemented a variety of successful—and presumably profitable—ventures

---

[27] *Bell Helicopter* also was decided in the context of vacatur of a default judgment and, thus, did not speak to pleading requirements.

that use, in one way or another, Confiscated Property.  For example, since 2014, CUPET has partnered with Sherritt International, a large Canadian-based energy company and direct competitor of Plaintiff, in a joint venture called Energas S.A.  Butcher ¶ 17.4.  CUPET purchases oil from Sherritt and refines it at the confiscated Ñico López refinery,[28] which has the largest capacity of any refinery in Cuba and processes both domestic and imported petroleum.  *See* Butcher ¶ 17.12.  Around 90% of Sherritt's total petroleum production comes from Cuba.[29]

CUPET has entered into similar ventures with other large, foreign energy companies that compete directly against Plaintiff and other U.S. companies, including PDVSA, S.A., Repsol-YPFD, S.A., Sonagol Group, and Melbana Energy.  SAC ¶ 101(d); *see* Butcher ¶ 17.13.  Melbana touts that its share in "Block 9" of Cuba's oil fields could contain 14.8 billion barrels of oil and could "be developed quickly and cheaply due to the proximity of Block 9 to existing oil field infrastructure."  *See* Butcher ¶¶ 17.8-17.9.  Also, Castrol, B.V (part of the multinational oil company, BP) partners with CUPET to manufacture lubricants at the confiscated refinery and processing facilities, which are sold at the confiscated service stations[30] and to foreign companies to support their operations in Cuba—one of Castrol's top customers in Cuba is Sherritt International.  *See* Butcher ¶ 17.10.

Congress found this type of unfair competition has direct effects in the U.S.[31]  *See* 22 U.S.C. §§ 6081(2), (5), (6) (finding that Cuba's partnerships disrupt commerce and undermine the

---

[28] *See* Butcher ¶ 17.11 (Ñico López refinery, which is the only refinery in Cuba with "conversion" capacity—i.e. the ability to create a wide range of fuels and lubricants.)

[29] *See* Butcher ¶ 17.13; *id*. ¶ 9.1 (Sherritt's Cuban operation has grown to an intermediate exploration and production business)

[30] *See* Butcher ¶ 17.10 ("In mid-April [2004], at the Cupet-Cimex gas station along Quinta Avenida in Miramar, a one-gallon jug of Castrol SAE-50 motor oil was selling for $14.20[.]")

[31] SAC ¶ 86.

ability of the U.S. to protect U.S. nationals' claims to the confiscated property). Defendants are "profit[ing] from economically exploiting Castro's wrongful seizures" and have refused to pay the appropriate compensation to Plaintiff. *Id.* § 6081(11). Courts considering similar facts have reached the same conclusion. In *WMW Machinery*, the court found a direct effect where the sovereign entity "transfer[red] [] ownership of newly privatized machine tool factories . . . to American competitors of [plaintiff, an American company]." *WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F. Supp. 734, 740, 744 (S.D.N.Y. 1997). The court observed that this conduct prevented plaintiff from fully receiving the competitive advantage for which it had bargained. *Id.* at 744; *see also Am. Bonded Warehouse Corp. v. Compagnie Nationale Air France*, 653 F. Supp. 861 (N.D. Ill. 1987).

### c.   Causing direct environmental-related effects

CUPET's operation of the confiscated refinery and processing facilities also has direct environmental-related effects in the U.S. As Sotolongo explains, representatives from CUPET have made a number of trips to the U.S. in recent years to meet with government officials and industry participants regarding coordination on oil spills and pollution in the Gulf of Mexico, resulting in two treaties being executed to address these issues. Sotolongo Decl. 2d ¶ 16. *Cf. Nnaka v. Fed. Rep. of Nigeria*, 238 F. Supp. 3d 17, 30 (D.D.C. 2017). And, as part of these activities, CUPET entered into discussions with an American company about a potential business relationship. *See Virtual Def. & Dev. Int'l, Inc.*, 133 F. Supp. 2d at 6 (solicitation of sovereign's agent in the U.S. to facilitate the sale of fighter jets to the U.S. was an activity carried on in the U.S., as required by the commercial activity exception).[32] The lobbying and industry meetings in

---

[32] The SAC also plausibly alleges hydrocarbons dumped into Havana Bay flow toward U.S. waters. *See, e.g.*, Butcher ¶ 17.20 (Ñico López refinery deposits 51.8 tons of organic matter, 12 tons of

the U.S. are commercial activities that directly result from CUPET's ongoing oil exploration and refining activities, which use the Confiscated Property.  Defendants act as if the U.S. waters in the Gulf are impervious to the effects of CUPET's operations, but if this were so, then there would be no reason for the lobbying and industry meetings in the U.S.

### 3.    Defendants' Remaining Arguments Are Unavailing

#### a.    Defendants are liable for the actions of their divisions

Defendants attempt to deflect any responsibility for the activities that affect the U.S.  They do this through declarations from two of their employees claiming that "independent" entities are responsible for these activities.  *See* Valmaña ¶¶ 1, 4, 22-28, 31 (identifying FINCIMEX and ALIMPORT); Sotolongo Decl. 2d ¶¶ 7, 8, 25 (identifying Empresa Comercializadora de Combustibles, Empresa Cubalub, Comercial CUPET, S.A. and Empresa Refinería de Petróleo). But Defendants offer no declarations from any officers or employees of these entities, nor do they submit any supporting documentary evidence.  As Dr. Martinez-Evora explains, CIMEX's divisions and CUPET's *empresas* are not separate entities.  Evora Decl. ¶¶ 81-83, 207-23.  Dr. Martinez-Evora opines that both companies are essentially single economic conglomerates without real distinctions among their sub-units.  *Id.* ¶¶ 21-25.  Consistent with this conclusion, the U.S. State Department recently added FINCIMEX to its restricted list as a "sub-entity" of CIMEX that is "under the control of, or acting for, or on behalf of, the Cuban military, intelligence, or security services."  *See* Butcher ¶ 13.[33]

---

hydrocarbons, and 12 tons of suspended solids *each day.*)  This pollution is itself a direct effect. *Cf. Nnaka*, 238 F. Supp. 3d at 30.

[33] On September 28, 2020, the U.S. State Department also added American International Services S.A. to its restricted list noting that it is also was "controlled by the Cuban military" and observing that the flow of remittances from the United States benefits the Cuban government.  *See* Press Statement of Secretary Pompeo, Sept. 28, 2020, available at https://www.state.gov/addition-to-the-cuba-restricted-list (accessed Sept. 28, 2020).

Furthermore, Defendants' employees—Sotolongo and Valmaña—make admissions that support Plaintiff's position or make statements that contradict one another or public statements by the companies.  For example, while concluding that CUPET is a distinct entity, Sotolongo affirms numerous times that each of CUPET's *empresas* are "integrated" with CUPET.  *Supra* at 5. Sotolongo also states that CIMEX does not benefit from CUPET's oil exploration and importation activities, but Valmaña concedes that CIMEX sells gasoline at 668 service stations in Cuba. Sotolongo Decl. 2d ¶ 14; Valmaña ¶ 5.  Sotolongo also asserts that CUPET is not involved in the refining and production of petroleum products, while CUPET's own website proclaims the opposite—that CUPET "is the organization that will effectively satisfy the supply of fuel and lubricant to the national market."[34]  Butcher ¶ 15.1  Defendants do not dispute that CUPET is the sole supplier of gasoline and other refined petroleum products to CIMEX.  SAC ¶ 100.

Similarly, while concluding that CIMEX is a distinct entity, Valmaña concedes that: (1) FINCIMEX, CIMEX-Cuba, and CIMEX-Panama all have the same president; (2) she has sat on the board of both CIMEX-Cuba and CIMEX-Panama since 2012; and (3) that FINCIMEX is a majority-owned subsidiary of CIMEX-Cuba.  Valmaña ¶¶ 1, 24, 27.  Valmaña also concludes that CIMEX does not procure goods from the U.S. while a public statement from CIMEX's vice director of purchasing notes that, in fact, CIMEX buys millions of dollars in American goods. *Compare* Valmaña ¶ 31 *with* Butcher ¶ 28.

Even if Defendants did follow corporate formalities, it would not absolve them of responsibility for trafficking in the Confiscated Property, since trafficking includes conduct that "causes, directs, participates in, or profits from trafficking . . . by another person."  22 U.S.C.

---

[34] *Compare* Sotolongo Decl. 2d ¶ 7 (Servi-Cupet is integrated with CUPET) *with* ¶ 9 (owner of trademark to Servi-Cupet is **not** integrated with CUPET).

§§ 6023 (11), (13)(A)(iii).  Defendants do not deny that they cause, participate in, and profit from the commercial activities of their divisions and *empresas*, including activities that involve the Confiscated Property and have effects in the U.S.  *See Foremost-McKesson, Inc.*, 905 F.2d at 439, 451 (allegations that Iran *directed* members of a board of directors to use their majority stake in a company to "lock an [American company] out" of its stake in the company was a direct effect in the U.S.); *Adler v. Fed. Rep. of Nigeria*, 219 F.3d 869, 876 (9th Cir. 2000) (direct effect where defendants participated in fraudulent conspiracy that caused plaintiff to pay bribes in the U.S.).

