IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXXON MOBIL CORPORATION,                )
                                        )
            Plaintiff,                  )
                                        )       CV No. 19-1277
        vs.                             )       Washington, D.C.
                                        )       March 10, 2021
CORPORACION CIMEX S.A., ET AL.,         )       2:04 p.m.
                                        )
            Defendants.                 )
_____)


         TRANSCRIPT OF ORAL ARGUMENT VIA ZOOM PROCEEDINGS
            BEFORE THE HONORABLE AMIT P. MEHTA
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              Steven K. Davidson
                                Jared R. Butcher
                                Michael J. Baratz
                                Eugene J. Silva
                                STEPTOE & JOHNSON LLP
                                1330 Connecticut Avenue, NW
                                Washington, D.C. 20036
                                (202) 429-8077
                                Email: sdavidson@steptoe.com


For the Defendants:             Michael Krinsky
                                Lindsey Frank
                                RABINOWITZ, BOUDIN, STANDARD,
                                KRINSKY & LIEBERMAN, P.C.
                                14 Wall Street
                                Suite 3002
                                30th Floor
                                New York, NY 10005
                                (212) 254-1111
                                Email: mkrinsky@rbskl.com

APPEARANCES CONTINUED:

Court Reporter:                     William P. Zaremba
                                    Registered Merit Reporter
                                    Certified Realtime Reporter
                                    Official Court Reporter
                                    E. Barrett Prettyman CH
                                    333 Constitution Avenue, NW
                                    Washington, D.C. 20001
                                    (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2              DEPUTY CLERK:  Good afternoon, Your Honor.
 3    This is Civil Action 19-1277, Exxon Mobil Corporation versus
 4    Corporacion Cimex S.A., et al.
 5              Steven Davidson, Jared Butcher, Michael Baratz,
 6    and Eugene Silva for the plaintiff.
 7              Michael Krinsky and Lindsey Frank for the
 8    defendants.
 9              THE COURT:  All right, Counsel.  Good afternoon.
10              Can everybody hear me all right?
11              MR. KRINSKY:  Fine, Your Honor.  Thank you.
12              THE COURT:  Okay.
13              Mr. Davidson?
14              MR. DAVIDSON:  Yes, Your Honor.
15              THE COURT:  Okay.  So ordinarily, I'd tell
16    everybody to have a seat to start out, but -- at least in
17    this case, but you're already seated.
18              There is, to say the least, a fair amount to get
19    my arms around here, and I've done my yeoman's efforts to
20    try and do so after the last many days.
21              So let me propose the following course of action
22    here this afternoon:
23              As I have sort of gone through the papers, I view
24    sort of there to be sort of six issues, and I'm sort of
25    prepared to address the parties' arguments in this order,
```

1    and I think it's essentially consistent with what you all --

2    how you all have framed it.

3            But the first question concerns the LIBERTAD Act

4    and whether it essentially is an independent grant of

5    subject-matter jurisdiction to include the abrogation of

6    sovereign immunity with respect to any claims against

7    agencies and instrumentalities of a foreign state.  That

8    seems to me to be sort of the threshold question 1.

9            If the answer is "no" and it's FSIA, Foreign

10   Sovereign Immunities Act, that applies to the question of

11   immunity, the question -- the threshold question there is,

12   does the expropriation exception trump the commercial

13   activity exception in this case.  So that's question 2.

14           Question 3 is, if the -- well, question 3 and 4,

15   respectively, are, does the expropriation exception apply or

16   does the commercial activity exception apply.

17           And then question 5 -- and maybe I said there were

18   six questions, I really meant five questions -- is the one

19   concerning due process and personal jurisdiction and whether

20   the defendants are essentially -- this is my term -- the

21   alter egos of the state, and, therefore, not entitled to

22   personal jurisdiction -- excuse me, to due process

23   protection, and, therefore, I don't need to worry about a

24   minimum-contacts analysis.

25           So those are sort of the five main questions that

1   I have sort of gleaned from the papers.  I know there's at

2   least one challenge to standing.  And I'm happy to hear

3   counsel address standing, if you wish, but I've sort of --

4   I've read your arguments and am fairly comfortable with the

5   standing inquiry.  But I thought the other -- these five

6   other big picture, big topics were the subject of -- would

7   be the subject of further discussion on these issues.

8            So with that, let me sort of get everyone's

9   reactions and see if that makes sense to proceed in that

10  fashion.  And maybe we can even just do this question by

11  question instead of granting a chunk of time to one side and

12  another chunk of time to the other side.

13           MR. KRINSKY:  For the defendants, Your Honor,

14  we think that's fine, makes a lot of sense.

15           THE COURT:  Okay.

16           Mr. Davidson, is that okay with you?

17           MR. DAVIDSON:  Yes, Your Honor.

18           THE COURT:  Okay.

19           All right.  So why don't we start out with this

20  first issue, and that is the question of whether the

21  LIBERTAD Act -- the plaintiffs have argued that the LIBERTAD

22  Act itself is a grant of subject matter jurisdiction,

23  including abrogation immunity, and the defendants, not

24  surprisingly, think otherwise.

25           So why don't we start there, Mr. Krinsky, and I'll

```
 1   hear argument on that and then I'll probably have some

 2   questions for you along the way.

 3           MR. KRINSKY:  Very good, Your Honor.

 4           I think the answer lies in the following

 5   circumstances:

 6           Title III does not explicitly override or create

 7   an additional exemption to the FSIA.  It does not explicitly

 8   say it is a new head of subject-matter jurisdiction.

 9           The provisions in the bill that would have done

10   just that, both things explicitly, were deleted as the bill

11   went through Congress.

12           THE COURT:  Can I ask about that?

13           I mean, there are -- let me sort of ask a couple

14   of textual questions and then I'll ask you sort of a

15   big-picture question.

16           The first textual question is, I mean, there are

17   elements within the LIBERTAD Act that are sort of a genus,

18   if you will, of subject matter jurisdiction, and not just

19   the granting of a private right of action, as you've

20   suggested.

21           So, for example, there is an amount in controversy

22   provision under 6082(b), which I think you would agree with

23   me, is something that goes to the Court's subject-matter

24   jurisdiction and is not sort of private-right-of-action

25   criteria.
```

1          So I mean in light of that, shouldn't I look at

2    this Act as doing more than simply granting a private right

3    of action and that I should be doing more and actually grant

4    subject-matter jurisdiction --

5          MR. KRINSKY:  I think it -- I'm sorry, Your Honor.

6          THE COURT:  -- to include the abrogation immunity?

7          MR. KRINSKY:  We think it's just to the opposite

8    effect, Your Honor.

9          It addressed certain things.  It addressed FSIA

10   provisions on execution.  It changed the amount in

11   controversy.  It did all these things explicitly.  But what

12   it did not do was explicitly say there's a new exemption to

13   FSIA immunity and there is no subject-matter jurisdiction.

14         And this was against the backdrop -- importantly,

15   against the backdrop of the Supreme Court saying I don't

16   know how many times by 1996, and the Circuit saying, by

17   1996, FSIA is exclusive source of jurisdiction.

18         So it addresses -- and I'll add to that:  Congress

19   has repeatedly amended the FSIA explicitly, but not this

20   time.

21         THE COURT:  I'm sorry to interrupt.

22         I guess the big-picture question to me is this,

23   which is:  It strikes me as a little odd, maybe it's not, I

24   suppose, but one could say, look, Congress has, in this

25   statute, constructed a fairly detailed construct in order to

1    sue persons, including sovereign persons, agencies and

2    instrumentalities, who traffic in confiscated goods.

3         It seems odd that Congress, at least implicitly

4    here, hasn't abrogated the immunity of an agency and

5    instrumentality that still possesses those confiscated goods

6    and traffics in those goods, and that courts would be asked

7    to look to the FSIA to determine immunity abrogation, when

8    the entire purpose of the statute is to be able to bring

9    causes of action against a person, to include agencies and

10   instrumentalities, that would have possession of this

11   property and traffic in this property.

12        MR. KRINSKY:  They still can bring actions against

13   agency of instrumentality that possess confiscated property,

14   if they can meet the FSIA expropriation exception.  It's not

15   a dead letter.

16        The expropriation exception says that if an agency

17   possesses -- I'm sorry, owns or uses, operates expropriated

18   property and it is engaged in commercial activity in the

19   United States, then it is subject to suit.

20        And that's an enormous impact.  That means that if

21   trade is resumed between the United States and Cuba, these

22   companies which are operating expropriated property cannot

23   sue in the United States -- cannot start doing business with

24   the United States without being subject to suit under the

25   FSIA and Title III.  So this is not by any means a dead

1   letter.

2          We should also remember, Your Honor, that --

3          THE COURT:  But, of course -- I guess,

4   Mr. Krinsky, but, of course, at the time Congress passed

5   this statute, there was an ongoing trade with Cuba to any

6   substantial degree.

7          And it just -- it strikes me that having to

8   satisfy -- if the interpretation is that Congress also

9   insisted that the expropriation exception be satisfied in

10  the FSIA, it would substantially curb an American person's

11  ability to do the very thing Congress wanted to do, which

12  was to recover for the confiscated property that continued

13  to be used in the commercial activity.

14         MR. KRINSKY:  But they didn't want to sweep aside

15  the limitations of the FSIA.

16         Where is the indication that it wanted to go that

17  far?  Why -- I mean, there were provisions that would have

18  done just that.  Literally, explicitly, there were

19  provisions in the bill as introduced and it went through

20  Committee.  And then when it got further through Committees,

21  consideration of committees, it was deleted.

22         THE COURT:  So couldn't another reasonable

23  inference of that action be that Congress thought the Act

24  self-evidently abrogated sovereign immunity; in other words,

25  we already took care of that immunity abrogation, we don't

```
 1   need to add expressly to the FSIA itself.

 2              MR. KRINSKY:  But we see no indication of that.

 3              And that's quite an assumption to make, given that

 4   the Supreme Court has said the FSIA is exclusive source of

 5   jurisdiction.  And they've said that multiple times, that if

 6   you want to amend a prior law, particularly a jurisdictional

 7   law, you better use those words, "immunity" -- use the words

 8   "immunity," use the word "jurisdiction."

 9              That's the background against which Congress

10   legislated.  And in the very same session of Congress, the

11   second session in the same Congress, they amended the FSIA

12   in a different way explicitly.

13              So the pattern of how Congress goes about amending

14   the FSIA, the fact that there was a bill to do just what

15   that assumption says Congress wanted was deleted, other

16   provisions of the FSIA were explicitly amended and yet this

17   was not.

18              Everything else about what Congress may have

19   intended, I submit, would be speculation.  And all the

20   presumptions of statutory construction that we rely upon,

21   which the courts have emphasized so strongly, nothing is

22   stronger than the presumption against Congress meant what it

23   deleted from the legislation during the process and on and

24   on and on.