### b.    Plaintiff is entitled to assert its claim for unlawful trafficking

Defendants also raise a red herring—that the confiscation of Plaintiff's subsidiary, Essosa, did not cause a financial loss in the U.S.  As an initial matter, the "direct effects" in the U.S. alleged here go well beyond the financial losses stemming from the expropriation of Plaintiff's assets. *See, e.g.*, SAC ¶¶ 86, 88 (Congressional findings on direct effects); ¶¶ 101-03 (effects on American oil companies); ¶ 102 (effects on American capital markets); ¶ 103 (effects on the American environment); ¶ 113 (transferring money to the U.S.); *see also Cruise Connections Charter Mgmt. 1, LP*, 600 F.3d at 666 ("The commercial activities exception requires only that the foreign government's 'act outside the territory of the United States . . . cause[ ] a direct effect in the United States.'")

Defendants' cited authorities are inapposite.  The Tenth Circuit's decision in *Big Sky* merely found that a single investment loss suffered by a Canadian company that had an American parent did not rise to the level of a "direct effect."  *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1190 (10th Cir. 2008).  And the Second Circuit's decision in *Carey* is "neither binding nor persuasive" and was abrogated by the Second Circuit in *Texas Trading* on the ground that "direct effect" is a broader concept that is determined before a court reaches the issue of personal jurisdiction.  *Foremost-McKesson Inc. v. Islamic Rep. of Iran*, 759 F.

Supp. 855, 860 (D.D.C. 1991) (discussing *Texas Trading and Milling Corp. v. Fed. Rep. of Nigeria*, 647 F.2d 300, 308-315 (2d Cir. 1981)); *see also WMW Mach., Inc.*, 960 F. Supp. at 742 (tort exception has no bearing on the commercial activities exception).

### c.   The expropriation exception does not preclude the commercial activities exception

Defendants incorrectly argue that the commercial activities exception cannot apply to actions that involve expropriated property and, in such cases, only the expropriation exception "controls." Mot. at 5. But nothing in Section 1605(a)(2) supports that position. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (statutory construction ends "where the statutory language provides a clear answer") (internal quotation marks and citations omitted). In fact, the D.C. Circuit has already expressly rejected this argument when it was raised by Iran: "It is clear that if a proper showing is made, [plaintiff] can rely on the 'commercial activity' exception . . . to pursue a claim against Iran." *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d at 450 n.15 (emphasis added).

None of the cases relied upon by Defendants holds differently, since each arose from conduct that could only be undertaken by a sovereign and thus could not be a "commercial activity." *See Africa Growth Corp. v. Rep. of Angola*, No. 17-2469 (BAH), 2019 WL 3253367, at *4 (D.D.C. July 19, 2019), *appeal dismissed*, No. 19-7090, 2019 WL 6218805 (D.C. Cir. Oct. 23, 2019) (using "official title[s] and rank[s] to effect [an] unlawful taking" were "abuses of official power . . . that could not be undertaken by private parties in a marketplace"); *Allen v. Russian Fed'n*, 522 F. Supp. 2d 167, 187 (D.D.C. 2007) (allegations stemming from "arrests, investigations, and seizing and auctioning assets as part of a criminal investigation," were "all activities undertaken by sovereigns that could not be undertaken by private citizens."); *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889 (D.C. Cir. 2006) (allegations of certain commercial

activities following an expropriation could meet commercial activity exception because *gravamen* of the suit was the taking itself and not the activities that followed the taking).[35]   The D.C. Circuit repeatedly rejected this misreading of its case law.   *See De Csepel v. Rep. of Hungary*, 859 F.3d 1094, 1103 (D.C. Cir. 2017) (rejecting the same argument as Defendants and noting that cases like *Rong* "stand only for the proposition that the activity at issue did not constitute 'commercial activity' under the FSIA"); *Foremost-McKesson, Inc.*, 905 F.2d at 450 n.15.

Plaintiff's complaint unambiguously arises from *trafficking* in expropriated property—Defendants' *engaging in commercial activities* with the Confiscated Property or benefitting from such activities.   22 U.S.C. § 6023(13).   Plaintiffs have alleged a number of non-sovereign, commercial acts.   *See* SAC ¶¶ 7, 127-130.   Unlike Defendants' cases, the activities at the "core of the lawsuit," *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395-96 (2015), are the "type of actions by which a private party engages in 'trade and traffic or commerce.'"   *Weltover, Inc.*, 504 U.S. at 614; *see also Foremost–McKesson, Inc.*, 905 F.2d at 449-50 ("corporate dispute between majority and minority shareholders" with the majority of shares held by the Iranian government rather than by a private party).[36]

Defendants' arguments regarding the FSIA's purpose and legislative history do not alter the analysis.[37]   Mot. at 6-7.   Twenty years *after* the FSIA was enacted, Congress explicitly

---

[35] *See also Sequeira v. Rep. of Nicaragua*, No. 19-11656, 815 F. App'x. 345, 351 (11th Cir. 2020); *Garb v. Rep. of Poland*, 440 F.3d 579, 587 (2d Cir. 2006).

[36] Defendants' argument that the only "wrongful" conduct was expropriation (Mot. at 7-8) misreads the SAC.   The Supreme Court has specifically rejected an analysis of the *gravamen* of the complaint that focuses on a single element of the cause of action.   *OBB Personenverkehr AG*, 136 S. Ct. at 395-96.   Congress was explicit; the "wrong" for which there is a private action is trafficking that occurred after November 1, 1996.   22 U.S.C. §§ 6081(8), (11); § 6082 (a)(1).

[37] Defendants' concerns about sovereignty do not apply when the sovereign acts in a commercial capacity.   *Alfred Dunhill of London, Inc. v. Rep. of Cuba*, 425 U.S. 682, 704 (1976).

authorized private civil actions against agencies and instrumentalities of foreign states that "*traffic[] in property* which was confiscated by the Cuban Government."  22 U.S.C. § 6082(a)(1). Thus, Plaintiff's trafficking claim is not foreclosed by the FSIA; rather, it falls squarely within the requirements of the FSIA's commercial activity exception to sovereign immunity.

### 4.    If Necessary, Discovery Should Be Granted

The foregoing commercial activities are sufficient to sustain jurisdiction under the FSIA. Should the Court have any doubts, however, jurisdictional discovery should be permitted as set forth in the Court's order of July 14, 2020.  Dkt. 46.

"[P]laintiffs encountering a motion to dismiss on the basis of foreign sovereign immunity have a right to conduct preliminary discovery."  *Crist v. Rep. of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998).   Courts have discretion to grant jurisdictional discovery where the "facts sought are peculiarly within the knowledge of the party against whom discovery is sought," *id.* (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)), or where Plaintiff has alleged facts that "generously interpreted []" require additional fact-finding by the district court.   *Id.* (quoting *Gilson v. Rep. of Ireland*, 682 F.2d 1022, 1026 (D.C. Cir. 1982)); *see also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*, 185 F. Supp. 3d 233, 244 (D.D.C. 2016) (granting discovery of foreign sovereigns' "power, influence, or practical control over the [expropriated property] as manifested through their control of their respective wholly owned subsidiaries"); *Agurcia v. Republica de Honduras*, No. 8:19-cv-38-TPB-SPF, Dkt. 42 at 7-9 (M.D. Fla. May 22, 2020) (authorizing discovery of twelve topics including commercial activities of state-owned entity and its affiliates, subsidiaries, partners and joint ventures).

*Foremost McKesson* is instructive.   There, plaintiff's complaint made "conclusory allegations" concerning the extent to which the government of Iran controlled certain co-defendants that were agencies and instrumentalities of Iran.  *Foremost-McKesson*, 905 F.2d at 448-

49.  The court found dismissal was premature and plaintiffs should be permitted to take discovery. This rationale applies with even greater force here, given that Plaintiff's detailed factual allegations have been met with only self-serving declarations citing information that is not readily available from another source.  Topics for discovery to test Defendants' declarations include the following:

- The overlapping relationships and operations of CUPET, CIMEX-Cuba, and CIMEX-Panama, and the Cuban State's influence and control over each of their operations.  *See* Valmaña ¶ 24; Sotolongo Decl. 2d ¶ 8.

- The lack of independence of Defendants' divisions and *empresas*, including their failure to observe corporate formalities, the extent of Defendants' control over them, and their contacts with the U.S. while acting as agents of Defendants.  *See* Valmaña ¶¶ 22-4, 28, 54; Sotolongo Decl. 2d ¶¶ 17-19.

- Defendants' commercial activities in or directed towards the U.S., including:

  o The precise flow of remittance dollars from U.S. persons to Cuba and the precise supply chain of consumer goods from U.S. producers to Cuba.  *See* Valmaña ¶¶ 6-13, 26, 30, 31, 38.

  o The nature, purpose, and extent of Defendants' admitted contacts with various U.S. government officials and private companies, including during travel to the U.S.  *See* Sotolongo Decl. 2d ¶¶ 16-17.

- Defendants' property records that they reviewed to confirm connections to the Confiscated Property at issue in this case.  *See* Valmaña ¶ 12.