25              All those weigh, I would submit, weigh too heavily
```

```
1    in order to make an assumption of speculation that's what
2    Congress might have wanted.  That's why there are these
3    rules of statutory construction.  That's why there's a
4    presumption, strong presumptions, so we're not left to
5    wonder what we should do speculating on purpose.
6              THE COURT:  Okay.
7              Mr. Krinsky, I don't have any further questions on
8    this issue.  If you want to -- if there's more you want to
9    add, I'm happy to hear it.
10             MR. KRINSKY:  No, Your Honor.  I'm fine.
11             THE COURT:  I'm sorry?
12             MR. KRINSKY:  I'm fine, Your Honor.
13             THE COURT:  All right.
14             So I'll turn it back to Mr. Davidson.
15             And then we'll continue this game of ping-pong,
16   given that you're the movant, Mr. Krinsky.  You can also
17   have a couple minutes of rebuttal, if that's something you
18   wish to have.
19             Mr. Davidson.
20             MR. DAVIDSON:  Yes.  Thank you, Your Honor.
21             And I think doing it in this method is helpful and
22   it allows us to focus on each particular issue as we go.
23             As to this one, Your Honor, I mean, I think your
24   questions to counsel in many ways sum up our position.
25             And if I could state it in a very general way,
```

1    this is a specific statute to deal with a particular

2    situation, not a general statute.

3              And the statute itself and the words of those who

4    enacted it make clear that an agency or instrumentality of a

5    foreign state can be sued; that this legislation was

6    necessary to provide "protection against confiscations by

7    foreign nations, particularly given the absence of fully

8    effective remedies."  So the statute itself, which is, of

9    course, our first and most important starting point, is, in

10   our view, explicit in giving this right.

11             The question then becomes, which has been raised

12   by defendants, what about the FSIA?  And I think,

13   Your Honor, and I think what we've submitted compels the

14   result, that Congress intended for litigants like our client

15   to avoid the thicket of the FSIA.

16             In the statute itself, Congress made clear to us

17   that it did not intend for claims like ours to be barred by

18   the FSIA.  And the language of the statute says, except as

19   provided in this chapter, Title 28, which includes the FSIA,

20   and the rules a court apply to this.  So what that means to

21   us --

22             THE COURT:  I guess -- you know.

23             MR. DAVIDSON:  -- is --

24             THE COURT:  I know you've sort of grappled -- or

25   you hung your hat -- can you hear me okay?

1          MR. DAVIDSON:  Yeah.  If you could turn up your

2   volume a little bit --

3          THE COURT:  Oh.  Let me see.

4          MR. DAVIDSON:  -- if you don't mind, Your Honor.

5   It might be a bad speaker on my end.

6          THE COURT:  Is that any better?

7          MR. DAVIDSON:  That's better.  Thank you.

8          THE COURT:  All right.

9          MR. DAVIDSON:  Sorry to make you do that.

10         THE COURT:  Yeah.  No.  That's all right.

11         That clause except as otherwise -- as provided in

12   the subchapter strikes me as a pretty thin read to hang your

13   hat on when it comes to abrogation of immunity.

14         I mean, the statute nowhere mentions the word

15   "immunity."  And I think Mr. Krinsky's right, at least

16   insofar as, don't I have to assume and presume that Congress

17   knew, when it was legislating, that it legislated against

18   the knowledge of what the FSIA requires, one; and, two, how

19   the Supreme Court had interpreted the FSIA, which was, at

20   least since *Amerada Hess*, if not earlier, to say, this is

21   the exclusive means by which jurisdiction is had over

22   foreign sovereigns, and that includes their agents and

23   instrumentalities.

24         And so against that backdrop to -- isn't it a bit

25   of a stretch to suggest that Congress abrogated silent

1    immunity in a clause that starts, except as provided in the

2    subchapter?

3              MR. DAVIDSON:  A couple responses, Your Honor.

4              One, I think -- remember the timing here:  FSIA is

5    an earlier statute, hence precedes the Helms-Burton Act.  So

6    like a lot of things, I guess, with legislative history or

7    interpretation, I think the fact -- those facts can be used

8    in our favor to suggest Congress knew what it was doing and

9    made clear in the grant of jurisdiction and the ability of a

10   litigant to sue, that a litigant could sue an agent or an

11   instrumentality of a foreign state.

12             If they weren't setting forth the specific grant

13   of jurisdiction to do that, there would be no need to refer

14   to an agency or instrumentality of a foreign state because

15   the FSIA would probably control that.

16             Our view is that here, there was a specific

17   situation that Congress was dealing with and they made that

18   clear.  And we have a number of quotes from the legislators

19   who voted on and passed this bill that suggest to us very

20   strongly that that was their intention.

21             And when President Clinton signed this, he said,

22   "An act" -- "The Act is an immediate step to protect the

23   interests of American citizens whose property was

24   expropriated by the Cuban regime."

25             So to us, admittedly, we would be on even stronger

1  ground if it made clear in the explicit language on

2  immunity.  But we believe, given what they've said and given

3  statutory construction rules, that is, a subsequent, more

4  precise rule should trump an earlier, more general one, that

5  those two elements give us a grant of subject-matter

6  jurisdiction.  The Act is replete with quotes about, this

7  gives citizens a right to go to court, immediate action, a

8  cause of action against the people who took property or

9  traffic in it.

10        And then on the *Amerada Hess* point, Your Honor,

11  which is one, obviously, we need to deal with, what I would

12  suggest about *Hess*, Your Honor, is that the Court itself,

13  when it issued the decision, made clear that there were

14  limits on its holding.

15        I would direct Your Honor to page -- to 488 U.S.C.

16  at 438.  There, the Court says, in our view, limiting its

17  holding, this is not a case where a more general statute is

18  claimed to have repealed by implication an earlier statute

19  dealing with a narrower subject.

20        So unlike the general-jurisdiction statutes that

21  the litigant in *Hess* was trying to rely on -- remember,

22  there was an admiralty statute and other general grants of

23  jurisdiction not specific to a sovereign.

24        In our case, we would say, it fits squarely within

25  the limitation set forth by the *Hess* court, where here, we

1    have a more specific subsequent statute that deals precisely

2    with the issue at hand.  So that's our argument, Your Honor.

3            THE COURT:  Mr. Davidson, can you just provide

4    that citation one more time?

5            MR. DAVIDSON:  Sure.  It's *Amerada Hess*, which is

6    488 U.S., and the pincite is 438.

7            THE COURT:  All right.  I just wanted to have the

8    pincite.  Okay.

9            So would your position be the same hypothetically

10   if this was the -- if your suit was against an agency or

11   instrumentality of a sovereign other than Cuba?

12           Say hypothetically one of the oil rigs --

13   I believe there's an oil rig involved at some of the

14   property here -- that an oil rig that was owned by Esso that

15   was appropriated by Cuba was then sold to Venezuela and

16   Venezuela was using that oil rig to drill for oil, would it

17   be your position that this statute also abrogates the

18   immunity of the downstream purchaser, even --

19           MR. DAVIDSON:  Well, assuming that entity, in your

20   hypothetical, the Government of Venezuela, was trafficking

21   in confiscated property, we would say Title III would give

22   us subject-matter jurisdiction, because the hook is

23   trafficking in confiscated property.

24           THE COURT:  And when you say "subject-matter

25   jurisdiction," that term, as you know, encompasses a lot of

1  different concepts.

2          The narrower question here is, would you agree or

3  is it your position that in that hypothetical scenario,

4  Title III would abrogate Venezuela's immunity?

5          MR. DAVIDSON:  In the sense that Title III would

6  continue to take precedence over the FSIA with respect to

7  the immunity of the state.

8          THE COURT:  Right.

9          I think your answer has to be "yes."

10          MR. DAVIDSON:  Yes.

11          And our answer would be "yes," because that's the

12  consequence, according to Congress, for anyone, including a

13  state, that traffics in confiscated property.

14          THE COURT:  Okay.

15          All right.  Well, those are the questions I had,

16  Mr. Davidson.  Did you have anything else you wanted to add

17  on this topic?

18          MR. DAVIDSON:  No, Your Honor.  I think I've given

19  you the sum of our argument, Your Honor.

20          THE COURT:  Very good.

21          Mr. Krinsky, I'll give you a couple minutes for a

22  rebuttal here.

23          MR. KRINSKY:  Thank you, Your Honor.

24          The first point I was going to add was the point

25  Your Honor made about agencies of other countries.

1        And it's not an insignificant point.  It's not

2   just Venezuela, Your Honor.

3        At the time --

4        THE COURT:  That's just the one that came to mind.

5        MR. KRINSKY:  Of course.

6        At the time, the trade was with Canada, with

7   Spain, with Germany, with the U.K., all those countries were

8   trading with Cuba, were entering into joint ventures with

9   Cuba.  And most countries all have agencies or

10  instrumentalities that engage in business.

11       And I would submit, it's inconceivable that

12  Congress, without saying a word of concern about this or the

13  impact of this, would have suddenly exposed them to new

14  lawsuits which otherwise could not have been brought under

15  the FSIA.

16       THE COURT:  Pause on that real quick, because

17  I have to confess, I've probably been thinking about this

18  too narrowly.

19       But in your view, say, for instance, the Cuban oil

20  company had entered into a joint venture with a Spanish

21  energy producer, and the Esso oil rig was being used to

22  drill for oil.  In your view, the Spanish company or the

23  Spanish entity would be trafficking in confiscated property?

24       MR. KRINSKY:  Oh, yes.

25       THE COURT:  Because --

1    MR. KRINSKY:  I mean, there was not an Esso oil

2    rig, by the way, but to use it as a hypothetical.

3    And, in fact, Your Honor, that was the main thrust

4    and concern of Helms-Burton.  All of these other countries

5    were beginning to invest in Cuba, and particularly in the

6    form of joint venturers.  And the legislative history and

7    the language of the statute is very clear:  That would

8    subject them to trafficking liability.  The idea that we

9    would take away the immunity of all of our allies without

10   saying one word about it is really hard to accept,

11   Your Honor.

12   The other point I would want to make, and just to

13   put it in context, yes, the embargo at that moment in March

14   1996 was pretty strong, but the history of the embargo has

15   gone up and down, opened and closed.

16   The Supreme Court said, in one of the cases we

17   litigated, *Zemel versus Rusk*, for travel, it contracts and

18   it collapses -- I'm sorry, it contracts and it expands, and

19   that's the history of it.  And maybe one day it would be

20   entirely eliminated.  There's a bill pending in Congress to

21   repeal Helms-Burton.  The Obama Administration opened up

22   trade and relations tremendously.

23   So there would have been, and there will be, if

24   trade opens, substantial opportunities for Title III

25   lawsuits that meet the agency -- the FSIA expropriation

1    exception.

2         THE COURT:  Okay.

3         MR. KRINSKY:  And one last point, because I don't

4    want to abuse my time, Your Honor, my friend, Mr. Davidson,

5    says, there was all this talk about people making -- in the

6    legislative history, about wanting to be able to sue, and it

7    was a lot of talk.

8         But none of that talk was about the FSIA, except

9    for the FSIA -- the provisions that would have amended the

10   FSIA were deleted.

11        THE COURT:  Are you aware of any legislative

12   history that explains the deletion?

13        MR. KRINSKY:  The only answer -- believe me,

14   Your Honor, we've looked.

15        The only insight is the bills were referred to

16   foreign affairs committees in both Senate and the House.

17   The House was moving forward.  The other committees that had

18   jurisdiction waived their jurisdiction.

19        After it came out of the subcommittee in the

20   House, there was consultation with the other committees,

21   including the Judiciary Committee.  And then after that,

22   this provision -- these provisions disappear.

23        I don't know what the Judiciary Committee and the

24   foreign affairs committee said to each other, but that's the

25   best we can find that gives a hint, a glimpse in time, of

1   what happened.

2           THE COURT:  All right.  Well, that's helpful.

3           All right.  Well, thank you, Mr. Krinsky.

4           Let's move -- unless there's anything further,

5   let's move to --