### B.   Defendants Also Lack Immunity Because They Operate Confiscated Property and Conduct Commercial Activities in the United States

In addition to the jurisdictional grant of Title III and the FSIA's commercial activity exception, the FSIA's expropriation exception provides a third, independent basis for jurisdiction. This is because (1) "rights in property" are at issue that (2) were taken in violation of international law and (3) the property at issue (or any property exchanged for it) is "owned or operated by an agency or instrumentality," and (4) "that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).  In other words, the FSIA's expropriation exception applies where, as here, a state-owned entity continues to use the expropriated property wherever it may be located *and* it also conducts commercial activity in the U.S., *even if* the

34

commercial activity is unrelated to the expropriated property.

**1.    Defendants Are "Agencies or Instrumentalities" and Thus the Nexus Requirement for Agencies and Instrumentalities Applies**

Contrary to Defendants' contention, the commercial nexus requirement that applies to *agencies and instrumentalities* controls here rather than the one that applies to *foreign states*.  This is a function of the FSIA, which distinguishes between foreign states and agencies and instrumentalities for some but not all purposes.  Defendants' argument that because the *Bancec* presumption is overcome for jurisdictional purposes, the foreign state nexus requirement should apply (Mot. at 17) cannot be reconciled with equity (which permits veil-piercing) or the FSIA.  None of Defendants' cited cases establish that piercing the veil for certain purposes transforms an agency or instrumentality into a foreign state for all purposes.  Indeed, the only reason Defendants assert this argument is because the FSIA applies a more lenient commercial nexus requirement to agencies and instrumentalities than to foreign states.

Equity pierces the veil to prevent injustices.  *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 633-634 (1983) ("*Bancec*").  Defendants' position would simply cause another injustice by permitting Defendants to avoid liability—to benefit from their government's misconduct and manipulate an equitable doctrine to their advantage.  The veil-piercing doctrine will not countenance that.  *See Schenley Distillers Corp. v. United States*, 326 U.S. 432, 437 (1946) ("One who has created a corporate arrangement, chosen as a means of carrying out his business purposes, does not have the choice of disregarding the corporate entity in order to avoid the obligations which the statute lays upon it for the protection of the public."); *Gabayzadeh v. Glob. Equip. & Mach. Sales Inc.*, 18 Civ. 3851 (LGS), 2019 WL 5880639, at *3 (S.D.N.Y. Jan. 28, 2019) ("[w]hile the corporate veil may be pierced for the benefit of those suing a corporation, it will not be pierced in the reverse manner *for the benefit of the corporation* or its

individual shareholders.") (emphasis added); *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d

200, 223 (S.D.N.Y. 2005) (similar).[38]

Nor will equity reward unclean hands. *See Precision Instrument Mfg. Co. v. Auto. Maint.*

*Mach. Co.*, 324 U.S. 806, 814 (1945); *Steele v. Isikoff*, 130 F. Supp. 2d 23, 34 (D.D.C. 2000).

Defendants' argument is contrary to the clear text of the FSIA, which provides that foreign states

and their agencies or instrumentalities are subject to distinct requirements for certain purposes.

*See De Csepel*, 859 F.3d at 1107 (explaining that "[t]he FSIA carefully distinguishes foreign states

from their agencies and instrumentalities" and citing 28 U.S.C. §§ 1603(a), (b) (defining the

terms); § 1606 (making punitive damages available against agencies and instrumentalities but not

foreign states); § 1610 (establishing different procedures for property execution)); *De Csepel v.*

*Republic of Hungary*, No. 1:10-CV-01261 (ESH), 2020 WL 2343405, at *12 (D.D.C. May 11,

2020).[39]   Contrary to Defendants' argument, the FSIA's text expressly distinguishes the nexus

requirement applicable to agencies or instrumentalities and the state.

Defendants attempt to elide over this clearly-drawn, statutory distinction by citing to

"commercial activity" cases in general but those cases fail to support their argument.  In *Peterson*

*v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 198 (D.D.C. 2004), *aff'd*, 416 F.3d 83

(D.C. Cir. 2005), the *Bancec* presumption was not satisfied and so the case has no bearing here.

Defendants also point to *Taylor v. Kingdom of Sweden,* No. 18-1133 (RJL), 2019 WL 3536599, at

---

[38] *See also Island Two LLC v. Island One, Inc.*, No. 13 Civ. 02121 (LGS), 2013 WL 5380216, at *2 (S.D.N.Y. Sept. 26, 2013); *Bross Utils. Serv. Corp. v. Aboubshait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) ("A parent corporation cannot create a subsidiary corporation and then ignore the separate corporate existence of that subsidiary whenever it would be advantageous to the parent"); *Colin v. Altman*, 333 N.Y.S. 2d 432, 433 (1st Dep't 1972) ("The corporate veil is never pierced for the benefit of the corporation or its stockholders").

[39] *See also Garb*, 440 F.3d at 589; Federal Judicial Center, *The Foreign Sovereign Immunities Act: A Guide For Judges* (2018) ("As is often the case under the FSIA, standards established for the foreign state differ from those established for its agencies and instrumentalities.").

*4 (D.D.C. Aug. 2, 2019) (applying *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994)) where this Court found an entity to be part of the foreign state and proceeded to apply the commercial nexus requirement for foreign states to that entity—*but critically* those cases fell under the "core functions" analysis of FSIA jurisprudence. *Taylor*, 2019 WL 3536599 at *3. The D.C. Circuit has explained that an entity that is an "integral part" of a foreign state's political structure is treated as the state itself, but an entity that is commercial in its structure and "core functions" is treated as an "agency or instrumentality." *Transero*, 30 F.3d at 151; *see also* Restatement (Fourth) of Foreign Relations Law of the United States § 452, Reporters' Note 4 (Am. Law Inst. 2018). In contrast to the Defendants in *Taylor*, no one has raised the "core functions" test. Instead, Plaintiff has alleged that Defendants are agencies or instrumentalities of the Cuban government under Section 1603 and alter egos of the Cuban government under the extensive control prong of *Bancec*. Therefore, cases examining the "core functions" test are not analogous and do not apply.

Defendants finally cite to *De Letelier v. Rep. of Chile*, 748 F.2d 790, 793 (2d Cir. 1984) and *EM Ltd. v. Rep. of Argentina*, 473 F.3d 463, 480 (2d Cir. 2007), but these cases also do not support Defendants' assertion that where the *Bancec* presumption is overcome, the expropriation nexus requirement necessarily shifts. In these cases, the Second Circuit examined whether the property at issue was subject to execution under 28 U.S.C. § 1610, not the expropriation exception.

**2.    The Nexus Requirement for Agencies or Instrumentalities is Satisfied**

**a.    Defendants "own or operate" the Confiscated Property**

For purposes of the motion to dismiss, Plaintiff's allegations that the Confiscated Property is operated by CIMEX and CUPET must be taken as true and in any event, Defendants admit them. *Supra* at 5-9. CUPET imports and refines crude oil using Plaintiff's Confiscated Property and uses Plaintiff's Confiscated Property for the exploration for and extraction of oil. CIMEX partners,

affiliates, associates, or the like with CUPET in operating confiscated service stations that benefit from CUPET's petroleum products.  *Id.*

> **b.**  **Defendants engage in commercial activity in the United States**

The commercial nexus requirement is satisfied with respect to both Defendants.  CUPET advertises its services in the U.S., and admits having at least some contract negotiations with U.S. companies, and there is evidence that CUPET has sold fuel to U.S. companies that operate charter flights from the U.S. to Cuba.  *Supra* at 9.  CUPET has also lobbied the U.S. government regarding environmental issues and, as part of these activities, entered into discussions with an American company about a potential business relationship.  *Supra* Part III(A)(2)(c).

Defendants contend that certain of CUPET's past commercial activities do not satisfy the commercial nexus requirement.  Citing *Schubarth*, 891 F.3d at 400, Defendants argue that the expropriation exception requires a foreign instrumentality's commercial activity to be contemporaneous with the filing of the suit.  In *Schubarth*, the D.C. Circuit acknowledged the District Court's observation that "'[c]ourts assessing the FSIA's commercial activity requirement [ ] have looked for evidence of recent or ongoing transactions'" but explicitly declined to decide "whether the FSIA's expropriation exception *always* requires contemporaneous or recent commercial activity" or "how recent such activity must be," and held that allegations of commercial activity in the U.S. "must be evaluated in the context of the complaint's other allegations . . . ."  *Id.* at 399-400.  Regardless, by CUPET's own admission, at least its lobbying of the U.S. government and solicitation of U.S. companies are recent and ongoing activities.  *Supra* Part III(A)(2)(b) & (c).

Defendants alternatively argue that CUPET itself has not engaged in commercial activity within the U.S. because *Empresa de Servicentros* operated the service stations.  *Mot.* at 18-19. Defendants admit, however, that *Empresa de Servicentros* is a company that was "integrated with

CUPET."  *Id.*  CUPET operates through its *empresas*, of which *Empresa de Servicentros* is one; therefore it is CUPET that is engaged in remittance activities, which as Plaintiff has explained, is akin to accessing U.S. capital markets for financing.  *Supra* Part III(A)(1).

Defendants further argue that CIMEX is not engaged in commercial activities because FINCIMEX, not CIMEX, carries out remittance activities.  Mot. at 19.  As Plaintiff has explained, FINCIMEX is not independent of CIMEX and at a minimum, acts as CIMEX's exclusive agent in the remittance business.  *Supra* Part III(A)(3)(a).  CIMEX also engages in other commercial activities in the U.S, including (i) owning a U.S.-registered website that actively solicits remittances from U.S. persons, (ii) operating a shipping business that facilitates package delivery from the U.S. to Cuba, and (iii) registering a trademark at the USPTO regarding the Cubita brand of coffee, which it successfully defended in a trademark dispute.  *Supra* at 9.