6           MR. DAVIDSON:  Your Honor, I don't know, could I

7   respond briefly on that point?  If not --

8           THE COURT:  Sure, Mr. Davidson, I'll give you a

9   couple seconds.

10           MR. DAVIDSON:  The hypothetical about suing, about

11   Venezuela or Canada or so on, remember a few things,

12   Your Honor, that, one, the statute talks about agents and

13   instrumentalities, not necessarily states, so I think it's

14   limited in that regard.  And, two, other countries have

15   reacted very negatively to Helms-Burton and have passed

16   blocking statutes in many instances to prevent its

17   application.  So I would suggest those countries are worried

18   about their agents and instrumentalities and believe that

19   this statute could apply to them.

20           So, again, narrowly, it's a narrow question

21   dealing with Helms-Burton, and I think Congress has the

22   power, of course, to determine who gets immunity in the

23   United States courts, and they've determined agents and

24   instrumentalities who traffic in confiscated material don't

25   get immunity.

1           THE COURT:  All right.

2           Well, let's turn to sort of my question 2, and

3    that is the question of, if the LIBERTAD Act does not

4    provide an independent grant of subject-matter jurisdiction

5    to include the abrogation of immunity, and that we have to

6    look to the FSIA for the immunity question.

7           The plaintiffs here -- excuse me, the defendants

8    here have argued that it's the expropriation exception that

9    must apply and that it trumps the commercial activity

10   exception in this case.  The plaintiffs have suggested

11   otherwise and argued that either exception can apply.

12          So let's turn to that question.  And, Mr. Krinsky.

13          MR. KRINSKY:  Yes, Your Honor.

14          Yes, we argue that the expropriation exception

15   alone must apply, and the reason is that the action presents

16   the classic expropriation scenario.

17          The state takes the property and then an agency

18   takes possession of it and operates it for commercial

19   purposes.  That is almost always -- and that's the phrase

20   that one of the courts we cite uses, that is almost always

21   the case.  So if there is nothing -- so if the commercial

22   activity exception applies, then it applies in almost every

23   case, and there is really nothing left to the expropriation

24   exception.

25          The expropriation exception, as the Supreme Court

1    reminded us just a couple days ago in *Phillip*, but it's

2    obvious anyway, it has very distinctive limitations.  It is

3    dealing with a very sensitive subject.  It is dealing with a

4    subject -- it's the only country in the world, the United

5    States, it's the only country in the world that has such an

6    exception.  So applying the commercial activity exception

7    eviscerates the statute and its particularities.

8              THE COURT:  Here's my question, which is, isn't

9    this case different in the following sense:  The cases that

10   you've cited and that you've relied on largely are cases in

11   which -- you know, for example, the *Rong* case from our

12   Circuit, is a case that actually -- in which the claim

13   arises from the expropriation directly.  And the claim is,

14   for example, for a taking, an international taking.  That

15   was the case, for example, in *Helmerich & Payne*.

16             This is different.  This is a statutory claim

17   that's based upon the trafficking activity and not the

18   expropriation.  It's true that the property at issue needs

19   to be confiscated, but the property -- it's the trafficking

20   of the property that gives rise to the liability here.

21             So why isn't this -- why doesn't that make this a

22   different case in which the commercial activity exception is

23   still in play, unlike in those other cases where all of the

24   causes of action are sort of arising from the

25   expropriations?

1          MR. KRINSKY:  Well, the other cases -- I beg to

2    differ, Your Honor.

3          The four cases we cited, two in this district,

4    were claims for unjust enrichment from the defendant's

5    commercial use of expropriated property.

6          They also had an expropriation claim, some anyway,

7    but the claim was a common law claim for unjust enrichment

8    for the commercial use of expropriated property, and that's

9    the same as Title III.

10          And, in fact, one of these plaintiffs, quite

11    aptly, said, its claim was really one for trafficking, he

12    used the word "trafficking."  So I don't -- is the common

13    law version of --

14          THE COURT:  Mr. Krinsky, can you repeat what you

15    just said a couple seconds ago.  I missed what you said.

16          MR. KRINSKY:  It was brilliant, Your Honor, and

17    you missed it.

18          THE COURT:  I know.  That's why I wanted you to

19    repeat yourself.

20          MR. KRINSKY:  The four cases we cited, two in this

21    district, had claims for unjust enrichment --

22          THE COURT:  Right.  I got that point.

23          MR. KRINSKY:  -- for commercial use of the

24    expropriated property.  That's on all fours with Title III.

25    It's based on common law, unjust enrichment.

1          This is statutory unjust enrichment, and, in fact,

2     the legislative history and the findings in Title III called

3     it unjust enrichment, a claim for unjust enrichment.

4          In those cases, the Court said -- the Court said,

5     no -- yes, you have stated a claim for common law unjust

6     enrichment, but you have to satisfy the expropriation

7     exception.

8          So I think these claims are -- in fact, they're --

9     there's no basis for distinguishing them, Your Honor.

10         THE COURT:  I mean, you know, *Sachs* --

11    Supreme Court's decision in *Sachs*, it's a case about

12    commercial activity exception and they recognize this.  And

13    it's premised on the interpretations and the statutory text

14    based on -- that appears in the FSIA.

15         But why shouldn't I sort of similarly look at what

16    the gravamen of the claim is here in the same way that the

17    Supreme Court did in *Sachs* and look at what the gravamen of

18    the claim is, what needs to be proven to establish the

19    claim.

20         In this case, what needs to be proven to establish

21    the claim is the trafficking.  That's the guts of the claim.

22    That's what gives rise to the liability, though concededly

23    the confiscation is an element of the claim.

24         So looking at it from that lens, I have a hard

25    time believing that this Congress that crafted this statute

1    that focused on trafficking would not have contemplated the

2    commercial activity exception as a way to abrogate immunity,

3    particularly when trafficking itself is defined in terms of

4    commercial activity.

5              MR. KRINSKY:  Yes.

6              Well, I think there are two answers, Your Honor.

7    One is, we would debate that the gravamen is the commercial

8    use.

9              If you look to *Sachs*, you know, what makes it

10   wrongful?  What makes it wrongful is the expropriation, the

11   taking of the property without appropriate compensation.

12   There's nothing wrong with selling or whatever you're doing

13   commercially.  So I think it is at least a debatable

14   question.

15             THE COURT:  Until Helms-Burton suggested

16   otherwise.

17             In other words, you're right, I think that the

18   selling of expropriated property or confiscated property by

19   itself may not be a problem, although it now becomes one and

20   when you've got a statute that specifically makes it

21   wrongful and gives rise to a private right of action.

22             MR. KRINSKY:  The second point, though,

23   Your Honor, which I would make, which dovetails in some

24   ways, is, I think that the more secure and appropriate and,

25   I think, actually compelled analysis is the analysis in

1  *Rong*.

2          The gravamen test in *Sachs* was a way of trying to

3  keep each category of exemption under the FSIA within its

4  proper bounds and applied in the proper way.  That's what

5  the gravamen test was meant to do.

6          *Rong* very specifically, and these other cases,

7  very specifically says, what does that mean?  How do we

8  preserve the structure and the integrity of the FSIA and the

9  expropriation exception?  And they come to the conclusion

10 that if you allow the commercial activity exception to

11 apply, that's the end of the expropriation exception.

12          So, as I say, I think the gravamen concept is

13 debatable.  Where is the real gravamen, what makes the

14 conduct really wrongful in the eyes of the United States.

15 But a surer guide, and the one I think is compelled is --

16 I have to ask the question:  What would be left of the

17 expropriation exception if the commercial activity exception

18 is applied, and I think the answer is:  Nothing.  And

19 I think that is an unacceptable -- I mean, legally

20 unacceptable result.

21          THE COURT:  All right.  Anything further on this

22 topic, Mr. Krinsky?  I'll turn it over to Mr. Davidson.

23          MR. KRINSKY:  I'll reserve for reply, Your Honor.

24          THE COURT:  Okay.  Mr. Davidson.

25          MR. DAVIDSON:  All right.  Thank you, Your Honor.

1            Your Honor, I think the analysis starts and could

2    even end, though there is case law on this point, obviously,

3    with the statutes.

4            The question is, does the commercial activity

5    exception and the expropriation exception apply to certain

6    events?  And they have certain statutory requirements.

7            And Mr. Krinsky suggested that the commercial

8    activity exception would essentially swallow the

9    expropriation exception, but I don't see how that would be

10   the case.  They both have different standards of conduct

11   that have to be found to apply, either commercial activity

12   or rights and property taken in violation of international

13   law.  I mean, those are the gravamen of the cases.  So I

14   would say there is no conflict -- or this is what I would

15   call a clever lawyerly argument to try to make one go away.

16           THE COURT:  I mean, it's clever except that it

17   seems to have some traction in various Circuit decisions.

18   And I think these Circuit decisions seem to reflect the

19   reality that once property is expropriated or confiscated,

20   it's not just, then, held.  It's actually put to commercial

21   use.  That's why you confiscate it in the first place,

22   right?

23           So if a claim arises from a confiscation, one can

24   presume there will always be commercial activity that

25   follows.  And so if that's true, then what's the purpose of

1    the expropriation exception at all?  When would it ever be

2    used if you can simply rely on the commercial activity

3    exception?

4            And I think the point that underlies this concern,

5    as far as I understand it, is that expropriation is the kind

6    of sovereign act that is sort of uniquely sovereign, and we

7    want to review this fairly restrictively and the

8    circumstances in which an expropriation can be found to have

9    given rise to an abrogation of immunity.

10           And so I think that's what courts are thinking,

11   and I think that's what Mr. Krinsky's argument is.  So

12   I guess why shouldn't that logic apply here since the claim

13   here does in a sense arise from the initial expropriation.

14           MR. DAVIDSON:  I would -- in response, Your Honor,

15   first, I would direct Your Honor to the case law of this

16   Circuit, and particularly the *Foremost-McKesson* case

17   involving Iran, in which the Court said flatly that there is

18   no per se rule when there is a claimed conduct that,

19   perhaps, grew out of an expropriation that has commercial

20   activity.

21           And to put a finer point on it, here, Helms-Burton

22   talks about what the action is, which is trafficking.  And

23   it doesn't say that -- it talks about someone who took

24   property, traffics in.  Here, those facts give rise

25   potentially to two exceptions.  And the cases

1    *Foremost-McKesson*, *Rong*, *De Csepel*, I think, make clear that

2    if the gravamen of the case is a commercial activity, the

3    commercial activity exception still applies and could apply

4    if the facts are sufficient under the law.  And I think

5    those cases make clear that in a case like ours, a litigant

6    has both exceptions at its disposal.

7              And remember, of course, this doesn't mean that

8    the exceptions have been proven, it just means that they're

9    potentially available.  And there are very different sets of

10   legal theories underlying each of these two different

11   exceptions, and we would have to prove and win that we

12   satisfy the different legal hooks of these two exceptions.

13             But I believe it's fair to say there is no per se

14   rule, and certainly not in this Circuit.  And even the other

15   cases from other Circuits do not establish such a per se

16   rule.

17             THE COURT:  Yeah.  It's interesting.  In

18   *Foremost-McKesson*, actually it's an interesting case just

19   because part of the discussion by the Circuit was that the

20   takeover in that case of the U.S. entity by the Iranian

21   government, the Court seemed to acknowledge was both

22   governmental and commercial in nature, and ultimately

23   concluded that there was -- it was sufficiently commercial

24   in nature to have the commercial activity exception apply,