Finally, with discovery, Plaintiff expects to establish that Defendants' commercial activity in the U.S., at minimum, satisfies the expropriation exception.

### 3.    Rights in Property Were Taken in Violation of International Law

The expropriation exception grants jurisdiction "where there is a legally valid claim that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law)."  *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1314 (2017) (emphasis original); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venezuela*, 784 F.3d 804, 815-16 (D.C. Cir. 2015) ("the FSIA's expropriation exception 'focuses . . . *broadly* on 'rights in' property'. . . and its text imposes no limitation on the source of those rights"), *vacated on other grounds and remanded*, 137 S. Ct. 1312 (2017) (quoting *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007)).

Plaintiff's trafficking claim satisfies the expropriation exception because the claim relates

to property—*i.e.*, the Confiscated Property—and that property was taken in violation of international law.  The first element is not disputed; Defendants only contend (incorrectly) that the Castro regime's expropriation of the Confiscated Property did not violate international law.

        **a.**        **Plaintiff's property was "taken in violation of international law"**

A taking violates international law where, as here, it is not accompanied by just compensation.  *See* Restatement (Third) of Foreign Relations Law of the United States § 712 (Am. Law Inst. 1987); H.R. Rep. No. 94-1487, at 19-20 (1976); *see also* SAC Ex. 1 at 2 (FCSC authorized to determine claims against the government of Cuba in "accordance with applicable law, including international law"); 22 U.S.C. § 6081(10).

Resolution No. 33 issued by the Cuban Petroleum Institute effected a taking of Plaintiff's property by the Cuban government:  Plaintiff lost ownership and control over its assets in Cuba and was forced to end all of its ongoing operations in Cuba.  Plaintiff has not been compensated for the taking of its property.  Defendants do not contest this.

Defendants argue that because the property was directly owned by a subsidiary, Essosa, and not directly by Plaintiff and/or because Essosa continued to operate *outside* of Cuba, Plaintiff cannot satisfy the exception.  Mot. at 23.  Both points are incorrect.

First, it is immaterial that Plaintiff indirectly owned the Confiscated Property through Essosa because Title III recognizes claims based on indirect ownership.  Pursuant to 22 U.S.C. § 1643b(a), the FCSC shall "[d]etermine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property including *any rights or interests therein owned* wholly or partially*, directly or **indirectly** at the time by nationals of the United States*."  22 U.S.C. § 1643b(a) (emphasis added).  The Court must presumptively accept Plaintiff's certified claim as conclusive

proof of Plaintiff's ownership interest in the property at issue. *See* 22 U.S.C. § 6083(a)(1) (presumption required).

Moreover, at least one court that dealt directly with this issue found that indirect ownership is permissible. *See Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1290 (S.D. Fla. 2019), motion to certify appeal denied, No. 1:19-CV-21725-JLK, 2019 WL 7945691 (S.D. Fla. Sept. 26, 2019) (holding that "Plaintiff plausibly alleges indirect ownership based on his claim to stock in La Maritima, the company that owned the docks before it was nationalized by the Cuban Government in October 1960"). Other courts have held outside of the Helms-Burton context that the ultimate owner of an expropriated corporate interest may pursue a claim for expropriation. *See Helmerich*, 784 F.3d 804, 814-15 ("[s]hareholders may have rights in corporate property . . . 'rights of their own, which exist by virtue of their exclusive beneficial ownership, control, and possession of the properties and businesses allegedly seized.'") (citations omitted); *Nemariam v. Fed. Democratic Rep. of Ethiopia*, 491 F.3d 470, 478 (D.C. Cir. 2007) ("a controlling interest in the corporation's stock was no different from the corporation's physical assets under section 1605(a)(3) because '[i]n either case, the foreign state has expropriated control of the assets and profits of the corporation.'") (citation omitted).

Second, contrary to Defendants' contention, the D.C. Circuit in *Helmerich* did not hold that a plaintiff must demonstrate the termination of a corporation in its place of incorporation in order to establish a taking in violation of international law and as Plaintiff explains below, no such requirement exists under U.S. law or customary international law. Moreover, *Helmerich* observes that "a state violates international law if it takes 'measures that have an effect equivalent to a formal expropriation of [a foreign] shareholder's own property rights,' even if the state does not formally divest the shareholder of its shares." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of*

*Venezuela*, 743 F. App'x. 442, 454 (D.C. Cir. 2018).   That is what the Complaint alleges here. SAC ¶¶ 28-31; *see also Helmerich*, 743 F. App'x at 455 ("alleging that Venezuela and PDVSA have expropriated its subsidiary corporation, H&P-IDC has presented 'a valid claim that 'property' has been 'taken in violation of international law'").

Finally, Plaintiff has alleged that its property rights are in issue.  The Court should reserve any further examination of the merits until after discovery.  *Helmerich*, 137 S. Ct. at 1316 (property rights "questions remain for the merits phase of the litigation"); *Schubarth*, 891 F.3d at 399 ("where jurisdictional questions turn upon further factual development, the trial judge may take evidence and resolve relevant factual disputes.") (quoting *Helmerich*, 137 S. Ct. at 1316).

> **b.** **U.S. law governs the expropriation exception**

Customary international law does not help Defendants.  U.S. cases interpreting the expropriation exception's elements control over international law.[40]   Because Plaintiff's allegations suffice under U.S. law, no international decision can compel a contrary holding.

> **c.** **Plaintiff's expropriation claim relates directly to its rights in property taken in violation of international law**

Although unnecessary, Plaintiff will demonstrate that, even if the Court were to consider Defendants' customary international law arguments, that law supports Plaintiff's claim.

> **(1)** **Plaintiff need not demonstrate that Essosa dissolved**

Defendants contend that because it was Essosa's property that was expropriated, not Plaintiff's direct property, Plaintiff cannot satisfy the expropriation exception.  Mot. at 21.  In so

---

[40] *Princz v. Fed. Repub. of Germany*, 26 F.3d 1166, 1174 & n.1 (D.C. Cir. 1994); *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("[T]he role of judges . . . is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."); *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 938 (D.C. Cir. 1988) (an "inconsistent statute simply modifies or supersedes customary international law to the extent of the inconsistency").

doing, Defendants both acknowledge that property was taken in violation of international law and advance a position that is unsupported by the relevant jurisprudence.

As explained above, Essosa was Plaintiff's wholly-owned subsidiary. The Cuban government confiscated property owned by Plaintiff via its shares in Essosa. Customary international law recognizes that a shareholder may bring a claim for the expropriation of property held by the company in which it holds shares, including but not limited to sole shareholders.

The decisions of the Iran-United States Claim Tribunal ("IUSCT") are illustrative.[41] In *Sedco Inc. v. National Iranian Oil Co. and the Islamic Republic of Iran*, Iran Award 309-129-3, 15 Iran-U.S. Cl. Trib. Rep. 23, 1987 WL 503885 (July 7, 1987), the U.S. claimant (Sedco) claimed expropriation by Iran and the National Iranian Oil Company ("NIOC") of its Panamanian subsidiary's (Sedco International, S.A. "SISA") oil rigs. *Id*. at *1-2, *5, *8. NIOC argued that the Treaty should not apply to the taking of SISA's properties because it was not a U.S. corporation. The IUSCT stated that the term "interests in property" in Article IV(2) of the Treaty "clearly is broad enough to encompass property owned indirectly through subsidiary corporations." *Id*. at *8 n.9. Therefore, Sedco was able to claim expropriation of property owned by its subsidiary.

Other decisions are in accord. *See Amoco Int'l Fin. Corp. v. the Govt. of Iran and Others*, Iran Award 310-56-3, 15 Iran-U.S. Cl. Trib. Rep. 189, 1987 WL 503881 (July 14, 1987) (U.S.

---

[41] The IUCST's decisions are relevant to determining customary international law. *See* Article IV(2) of the Treaty of Amity, Economic Relations, and Consular Rights between the United States and Iran (the "Treaty") ("Property of nationals and companies of either [the U.S. or Iran] . . . shall receive the most constant protection and security . . . *in no case less than that required by international law*.") (emphasis added); *Sea-Land v. Islamic Rep. of Iran*, Iran Award 135-33-1, 6 Iran-U.S. Cl. Trib. Rep. 149, 1984 WL 301304, at *14 (June 22, 1984); *Sedco Inc. v. Nat'l Iranian Oil Co. and Iran*, Iran Award 55-129-39, 9 Iran-U.S. Cl. Trib. Rep. 248, 1985 WL 324069, at *18, (Oct. 28, 1985) (Interlocutory Award) (nothing in the Treaty "extends the scope of either State's international responsibility beyond those categories of acts already recognized by international law" for a taking).

parent company claimed expropriation based on 50% interest in a joint venture company in Iran); *Starrett Housing Corp. and Others v. the Govt. of Iran and Others*, Iran Award 314-24-1, 1987 WL 503823, at *61 (Aug. 14, 1987) (explaining that the Treaty of Amity protects "indirect ownership of property rights held through a subsidiary that is not a United States national.")