25   as opposed to something else.

1          I'm not so sure that's true here in the sense

2     that, at least as I understand it, it was fairly clear that

3     the expropriation here took place as a result of sovereign

4     acts, correct?  And as I understand it, the Government of

5     Cuba issued decrees or legislation that require the taking

6     of the property?

7          MR. DAVIDSON:  Right.  It was pursuant to Cuban

8     law 851, I forget the number, but the law that allowed --

9     caused the plaintiff's property to be expropriated in 1960.

10         But again, Your Honor, I would -- we would submit

11    that those facts can potentially give rise to two

12    exceptions.  It doesn't mean, as I said, that they

13    necessarily -- the facts allow for both to be found, they

14    may, but at this stage on a motion to dismiss, we're just

15    talking about whether they can potentially apply.

16         And here, based on the law of this Circuit, I

17    think it's clear, respectfully, Your Honor, that they both

18    can apply and be adjudicated.

19         THE COURT:  So I guess to put a finer point on it,

20    I mean, if commercial activity follows every expropriation,

21    in your view, a litigant, a plaintiff could rely on either

22    exception in every case?

23         MR. DAVIDSON:  I think so, Your Honor.

24         I mean, I think here, it's a unique situation

25    because the statute is aimed at agents and instrumentalities

1   that didn't exist at the time of the taking.  So we have the

2   right -- we can prove under international law that these --

3   this property was taken in violation thereof, but we can

4   also prove that a commercial activity applies because of the

5   trafficking.

6           So the answer to your question, Your Honor, would

7   be, I would think that it should be left to the pleading and

8   proof, rather than preliminarily saying the two exceptions

9   are somehow inconsistent with each other and can't apply.

10          And even if one found them to be potentially

11  inconsistent, which I'm not suggesting they are, it's no

12  different than a plaintiff claiming alternative theories of

13  relief.  At some point, if they actually are in conflict

14  with each other, we would have to choose.

15          We don't think they are and both can be pursued,

16  but I think at this stage of the case without proof to

17  deprive the plaintiff the ability to have one of these

18  exceptions apply, we think is premature and unwarranted

19  based on the law of this Circuit and at this stage of the

20  case, Your Honor.

21          THE COURT:  All right.  Thank you, Mr. Davidson.

22  Anything further?  I'll give Mr. Krinsky the last word here.

23          MR. KRINSKY:  No, Your Honor.  I'm fine.

24          THE COURT:  All right.  Well, let's, then, turn to

25  these exceptions, and you all have spent a lot of time on

1    them, starting with the expropriation exception and let's

2    start there.

3              And I actually want to start with Mr. Davidson on

4    this subject, because I wanted to --

5              MR. DAVIDSON:  It's never a good thing,

6    Your Honor.

7              THE COURT:  Well, I wanted to be clear on what it

8    is that you are asserting Exxon's property right is here.

9              Am I right that your assertion of the property

10   right here is Exxon's right to the property of its sub,

11   Esso -- I may be mispronouncing that -- that is, that sort

12   of indirect ownership of the sub's assets.  Is that the

13   property right you're claiming has been infringed here?

14             MR. DAVIDSON:  More or less, Your Honor.

15             But first and foremost, our property right is as

16   the owner of a certified claim, and that as an owner of

17   certified claim, by virtue of the enabling legislation, it

18   is conclusive proof of ownership and it is given a

19   presumption of proof, obviously, to its value and its

20   validity.  So, one, our ownership claim comes through that.

21             Two, we would -- I'm sorry, Your Honor.

22             THE COURT:  Let me pause there for a second.

23             If that's your property right, I guess I don't

24   understand how that property right has been violated by

25   international law; in other words, the claim is something

1    that arose from the claimed violation, right?  I mean, you

2    went and you got a claim after the property was taken.

3    I don't understand how if the claim itself is the property

4    right, how that property right has been violated by an

5    expropriation in violation of international law.

6          MR. DAVIDSON:  Well, I think there are two bases

7    for our claim; one is the ownership and two is the indirect

8    ownership through the subsidiary.

9          This was a subsidiary of then-Standard Oil, which

10   is the same entity that is the plaintiff in this case just

11   by virtue of two name changes, first to Exxon and then to

12   Exxon Mobil Corporation.

13         So it is a property right and we think, as the law

14   of this Circuit says, that this indirect ownership right is

15   sufficient and the Helms-Burton cases that have been

16   litigated to date, which are cited at our opposition at 41,

17   the *Garcia* case in particular, show that indirect ownership

18   is sufficient to give rise to a property right that can be

19   litigated under Helms-Burton.

20         THE COURT:  Well, I think -- and there's certainly

21   no doubt that an indirect interest gives right to a property

22   right under Helms-Burton in terms of domestically, U.S. law.

23         But let me ask you, would you agree with me that

24   the property right under the expropriation exception, that

25   property right is one that's defined by international law?

1          MR. DAVIDSON:  I think the property right is

2    defined by the claim process, and the executive gave -- the

3    executive adjudicated in 1970 what the property rights are,

4    and they're set forth in the claim.

5          THE COURT:  That's not -- I mean, I didn't --

6    I mean, you'll tell me -- please tell me if I'm wrong, but I

7    read the Circuit's remand decision in *Helmerich & Payne*.

8          And I read that to mean that the question of

9    whether there is a property right is one that's determined

10   by international law in the first instance.  And you'll

11   remember in that case, there was a determination that there

12   was no property right because international law didn't

13   recognize an expropriation of a national -- taking of a

14   governmental of its own national property.  So there was no

15   property right there, no violation of international law.

16          But with respect to the holding company, there was

17   a violation, and it was recognized in international law that

18   the property right was that of the shareholder and the

19   rights attendant to being a shareholder.  And so that's why

20   I started with you, because I didn't see that you had

21   asserted that your rights as a shareholder were the ones

22   that were violated here, but, rather, it's this sort of

23   indirect ownership of the assets of the sub.

24          MR. DAVIDSON:  Well, I would submit, Your Honor,

25   that it is -- that comes with our rights as a shareholder,

1    that the rights of our subsidiary or the property of our

2    subsidiary were confiscated.

3                I think to answer the question that preceded that,

4    the rights and property taken in violation of international

5    law is the applicable standard here under the exception.

6                So I think to answer your question, it would have

7    to be rights and property taken in violation of

8    international law and that -- and there -- as you know,

9    there's extensive briefing in each side's papers on what

10   that means and whether there has been a violation of

11   international law, which we submit there has been.

12               THE COURT:  And so where would I look, in your

13   view, for the proposition that it is a violation of

14   international law, that a country violates international

15   law, property rights of a foreign shareholder in its sub's

16   assets?

17               MR. DAVIDSON:  Well, Your Honor, we would direct

18   your attention to our opposition brief.

19               THE COURT:  Because I think it's the *Barcelona*

20   *Traction* case from the International Court of Justice,

21   I guess, from 1970 or so, seems to say just the opposite,

22   which is that there is no recognized property rights of a

23   shareholder to its assets of its subsidiary, even a

24   wholly-owned subsidiary.  And that to the extent

25   international law recognizes the rights of a shareholder,

1    those rights that are attendant to a shareholder, the right

2    to vote, the right to attend meetings, the right to receive

3    dividends.

4           MR. DAVIDSON:  Well, we would direct Your Honor's

5    attention to our brief beginning -- the discussion begins on

6    page 42, but the guts of it is on page 43, where we say Esso

7    was plaintiff's wholly-owned subsidiary.

8           And then we say, customary international law

9    recognizes that a shareholder may bring a claim for

10   expropriation of property held by the company in which it

11   holds shares.  And for that proposition, you'll see we cite

12   various decisions from the Iranian Claims Tribunal that

13   wrestled with that very question in a number of its

14   decisions.

15          THE COURT:  Right.

16          MR. DAVIDSON:  So that is the support we provide

17   for that.

18          And in addition, there's the *Argentine-Total* case,

19   an ICSID case, where international law -- which if you carry

20   over to page 44 of our brief and there are other

21   international-type cases, arbitration cases, and claims

22   tribunal cases cited there.

23          THE COURT:  I want to just --

24          MR. DAVIDSON:  And we attempted to distinguish the

25   *Barcelona* case.

1          THE COURT:  I want to just say the following,

2    I mean, you know, in *Foremost* -- I'm sorry, not

3    *Foremost-McKesson*.

4          In *Helmerich & Payne*, the Circuit was pretty clear

5    that these type of bilateral agreements that may define what

6    property and property interest is as the U.S. in an Iranian

7    Claims Tribunal is, doesn't necessarily establish customary

8    international law, right?

9          I mean, these are bilateral agreements.  They

10   don't necessarily rise to the level of customary

11   international law.  So I'm not sure how terribly persuasive

12   it is to look at the Iranian Claims Tribunal cases in light

13   of *Helmerich & Payne*.

14          MR. DAVIDSON:  Well, I think in particular with

15   regard to the Iranian Claims Tribunal, I think that body is

16   more than a bilateral investment, I think, treaty-type

17   resolution.  I mean, that was adjudicating questions of

18   international law as it applied to these takings.  And

19   I think there, the case law that comes from that tribunal

20   can be used in an effort to define what customary

21   international law is, Your Honor.

22          THE COURT:  Okay.  That's helpful.  Thank you,

23   Mr. Davidson.

24          Anything further on this topic, or at least on

25   this narrow issue?  And we can talk more broadly about the

1    expropriations exception.  I just wanted to make sure I

2    understood what your position was on the property issue.  We

3    can, perhaps, talk a little bit more, if we need to, on the

4    violation of the various issues Mr. Krinsky's raised about

5    whether this is a violation or not.

6          Mr. Krinsky, your response and thoughts on what

7    we've just been talking about?

8          MR. KRINSKY:  Yes, Your Honor.

9          I have a few things to say, and I'll try to work

10   in reverse order in which Mr. Davidson addressed them.

11         The treaties and the arbitral decisions which he

12   cites actually show conclusively the opposite.  They are

13   about provisions that were added expressly and purposely

14   because customary international law did not provide the

15   parent company with the right to make a claim for the taking

16   of a subsidiary's property.  And it's not only my reading of

17   that, that has been the United States Government's position,

18   which has been a party to some of these arbitrations, and it

19   has said it again and again and again.  So there is no

20   support for the proposition that Mr. Davidson has advanced.

21         International law, as stated in *Barcelona*

22   *Traction*, with the addition that *Helmerich* indicated and

23   which is the position of the United States Government, is

24   when all of the assets of the subsidiary are taken,

25   literally all of the assets, nothing is left, then the

1   D.C. Circuit and the United States Government have said that

2   be the equivalent of the taking of the shares.

3           THE COURT:  Right.

4           But they don't even allege that here.

5           MR. KRINSKY:  Excuse me?

6           THE COURT:  They don't even allege that here.

7           In other words --

8           MR. KRINSKY:  Excuse me?

9           They don't allege that.

10          And it's clearly not the case, Your Honor, I mean,

11  undisputed proof.

12          And Esso had assets outside of Cuba, had business

13  outside of Cuba.  It continued without interruption until

14  today.  It's in existence in operation in Panama, Standard

15  Oil or Exxon Mobil owned the shares until 2012 and then it

16  sold these shares to Puma Energy, a third-country company.

17  So that exception or extension of Barcelona Traction that

18  the Court in *Helmerich* recognized has no application here.