Investor-state arbitration decisions further confirm the propriety of Plaintiff's claim. In *Total S.A. v. The Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Objections to Jurisdiction (Aug. 25, 2006), the tribunal permitted the claimant's claimed expropriation of Argentinian companies in which it held shares (some as a minority shareholder) as well as the underlying assets of those companies. *Id.* at ¶¶ 10-12, 15-17, 76, 80. The *Total* tribunal held that "it is immaterial that they belong to Argentine companies in accordance with the law of Argentina." *Id.* at ¶ 80. *See also Sedelmayer v. Russia*, SCC Case No. 106/1998, Award, 57-59 (July 7, 1998) (permitting expropriation claim of indirectly held assets owned through various companies controlled by claimant); *Bernhard von Pezold and Others v. Rep. of Zimbabwe*, ICSID Case No. ARB/10/15, Award (July 28, 2015) (permitting expropriation claim in relation to land owned by companies in which claimants were shareholders).

Defendants attempt to obscure this clear line of authority by ignoring the well-established distinction between the law of diplomatic protection (State-to-State action where the State formally espouses a claim on behalf of its nationals) and the law of expropriation concerning claims against States by investors.[42] Defendants cite to *Barcelona Traction, Light & Power Co.* (*Belg. v. Spain*),

---

[42] *See* ILC Draft Articles on Diplomatic Protection, Art. 1, Cmt (1) ("[t]he present draft articles are concerned only with the rules governing . . . diplomatic protection. . . . *They do not seek to define or describe the internationally wrongful acts that give rise to the responsibility of the State for injury to an alien*.") (emphasis added); *see also* ILC Draft Articles on the Responsibility of States for Internationally Wrongful Acts, Art. 33 (international responsibility of a State "may accrue directly to any person or entity other than a State"); *id.* Art. 36 ("The State responsible for

Judgment, 1970 I.C.J. Rep. 3, ¶ 41 (Feb. 5), *Ahmadou Sadio Diallo (Rep. of Guinea v. Dem. Rep. of the Congo)*, Judgment, 2010 I.C.J. Rep. 639, ¶ 63 (Nov. 30), and Article 11 of the ILC Draft Diplomatic Protection Articles, none of which is applicable.  Mot. at 21-22.  Those authorities concerned whether diplomatic protection could be exercised by a State under customary international law on behalf of its nationals who were shareholders in companies.  They did not involve claims by investors (shareholders or otherwise) for the expropriation of their property outside of diplomatic protection.

### (2)     Cuba was obligated to compensate Plaintiff

Defendants next argue that in 1960 customary international law did not require compensation, but this, too, is unfounded.  As a preliminary matter, customary international law does not require absolute unanimity, so the existence of opposing views is not preclusive.[43]  It is significant that, even though Defendants rely heavily on *Sabbatino*, the Supreme Court chose not to undertake a critical examination of the authorities:  "We do not, of course, mean to say that there is no international standard in this area; we conclude only that the matter is not meant for adjudication by domestic tribunals."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428-29 n.26 (1964); *see also id.* at 455-56 (White, J. dissenting) (criticizing the majority for having failed to undertake a "critical examination" of the matter).  *Sabbatino* does not preclude a finding that customary international law as of 1960 required compensation upon expropriation.

---

an internationally wrongful act is under an obligation to compensate for the damage caused thereby.").

[43] As the International Law Commission has explained, in order for a rule of customary international law to exist, "[t]he relevant practice must be general, meaning that it must be sufficiently widespread and representative, as well as consistent."  ILC, Draft Conclusions on Identification of Customary International Law, with Commentaries (2018), in U.N. Doc A/73/10, 135, Conclusion 8(1).  The Commission added that "universal participation is not required" nor is "complete consistency in the practice of States."  *Id*. at 136-7, Comments (3) and (7).

Had the Supreme Court adjudicated the issue, it would have observed two significant points:  First, "the overwhelming practice and the prevailing legal opinion before World War II supported the view that customary international law required compensation equivalent to the full value of the property taken."[44] *Sedco, Inc. v. Nat'l Iranian Oil Co.*, Iran Award 59-129-3, 10 Iran-U.S. Cl. Trib. Rep. 180, 1986 WL 424318, at *4 (Mar. 27, 1986).  Second, the existence of an obligation to compensate was put beyond all doubt by the UN General Assembly ("UNGA"), which provided that in cases of "[n]ationalization, expropriation or requisitioning . . . the owner shall be paid appropriate compensation . . . ."  *See* G.A. Res. 1803 (XVII), ¶ 4 (Dec. 14, 1962). The resolution was adopted by a vote of 87 to 2 (France and South Africa) and 12 abstentions (comprised of the Communist bloc, including Cuba).  As such, it is a significant instance of State practice.  *See Texaco Overseas Petroleum v. Libya*, 17 I.L.M. 1, Translation of the Award on the Merits, ¶ 87 (1978) ("by expressing an *opinio juris communis*, Resolution 1803 (XVII) seems to this Tribunal to reflect the state of customary law existing in this field").

Moreover, the obligation to compensate requires full compensation.  "[U]nder every rule of law and equity, no government is entitled to expropriate private property, for whatever purpose,

---

[44] See also *Ebrahimi v. The Gov't of the Islamic Rep. of Iran*, 30 Iran-U.S. Cl. Trib. Rep. 170, No. 560-44/46/47-3, Separate Opinion of Richard C. Allison, at n. 9, (Oct. 12, 1994) (noting "centuries of international jurisprudence," dating back to 1794); *Upton Case*, (*U.S. v. Venez.*), 9 R.I.A.A. 234, 236 (US-Venezuela Mixed Claims Commission 1903) (noting "the corresponding obligation to make just compensation to the owner thereof"); *Case Concerning the Factory at Chorzów* (Claim for Indemnity) (Merits) (Ger. v. Po.), Judgment, 1928 P.C.I.J. (ser. A) No. 17, 46-47 (Sept. 13) (stating that "fair compensation" was necessary); *Goldenberg Case* (Ger./Rom.), 2 R.I.A.A. 901, 909-10 (Sole Arbitrator Sept. 27, 1928) ("fair payment shall be made for the expropriated or requisitioned property as quickly as possible"); *Marguerite de Joly de Sabla* (*U.S. v. Pan.*) 6 R.I.A.A. 358, 366-7 (General Claims Commission June 29, 1933) ("[i]t is axiomatic that acts of a government in depriving an alien of his property without compensation impose international responsibility"); *see also FV García Amador* (*Special Rapporteur*), Fourth Rep. on State Resp., U.N. Doc. A/CN.4/119, ¶ 89 (Feb. 26, 1959) ("the general principle . . . is that the compensation must be 'adequate', that is to say, that it must cover the value of the property expropriated").

without provision for prompt, adequate, and effective payment therefor." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 888 (2d Cir. 1981); *see also id.* at 890-893 (observing that UNGA Resolution 1803 "reject[ed] the view that a state had no obligation to pay compensation"; and that it required compensation to be paid "in accordance with international law" and finding that "full compensation" was "appropriate compensation"); 22 U.S.C. § 2370(e) (the First Hickenlooper Amendment, requiring the President to suspend foreign assistance to any country whose government on or after January 1, 1962 expropriates the property but "fails within a reasonable time . . . to take appropriate steps, . . . including speedy compensation for such property . . . equivalent to the full value thereof, as required by international law").

Cuba's practices (before and after Castro) were not to the contrary. Even though it never entered into force, both the U.S. and Cuba signed the Economic Agreement of Bogotá (signed May 2, 1948),[45] which provides in Article 25 that: "Any expropriation shall be accompanied by payment of fair compensation in a prompt, adequate and effective manner." Economic Agreement of Bogotá, Article 25 (1948), O.A.S.T.S. No. 21. Cuba declared that it had "voted affirmatively on Article 25 with the understanding that the last paragraph thereof, interpreted dogmatically, contains provisions in accordance with the Constitution of Cuba."[46] The 1940 Cuban Constitution required that: "Confiscation of property is prohibited. . . . No one can be deprived of his property . . . and always after payment of the corresponding indemnity in cash, judicially fixed." Art. 24.[47]

---

[45] The following 21 States signed the Agreement: Argentina, Bolivia, Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, United States, Uruguay, and Venezuela. *See* http://www.oas.org/juridico/english/Sigs/a-43.html (accessed Aug. 20, 2020).

[46] Although the Agreement did not enter into force, it remains relevant state practice.

[47] *See* Ignacio E. Sánchez, *Cuban Property Rights and the 1940 Constitution*, 3 J. Transnat'l L. & Pol'y 135, 140 (1994).

Moreover, Cuba has negotiated expropriation settlement agreements with every other key state in the world, other than the U.S.[48]

### (3)   The expropriation was not a lawful countermeasure

Defendants' permissible countermeasure argument also fails.  Mot. at 38-40.  First, they cite the reduction of the sugar quota, but that occurred *after* the expropriation on July 1, 1960.  Therefore, Cuba's Law No. 851 cannot have been a countermeasure.  Second, Cuba previously raised this defense and it was rejected.  *See Sabbatino*, 307 F.2d at 866 (considering the argument that the U.S. was "the first offender against international law," finding that no "established principle of international jurisprudence . . . requires a nation to continue buying commodities from an unfriendly source," and concluding that the U.S. action did not excuse Cuba's breach).