19  The international law is clearly what, as Your Honor,

20  I believe, has indicated under *Barcelona Traction* and

21  *Helmerich* itself.

22          The second thing I want to mention, Your Honor, is

23  to clear up this business about the Foreign Claims

24  Settlement Commission.  The Foreign Claims Settlement

25  Commission, first it confers no rights, it's a certification

1    to the Secretary of State for her to use in diplomatic

2    negotiations with Cuba.

3            But even more fundamentally, the mandate of the

4    Foreign Claims Settlement Commission includes interest and

5    not just rights in property.  And it includes indirect

6    interests, not only direct interests.  And indeed for that

7    reason, it hears and determines, as it's required by

8    statute, the claims of parents for the taking of their

9    subsidiary's property.

10           And that's all that the Foreign Claims Settlement

11   Commission did or could do in the case of Standard Oil's

12   claim.  It certified the damages suffered by Standard Oil

13   with a taking -- to its interest of -- resulting from the

14   taking of its subsidiary's property.  That fits within the

15   FCSC.  It fits in maybe what the Secretary of State wants to

16   talk about with Cuba.  But it doesn't fit within the FSIA

17   under *Helmerich*.

18           And Title III doesn't advance that at all, doesn't

19   advance the plaintiff at all.  Title III's provision says

20   the FCSC decision shall be taken as conclusive proof of the

21   ownership of an interest.  That's the word, an interest in

22   property, not of a right, but of an interest in property.

23   So the FCSC provision, I would suggest, Your Honor, gets the

24   plaintiff nowhere.

25           THE COURT:  So let me ask you a question:

1          Do you read the expropriation exception to define

2     the property right -- let me put it differently, which is:

3     Could the expropriation exception refer to the property

4     right, and the property right as defined by domestic law;

5     in other words, one could in theory have a law that the

6     property rights recognize domestically but not by customary

7     international law, but that the violation -- the taking or

8     the abrogation of that or the infringement of that right

9     could violate an international law.  Does that make sense to

10    you?

11         MR. KRINSKY:  Yes.  I read it as international

12    law, Your Honor.

13         But what else is there a source of law?  I mean,

14    it's a Panamanian -- I think it's a moot point in a way,

15    because this is a Panamanian corporation.  We have an

16    affidavit under Panamanian law that the shareholder of a

17    Panamanian company does not have a right in the property of

18    the subsidiary.

19         THE COURT:  Which you'll have to -- can you just

20    remind me which declaration that is.

21         MR. KRINSKY:  Fábrega, Juan Pablo Fábrega.

22         And I just -- without wanting to burn the Court

23    too much, I just wanted to mention -- since *Garcia-Bengochea*

24    was mentioned, District Court decision in Southern District

25    of Florida.

43

1           THE COURT:  Right.

2           MR. KRINSKY:  But Judge King --

3           THE COURT:  That's okay.

4           I read the case.  I know it's a Title III case.

5  It doesn't have anything to do with the FSIA or the

6  expropriation exception.

7           MR. KRINSKY:  Okay.

8           THE COURT:  I didn't mean to cut you off, but I

9  knew what you were going to say.

10          MR. KRINSKY:  That's fine.

11          THE COURT:  Okay.

12          Can I shift your thinking and focus for one minute

13  here real quick.

14          Say hypothetically we got past this issue that

15  we've been talking about and when we do reach the question

16  that I am required -- or I do have to reach the question of

17  whether there actually has been a violation of international

18  law here, I mean, you've argued on multiple grounds that

19  there is not a violation of international law, including

20  that the taking here was justified for various reasons.

21          I mean, wouldn't that sort of conclusion require

22  me to go against the findings of Congress?  Isn't any

23  conclusion here that the taking by Cuba was justified, for

24  example?  You've suggested it was done, I guess, effectively

25  in self-defense.  That seems to me to flatly be

1    contradictory to what Congress had as the roots of its

2    findings for purposes of the LIBERTAD Act.

3              MR. KRINSKY:  No, Your Honor.

4              THE COURT:  And how can I essentially countermand

5    what Congress has already found?

6              MR. KRINSKY:  Well, because of this special

7    circumstance, the circumstances particular to the

8    expropriation of the Esso property, Congress wasn't thinking

9    and didn't say anything about the situation of the

10   expropriation of the Esso property.  That property was not

11   taken the same as all -- so many other companies in Cuba.

12   I'll come back to whether Congress even addressed those

13   situations.

14             But we found -- there's nothing in Helms-Burton or

15   the legislative findings that address this situation.  The

16   situation is dramatic, Your Honor.  The situation -- and, in

17   fact, I think it presents a non-justiciable political

18   question.

19             The State Department published documents,

20   published in the late 1990s, show that President Eisenhower

21   asked Standard Oil to tell Essosa not to refine the Cuban

22   state's Soviet oil as part of the U.S. Government's plan to

23   overthrow the Cuban government.  We think that presents to

24   Your Honor a non-justiciable political question.

25             But in any event, it is nothing that was in the

1   mind of Congress.

2            THE COURT:  And I guess the question -- a further

3   question here is:  Is this something I can really resolve on

4   a motion to dismiss?  In other words, it seems to be that

5   this question is not one that's terribly fit for resolution

6   on the papers and is something that might require, at a

7   minimum, a hearing and testimony from experts on this

8   subject, if it's even one that I could consider.

9            MR. KRINSKY:  Well, Your Honor, we think -- you

10  know, I think the law is for the Court's decision, but we

11  think it's pretty clear, Your Honor.

12           And it's not like we're making this up; it's not

13  like we're saying it.  We were very meticulous, Your Honor.

14  I spent a long time going through the State Department's

15  public records, and then I tried not to be argumentative in

16  presenting them.

17           THE COURT:  That lack of meticulousness is not a

18  criticism I would heed in your direction.

19           MR. KRINSKY:  So I'm not sure what else there is.

20           And I would suggest, Your Honor, that's going down

21  a path that the political question doctrine says you

22  shouldn't go down.

23           THE COURT:  Right.

24           MR. KRINSKY:  And in *Schneider* and in *Gonzalez*,

25  where the Circuit said political question precluded

1    reviewing the U.S. conduct towards the Allende Government

2    and its supposed alleged support of a coup, the coup against

3    the Allende, a hearing would be going down that path,

4    Your Honor, and I don't think the political question lets

5    you, frankly, unless you decide otherwise.

6              THE COURT:  All right.  Look, I'm not any more

7    interested in becoming a historian here than any other

8    federal judge is.

9              Mr. Davidson, I'll give you a couple minutes if

10   you want to respond to what Mr. Krinsky said.

11             MR. DAVIDSON:  Sure.

12             To follow up on what Mr. Krinsky says, we don't

13   want a hearing or more briefs unless we're going to lose, in

14   which case we do.

15             But beyond that point, Your Honor, in some ways,

16   the international-law question is simple and in other ways

17   it becomes very complex.

18             The simplicity to us and why we believe this

19   motion to dismiss should be denied based on this point is

20   that the property of our subsidiary was confiscated and now

21   the State Department has said we can sue for that

22   confiscation and trafficking and that we have a remedy.

23   We're allowed to sue an agent or instrumentality for that.

24             In order to prove the exception -- the

25   applicability of this exception, we have to prove that the

1  rights were taken in violation of international law.  We

2  think the law is clear and simple that in an uncompensated

3  expropriation, that international law has been violated.

4          Now, defendants have raised a whole series of

5  issues trying to create a political question or others, that

6  if Your Honor needs to resolve, which I don't think

7  Your Honor does, this isn't the forum for that.  I mean, we

8  would need to have experts, we'd need to have evidence, we'd

9  need potentially discovery, cross-examination.

10         But in terms of the motion to dismiss, at this

11 stage, we believe it should be denied, because we think,

12 based on the simple predicate that I established, we survive

13 a motion to dismiss and can ultimately prove that this

14 exception applies.

15         THE COURT:  All right.

16         So we've been at this for about an hour and

17 15 minutes.  I've got a couple more topics we need to cover,

18 but I want to give the court reporter a break.

19         So why don't we all just take about ten minutes

20 and we'll resume at 3:25.  It's 3:15, okay?

21         MR. DAVIDSON:  That would be great.  Thank you,

22 Your Honor.

23         THE COURT:  Thanks, everyone.

24         (Recess from 3:15 p.m. to 3:16 p.m.)

25         THE COURT:  Okay, everyone.  Welcome back.

1          All right.  So I've got a couple more questions,

2    topics to cover this afternoon.

3          MR. KRINSKY:  Sorry.  Excuse me.

4          Your Honor, it's Michael Krinsky.  If I could just

5    go back to one point I forgot to mention on the prior

6    discussion.

7          THE COURT:  Okay.

8          MR. KRINSKY:  It's that I'm not sure what

9    Mr. Davidson exactly was suggesting, but I think the

10   Supreme Court in *Helmerich*, the Supreme Court in *Helmerich*

11   made it clear that the question of violation of

12   international law must be decided at the motion-to-dismiss

13   stage, Your Honor.

14         THE COURT:  Right.  Right.  Or soon thereafter.

15         MR. KRINSKY:  Or soon thereafter.

16         THE COURT:  Okay.

17         Well, let's talk about the commercial activity

18   exception, there's a lot to unpack on that front.

19         So, Mr. Krinsky, let's begin with you on the

20   commercial-activity issue.

21         MR. KRINSKY:  Yes, Your Honor.

22         As Your Honor knows, it's based upon an act

23   outside the United States that causes a direct effect in the

24   United States.

25         And let me first address it as to CUPET.

1           THE COURT:  Hang on.

2           MR. KRINSKY:  Yep.

3           THE COURT:  Before you do that, before you get

4    into the specifics as to each of the defendants, let me just

5    sort of ask some questions that are applicable to all of

6    them.

7           The first is, I want to make sure you agree with

8    me on this legal principle, which is that the term "direct

9    effect" means something other than harm or injury to the

10   plaintiff.  Would you agree with that statement?

11          MR. KRINSKY:  Sure, Your Honor.  I think

12   *Bell Helicopter* settled that for the Circuit.

13          THE COURT:  Okay.

14          So the direct effect here can be something less

15   than an actual injury, and, in fact, direct effect need not

16   be to the plaintiff, it can be to a third party in theory in

17   the United States.

18          MR. KRINSKY:  I actually don't think so,

19   Your Honor.

20          And I think it could be to the plaintiff or it can

21   be to someone in privity with the plaintiff.  We have cases

22   of sort of interlocking contracts on -- the *Cruise*

23   *Connections* case is like that.

24          We have *Atlantica* in the Second Circuit, which was

25   discussed at EIG, where it was the same tort that injured

1   people in the United States and outside the United States.

2          But we found no case where the plaintiff was a

3   complete stranger, complete stranger to the effect of the

4   United States and --

5          THE COURT:  Because didn't the Second Circuit in

6   *Atlantica* hold that the injury need not be to the plaintiff?

7          It may be true as a factual matter that there was

8   a plaintiff who was injured, but didn't they hold that the

9   FSIA doesn't require injury to the plaintiff?

10         MR. KRINSKY:  Yes, but it was in the context of --

11  I think what I mentioned, which is, there was proximity to

12  it.  And that's not what the plaintiff here is -- and our

13  opposition.  It's a total, complete stranger to everything

14  that they talk about being an effect.  It has nothing to do

15  with them at all, not even their brothers and sisters.

16         THE COURT:  What about the other -- another sort

17  of threshold question here, and that has to do with

18  Congress's findings.  But why doesn't Congress's findings

19  sort of end the debate here about direct effect?

20         MR. KRINSKY:  Because of *Weltover*.

21         THE COURT:  I'm sorry?

22         MR. KRINSKY:  Because of *Weltover*, Your Honor.

23         THE COURT:  Why is that?

24         MR. KRINSKY:  Immediate consequence without

25  intervening event, flowing -- great language:  Flowing in