Defendants attempt to distinguish *Sabbatino* by arguing that new evidence establishes that "the ban on Cuban sugar quota was part of the U.S. plan to overthrow the Cuban Government by armed force" and that the expropriation was a lawful countermeasure in response to that plan.  Mot. at 38-40.  Defendants have provided no authority that the existence of a mere "plan" to use armed force itself breached international law so as to permit Cuba to take countermeasures in July/August 1960.  And even if it were accepted that the overall plan alleged by Defendants violated international law, it cannot be said that a violation had occurred by July/August 1960.  International law does not permit countermeasures to be taken on a pre-emptory basis.[49]

---

[48] *See generally* Michael W. Gordon, The Settlement of Claims for Expropriated Private Property Between Cuba and Foreign Nations Other than the United States, 5 U. Miami Inter-Am. L. Rev. 457 (1973) (discussing settlements with Canada (1980), Great Britain (1978), France (1967), Spain (1967), and Switzerland (1967)).

[49] *See* Int'l Law Comm'n Rep. on the Work of Its Fifty-Third Session, U.N. Doc. A/56/10, at 130, comment (2) to Article 49 (2001) ("A fundamental prerequisite for any lawful countermeasure is the existence of an internationally wrongful act which injured the State taking the countermeasure"), (citing *Gabčíkovo-Nagymaros Project* (Hung./Slov.), Judgment, 1997 I.C.J. Rep. 7 case (countermeasures "must be taken in response to a previous wrongful act")).

Relatedly, a State may only take countermeasures against violations of international law known to it at the time such measures are taken.  As evidenced by Defendants' reliance on subsequently declassified U.S. documents, Cuba was unaware of any connection between the U.S. sugar quota reduction and plan to use armed force at the time of the expropriation.  Rather, as the Second Circuit concluded in *Sabbatino*, the purpose underlying Law No. 851 was to retaliate against the U.S. sugar quota reduction.  Cuba acted in response to the sugar quota reduction—which did not violate international law—not some unknown future plan to use armed force. Defendants cannot now invoke new evidence to justify Cuba's retaliation *ex post facto*.

Finally, even if the U.S. had breached its international obligations (which is denied), Cuba's punitive, disproportionate expropriation of Plaintiff's fundamental property right without compensation does not satisfy the conditions for a lawful countermeasure under customary international law.  *See Gabčíkovo-Nagymaros Project* (Hung./Slov.), Judgment, 1997 I.C.J. Rep. 7, at 83-85 and 87 (holding that "the effects of a countermeasure must be commensurate with the injury suffered, taking account of the rights in question . . . [I]ts purpose must be to induce the wrongdoing state to comply with its obligations under international law, and . . . the measure must therefore be reversible."); Int'l Law Comm'n Rep. on the Work of Its Fifty-Third Session, U.N. Doc. A/56/10, at 30, Art. 51; *Id.* at 30, Art. 50(1)(b) ("[c]ountermeasures shall not affect . . . obligations for the protection of fundamental human rights").[50]

### (4)     The "police powers" exception does not apply

---

[50] Cuba's Constitution recognized the right to property as a fundamental human right.  *See* Ignacio E. Sánchez, *Cuban Property Rights and the 1940 Constitution*, 3 J. Transnat'l L. & Pol'y 135, 141-2 (1994).  *See also* Article 17 of G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948); American Convention on Human Rights art. 21, Nov. 22, 1969, 1144 U.N.T.S. 123; and First Protocol to the European Convention on Human Rights art. 1, Mar. 20, 1952, E.T.S. No. 9.

Nor did the expropriation constitute a lawful exercise of police powers in response to a breach of Cuban law, *i.e.*, the refusal to refine the Cuban State's oil pursuant to the Law of Combustible Minerals of 1938. Mot. at 26. When Cuba "intervened" Essosa's properties on July 1, 1960, it invoked Article 44(III) of the Law of Combustible Minerals.[51] Article 44(III) provided that: "Petroleum refineries . . . must comply with the following provisions: . . . Its facilities shall be obliged to refine *petroleum belonging to the State* . . . at a price that does not exceed the cost of the operation, plus a reasonable industrial profit." HA-A (Dkt. 43-01), Ex. 2 at 43 (emphasis added). The Law of Combustible Minerals thus "appl[ied] solely to the refining of petroleum drawn from Cuban soil." Butcher ¶ 4 (DOS Bulletin at 142). But Cuba expropriated Plaintiff's property because Plaintiff refused to refine *petroleum from Russia* (the then Soviet Union). *Id*; *see also id.* ¶¶ 3, 5. Essosa fully complied with its obligations to refine Cuban-produced oil. It was Cuba that breached its obligations to Plaintiffs under Cuban law. *Id.* ¶ 4 (DOS Bulletin at 142 explaining that the intervention by Cuba breached the legal regime that "exclusively governed" Plaintiff's property); *see also Exxon Corp. v. United States*, 7 Cl. Ct. 347, 350 (1985), *rev'd on other grounds*, 785 F.2d 277 (Fed. Cir. 1986) (confirming expropriation because Essosa "refused to refine the Soviet oil").

Moreover, even if a violation of the 1938 Law of Combustible Minerals did occur, which it did not, the police powers exception would not apply. The exception concerns forfeitures for criminal offences and Essosa's alleged violation would have been civil. None of the legislation[52]

---

[51] When Cuba "intervened" Essosa's properties on July 1, 1960, it did so pursuant to the Prime Minister's Resolution No. 190 of June 30, 1960 and the Cuban Petroleum Institute's Resolution #33 of July 1, 1960. HA-A (Dkt. 43-01), Exs. 1 & 3. Resolution No. 190 invoked Article 44(III) of the Law of Combustible Minerals of May 9, 1938.

[52] Defendants reliance on the U.S. Trading with the Enemy Act of 1917 ("TWEA") is misplaced. TWEA authorized confiscation of property used in connection with specified criminal offenses.

or cases[53] cited by Defendants is to the contrary.  Finally, even if the alleged violation had been criminal, the "intervention" would fall outside the police powers exception.  The expropriation without compensation was illegal under Cuban law, without due process,[54] disproportionate,[55] and discriminatory.[56]  *See* Butcher ¶ 6.  Cuba thus remained obligated to compensate Plaintiff for the Confiscated Property.  Finally, even if the initial taking in July 1960 is construed as a response to

---

Ch. 106, § 16(2), 40 Stat. 411 (1917); 31 C.F.R. § 501.701(a)(2).  The same is true of the Australian, Canadian, U.S. and UK legislation and the international treaty cited by Defendants. Mot. at 27 n.12.  Likewise, the cases cited by Defendants do not recognize a broad sovereign right "to impose forfeiture for violations of law."  Mot. at 28 n.13.

[53] *Sedco Inc. v. Nat'l Iranian Oil Co. and Iran*, Iran Award 55-129-39, 9 Iran-U.S. Cl. Trib. Rep. 248, 1985 WL 324069, at \*20 (Oct. 28, 1985) ("a taking must be presumed to have occurred" and observing that the "*one exception* to this rule" is "*forfeiture for crime*.") (emphasis added).

[54] Due process requires "the legal procedure must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard." *ADC Affiliate Ltd. & ADC & ADMC Management Ltd. v. Rep. of Hungary*, ICSID Case No. ARB/03/16, Award, ¶ 435 (Oct. 2, 2006); *see also Ioannis Kardassopoulos and Ron Fuchs v. Rep. of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, ¶ 396 (Mar. 3, 2010).  Essosa appealed the intervention on constitutional law grounds and its case was dismissed by executive fiat in violation of applicable Cuban law.  *See* Dkt. 43-1, ECF Page 168-69, ¶¶ 113, 118 (describing the appeals and the Cuban President's decision to deny Essosa's administrative appeals).

[55] *See Tecnicas Medioambientales Tecmed S.A. Tecmed v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, ¶ 122 (May 29, 2003) ( "[t]here must be a reasonable relationship of proportionality between the charge or weight imposed to the foreign investor and the aim sought to be realized by any expropriatory measure").

[56] *See, e.g.*, *Mohamed Abdel Raouf Bahgat v. Egypt*, PCA Case No. 2012-07, Final Award, ¶ 230 (Perm. Ct. Arb. Dec. 23, 2019) ("[T]he police power defense is not *carte blanche*; a State's actions must be justified, meet the international standards of due process, and *inter alia* be proportional to the threat to public order to which it purports to respond."); *Bischoff Case* (*Ger. v. Venez.*), 10 R.I.A.A. 420, 420-21 (1903) (reprinted in 1960) ("reasonable"); *Sedco Inc. v. Nat'l Iranian Oil Co. and Iran*, Iran Award 55-129-39, 9 Iran-U.S. Cl. Trib. Rep. 248, 1985 WL 324069, at \*19 (Oct. 28, 1985) ("*bona fide*" and "does not discriminate against aliens"); *Tecmed*, ¶ 122 (May 29, 2003) ("legitimate," "appropriate" and "proportionate"); Jorge E. Viñuales, *Customary Law in Investment Regulation*, 23 Italian Y.B. Int'l Law 23, 33 n.17 (2013) (must be "non-discriminatory," "for a public purpose," and "enacted in accordance with due process,"); and *Gogitidze et al. v. Georgia*, App. No. 36862/05, Judgment, Eur. Ct. H.R. ¶¶ 96-97 (May 12, 2015) (must be "lawful," *i.e.*, enacted in accordance with domestic law, "serve[] a legitimate public (or general) interest," and "proportionate").

a violation of Cuban law, which is incorrect, the total expropriation pursuant to Law No. 851 one month later is without question unjustifiable under international law.[57]

### (5)    The "war powers" exception does not apply

Defendants incorrectly contend that the taking was a response to "non-war hostilities." Mot. at 28-31.  But States may not exercise war powers in times of "non-war hostilities."[58] Defendants' cases are all inapposite.  The *Mary Lowell* case, Arbitration, 9 December 1879 (in 3 J.B. Moore, *Moore's Digest of International Law* 2772-77 (1989)) did not resolve the propriety of a confiscation by Spain, finding instead that it was "irrelevant . . . to state how far, if at all, the acts of the Spanish forces, done in self-defense, were unauthorized by international law." *Id.* at 2776-77.  In *Weiner's Case*, Inter-State Correspondence, November 1894 to January 1985 (in 4 J.B. Moore, *Moore's Digest of International Law* 82-88 (1906)), the issue involved an expulsion, with no indication that Weiner's assets were confiscated.  In *E.R. Kelley v. United Mexican States*, 4 R.I.A.A. 608 (U.S.-Mexico Claims Commission 1930), the confiscation issue arose during a formal armed conflict, whereas no such armed conflict existed between Cuba and the U.S. in 1960.