```
 1    direct line without deviation or interruption.  That's the

 2    Circuit's and *Weltover*'s standing.

 3              THE COURT:  Right.

 4              But Congress, for example, makes a finding that

 5    the trafficking -- this is 22 U.S.C. 6081(6):  "Trafficking

 6    in confiscated property provides badly needed financial

 7    benefit, including hard currency, oil and productive

 8    investment and expertise, to the current Cuban Government

 9    and thus undermines the foreign policy of the United States

10    - to protect the claims of United States nationals who had

11    property wrongfully confiscated by the Cuban government."

12              That seems to be a congressional finding about

13    some effect in the United States.  It's at paragraph 9.

14              MR. KRINSKY:  That's an effect, but I think it is

15    clearly indirect effect, not what *Weltover* has in mind,

16    should be, though.

17              This, it affects foreign policy, it affects

18    foreign policy under one Administration and not in another

19    Administration.

20              There are so many -- I mean, what could be more

21    complicated than international relations and what could be

22    more complicated than international relations between the

23    United States and Cuba?

24              I'm not trying to be facetious, Your Honor, but

25    this is not the interlocking -- this is not the direct
```

1  effect without intervening events by third parties that the

2  direct effect is about.

3           It may have been and it was sufficient concerns

4  for the Congress to want to get into this area that it saw

5  the national interest being injured, but that's not -- that,

6  I would submit, is far from what *Weltover* is talking about.

7           THE COURT:  And even if -- you know, Congress here

8  in paragraph 9 of that section says, international law

9  recognizes that, "a nation has the ability to provide for

10  rules of law with respect to conduct outside its territory

11  that has or is intended to have substantial effect within

12  its territory."

13           I mean, it seems unmistakable to me that Congress

14  used that substantial-effect language.  And it's hard to

15  believe that if they're legislating against the FSIA, as you

16  argued earlier, that substantial-effect language doesn't

17  carry some meaning here.

18           MR. KRINSKY:  Well, I think it carries meaning,

19  but it doesn't carry the meaning of direct effect.

20           Yes, you know, this is Congress legislating in the

21  national interest.  It's not addressing FSIA direct effect.

22  It is stating its goals, its concerns.  Cuba is a problem.

23  Cuba has always been a problem.  It has an impact on the

24  United States.  It has an impact on the people here.  It has

25  impact on the companies.  But that's not -- I would submit,

1    Your Honor, that's far from direct effect under *Weltover*.

2              Direct effect is -- it follows inexorably.  That's

3    the language that's used in one of the Circuit decisions.

4    One step to the other.  Cause and effect.  Nothing in

5    between.

6              And so these broad legislative findings, I suppose

7    there are -- Helms-Burton was a controversial piece of

8    legislation, but I suppose there's all kinds of findings

9    about effects on the United States in all kinds of

10   legislation.  I don't think that does the job under

11   *Weltover*.

12             THE COURT:  All right.

13             Well, let's talk about the specifics then.  You

14   were going to start with -- I can't remember whether you

15   were going to start with CUPET or CIMEX.

16             MR. KRINSKY:  Pardon, Your Honor?  I didn't hear

17   you.

18             THE COURT:  I said, let's talk specifics.  I can't

19   remember whether you were going to talk about CUPET or CIMEX

20   first.

21             MR. KRINSKY:  I'll start with CUPET, Your Honor.

22             And, you know, the language is based upon an act

23   outside of the United States that causes a direct effect in

24   the United States.

25             It's pretty hard to see where plaintiff has come

1    forward with anything about that.  I mean, not surprisingly,

2    given that there's an embargo in oil, there's some

3    exemptions for remittances and so forth.  CUPET is not in

4    that business.  There's an embargo on oil:  Transactions

5    with CUPET are prohibited by law.

6              In any event, CUPET -- and it's not alleged --

7    does not sell to the United States, it does not buy from the

8    United States, it has no contracts with the United States.

9    It's not engaged in remittance business.

10             Even if -- which it hasn't -- even if plaintiff

11   could show -- or has come forward and can show that it's

12   involved in the service stations beyond selling them gas,

13   the allegation is Western Union contracts with Fincimex,

14   Fincimex contracts with CIMEX.  There's no CUPET in that.

15             Doesn't engage in the purchase of food stuff that

16   winds up on the shelves of these service stations.  Even

17   according to plaintiff, that's Alimport to CIMEX.  CUPET is

18   absent.

19             This talk -- and, you know, when you break it down

20   and you look at what they're saying is, there's

21   solicitations and discussions about off-shore oil spills,

22   dealing with that, no contract, lobbying the United States

23   Government at state-to-state meetings.

24             And then we have this business in 2010 with

25   *Société Générale* and the Dutch trader, which, if you look at

1    the statement --

2            THE COURT:  What about the general proposition

3    they've advanced, which is that there's direct harm here or

4    direct effect from the fact that CUPET continues to use

5    these assets and it affects their competitive playing field,

6    if you will, in the oil markets and that has an effect on

7    Exxon, it has an effect on other American oil consumers?

8            MR. KRINSKY:  That's financial harm, which is not

9    enough.

10           And it's not -- it doesn't satisfy *Weltover*.

11   I mean, I can't think of the number of intervening events

12   and players in that notion of global competition.

13           And it's global competition outside the

14   United States.  It's not even global competition in the

15   United States.

16           CUPET can't sell in the United States, can't do

17   any business in the United States.  It's prohibited by U.S.

18   law.  U.S. companies can't do business -- can't do business

19   in Cuba, it's prohibited by U.S. law.

20           So their competition is financial harm, but that's

21   not enough, plus it has all these intermediary intervening

22   events.

23           THE COURT:  Why isn't -- I mean, it seems like

24   *Foremost-McKesson* is probably the best case or the most

25   analogous case to what we have here.

1          And there, the Court held, I think it was on a

2   motion to dismiss, that the Iranian government's takeover of

3   the dairy through essentially appropriations of shares had a

4   direct effect in the United States.

5          MR. KRINSKY:  Well --

6          THE COURT:  Why isn't that what we have here?

7          MR. KRINSKY:  Well, first of all, Your Honor, the

8   flow goes to Panama, not to the United States, as it's the

9   Panamanian company's property that was taken.  This flow

10  ended in -- this flow ended in 1960.  But if it continued

11  either then or now, the flow is to Panama, not to here.

12          And so I think at bottom, Your Honor is focusing

13  on the right issue, which is what they really have here is

14  financial harm, but financial harm doesn't do it.  And

15  what's -- on under *Bell Helicopter*, unauthorized use of

16  property.

17          THE COURT:  And I think you've taken even one step

18  further -- I'm curious what Mr. Davidson would say -- it's

19  not even direct financial harm.  It's financial harm in the

20  sense of value to shares.

21          MR. KRINSKY:  Exactly.

22          THE COURT:  And I suppose to the extent that

23  profits would roll up into a general balance sheet, it's not

24  direct harm.

25          MR. KRINSKY:  I'm sorry, I thought you were

1    talking to Ms. Davidson.

2              THE COURT:  I assume you would agree with that,

3    that it's not direct -- even if it's financial harm, it's

4    not direct financial harm, because it's either diminishment

5    or diminution of share value or a reduction of whatever

6    profits would roll up into the balance sheet of the parent

7    company.

8              MR. KRINSKY:  Exactly.

9              And we have the Second and Tenth Circuit cases

10   which talk about this exactly, it's the harm to a

11   subsidiary.  And, of course, if there's a harm to a

12   subsidiary, there's a harm to the parent company.  But the

13   Second and Tenth Circuit said, well, that's indirect, not

14   direct.

15             THE COURT:  Let's talk about CIMEX then.

16             Help me -- what's your -- help me with your

17   argument for why the two commercial activities that CIMEX

18   engages in, the remittance and the purchasing of food,

19   American food through an agent isn't enough to satisfy the

20   direct-effect test?

21             MR. KRINSKY:  The remittances have cause and

22   effect backwards.

23             Fincimex and CIMEX providing services in Cuba does

24   not cause the Cuban Americans to send remittances to their

25   relatives in Cuba.  There's not an effect.

1          THE COURT:  It's an effect in the sense that it's

2     a continuing course of business with the United States,

3     right?

4          I don't think it has to have an effect, either be

5     injurious or not.  Direct effect seems to me to capture the

6     notion that there is some effect of the commercial activity

7     in the United States.

8          And here, the allegation is that Cuban Americans

9     are sending millions of dollars to Cuba through facilities

10    owned by CIMEX.

11         MR. KRINSKY:  Yes, Your Honor, but is that a

12    direct effect?

13         It says it causes a direct effect.  It doesn't say

14    an effect from something that happens in the United States.

15    It says that what is done in Cuba has to cause an effect in

16    the United States.

17         THE COURT:  I mean, but for CIMEX at least making

18    available these facilities for remittances, Cuban Americans

19    would not be sending remittances to Cuba.  I mean, in other

20    words, without that facility, the ability to send the

21    remittances would not be possible.  And perhaps there's some

22    other party, but CIMEX is making them available.

23         MR. KRINSKY:  There are 500 remittance locations

24    in Cuba, Your Honor.

25         THE COURT:  I'm sorry?

1          MR. KRINSKY:  There are 500 remittance locations

2     in Cuba.

3          We figure that possibly four to ten are

4     remittances at service stations on Esso land.  But whatever

5     the number is, it is a small number.  And the notion that

6     that has played any kind of causal role here in anything

7     that goes on between the United States and Cuba, it doesn't

8     add up.

9          I would add, too, Your Honor, that we can't

10    forget -- *Weltover* and the decisions applying it, I think,

11    establish a pretty strong high standard.  And someone in the

12    United States has to decide to send the remittance, has to

13    decide whether to use Western Union and not someone else,

14    one of its competitors.  The family-member recipient in Cuba

15    has to go to -- has 500 choices where to pick that up, has

16    to go to this one.  That's not an inexorable sequence of

17    events, which I think is what *Weltover* talks about.

18          THE COURT:  You wouldn't dispute that it happens;

19    in other words, there are enough facts here to establish

20    that that chain that you've just established, that a Cuban

21    American goes to a Western Union, Western Union remits the

22    money to a CIMEX facility that was owned by Esso.  I mean,

23    that happens.  I don't know how frequently it happens,

24    I don't know what the value of the dollar is, but you would

25    agree with me that happens to some extent --

1          MR. KRINSKY:  Surely.

2          THE COURT:  -- perhaps not even on a daily basis.

3          MR. KRINSKY:  Surely.

4          But is it a cause of -- is what CIMEX -- Fincimex

5     are doing with respect to the Esso property, the cause, and

6     I would suggest not.

7          I think that the direct effect has some real bite

8     to it, Your Honor, some real meaning.  And the courts,

9     I think, for sure have struggled with how to define that,

10    how to cabin that.

11         But providing services in a foreign country for a

12    U.S. company, which is what we have here, doesn't seem to be

13    one of the situations.

14         And then you have other things.  You have,

15    Your Honor -- liability here is to set -- liability under

16    Title III is established -- completely established in full

17    simply by CIMEX taking possession, taking possession of the

18    service station.  That defines trafficking and full

19    liability for the value of the station.

20         So I mean, there's nothing --

21         THE COURT:  I'm not saying that it's not somewhat

22    attenuated --

23         MR. KRINSKY:  Excuse me, Your Honor?

24         THE COURT:  I'm not saying that it's not somewhat

25    attenuated, but it certainly does meet the definition of

1    trafficking, given how broad that definition is.

2              MR. KRINSKY:  Possession meets trafficking.

3              My point is, Your Honor, that courts often, not

4    always, often look to where was the tort, locus of the tort.

5    Locus of the tort is when Cuba -- CIMEX took possession of

6    the service stations.  They often look maybe at the change

7    of movement actually with -- is anything happening in the

8    United States that is legally significant to the cause of

9    action.

10             Nothing in the United States is legally

11   significant to the cause of action.  Plaintiff has their

12   complete cause of action on the basis of CIMEX taking

13   possession of the service station.  It doesn't matter

14   whether or not remittances are serviced there, it doesn't

15   matter whether food is sold there.

16             THE COURT:  Let's talk about the food, then,

17   because at least as I understand your primary argument, is

18   that it's not CIMEX that's buying the food.  That's

19   purchased through an intermediary that is a separate

20   company.  I can't remember what the name of the company is.

21             MR. KRINSKY:  Alimport.

22             THE COURT:  Right.

23             So why does that matter?

24             I mean, why does it matter that in order to engage

25   in this commercial activity, they're using an agent to make

1    the purchases?

2            I mean, there's no dispute -- you're not disputing

3    that they do sell American food in these stores.  So why

4    does it matter that they're not buying the American goods

5    directly, as opposed to indirectly through an agent?

6            MR. KRINSKY:  Because first even on the

7    plaintiff's own proof, Your Honor, which are U.S. Government

8    reports, Alimport is not CIMEX's agent.  Alimport is under

9    the Ministry of Foreign Commerce, it's the principal buyer

10   of food for the whole country from all over the world.  It's

11   the exclusive buyer from the United States.  It buys and it

12   sells.

13           THE COURT:  But I mean, all it does is facilitate

14   the purchase of goods for CIMEX; I mean, in other words --

15           MR. KRINSKY:  For the whole country.

16           THE COURT:  I'm sorry?

17           MR. KRINSKY:  For the whole country.

18           THE COURT:  Yeah.  Fine.

19           But CIMEX has made the decision to carry American

20   goods in its stores.  And by virtue of the way Cuba has done

21   this, there's only one purchaser of American goods, and

22   presumably the U.S. is the only authorized purchaser of

23   American goods.

24           But CIMEX has seemingly, purposely injected itself

25   into the stream of commerce of U.S. goods by agreeing to

1   purchase and sell those goods.

2          MR. KRINSKY:  There's no proof of that,

3   Your Honor.

4          And the U.S. Government report itself says --

5   that's the plaintiff's only proof -- the U.S. Government

6   report says, Alimport decides we're going to buy from any

7   country in the world.  CIMEX doesn't tell it to buy in the

8   United States, and it doesn't say, send us U.S. food either.

9   It's up to Alimport.

10          So we have a *Weltover* situation again; we have an

11   intermediary between what happens in Cuba and what happens

12   in the United States.  And it's not -- there's no proof of

13   being an agent.  The proof is the opposite.  Their own proof

14   is the opposite.

15          THE COURT:  How about, I can't --

16          MR. KRINSKY:  And I would also add -- I'm sorry.

17          THE COURT:  I forgot to ask you with respect to

18   Cuba -- well, sorry.  Different question.  Different

19   question.

20          Sorry.  Go ahead.  Go ahead.

21          I'll ask the question later.  It was a question in

22   connection with the personal jurisdiction issue.

23          MR. KRINSKY:  I also -- now, this is a fairly