Defendants' other arguments also fail.  The 1933 amendment to the TWEA (Mot. at 27) extended a war power (under U.S. law) to emergencies, but it did not permit uncompensated takings of private enemy property.  *See also Sabbatino*, 307 F.2d at 866 ("Peacetime seizure of the

---

[57] *Sedco Inc. v. Nat'l Iranian Oil Co. and Iran*, Iran Award 55-129-39, 9 Iran-U.S. Cl. Trib. Rep. 248, 1985 WL 324069, at *22 (Oct. 28, 1985) (earlier of two expropriatory acts constituted date of taking where action had "ripen[ed] into an outright taking of title."); *Sabbatino*, 307 F.2d at 865 (regarding Law No. 851 and Resolution No. 1, "we have no doubt that one of the basic reasons for the seizure here involved was *to retaliate* against the reduction by the United States in the sugar quota it had allotted to Cuba.") (emphasis added).

[58] Defendants rely on JG Starke for their assertion that States may exercise war powers even in times of non-war hostilities, Mot. at 29, but omit that when Starke speaks of "non-war hostilities," he is referring to *armed conflict*.  JG Starke, *An Introduction to International Law*, 347-48 (Butterworths 4th ed. 1958) (referring to Korean War, the First Indochina War and the Suez Crisis).

property of nationals of a particular country, as an act of reprisal against that country, appears to this court to be contrary to generally accepted principles of morality throughout the world").

Moreover, even in the context of war, "there is now a customary rule of International Law . . . prohibiting the confiscation of private enemy property . . . on the territory of a belligerent." *E.R. Kelley*, 4 R.I.A.A. at 613; *see also* Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) art. 38, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (entered into force October 21, 1950) ("the situation of protected persons shall continue to be regulated, in principle, by the provisions governing aliens in time of peace").[59] Defendants' own cited commentaries confirm this customary rule. *See* U.S. Department of Justice, *Acquisition of Property for War Purposes* 28 (U.S. Government Printing Office 1944) (noting that the Hague Convention of 1907 "categorically states that private property cannot be confiscated"); Rex M. Potterf, *Treatment of Alien Enemy Property in War Time and After by the United States*, 2(6) Ind. L. J. 453, 453-54 (1927) ("When private enemy property is employed for a hostile purpose, of course its immunity [from confiscation] is at an end, but there still remains the duty of the belligerent ultimately to reimburse the owner.").

### (6) Compensation has not been provided

Defendants argue that even if an obligation to compensate existed, that obligation was satisfied because Cuba *would* have compensated Plaintiff but was purportedly thwarted by U.S. policy.  On this point, Defendants' brief is more akin to a conspiracy *noir* than a legal argument. Setting aside the speculative nature of Defendants' theory and its incompatibility with the certified claims process, there is no authority in customary international law that relieves Cuba of its

---

[59] *See* Geneva Convention Relative to the Protection of Civilian Persons in Time of War (accessed Aug. 20, 2020), *available at* https://treaties.un.org/Pages/showDetails.aspx?objid=0800000280158b1a.

obligation to compensate for expropriation even if the U.S. had thwarted the mechanism by which Cuba intended to raise revenue to compensate Plaintiff.

Nor is there support for Defendants' proposition that the failure of negotiations between the U.S. and Cuba precludes Plaintiff's claim. The authorities Defendants cite do not support their argument. *See North Sea Continental Shelf (F.R.G. v. Den. & Neth.)*, 1969 I.C.J. Rep. 3, Judgment, ¶¶ 85-86 (Feb. 20) (did not find that failure to negotiate relieves the State from its obligation to make "full reparation," as referenced in Article 32 of the ILC Articles on Responsibility of States for Internationally Wrongful Acts with commentary, and comment (2) thereto; *Fisheries Jurisdiction Case (U.K. & N. Ireland v. Iceland)*, 1974 I.C.J. Rep. 3, ¶¶ 73-75 (July 25) (involved States' competing claims to fishing rights, not one State's unilateral expropriation of property).

Defendants similarly mischaracterize the ICJ decision in *Case Concerning Gabcikovo-Nagymaros Project (Hung. v. Slov.)*, Judgment, 1997 I.C.J. Rep. 7 (Sept. 25)—in particular, an excerpt from ¶ 112—as suggesting that the ICJ stated that the obligation to compensate must be negotiated. The text before the quoted passage of the ICJ judgment makes it clear that the ICJ's statement regarding negotiation is in regard to "[t]he obligations contained in Articles 15, 19 and 20" of the applicable treaty (which are set out in ¶¶ 22-23 of the judgment). *Id.* ¶ 112. The ICJ did not state that failure to negotiate relieves the State that committed the wrongful act from its obligation to make "full reparation." *See* Article 32 of the ILC Articles on Responsibility of States for Internationally Wrongful Acts with commentary, and comment (2) thereto.

### 4.    Defendants' Political Question Argument Should Be Rejected

This case does not implicate the political question doctrine. *See Baker v. Carr*, 369 U.S. 186, 211 (1962) (not "every case or controversy which touches foreign relations lies beyond judicial cognizance"). Analyzing the expropriation exception does not call for any political judgment by the Court. *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221,

230 (1986) (explaining that "interpreting congressional legislation is a recurring and accepted task for the federal courts."); *Biton v. Palestinian Interim Self-Gov't Auth*., 310 F. Supp. 2d 172, 184 (D.D.C. 2004) (claims under the Antiterrorism Act were justiciable).

Defendants argue that this case is committed to the Executive branch. But there is no need to reexamine the history of U.S.-Cuban relations here. Defendants have raised sovereign immunity and therefore the only question the Court "must answer, then, is whether the defendants have set forth sufficient evidence to support their claim of immunity—no more and no less." *Ungar v. Palestine Liberation Org*., 402 F.3d 274, 280-81 (1st Cir. 2005).

## IV.    This Court Has Personal Jurisdiction Over Defendants

Defendants concede that they are subject to personal jurisdiction—and are not entitled to any due process protections—if the *Bancec* criteria are satisfied. *See* Mot. at 17, 46-47. Under *Bancec*, the "presumption of separateness" "gives way only if a foreign 'corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,'" or "when 'broader equitable principle[s]' dictate that separate treatment 'would work fraud or injustice.'" *GSS Group Ltd. v. Nat'l Port Authority*, 680 F.3d 805, 814 (D.C. Cir. 2012).

### A.    Defendants Are Not Entitled to Due Process Protection

"If the State of [Cuba] exerted sufficient control over the [Defendants] to make [them] an agent of the State, then there is no reason to extend to the [Defendants] a constitutional right that is denied to the sovereign itself." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005). Because Cuba does extensively control Defendants, no further inquiry into personal jurisdiction is needed.

#### 1.    Cuba Has *De Jure* Control over Defendants under Cuban Law

As explained in the declaration of Dr. Joan Martínez Evora, Cuba's Constitution and Civil Code give the State total control over Defendants' operations and assets. Property in Cuba is

assigned to state-owned entities that must operate in accordance with the State's economic plan and under the control of State officials.   Evora Decl. ¶¶ 67-69.   Those entities—including Defendants—are not independent and are subject to extensive State control.   *Id.* ¶¶ 24-25, 81-83.

Defendants' own legal expert, Dr. Cruz, largely agrees with this analysis.   For example, she admits that Defendants' are assigned property by the government and that the majority of their property (all real property plus certain "movable property") is owned by the State.   Cruz Decl. 2d ¶¶ 4(b), (d).   She fails to explain what property, if any, survives this broad exception, and she also neglects to discuss key provisions of the Cuban Constitution and Civil Code that give the State total control over Defendants' plans and operations.   *See* Evora Decl. ¶¶ 55, 112-14, 159-60, 177.