24   important point in the context of this case.  Even if

25   Your Honor, I think, holds that selling -- having

64

 1    remittances at a service station is a direct effect, it's

 2    only a direct effect as to that service station.  And so not

 3    100 service stations, not 200 service stations, only to

 4    those ones.  And we say it's 4 to 10, and plaintiff has not

 5    said the opposite.

 6           Where these service stations -- where these

 7    remittance service stations are -- is on the website.

 8    I mean, there's a list.  Defendants have said there is

 9    4 to 10, that maybe it's on Esso land.  Plaintiff has not

10    said otherwise.

11           And so we think the tail should not wag the dog.

12    And if there is -- if direct effect is established by

13    remittances, then it's only for those service stations.  And

14    similarly about the food, it's where the food is sold.

15    So I think that has some bearing here.

16           But I do think, Your Honor, that -- the basic

17    position we have, the basic understanding we have is that

18    doing a service in Cuba for a U.S. company is not a direct

19    effect, it doesn't cause the activity, and that's true of

20    both Alimport, and that's true about -- I mean, the food and

21    about the remittances.

22           And when you look at all the other indicators of

23    how the courts have tried to grapple with what is direct

24    effect, they're not here, it doesn't injure the plaintiff.

25           THE COURT:  Of course, I guess the response,

1   Mr. Krinsky, is CIMEX doesn't have to do this; in other

2   words, CIMEX doesn't have to be the agent in Cuba for

3   Western Union, but it's chosen to do so.

4           Similarly, CIMEX doesn't have to purchase American

5   products, even if Alimport is the one that is doing the

6   buying, but it's done so --

7           MR. KRINSKY:  But why --

8           THE COURT:  -- but it's done so.

9           MR. KRINSKY:  Right.

10          But why is that an effect, Your Honor, we would

11  ask.

12          The action is based upon taking over, without

13  authorization, property in Cuba.  It is based upon

14  possession of that property.  That's liability.

15          THE COURT:  Well, that's -- I disagree with that.

16          MR. KRINSKY:  And that doesn't have an effect on

17  the United States.

18          THE COURT:  I disagree with that.

19          I mean, the trafficking is not just about the

20  initial appropriation, it's not just about possession, it's

21  the use of the property.

22          And at least here, the allegation is that the

23  service stations are being used in two respects in

24  connection with the American marketing, remittances and the

25  buying and selling -- or purchasing of American goods that

1    can be resold to the Cuban public.

2              MR. KRINSKY:  Yeah.

3              Well -- yes.

4              Our view, Your Honor, is that -- well -- but then

5    there's no legally significant consequence -- act in the

6    United States, Your Honor.

7              Everything that's legally significant, even if you

8    take use, even if -- everything that's legally significant

9    takes place in Cuba, Your Honor.

10             And legally significant, plaintiff would have its

11   cause of action from CIMEX taking over, CIMEX selling gas.

12   Nothing turns on whether the remittances, as well as selling

13   gas, or U.S. foods are on the shelves.

14             THE COURT:  Right.

15             Can you --

16             MR. KRINSKY:  The next -- the tight nexus, the

17   tight cause and effect that we believe the courts have

18   grappled with to get to direct effect is absent here,

19   Your Honor, in our view.

20             THE COURT:  Okay.

21             All right.  Thank you, Mr. Krinsky.

22             Let me turn it over to Mr. Davidson and I'll give

23   Mr. Krinsky an opportunity for rebuttal on this issue, too.

24             So, Mr. Davidson, your thoughts.

25             MR. DAVIDSON:  Okay.  Thank you, Your Honor.

1              There's a lot in there.

2              THE COURT:  Yes.

3              MR. DAVIDSON:  Let me just -- I won't repeat

4    everything we say in our complaint or in our papers because

5    a lot of this is very factually intensive, but a few,

6    I think, overarching legal principles are important to

7    return to in order to understand this issue.

8              First is, the --

9              THE COURT:  Mr. Davidson, can I interrupt you?

10             Can I ask you to just tilt your screen toward you

11   a little bit?  Because that --

12             MR. DAVIDSON:  Is that better?

13             THE COURT:  Yeah, much better.

14             You're now centralized in the screen and I'm

15   getting more of you than your window.

16             MR. DAVIDSON:  Most people want to see less of me

17   rather than more.

18             THE COURT:  You're a handsome guy, right?

19   I'd rather see you than the window behind you.

20             MR. DAVIDSON:  But in any event, Your Honor, let's

21   talk about the legal principles before we get to the facts

22   that you and Mr. Krinsky were discussing.

23             The Helms-Burton statute, again, to us is sort of

24   the beginning and end to this.

25             In that statute, as Your Honor was saying a moment

1    ago, it's the unauthorized use of and profit from the

2    confiscated property.  Here, the refinery and the service

3    stations, it causes a direct effect in the U.S.

4           We think that is another reason why this shows

5    that Helms-Burton, the statute itself controls and it

6    directs us to an outcome, we believe, with respect to direct

7    effect in the U.S. by saying so, but it also shows that, as

8    a way to determine sovereign liability, the Helms-Burton Act

9    does it on its own, so I would point first and foremost to

10   that.

11          Second, there was much discussion that you and

12   Mr. Krinsky had about whether the injury need be felt by the

13   plaintiff or just a direct effect generally in the

14   United States, and there's no case that says the direct

15   effect has to be visited upon the plaintiff.

16          And, in fact, we would direct Your Honor's

17   attention to the *Cruise Connections Charter Management* case,

18   the D.C. Circuit case from 2010, 600 F.3d 661, where I think

19   the Court is pretty clear that the effect can be more

20   general, rather than plaintiff specific.  And to us, I think

21   that disposes of that question, though we can prove,

22   I believe, direct effects that happen to us; one, with

23   respect to the unsatisfied claim; and, two, with respect to

24   the competition that you've discussed.

25          THE COURT:  Let's put a hold on the competition

1    for a moment, because I want to get back to that in CUPET.

2          But let me ask you:  Is it your position, and if

3    it is, what's your best case for the proposition that a

4    direct effect can include injury to U.S. foreign policy

5    where Congress has explicitly recognized it?

6          I mean, that's what Helms-Burton does.

7    It recognizes injury to foreign policy from trafficking in

8    confiscated property.  Now, Mr. Krinsky has said that's not

9    direct enough, and maybe he's right.

10          But I'm curious what you think the best case is

11   that would stand for the proposition that I could look to

12   U.S. foreign policy in a congressional finding to make a

13   determination of direct effect, because, you know, in all

14   the cases you all cited, I'm not sure I found anything that

15   was quite on point.

16          MR. DAVIDSON:  Well, probably not, Your Honor,

17   because the Helms-Burton is an unusual statute, and, again,

18   not to be repetitive, but we think it defines and controls

19   this.

20          It says the actionable conduct is trafficking, and

21   then it says what the effect of that trafficking is in the

22   United States.

23          In two ways at least, one is the effect on U.S.

24   foreign policy, which is clearly stated in the statute as a

25   direct effect and a reason for the statute.  Another is that

1    these unsatisfied claims -- because, remember, the claim is

2    the essential piece of our cause of action, that -- the

3    unsatisfied claim as the Congress said in 1996, has a direct

4    effect in the United States.

5            So we think that shows a direct effect as to us.

6    It also shows a direct effect which is allowed more

7    generally by virtue of the Circuit precedent with respect to

8    U.S. foreign policy.

9            And then we go to the direct effect --

10           THE COURT:  So let me just interrupt you.

11           Your line of logic is that you all are holding a

12   claim, and the logic of Congress was that by virtue of the

13   trafficking, that claim and the payment on that claim is

14   impaired, correct?

15           MR. DAVIDSON:  Correct.

16           THE COURT:  Okay.

17           MR. DAVIDSON:  Correct.

18           And we think the statute, as reflected in the

19   citations to it and quotations from it in our brief, go to

20   this point directly.

21           THE COURT:  And this discussion we've been having

22   about whether the plaintiffs are harmed or not in a sense is

23   academic, because you think you've had a direct effect,

24   which is the trafficking -- the continued trafficking in

25   confiscated property essentially impairs your claims, the

1    claims that you have.

2            MR. DAVIDSON:  Continued trafficking without

3    compensation.

4            THE COURT:  Right.

5            MR. DAVIDSON:  We find -- and that's a recognized

6    effect and the essential piece of the statute.

7            Then in terms of the specifics, I mean, one, I

8    would say and remind us all that we're here on a motion to

9    dismiss, and there are -- to the extent there are any

10   questions about who said what, we believe the evidence

11   overwhelmingly shows that we satisfy this exception.

12           But we're here on a motion to dismiss.  And

13   we believe that given that standard, recognizing that the

14   standard is a little more lenient in terms of looking at the

15   evidence with respect to a sovereign's claim than, perhaps,

16   a private litigant.  But even with that view, I think we

17   have to realize that these facts are -- some of which are

18   unproven, some of are which are they say so facts, and not

19   ones that are necessarily at all dispositive.

20           And we believe the facts that we have adduced on

21   direct effects in the United States, even if the FSIA

22   applies, which we think it doesn't, and even if you have to

23   go beyond the findings of the Helms-Burton Act, which we

24   think are sufficient, but even if we get down to that level

25   and look at the impacts -- the direct effects the

 1    United States felt by trafficking in the refinery and

 2    processing facilities and the trafficking in the service

 3    stations, we've set forth in our papers and all the exhibits

 4    and attachments all of the -- generally how -- all the

 5    commercial activity undertaken by Cuba and CIMEX.

 6            With respect to, in particular, direct effects in

 7    the United States, we compete in global markets with joint

 8    ventures, which certainly has an impact as a potential

 9    competitor on Exxon Mobil in the United States.  If you look

10    at Exhibit 49 to the Butcher Declaration, solicited foreign

11    investment, invited conferees from the U.S., solicited

12    financing, which we have at the Butcher Declaration 17.20,

13    trips to the U.S. to meet with government officials.

14            These, we believe, have a direct effect in the

15    United States, in particular the competition, and that's on

16    the CUPET side.

17            And we've listed this in our complaint --

18            THE COURT:  And what case best stands for the

19    proposition that competition on global markets -- because

20    I don't think you're suggesting there's competition in the

21    United States, correct?

22            MR. DAVIDSON:  Well, it's competition in the

23    global markets as it impacts an American citizen.

24            THE COURT:  Right.

25            So framed in that way, is there a case that stands

1    for that proposition, that it has a direct effect in the

2    United States?

3              MR. DAVIDSON:  The case we would submit,

4    Your Honor, is the *EIG* case, the D.C. Circuit case from

5    2018.  I can find the citation.

6              THE COURT:  No, I'm very familiar with that case,

7    because --

8              MR. DAVIDSON:  Right.

9              THE COURT:  -- it was --

10             MR. DAVIDSON:  In that case --

11             THE COURT:  It's actually my case.

12             It was my case and it's back before me and they're

13   in discovery right now.

14             MR. DAVIDSON:  All right.

15             Well, as you -- I think as you well know, the

16   D.C. Circuit in that case said activities ricocheting around

17   the world that eventually and ultimately have some impact in

18   the United States is sufficient.

19             So for the global competition theory that has an

20   impact in the United States, we would primarily rely -- in

21   addition to Helms-Burton, but we would rely on the more

22   general FSIA jurisprudence of *EIG*.

23             THE COURT:  All right.  Good.

24             So you already answered one of the questions that

25   I had, which is, I wanted to be clear on what your stance

1    was on CUPET.  I mean, I think on CIMEX, it's obviously much

2    clearer, you've relied on the remittances and the grocery

3    sales -- or food sales or other American goods.

4              MR. DAVIDSON:  And just to put sort of the bow on

5    that with respect to CIMEX, remember, Americans pay for

6    these remittances and the Cubans take a slice out of them on

7    the other end as a tax.  So there's clearly a direct effect

8    in the United States as it is impacting Americans who are

9    paying for these remittances.

10             THE COURT:  Because the full amount that they've

11   remitted is not -- doesn't reach their Cuban relative?

12             MR. DAVIDSON:  Correct.

13             And Western Union charges for the service.

14             And ultimately like *EIG* in terms of the

15   ricocheting effect, remember, this is CIMEX and also CUPET,

16   because the remittance machines are in some of CUPET's gas

17   stations that serve -- CUPET gas stations that were once

18   ours.

19             THE COURT:  Is that -- I mean, I thought there was

20   a declaration to the effect that the CUPET gas stations,

21   that there was no ownership tracing to the Esso properties.

22             MR. DAVIDSON:  I don't believe that's correct,

23   Your Honor, based on my understanding of the evidence, that

24   the Servi-Cupet gas stations which are operated, some of

25   which trace back to the -- our gas stations, and many of

1    which are on land that was once owned by the subsidiary on

2    which these service stations are located.

3              THE COURT:  Okay.

4              What about CIMEX Panama?  I have to confess, I've

5    been trying to keep all these entities straight and figure

6    out who does what.

7              MR. DAVIDSON:  With respect to --

8              THE COURT:  It hasn't settled into my head exactly

9    how CIMEX Panama, what they own and what your claim is with

10   respect to that defendant.

11             MR. DAVIDSON:  Well, with respect to CIMEX,

12   Your Honor, we've had a similar quandary.

13             As you may recall, it only became through factual

14   digging in this case that we learned that there are two

15   CIMEXes, one incorporated in Panama, one in Cuba, both of

16   which have the same officer, same address.  And it appears

17   to us, notwithstanding any claims to the contrary, that

18   there actually one and the same.  We added -- we filed a

19   second amended complaint to add the second CIMEX entity just

20   as an abundance of caution, but we think they're one and the

21   same.

22             THE COURT:  What evidence do you have to support

23   that?

24             Where would I look in the record to support some

25   identity between CIMEX Panama and CIMEX Cuba other than the

1    interlocking directors at the same address?

2              MR. DAVIDSON:  First, there's an absence of

3    evidence, in that there isn't any suggestion that they're

4    different from any of the declarants or evidence that's come

5    from the Cuban side.

6              And we have -- I'll get which exhibit number it

7    is, but we have -- I will get that to you while we're just

8    talking, but there's an exhibit that has -- shows that they

9    have the same officers, directory, the same address.

10             And I don't have that right at my fingertips,

11   Your Honor, but I can get that to you before we finish

12   today.

13             THE COURT:  That's all right.  We can try and find

14   that.

15             So I guess the bottom line is, with respect to

16   CIMEX Panama, your theory is one of alter ego.

17             MR. DAVIDSON:  Yes.

18             THE COURT:  In other words, the same acts that you

19   are attributing to CIMEX Cuba that you contend are the

20   direct effects of the United States also apply equally to

21   CIMEX Panama by virtue of the fact that they're alter egos

22   of one another or there's no real corporate distinction