## 2.   Cuba Has *De Facto* Control over Defendants

Defendants do not contest—and therefore concede—that four of the five *Bancec* factors are met here.   *See Crystallex International Corp. v. Bolivarian Rep. of Venezuela*, 932 F.3d 126 (3d Cir. 2019) (applying the five *Bancec* factors to conclude that Venezuela extensively controlled the state-owned oil company PDVSA).   Defendants only dispute that the State exercises "day to day" control over their operations.   Mot. at 48.[60]

CIMEX is controlled by, and functions in its daily activities as a branch of, the Cuban military.   Evora Decl. ¶¶ 23, 214-18.   The State Department added CIMEX as a sanctioned entity on the Cuba Restricted List, which represents the "list of entities and sub-entities under the control

---

[60] Defendants ignore *Rubin*, where the Supreme Court affirmed *Bancec* and misconstrue the D.C. Circuit's precedent, when they incorrectly claim that the only relevant factor is "day to day" control.   *See* Mot. at 48; *see also Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843, 850-51 (D.C. Cir. 2000) (other factors were relevant to the control analysis); *DRC, Inc. v. Rep. of Honduras*, 71 F. Supp. 3d 201, 215-16 (D.D.C. 2014) (analyzing financial, political, and contractual control); *Cont'l Transfert Technique, Ltd. v. Nigeria*, No. 08-cv-2026 (PLF), 2019 WL 3562069, at *16 (Aug. 6, 2019) (analyzing multiple factors regarding ownership and use of bank account at issue).   *Gibbons v. Rep. of Ireland* is about principal-agency, not extensive control under *Bancec*.   532 F.Supp. 668, 670 (D.D.C. 1982).

of, or acting for or on behalf of, the Cuban military, intelligence, or security services or personnel . . . ."  SAC ¶ 77; Butcher ¶ 13.  High-ranking military officials and members of the Castro family serve as directors, officers, and shareholders, and CIMEX is part of the military's effort to operate in every profitable area of the Cuban economy.  SAC ¶ 72; Butcher ¶ 11.1.

Although CIMEX claims to observe corporate formalities by "maintain[ing] its own books and records" (Valmaña ¶¶ 23-4, 28 54), there is no supporting documentation thereof, nor is any mention made of the other corporate formalities that must be observed, including whether CIMEX's funds are diverted for non-corporate uses by the military.  *United States v. Emor,* 850 F. Supp. 2d 176, 207 (D.D.C. 2012) (factors include "domination of the organization by a single individual" and failure to maintain corporate formalities, including "diversion of the corporation's funds or assets to non-corporate uses such as personal use by the . . . dominant, controlling person."); *see also* Butcher ¶ 13 (military use of CIMEX funds).

CUPET likewise is controlled by the Cuban Government, specifically the Ministry of Energy and Mines, which dictates CUPET's daily activities.   Evora Decl. Part VII.B.   The government determines its organizational structure and appoints the Director and Deputy Director; the Director then appoints the remainder of the group that has "all the legal authority needed for their operation without the need for government approval."   Cruz Decl. 2d ¶ 4(b)(ii); *see also* Sotolongo Decl. 1st ¶ 1; SAC ¶ 80.  The government controls CUPET's operations, including its planning, compliance with government directives, setting performance goals, analyzing business opportunities, and "directing, coordinating, executing and controlling compliance with the policy approved by Cuban government for the sustainable development of the activities of the oil and gas

sector in the country."  SAC ¶ 82(f); Evora Decl.  ¶¶ 126-36, 144-53, 177-81.[61]

Other courts in this Circuit and elsewhere have found the *Bancec* factors satisfied under similar circumstances.  *See McKesson Corp. v. Islamic Rep. of Iran*, 52 F.3d 346 (D.C. Cir. 1995) (factors were government ownership, board appointments, policy directives, declarations of dividends, and required actions by entity against its economic interest); *see also Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323 (S.D.N.Y. 2019) (similar circumstances); *In re 650 Fifth Ave. & Related Properties*, 881 F. Supp. 2d 533 (S.D.N.Y. 2012) (same); *Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Rep. of Peru*, 655 F. Supp. 2d 361 (S.D.N.Y. 2009) (same); *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 Civ.1917(CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) (same).

### B.    Any Juridical Separateness Should Be Disregarded to Prevent Injustice

"[T]he doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice."  *Bancec*, 462 U.S. at 629.  The exception applies in cases "where a foreign sovereign intentionally seeks to gain a benefit while using the legally separate status of its instrumentality as a shield to guard against concomitant costs or risks . . . where a sovereign otherwise unjustly enriches itself through the instrumentality . . . or where a sovereign uses its instrumentality to defeat a statutory policy."  *DRC, Inc.*, 71 F. Supp. 3d at 218.

It is undisputed that Cuba profits from the commercial activities of CUPET and CIMEX and that some of those activities involve use of Plaintiff's Confiscated Property, which violates

---

[61] Defendants cite several cases for the proposition that "courts have respected the separate status of Cuban entities on multiple occasions," (Mot. at 47 n.27), but none of these cases involves a Cuban OSDE entity like CUPET, which is essentially another arm of the government (Evora Decl. ¶¶19-25), or an entity, like CIMEX, that has been recognized by the U.S. Government as "under the control of" the Cuban military.  Moreover, one of the cases is the Second Circuit's decision in *Bancec*, which was subsequently overruled by the Supreme Court in deciding that the Cuban bank's separate juridical status should be disregarded.

Title III and the policy of "deny[ing] traffickers any profits from" economic exploitation of the Confiscated Property.  *See* 22 U.S.C. § 6081(11).  Defendants are tools of the Cuban State (Evora Decl. ¶¶ 24-25), and it would be unjust to allow Cuba to benefit from the ongoing violation of U.S. laws by Defendants, while hiding behind a façade of juridical separateness.

## C.    Regardless, Defendants Have Minimum Contacts with the United States

As discussed, Defendants have minimum contacts by virtue of their commercial activities involving the U.S. and U.S. entities.  *Supra* Section III(B)(2)(b).  Personal jurisdiction is conferred on this Court so long as it "is consistent with the United States Constitution and laws."  Fed R. Civ. P. 4(k)(2)(B).  In this Circuit, personal jurisdiction "turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process," which is the case when a defendant "purposefully directed" its activities at residents of the U.S., even if there is no physical conduct in the U.S.  *Mwani v. bin Laden*, 417 F.3d 1, 11, 13 (D.C. Cir. 2005).

At a minimum, Defendants' use of Plaintiff's Confiscated Property, without paying the rightful compensation due to Plaintiff, is purposefully directed at Plaintiff.  And some of the specific uses—*e.g.*, obtaining billions in remittances from U.S. persons, procuring hundreds of millions worth of consumer goods from U.S. companies, and lobbying efforts directed towards the U.S. government and energy companies—occur in the U.S. and involve U.S. residents.  *Supra* Section III(A)(1) & (2).  Moreover, Defendants' trafficking in confiscated property has broader effects in the U.S., as Congress has found.  22 U.S.C. § 6081.

Defendants' arguments misconstrue the facts and law.  *See* Mot. at 54-60.  They cannot avoid jurisdiction "merely because the defendant did not physically enter the forum."  *Mwani,* 417 F.3d at 12.  Nor can they pass the buck to subsidiaries (such as FINCIMEX) that assist with the trafficking activities, because Defendants benefit therefrom.  *See* 22 U.S.C. § 6023(13)(A)(ii).  At a minimum, it is appropriate for this Court to exercise its discretion to order jurisdictional

discovery.  *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).[62]

Finally, CIMEX-Panama has minimum contacts based on its status as an alter ego of CIMEX-Cuba.  SAC ¶ 3; *Diamond Chem. Co. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 7 (D.D.C. 2003).  Defendants offer no CIMEX-Panama declarant to rebut this fact.  One declarant is a private attorney in Panama who discusses Panamanian corporate law without applying it to CIMEX.  *See* Declaration of Juan Pablo Fabrega, Dkt. 42-13.  The other declarant is the legal director of CIMEX-Cuba who offers no foundation for her assertion that CIMEX-Panama observes corporate formalities.  Valmaña ¶ 54.

## V.  Defendants' Motion for a More Definite Statement Should Be Denied

Defendants' one-sentence "motion" (Mot. at 60) is insufficient to support a motion. Regardless, it is unnecessary since Defendants know what property was confiscated and how it is used.  *See Feldman v. C.I.A.*, 797 F. Supp. 2d 29, 42 (D.D.C. 2011).

---

[62] Defendants also contend that a separate analysis must be conducted with respect to each parcel of Confiscated Property, but nothing in the Helms Burton Act requires this.  As long as some "overt acts" occur in the U.S. as part of ongoing trafficking, this suffices to establish jurisdiction over claims regarding all injuries caused by the scheme.  *See Mwani*, 471 F.3d at 13.

Date:  September 29, 2020                    Respectfully submitted,


                                    By:     */s/ Steven K. Davidson*

                                         Steven K. Davidson (DC Bar #407137)
                                         Michael J. Baratz (DC Bar #480607)
                                         Jared R. Butcher (DC Bar #986287)
                                         STEPTOE & JOHNSON LLP
                                         1330 Connecticut Ave., NW
                                         Washington, DC 20036
                                         Telephone:  202-429-3000
                                         Facsimile:  202-429-3902
                                         sdavidson@steptoe.com
                                         mbaratz@steptoe.com
                                         jbutcher@steptoe.com

                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system that will automatically send email notification of such filing to all counsel of record.

By: *  /s/ Steven K. Davidson*
Steven K. Davidson