23   between them?

24             MR. DAVIDSON:  Correct, Your Honor.

25             THE COURT:  All right.

1          Okay.  Anything else you want to add on the

2     commercial-activity exception, Mr. Davidson?

3          MR. DAVIDSON:  The only thing I would say,

4     Your Honor, is that obviously, the record is voluminous here

5     and that I may -- I think I've hit, what I would say, the

6     highlights and, I think, the keys to this.

7          There are a few things that I know that I will

8     have missed, like, for example, the defendants have a

9     website to process remittances that's registered in the

10    United States, CIMEX does.

11         So there are a lot of little facts like that that

12    I might have not recited every one to you, Your Honor.  But

13    in our opposition, they're referenced, and, in particular,

14    the document to focus your attention on would be the Butcher

15    Declaration, would be the exhibits there.

16         MR. KRINSKY:  Your Honor, may I respond?

17         THE COURT:  Mr. Krinsky, I'll give you an

18    opportunity.  Just hang on one second.

19         MR. KRINSKY:  I'm sorry, I thought you were

20    through.  Yeah.

21         THE COURT:  Okay.  Go ahead, Mr. Krinsky.

22         MR. KRINSKY:  Let me go back to CUPET, Your Honor.

23         Unfair competition outside the United States

24    markets is simply an assertion of financial harm and cannot

25    be squared with *Weltover*, I would suggest.

1          About *EIG*, Your Honor, I would not read the

2    case -- either your case or the Circuit case as Mr. Davidson

3    said.  The direct effect was because the defendants caused

4    the plaintiff to part with their money in the United States,

5    and they came to the United States and made false

6    representations to them in the United States.  That was the

7    Circuit's basis for its holding, and it was essentially the

8    same, I think, with Your Honor, which also talked about

9    locus of the tort.  So I don't think we have -- and we

10   definitely clearly do not have anything like that here.

11         Trips to the United States on A-2 visas for the

12   State Department, that discussion is hard to see as a direct

13   effect.

14         CUPET doesn't engage in remittances at service

15   stations, it doesn't engage in selling food at service

16   stations, it's not even involved in service stations except

17   to sell gas to the service stations.  There's no support in

18   the record that supports that.

19         THE COURT:  I had said earlier that there were no

20   Esso-owned service stations that CUPET operates.  Is that an

21   incorrect statement or a correct statement?

22         MR. KRINSKY:  We don't assert that, Your Honor.

23   We think it's a very small number.

24         THE COURT:  Okay.

25         MR. KRINSKY:  But we don't assert there's none at

1    all.

2              THE COURT:  Hang on.

3              So I'm clear in my head, your position factually

4    with respect to CUPET is a small number of service stations

5    that were owned by Esso, but those service stations only

6    sell gas, no remittances, and no food.

7              MR. KRINSKY:  No, Your Honor.  I think, perhaps,

8    I misunderstood you.

9              Our position is CUPET has nothing to do with the

10   service stations, any service stations in the country,

11   whether they're on Esso land or anyone else's land, it just

12   sells gas to those service stations.

13             THE COURT:  I see.  Okay.

14             MR. KRINSKY:  But what I'm saying -- and what I'm

15   saying is that plaintiff has not put forward anything to

16   controvert that that supports controverting that.

17             But I'm also saying that even if we assume, for

18   the sake of argument, that CUPET is involved with the

19   service stations, it's not involved with remittances at the

20   service stations, and it's not involved with selling food in

21   the service stations.

22             Plaintiff's own proof and the agreed-upon facts

23   are different.  Certain remittances are Fincimex, Western

24   Union, CIMEX, not CUPET; food is Alimport, CIMEX, not CUPET.

25   So we think this -- I think we see this effort to link

1   CIMEX, CUPET -- I'm sorry -- to the service stations just

2   doesn't get the plaintiff anywhere.

3           About CIMEX Panama, Your Honor, all that plaintiff

4   has brought forth and asserted is that they are the same

5   offices and same board.  But that doesn't get to alter ego,

6   it doesn't even open the door to alter ego.  I think

7   Your Honor's decisions and numerous decisions say that's not

8   enough.  So those were my specific comments, Your Honor.

9   Yeah.

10          THE COURT:  All right.  Well, let's, then, turn to

11  the final issue.

12          MR. DAVIDSON:  Your Honor, I'm sorry, could I

13  just -- on the question you asked me about our citations for

14  the support, could I provide those to you, Your Honor?

15          THE COURT:  Of course.

16          MR. DAVIDSON:  It really comes in two places; one

17  is in the declaration from defendants on the CIMEX legal

18  director Valmana, who -- and she conceded CIMEX Cuba and

19  CIMEX Panama have the same President and she's on the board

20  of both.

21          In addition, in our evidence at the Butcher

22  Declaration at paragraph 13.2, 13.3, but where we've

23  attached Exhibit 22 and Exhibit 23 shows the overlap in

24  management.

25          And on this point, Your Honor, we didn't

1   originally sue CIMEX Panama, we sued CIMEX Cuba, who we

2   think -- thought to believe to be the operative actor.

3           We discovered CIMEX Panama, and we really wanted

4   to avoid a situation in which one CIMEX blamed the other

5   CIMEX, so we didn't want to have an empty chair.  So that's

6   why we added them.  We believe the evidence would show that

7   there is an alter ego and that no one seriously disputes

8   that.

9           But in any event, Your Honor, I don't want to

10  overstate the case here in terms of the importance of CIMEX

11  Panama.  We were really seeking to avoid a situation where

12  CIMEX Cuba blamed CIMEX Panama, and CIMEX Panama is not in

13  the case.

14          THE COURT:  Yeah.  No, I appreciate that,

15  Mr. Davidson.  And my goal here was to try and just clarify

16  what your theory is of both the trafficking and the direct

17  effect --

18          MR. DAVIDSON:  Right.  Thank you, Your Honor.

19          THE COURT:  -- that involved CIMEX Panama.

20          Okay.  Let's turn, then, in our remaining time, to

21  the due-process, personal-jurisdiction issue.

22          Let me just give everybody a heads-up.  I've sort

23  of got a hard stop at 4:45, and I will try to get done as

24  much of this as we can here today.  I know you all may not

25  have expected to be here for two-plus hours, but sometimes

1   these things go on for a while.

2          But let me start with Mr. Davidson.  And I just

3   had a quick sort of threshold question that I don't know

4   that you've really addressed in your brief, and that was the

5   suggestion by Mr. Krinsky and the defendants that we sort of

6   put a pause on the personal-jurisdiction question until

7   immunity is resolved and subject-matter jurisdiction is

8   resolved, which I take him to mean it's going to be appealed

9   immediately.

10          So can I get your response to that suggestion

11   first before we get to the merits?

12          MR. DAVIDSON:  Yes.  Thank you, Your Honor.

13          Well, Mr. Krinsky and I have had substantial

14   discussions on this.  And as you can see, you know, the

15   parties have gotten along well in trying to limit the issues

16   as best we can for you and to process the procedure.

17          Our view upon Mr. Krinsky's request to bifurcate

18   the questions is that the facts substantially, if not close

19   to entirely, overlap with respect to the conduct in the U.S.

20   direct effects so that it seemed prudential to try to decide

21   both of these questions at the same time if they largely

22   have the same facts.  There's no legal reason why they can't

23   be bifurcated.

24          I think, depending on the outcome, the result

25   might follow in the sense of whether to deal with personal

1    jurisdiction now or later, because one of our other concerns

2    was, as you know, matters of immunity get an immediate right

3    of appeal to the Circuit.  The law is not so clear on

4    personal jurisdiction.

5              But what we didn't want to be in the situation,

6    whatever Your Honor's ruling, we go upstairs, and then we're

7    back and we've survived and we continue, to then deal with

8    personal jurisdiction and potentially a discretionary appeal

9    of that, rather than trying to decide it all at once.  But,

10   of course, it doesn't have to be that way --

11             THE COURT:  Right.

12             MR. DAVIDSON:  -- but that was sort of our

13   suggestion.

14             THE COURT:  Well, let me ask:  Have you had

15   discussions with Mr. Krinsky as to whether he would

16   stipulate to not seeking an interlocutory review of a later

17   personal -- an adverse personal jurisdiction ruling?

18             In other words, say hypothetically, I rule against

19   him on immunity and it goes up to the Circuit, the Circuit

20   agrees, comes back down, we then need to resolve personal

21   jurisdiction.

22             Say I again rule against him, has he -- have you

23   all talked about whether he would agree to stipulate and not

24   to seek an immediate appeal?

25             Mr. Krinsky, I don't know whether you've --

1          MR. DAVIDSON:  We haven't discussed that, but

2    Your Honor is asking good questions, which we hadn't asked

3    of each other.  But I mean, that's principally our reason.

4          And I know this is a heavy case and we don't

5    needlessly want to throw more decision-making that could be

6    deferred to Your Honor.

7          But really, we want to try to have efficiency.

8    And if there -- if in your hypothetical there's not an

9    interlocutory appeal on the personal-jurisdiction question,

10   we don't see any compelling reason why personal jurisdiction

11   has to be resolved now.

12         THE COURT:  I'll tell you, Mr. Davidson, while

13   there may be partly some overlap on this

14   personal-jurisdiction question, I mean, I think it's a very

15   difficult -- or let me put it differently:  There's sort of

16   sufficiently unique inquiries I need to make on the question

17   of whether these entities are essentially -- are the state

18   such that there's no separate identity, or that these

19   entities are essentially agents of the state.  And that's a

20   pretty fact-intensive inquiry that may not have a whole lot

21   to do with whatever context these companies have with the

22   United States.

23         MR. DAVIDSON:  Your Honor, that's a fair point.

24         I mean, the *Bancec* analysis is somewhat different

25   and very fact-intensive.

1            And, frankly, to the extent Your Honor isn't

2    satisfied with the record that we've presented, it really

3    opens itself, if not compels there to be some discovery in

4    personal jurisdiction.

5            And I think Mr. Krinsky's position would be, that

6    should wait until the subject-matter-jurisdiction question

7    has been resolved.

8            THE COURT:  Yeah.

9            I mean, look, I'll be perfectly candid with you,

10   Mr. Davidson.  I mean, I read your expert's report.  And

11   I have to tell you just candidly, I found it challenging to

12   get through and fully comprehend.

13           You know, I mean, I think his basic thesis is that

14   the Cuban state is a socialist one, and, therefore, you

15   know, it owns all assets.  There are no private rights of

16   property, and, therefore, the country and the entities are

17   one and the same.  It took him 60 or 80 pages to say that,

18   but he got through it.

19           All right.  Let me turn to Mr. Krinsky and get

20   your reaction to this.

21           I mean, I think you're prepared to defer the

22   personal-jurisdiction issue; is that correct?

23           MR. KRINSKY:  I'm sorry, Your Honor.  I'm a little

24   hard of hearing.  I didn't catch the last past.

25           THE COURT:  I said, you're prepared to defer the

1    personal-jurisdiction question?

2            MR. KRINSKY:  Yes.

3            On that issue, I'm not sure whether Your Honor is

4    asking about this notion of a stipulation.  It hasn't been

5    discussed and it hasn't been considered by us, but it surely

6    is something that I think we should very seriously consider.

7            But I would not want to respond immediately to

8    Your Honor.  And perhaps after the hearing, I can talk about

9    it with Mr. Davidson and we can advise Your Honor on our

10   position.  It clearly has some appeal right away.

11           I do want to say, to sort of reinforce what

12   Your Honor has said, that the *Bancec* issues are very --

13   different -- the fact issues are different than all the

14   other sovereign immunity issues, Your Honor.

15           And I also would say, the *Bancec* issue is a very,

16   very weighty issue; it has very serious consequences.

17           I'm very found of *Bancec*; I actually argued it in

18   the Supreme Court.

19           THE COURT:  Okay.

20           MR. KRINSKY:  And what I told the Court in our

21   briefs is, we don't see how you can have trade and finance

22   with a socialist country, essentially, a planned economy,

23   without the full protection of *Bancec*.

24           I only say this, Your Honor, that there's not only

25   the question of factual issues being different, but we don't

1    think a decision on *Bancec* should be reached if the case is

2    going to be dismissed on subject-matter jurisdiction.

3              THE COURT:  Yeah.

4              Look, I agree with both of you that *Bancec* is --

5    it's weird how these things happen.  This is the third one

6    of these *Bancec* cases I've had in quick succession over the

7    last year.  And in the prior five years on the bench, I

8    hadn't had any.  So I've become more familiar with the case

9    and the cases that have followed with it.

10             You know, this one presents an interesting twist

11   in the sense that they do have a socialist state, and my

12   understanding is that the assets themselves are state-owned

13   property.  Maybe I'm misunderstanding that, but,

14   nevertheless, it just -- there seem to be enough factual

15   issues here that are quite thorny, that if they can be

16   deferred and everybody can agree they can be deferred, that

17   wouldn't be a bad thing from my perspective.

18             MR. KRINSKY:  Would Your Honor let us --

19             MR. DAVIDSON:  Oh, I'm sorry.

20             MR. KRINSKY:  I'd like to consider it and discuss

21   it and speak with Mr. Davidson and then get back to Your

22   Honor on that.

23             THE COURT:  Okay.

24             Mr. Davidson.

25             MR. DAVIDSON:  I agree.  I was going to suggest

1   the same thing.

2            I mean, as I said, we have very much an open

3   dialogue, so we can speak about this frankly and see if we

4   can come to some sort of agreement by which personal

5   jurisdiction is deferred.

6            THE COURT:  Let's do this:  Why don't you all talk

7   amongst yourselves and see if you can come to some

8   agreement.  And can you just get back to me by next

9   Wednesday?  Is that a reasonable amount of time?

10            MR. KRINSKY:  Sure.  Thank you.

11            MR. DAVIDSON:  Yes, Your Honor.

12            THE COURT:  Yes.

13            So just file a Joint Status Report indicating what

14   your position is.  And if it's something that I do need to

15   resolve now, you all can't come to an agreement, then I may

16   have you back in to have a further hearing on the

17   personal-jurisdiction question.

18            MR. KRINSKY:  Thank you, Your Honor.

19            MR. DAVIDSON:  Thank you, Your Honor.

20            THE COURT:  All right.

21            Well, with that, that's sort of what I had in mind

22   for this afternoon, and I think we've covered a lot of

23   territory.

24            You know, I didn't want to necessarily suggest

25   that this was all anybody wanted to talk about, and maybe

1  there's some other issues you wanted to raise or points.

2  And so before we conclude, if there was anything that we

3  didn't touch on in the last two and a half hours that you've

4  been burning to want to get out in front of me, now would be

5  the time to do it.

6          MR. KRINSKY:  I'm fine, Your Honor.

7          THE COURT:  Okay.

8          MR. KRINSKY:  I appreciate all the time.

9          MR. DAVIDSON:  Yes, Your Honor.

10  Thank you very much for the Court's attention and diligence,

11  it's very much appreciated.

12          THE COURT:  All right.  You're welcome.

13          Thank you, all, very much.  We'll get to the task

14  of getting you all a decision as soon as we can.

15          (Proceedings concluded at 4:27 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Please note:  This hearing occurred during the COVID-19 pandemic and is therefore subject to the technological limitations of court reporting remotely.


Date:__March 16, 2021_____     /S/__William P. Zaremba_____

                                 William P. Zaremba, RMR, CRR