UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EXXON MOBIL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-cv-01277 (APM) |
| ) | |
| CORPORACIÓN CIMEX S.A. et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §§ 6021 *et seq.*, also known as the LIBERTAD, or Helms-Burton, Act.  Title III of the LIBERTAD Act creates for U.S. nationals a private right of action against any "person" who traffics in property expropriated by the government of Cuba after January 1, 1959, and defines "person" to include any agency or instrumentality of a foreign state.  The Act, however, contains a unique provision that authorizes the President to suspend the private right of action.  Every presidential administration since the statute's passage had done just that.  But then the Trump Administration announced that it would lift the suspension in May 2019.  That action opened the door for this novel lawsuit.

Over sixty years ago, Plaintiff Exxon Mobil Corporation ("Exxon") held an interest in various oil and gas assets located in Cuba that were owned and operated by its wholly owned subsidiaries.  The government of Cuba expropriated those assets in 1960.  Exxon now seeks compensation under Title III of the LIBERTAD Act from the Cuban state-owned entities that allegedly traffic in its confiscated properties:  Defendants Corporación CIMEX S.A. (Cuba)

("CIMEX"), Corporación CIMEX S.A. (Panama) ("CIMEX (Panama)"), and Unión Cuba-Petróleo ("CUPET").  Exxon seeks entry of an actual damages award of over $71 million plus treble damages.

Defendants now move to dismiss Exxon's complaint, arguing that this court lacks subject matter jurisdiction over the dispute.  For the reasons that follow, the court denies Defendants' motion to dismiss as to CIMEX, defers ruling as to CUPET and CIMEX (Panama), and allows limited jurisdictional discovery as to CUPET and CIMEX (Panama).

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Exxon's Operations in Cuba

Until 1960, Exxon, then known as Standard Oil, owned several subsidiaries operating in Cuba.  *See* Second Am. Compl., ECF No. 33 [hereinafter SAC], ¶¶ 23–24.  One such subsidiary was Esso Standard Oil, S.A. ("Essosa"), a wholly owned Panamanian corporation that operated in the Caribbean Basin and had its headquarters in Havana, Cuba.  *Id.* ¶ 24.  Exxon also operated Esso Standard (Cuba) Inc. and Esso (Cuba) Inc. (the "Exploration Companies"), which explored for and produced crude oil in Cuba.  *Id.*

In October 1959, following the rise of Fidel Castro, the Cuban government arrived at the Exploration Companies' Cuban office and "confiscated and copied all files, maps, and other records of geological exploration."  *See id.* ¶ 27.  The Exploration Companies subsequently stopped all exploration efforts in Cuba and closed their office on the island.  *See id.*

Some months later, in the summer of 1960, the Cuban government issued a series of resolutions that expropriated Essosa's rights to its Cuban property.  *Id.* ¶ 28.  The resolutions prohibited Essosa "from operating its expanded Belot Refinery," forced the company to "abandon

2

its Cuban-based marketing operation," and resulted in the closure of Essosa's gasoline service stations in the country.  *Id.* ¶ 29.  All told, the Cuban government confiscated Essosa's Belot Refinery, multiple bulk products terminals, and more than one hundred service stations.  *See id.* ¶ 31.  According to Exxon, "Cuba has never paid, and Plaintiff has never received, compensation for the expropriation of" that property.  *Id.* ¶ 33.

> 2.    *The Foreign Claims Settlement Commission*

In response to Cuban expropriations, Congress in 1964 established a program pursuant to the International Claims Settlement Act of 1949, 22 U.S.C. §§ 1621 *et seq.*, to provide a way for "nationals of the United States" to submit expropriation claims against Cuba to the U.S. Foreign Claims Settlement Commission ("FCSC").  *See* Pub. L. No. 88-666, 78 Stat. 1110 (1964); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich III*), 743 F. App'x 442, 451 (D.C. Cir. 2018).  The FCSC was tasked with determining "the amount and validity of claims against the Government of Cuba . . . which have arisen since January 1, 1959, . . . out of nationalization, expropriation, intervention, or other takings of, or special measures directed against, property of nationals of the United States . . . in order to obtain information concerning the total amount of such claims against the Government of Cuba . . . on behalf of nationals of the United States."  22 U.S.C. § 1643.

In 1969, Standard Oil, Exxon's predecessor, submitted a claim to the FCSC.  SAC ¶ 34. The FCSC certified that Standard Oil "suffered a loss in the total amount of $71,611,002.90 . . . as a result of the intervention on July 1, 1960, of the Cuban branch of Essosa, a Panamanian corporation wholly owned by claimant."  SAC, Ex. 1, ECF No. 33-1 [hereinafter FCSC Claim], at 9.  The award also entitled Standard Oil to interest at a rate of 6% per annum from July 1, 1960, to the date of settlement.  *Id.* at 10.  Exxon "has never settled the outstanding certified claims or

received any payment from any entity with respect to the principal or interest due on its certified claim." SAC ¶ 43.

### 3.   *The LIBERTAD, or Helms-Burton, Act*

In 1996, President Clinton signed into law the LIBERTAD Act, also known as the Helms-Burton Act, Pub. L. No. 104–114, 110 Stat. 785 (1996) (codified at 22 U.S.C. §§ 6021 *et seq.*).  Title III of the Act creates for U.S. nationals who owned property in Cuba a private right of action against any "person" that "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959."  22 U.S.C. § 6082(a)(1)(A).  The Act defines "person" to include "any agency or instrumentality of a foreign state."  *Id*. § 6023(11).

A person engaged in trafficking confiscated property shall be liable to the U.S. national "for money damages."  *Id.* § 6082(a)(1)(A).  The statute provides multiple ways for computing money damages, one of which is "the amount . . . certified to the claimant by the [FCSC], plus interest."  *Id.* § 6082(a)(1)(A)(i)(I).  A certified claim from the FCSC creates a rebuttable presumption as to the amount of an award.  *Id.* § 6082(a)(2).  It also entitles the claimant to receive treble damages from the person trafficking the confiscated property.  *Id.* §§ 6082(a)(3)(A), (C)(ii).

Title III, however, contains an important condition on the availability of its private cause of action.  No doubt due to the potential foreign policy implications of such claims, Congress authorized the President to suspend Title III's private right of action for sequential periods of up to six months upon notification to Congress that "the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba."  *Id*. § 6085(b)(2).  Since the Act's passage every administration has issued a sequential six-month suspension of the right of action.  SAC ¶ 45.

That changed under President Trump.  On April 17, 2019, Secretary of State Michael Pompeo announced that the Trump Administration "would no longer suspend the right to bring an action under Title III effective May 2, 2019."  U.S. Dep't of State, Cuba: Title III FAQs (LIBERTAD), https://www.state.gov/cuba-title-iii-faqs-libertad/ (last visited Mar. 22, 2021).  That announcement opened the door for Exxon to file this action, which it did on May 2, 2019.  *See* Compl., ECF No. 1.

### 4.   *Defendants' Alleged Trafficking Activities*

Exxon contends that Defendants have "trafficked" in Essosa's confiscated property for commercial gain.

*CIMEX.*  According to Exxon, CIMEX "engages in a variety of foreign commerce across a variety of industries," and, as relevant to Exxon's suit, "operates over 600 service stations that sell gas and consumer goods across Cuba."  SAC ¶¶ 105–106.  CIMEX, along with CUPET, operates over 300 such service stations under the name "Servi-Cupet."  *Id.* ¶ 106.  Exxon explains that Servi-Cupets "are the functional equivalent of a 7-Eleven convenience store."  *Id.* ¶ 109.  The stations sell "a variety of American products, including poultry, cereal, rice, cleaning supplies, frozen vegetables, and alcoholic beverages."  *Id*.  Some of those service stations are built and maintained on property that formerly belonged to Essosa.  *Id.* ¶ 107.

CIMEX also uses its service stations to process remittances, or money transfers.  *Id.* ¶ 111.  When a remittance is sent to Cuba from the United States, "U.S. dollars are transferred by persons in the United States using agent locations in the United States."  *Id.* ¶ 121.  Recipients can then collect their remittances at CIMEX's service stations, among other locations in Cuba, and some of the service stations that process remittances are maintained on Essosa's former property.  *See id.* ¶¶ 115–116.

Exxon alleges that "Cuba received an estimated $3.6 billion U.S. dollars in 2018 from remittances, and it is estimated that 90% of these remittances come from the United States." *Id.* ¶ 112. Remittances are "the only conduit for persons residing in the United States to transfer U.S. dollars to support family and friends in Cuba." *Id.* ¶ 122. Exxon maintains that the remittance business is crucial to the Cuban economy because it provides U.S. dollars for the Cuban government and financial system, which are strained for hard currency. *See id.* ¶ 121. Cuba channels remittances through FINCIMEX, which has "a license to manage all remittance wire transfers from the United States," and "CIMEX facilitates remittance transactions through its partnership with a U.S.-based remittance provider." *Id.* ¶ 113.

*CIMEX (Panama).* Exxon makes no direct trafficking allegations against CIMEX (Panama). Instead, it claims that CIMEX and CIMEX (Panama) "are alter egos of one another." *Id.* ¶ 3. The two entities, according to Exxon, share "the ultimate same ownership, with the same officers and directors, [and] work[] out of the same office at the same address without any regard for corporate formalities or respecting the separateness of either entity." *Id.*; *see also id.* ¶ 19.

*CUPET.* CUPET is Cuba's state-owned oil company. *Id.* ¶ 91. It operates Essosa's former Belot Refinery, which, following a merger with another refinery, is now known as the Ñicó Lopez Refinery, one of four refineries owned by CUPET. *Id.* ¶¶ 92–93. One of CUPET's "main objectives is to supply the domestic needs for petroleum products, including gasoline, diesel, and fuel oil." *Id.* ¶ 93.

CUPET also allegedly uses Essosa's confiscated property—including its former refinery and "plants, terminals, and infrastructure"—to import and refine crude oil, as well as to explore for and extract oil. *Id.* ¶¶ 97–98. In support of these activities, CUPET engages in business with foreign companies, "allow[ing] CUPET to import crude oil to supply the domestic needs for

6

petroleum products and engage in joint oil exploration projects in Cuba and the Gulf of Mexico."
*Id.* ¶ 99.   CUPET provides "offshore exploration opportunities for a range of international
companies" and "host[s] annual conferences seeking foreign partners in oil and gas exploration
and production."  *Id.* ¶ 101(c).

Apart from CUPET's commercial activities, Exxon also contends that CUPET has
negligently operated the Ñicó Lopez Refinery and "cause[d] considerable environmental damage
to the Florida Straits."  *Id.* ¶ 103.  The Ñicó Lopez Refinery allegedly "dumps hydrocarbons and
industrial waste into Havana Bay," and polluted water has run "northeasterly 40-50 miles" from
the refinery, which Exxon contends "bring[s] the pollution at or near the United States-Cuba
maritime boundary."  *Id.*

### B.    Procedural Background

On May 2, 2019, Exxon filed its initial Complaint in this matter.  *See* Compl., ECF No. 1.
Thereafter, it filed the Second Amended Complaint, adding CIMEX (Panama) as a defendant.
*See* SAC.  The Second Amended Complaint is the operative pleading.

Defendants have moved to dismiss the Second Amended Complaint for lack of subject
matter and personal jurisdiction.  *See* Defs.' Mot. to Dismiss Action with Prejudice, & for Other
Relief, ECF No. 42 [hereinafter Defs.' Mot.].  As to subject matter jurisdiction, Defendants assert
that: (1) they are agencies or instrumentalities of a foreign sovereign, Cuba, and thus are immune
from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA"), and (2) Exxon lacks
Article III standing.  *See* Defs.' Mot., Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss with
Prejudice & for Other Relief, ECF No. 42-3 [hereinafter Defs.' Br.].  As to personal jurisdiction,
Defendants contend that, as agents or instrumentalities of a foreign sovereign, they enjoy

protection under the Due Process Clause and lack the requisite minimum contacts with the United States to be subject to suit here. *Id.* at 47–60.

The court heard oral argument on March 10, 2021. *See* Minute Entry, Mar. 10, 2021. Following the hearing, the parties agreed to defer their dispute over personal jurisdiction until after the question of subject matter jurisdiction is resolved, including possible interlocutory appellate review. *See* Stip. & Order, ECF No. 59. Therefore, the court in this decision focuses only on its subject matter jurisdiction and does not consider the parties' positions on personal jurisdiction.

## II.   LEGAL STANDARD

Defendants have asserted immunity from suit under the FSIA, and so "the court's focus shifts to the exceptions to immunity laid out in 28 U.S.C. §§ 1604, 1605, and 1607." *Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "[T]he foreign-state defendant bears the burden of establishing the affirmative defense of immunity" and must prove "that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 344–45 (D.C. Cir. 2018).

In moving to dismiss, a foreign-state defendant may challenge either the legal or factual sufficiency underpinning an exception. *See Phx. Consulting*, 216 F.3d at 40. Defendants here have taken the latter approach. They have submitted voluminous evidence, including multiple sworn declarations, contesting the jurisdictional facts alleged by Exxon and giving rise to mixed questions of law and fact. *See id.* "When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Id.* Rather, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* The court retains "considerable latitude" in how it

8

will "ferret out the facts pertinent to jurisdiction," including ordering jurisdictional discovery. *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984)).

## IV.  DISCUSSION

The parties agree that Cuba wholly owns Defendants CIMEX, CIMEX (Panama), and CUPET, and therefore Defendants are presumptively immune from suit in U.S. courts as agencies or instrumentalities of a foreign state. *See* 28 U.S.C. § 1604 (stating "a foreign state" is immune from suit in the courts of the United States, unless a statutory exception applies); *id.* § 1603(a) (defining "foreign state" to include "an agency or instrumentality of a foreign state"); SAC ¶ 9 (alleging Defendants to be "agencies or instrumentalities of a foreign state").

Exxon nevertheless argues that this court has jurisdiction over Defendants because Congress abrogated their sovereign immunity in three statutory provisions:  (1) Title III of the LIBERTAD Act, (2) the FSIA's commercial activity exception, and (3) the FSIA's expropriation exception. *See* Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss the Action & for a Partial Stay, ECF No. 47 [hereinafter Pl.'s Br.], at 2–3.  Short of a finding that Defendants are not immune to suit, Exxon has also requested limited jurisdictional discovery. *Id.* at 33–34.  Defendants counter that none of the cited grounds to abrogate immunity apply and that jurisdictional discovery is unwarranted; they also argue that Exxon lacks standing. *See* Defs.' Br. at 2–4, 45–46.

The court first turns to Exxon's reliance on Title III as a source for abrogating immunity, then addresses the immunity exceptions under the FSIA, and concludes with a discussion of standing.

### A.    Title III of the LIBERTAD Act

Exxon's opening salvo is unusual.  It has been a common refrain since the Supreme Court's decision in *Argentine Republic v. Amerada Hess Shipping Corp.* that "the FSIA [is] *the sole basis*

for obtaining jurisdiction over a foreign state in our courts."  488 U.S. 428, 434 (1989) (emphasis added); *see also OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015).  Yet, Exxon here urges an end run of the FSIA, and asks the court to find an exception to foreign sovereign immunity in Title III.  *See* Pl.'s Br. at 12–15.  The court declines Exxon's novel invitation.

Exxon's argument proceeds as follows.  Title III permits actions against "any person" trafficking in confiscated property, 22 U.S.C. § 6082(a)(1)(A), and the term "person" is defined to include "any agency or instrumentality of a foreign state," *id*. § 6023(11).  Title III further provides that, "[e]xcept as provided in this subchapter, the provisions of Title 28 . . . apply to actions under this section to the same extent as such provisions and rules apply to any other action brought under section 1331 of Title 28."  *Id*. § 6082(c)(1).  The FSIA, Exxon points out, is contained in Title 28.  Key to Exxon's reading is the clause "except as provided in this subchapter," *id*.  According to Exxon, by including the clause "except as provided in this subchapter" in Title III, Congress intended to take Title III cases outside the strictures of the FSIA.  *See* Pl.'s Br. at 13.  More pointedly, Exxon maintains that "the FSIA applies only so long as it does not conflict with Title III, in which case Title III must control as Congress directed."  *Id*.  Such a conflict exists between the FSIA's immunity provisions and Title III, according to Exxon.  Requiring a Title III plaintiff to satisfy an immunity exception under the FSIA would frustrate Congress's purpose in creating a private right of action that includes actions against an agency or instrumentality of a foreign state.  Title III, Exxon urges, therefore obviates the need to satisfy an FSIA immunity exception.  Exxon's logic, though not without superficial appeal, ultimately fails.

To begin, the court looks to the FSIA.  Congress used its power to determine "the exact degrees and character" of "the subject-matter jurisdiction of the lower federal courts" to create in the FSIA a presumption of immunity for foreign sovereigns.  *Amerada Hess*, 488 U.S. at 433

10

(internal quotation marks omitted).  The FSIA thus provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Section 1604 of the FSIA thus (1) establishes the presumption of foreign state immunity in U.S. courts ("a foreign state shall be immune") and (2) identifies where the exceptions to that immunity can be found ("existing international agreements" and "except as provided in sections 1605 to 1607 of this chapter").  *See Sachs*, 136 S. Ct. at 393–94; *see also Amerada Hess*, 488 U.S. at 434 ("§ 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity.").  The FSIA "comprehensively regulat[es] the amenability of foreign nations to suit in the United States."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983).  Thus, the Supreme Court has instructed that "the FSIA '*must* be applied by the district courts in *every action* against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the *specified* exceptions to foreign sovereign immunity."  *Amerada Hess*, 488 U.S. at 434–45 (emphasis added) (quoting *Verlinden*, 461 U.S. at 493).

Title III of the LIBERTAD Act, codified at 22 U.S.C. § 6082, is not among the listed exceptions in the FSIA.  Moreover, Title III does not mention sovereign immunity.  That is because Title III does no more than create a private right of action and is not an exception to sovereign immunity.  Exxon's argument boils down to a contention that Title III's private right of action conflicts with the FSIA and therefore the private right of action waives sovereign immunity, but the D.C. Circuit has been clear that private rights of action and exceptions to sovereign immunity

are two entirely different species.  In *Cicippio-Puleo v. Islamic Republic of Iran*, the court considered Congress's efforts to legislate liability against foreign state sponsors of terrorism.  *See* 353 F.3d 1024 (D.C. Cir. 2004), *superseded by statute*, 28 U.S.C. § 1605A.  There, while Congress had abrogated foreign sovereign immunity for foreign states that participated in terrorism, it had not created a private right of action for suits on those grounds.  *See id.* at 1032–33.  The D.C. Circuit concluded that the terrorism exception to the FSIA was "merely a jurisdiction conferring provision that d[id] not otherwise provide a cause of action against a foreign state or its agents." *Id.* at 1032.  At the root of its decision was the "clearly settled distinction in federal law between statutory provisions that waive sovereign immunity and those that create a cause of action."  *Id.* at 1033.

The same "clearly settled distinction" defeats Exxon's argument here.  While Title III provides Exxon with a cause of action against Cuba, it is silent as to sovereign immunity.  Just as the existence of a waiver of sovereign immunity did not establish a private right of action in *Cicippio-Puleo*, the converse must also be true:  the existence of a private right of action cannot establish a waiver of foreign sovereign immunity.  Title III's private right of action therefore cannot be construed to create a conflict with the FSIA's sovereign immunity provisions, and Exxon's jurisdictional theory fails.

Furthermore, as written, Title III does not reflect an intention to waive sovereign immunity. The court must presume that Congress was aware of the Supreme Court's sovereign immunity jurisprudence when it passed the LIBERTAD Act in 1996, *see Nat'l Ass'n of Mfrs. v. Dep't of Lab.*, 159 F.3d 597, 601 (D.C. Cir. 1998), and that if Congress intended to deviate from the FSIA, it would have done so explicitly.  As noted, ever since *Amerada Hess*, the Supreme Court has said that "the FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in our courts."  488

12

U.S. at 434.  The Supreme Court re-affirmed that principle twice in the five years preceding the passage of the LIBERTAD Act:  first in 1992 in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992), and again the following year in *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Title III, however, is wholly silent with respect to sovereign immunity.  The vague phrase "[e]xcept as provided in this subchapter," 22 U.S.C. § 6082(c)(1), cannot overcome Congress's silence in the face of clear Supreme Court precedent.

Congress's silence as to immunity is amplified by other provisions of Title III that make explicit reference to the FSIA.  Subsection (c)(2), which immediately follows the provision on which Exxon relies, explicitly mentions the FSIA, providing that "service of process . . . shall be made in accordance with section 1608 of Title 28."  22 U.S.C. § 6082(c)(2).  Given that Congress knew how to refer to a provision of the FSIA when it wanted to, the court doubts that Congress would have cavalierly jettisoned for Title III actions the comprehensive scheme that the FSIA creates simply by stating in subsection (c)(1) that Title 28 applies "[e]xcept as provided in this subchapter," *id.* § 6082(c)(1).  *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (noting courts generally presume that "Congress . . . does not . . . hide elephants in mouseholes"); *cf. Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021) ("We interpret the FSIA as we do other statutes affecting international relations:  to avoid, where possible, producing friction in our relations with other nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation." (cleaned up)).

In addition, Congress was careful to anticipate and explicitly provide instructions for instances in which Title III was in tension with existing doctrines, suggesting that Congress would have explicitly stated the FSIA did not apply to Title III if that were its intention.  For example, Congress provided that a court may not invoke the "act of state doctrine"—which "precludes the

courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964), *superseded by statute*, 22 U.S.C. § 2370(e)(2)—to "decline . . . to make a determination on the merits in an action" brought pursuant to Title III, 22 U.S.C. § 6082(a)(6). Similarly, Congress also anticipated that Title III might someday create tension with a democratically elected government in Cuba. Title III therefore explicitly provides that "any judgment against an agency or instrumentality of the Cuban Government shall not be enforceable against an agency or instrumentality of either a transition government in Cuba or a democratically elected government in Cuba." 22 U.S.C. § 6082(d). Despite these instances in which Congress took pains to explicitly define how Title III would interact with existing doctrines, Congress said nothing with respect to foreign sovereign immunity. It would therefore be inconsistent with the comprehensive scheme Congress drafted in Title III for the court to interpret Congress's statement that Title 28 applies "[e]xcept as provided in this subchapter" to quietly abrogate foreign sovereign immunity.

Beyond the text of Title III, the court's conclusion is bolstered by the fact that when Congress has devised new exceptions to the presumption of sovereign immunity in the past, it has amended the FSIA in plain and certain terms. For example, in 1996, Congress passed the Antiterrorism and Effective Death Penalty Act, which introduced a new exception to sovereign immunity for state acts of terrorism. Pub. L. No. 104-132, 110 Stat. 1214 (1996); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 763 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). The "terrorism exception" explicitly abrogates foreign sovereign immunity. *See* 28 U.S.C. 1605A(a)(1); *see also Owens*, 864 F.3d at 765 ("The new exception withdrew immunity, granted jurisdiction, and authorized suits against

14

state sponsors of terrorism for 'personal injury or death' arising from [certain] predicate acts . . . .").
Title III's silence on sovereign immunity stands in stark contrast to Congress's abrogation of
sovereign immunity in the terrorism exception.  The court again finds it quite improbable that
Congress would delineate the terrorism exception to sovereign immunity in incontrovertible terms
but subtly dispatch the FSIA in Title III.

Finally, as a matter of textual interpretation, the "[e]xcept as provided in this subchapter"
clause bears a straightforward reading that does not require the court to upend the FSIA's sovereign
immunity scheme.  The clause is most naturally understood to mean that where an *express*
provision of Title III directly contradicts an *express* provision of Title 28, including the FSIA, the
text of Title III governs.  And certain provisions of Title III do conflict with Title 28.  For example,
Title III creates a $50,000 amount-in-controversy requirement, 22 U.S.C. § 6082(b), whereas
under the FSIA, federal district courts have original jurisdiction over foreign states "without regard
to amount in controversy," 28 U.S.C. § 1330(a).  For suits brought pursuant to Title III, then, the
$50,000 amount-in-controversy trumps the FSIA.  No similar provision expressly abrogates
sovereign immunity.  Had Congress intended to create a special immunity waiver for Title III
actions that avoids the FSIA's strictures, the court would have expected Congress to do so clearly,
as it did in other instances when Congress set rules specific to Title III actions.

B.     The FSIA

Having determined that Title III does not supply the waiver of sovereign immunity needed
to advance Exxon's case, the court turns to the FSIA's immunity exceptions.  Two are relevant
here:  the commercial activity exception and the expropriation exception.

###### 1.    *Which Exceptions Can Apply*

At the outset, the parties clash over the interplay between the commercial activity and expropriation exceptions.  According to Defendants, the expropriation exception in this case fully eclipses the commercial activity exception because Exxon's claim turns on Cuba's "quintessentially sovereign act" of expropriating property.  Defs.' Br. at 5–8 (internal quotation marks omitted).  Relying on *Rong v. Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006), Defendants contend that because "commercial use almost always follows expropriation, allowing suit on that commercial use under the commercial activity exception would eviscerate the distinct limitations of the expropriation exception."  Defs.' Br. at 6.

But this argument runs aground on controlling precedent.  The D.C. Circuit has "never held that in order to proceed against a foreign government, a claim must fall into just one FSIA exception."  *de Csepel v. Hungary*, 859 F.3d 1094, 1103 (D.C. Cir. 2017).  In *de Csepel*, the Circuit rejected the contention that "either the expropriation exception or the commercial activity exception [must apply], not both."  *Id.*; *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 n.15 (D.C. Cir. 1990) (rejecting argument that the expropriation exception was "the *only* provision in the FSIA which denies to foreign states immunity from suit for the taking of property" because "[i]t is clear that if a proper showing is made, the appellee can rely on the 'commercial activity' exception" as well (cleaned up)).  *Rong* and the other cases on which Defendants rely "stand only for the proposition that the activity at issue did not constitute 'commercial activity' under the FSIA."  *de Csepel*, 859 F.3d at 1103.  Accordingly, the court will analyze whether Exxon's claims fall under both the commercial activity exception and the expropriation exception.

2.      *The Commercial Activity Exception*

As relevant here, the commercial activity exception provides that a "foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . in which the action is based . . .  upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  The parties' differences center on two elements of this exception: (1) whether Exxon's claim is "based upon" a "commercial activity" and (2) whether Defendants' alleged commercial activity "causes a direct effect in the United States."  The court addresses each element in turn.

a.      <u>Commercial activity</u>

The Supreme Court has instructed that the inquiry of whether a suit is "based upon" a "commercial activity" "first requires a court to identify the particular conduct on which the plaintiff's action is 'based.'" *Sachs*, 577 U.S. at 33 (cleaned up) (quoting *Nelson*, 507 U.S. at 356). A court should identify the "particular conduct" at issue "by looking to the 'basis' or 'foundation' for a claim," *id.* (quoting *Nelson*, 507 U.S. at 357)—that is, "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357. The Court's decisions require that more than a single element of a claim involve commercial activity—instead, a court must "zero[] in on the core of the[] suit" and determine whether "the particular conduct that constitutes the gravamen of the suit" is commercial.  *Sachs*, 577 U.S. at 35 (internal quotation marks omitted).

Here, the "core" of Exxon's action arises from "trafficking" in expropriated property. Under Title III of the LIBERTAD Act, "any person that . . . traffics in property which was confiscated by the Cuban Government" shall be liable to any U.S. national who owns the claim to

such property.  22 U.S.C. § 6082(a)(1)(A).  The statutory text of Title III thus makes clear that trafficking, and not expropriation, is the gravamen of the claim.  Defendants are wrong to contend otherwise.  *See* Defs.' Br. at 5–8.  The Act does not grant a cause of action for the mere expropriation of the property.  Rather, liability under the Act attaches only when a U.S. person's property has been confiscated *and* trafficked.  To be sure, expropriation, or a showing that the plaintiff's property has been "confiscated," is a necessary element of a trafficking claim, but that element alone would not "entitle a plaintiff to relief," *Sachs*, 577 U.S. at 33 (internal quotation marks omitted).  Trafficking in expropriated property is the "gravamen" of a Title III claim, not Cuba's expropriation of the property.  *See id*. at 34 (holding that "a one-element approach" is "flatly incompatible" with the Court's precedent).

Having determined that "trafficking" is the "gravamen" of a Title III claim, the court has little trouble concluding that the acts of trafficking alleged here constitute "act[s] . . . in connection with a commercial activity" for purposes of the FSIA.  28 U.S.C. § 1605(a)(2).  "[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  *Nelson*, 507 U.S. at 360 (internal quotation marks omitted).  This inquiry focuses on the "'nature'" of the foreign state's act "rather than its 'purpose.'"  *Weltover*, 504 U.S. at 614.  So, instead of asking "whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," the court must ask "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Id.* (internal quotation marks omitted).

In Title III, Congress selected a decidedly broad definition for the term "traffics" that plainly encompasses the types of actions taken by private citizens acting in trade or commerce. A person "traffics" in confiscated property if that person knowingly and intentionally:

> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,
>
> without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A). The breadth of this definition makes clear that, generally speaking, an act of "trafficking" under the LIBERTAD Act will likely qualify as commercial activity for purposes of the FSIA.

And it does here. Exxon alleges that Defendants have acted as private parties, not sovereign entities, with respect to the confiscated property. Exxon alleges that Defendants traffic in the expropriated property via (1) "commercial activities in the global oil market," including owning and operating refineries, importing and refining crude oil, and conducting exploration and extraction of oil, SAC ¶¶ 91–104; (2) operating service stations "that sell gas and consumer goods" on confiscated property, *id.* ¶¶ 105–110; and (3) processing remittances on confiscated property, *id.* ¶¶ 111–122. Each of these actions is "commercial in nature," *Foremost-McKesson*, 905 F.2d at 450, and could be accomplished by "[a] private party in the market," *Rong*, 452 F.3d at 890.

Exxon's suit is therefore "based on" an "act . . . in connection with a commercial activity," 28 U.S.C. § 1605(a)(2).

Defendants cite the D.C. Circuit's decisions in *Foremost-McKesson* and *Rong*, but their reliance is misplaced. In those cases, the plaintiffs brought claims that were based on the expropriation of their assets. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, No. 82-cv-0220, 1989 WL 44086, at *1 (D.D.C. Apr. 18, 1989) (describing complaint as alleging "a so-called creeping expropriation"); *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 86 (D.D.C. 2005) (noting Rong asserted claims "for conversion, expropriation, the violation of international law and unjust enrichment"). Here, as discussed, Exxon's suit is based on the *trafficking* of confiscated property rather than the expropriation of that property. Thus, this case concerns commercial activity, not the exercise of a power unique to sovereigns.

### b.    Direct effects

The commercial activity exception also requires that the "act . . . in connection with a commercial activity" "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The Supreme Court has explained that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618 (alteration omitted) (internal quotation marks omitted); *see also EIG Energy Fund XIV*, 894 F.3d at 345. "A 'direct effect' . . . is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (internal quotation marks omitted). The commercial activity exception's direct-effect requirement does not "contain[] any unexpressed requirement of 'substantiality' or 'foreseeability'" but nonetheless "may not be predicated on purely trivial effects in the United States." *Weltover*, 504 U.S. at 618; *see also EIG Energy Fund XIV*, 894 F.3d at 345.

20

Exxon alleges that Defendants' trafficking has had the following direct effects in the United States: (1) CIMEX channels money from U.S. citizens to Cuba through remittances processed at service stations located on former Essosa properties, Pl.'s Br. at 17–21; (2) CIMEX sells food and consumer goods imported from the United States at service stations on confiscated properties, *id.* at 21–22; (3) Defendants deprive Exxon of the use of the confiscated property, *id.* at 23–25; (4) CUPET uses the confiscated property to compete with Exxon in the global oil market, *id.* at 25–27; and (5) CUPET's operation of the confiscated refinery and processing facilities has polluted U.S. waters, *id.* at 27–28.

i.    *Remittances*

Starting with remittances, Exxon argues that CIMEX's trafficking has a direct effect in the United States because CIMEX operates on confiscated property service stations that process remittances sent by individuals in the United States to recipients in Cuba.[1]  According to Exxon, "[t]he 'immediate consequence' of opening these channels is that they create a market for remittances to flow from the U.S. to Cuba and enable these transactions to occur."  Pl.'s Br. at 18. The court agrees.

It is clear from Defendants' own description of CIMEX's remittance business that CIMEX uses confiscated property to engage in continuous commerce with the United States.  According to Defendants' declarant, Mali Suris Valmaña, the legal director of CIMEX, certain of CIMEX's service stations process remittances sent from the United States via Western Union.  Defs.' Mot.,

---

[1] Defendants have submitted a declaration stating that "[n]either CUPET, nor any of the *empresas* or mercantile societies that are integrated with it has any involvement in the money transfer (remittance) business."  Defs.' Mot., Second Decl. of Roberto Suárez Sotolongo, ECF No. 42-7, ¶ 10.  Exxon offers no evidence to dispute CUPET's claimed non-involvement in the remittance business, despite allegations suggesting otherwise in the Second Amended Complaint, *see* SAC ¶¶ 115–116.  Having failed to contradict the evidence CUPET presents, the court at this juncture finds that CUPET is not involved in the remittance business, and thus considers whether remittances have a direct effect in the United States only as to CIMEX.

Decl. of Mali Suris Valmaña, ECF No. 42-4 [hereinafter Valmaña Decl.], ¶ 6.  A remittance is initiated when a U.S. resident designates a recipient in Cuba for a transfer of money and makes payment to Western Union.  *Id.* ¶¶ 13(a)–(b).  The U.S. resident receives a "Unique Code" identifying the particular remittance, which she then shares with the intended recipient in Cuba. *Id.* ¶¶ 13(b)–(c).  The recipient can select any of 502 Western Union locations in Cuba, present the Unique Code and appropriate identification, and collect an amount in Cuban convertible pesos, or "CUCs," equal to the original remittance amount.  *Id.* ¶¶ 13(d)–(e), (i).  Defendants concede that between four and ten of CIMEX's properties that have Western Union locations operate on property connected to Essosa.  *Id.* ¶ 12.

In arguing whether CIMEX's processing of remittances constitutes a direct effect in the United States, neither side has presented a case squarely on point.  The Supreme Court and the D.C. Circuit have held, however, that the direct effect requirement is met in cases involving commercial transactions that contemplate contract performance or designate a place of payment in the United States.  *See, e.g.*, *Weltover*, 504 U.S. at 618–19 (finding direct effect where "Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments"); *de Csepel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013) (finding direct effect where bailment contract provided for "return . . . to be directed to" individuals "Hungary knew to be residing in the United States"); *Cruise Connections Charter Mgmt. 1, LP v. Atty. Gen. of Can.*, 600 F.3d 661, 664–65 (D.C. Cir. 2010) (finding direct effect where, due to termination of contract, "revenues that would otherwise have been generated in the United States were not forthcoming" (internal quotation marks omitted)).  The "direct effect" here is similar.  Remittances are sent from the United States and received in Cuba, causing an outflow of money from the United

States.  Such an outflow creates a "direct effect" in the United States much like the failure to transmit payment to the United States.  In both scenarios there is an "immediate" negative economic impact on the domestic economy.  *See Weltover*, 504 U.S. at 618–19 (finding a "direct effect" where "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming").

Defendants raise a number of objections to this conclusion.  First, they argue that, under *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988), Exxon must identify a legally significant act—that is, an act that forms the basis of an element of Exxon's claim—that occurred in the United States and that CIMEX's remittance business is not a legally significant act.  *See* Defs.' Br. at 12–13.  Neither the Supreme Court nor the D.C. Circuit have applied such an exacting requirement in determining whether a foreign defendant's actions have had a direct effect in the United States.  *Weltover*, which post-dates *Zedan*, makes no mention of any requirement that a direct effect be legally significant, and instead instructs that the focus of the direct-effect analysis is on whether the effect is more than "purely trivial," *see* 504 U.S. at 618—a standard that is decidedly less rigorous than whether the effect results from a legally significant act.  And while the D.C. Circuit in *Zedan* made a passing mention that in other direct-effect cases courts had found "something legally significant actually happened in the United States," it did not articulate a freestanding requirement that a direct effect be a legally significant act.  *Zedan*, 849 F.2d at 1515.  Moreover, the D.C. Circuit's post-*Weltover* decisions do not apply or even reference the legally significant act test.  *See, e.g.*, *Princz*, 26 F.3d at 1172–73 (applying *Weltover*'s "purely trivial" standard (internal quotation marks omitted)); *EIG Energy Fund XIV*, 894 F.3d at 345–46 (similar); *see also Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 113 (D.D.C. 2003) (noting the D.C. Circuit has not "expressly adopted or rejected the 'legally significant act' test," but instead

follows the "more general approach set forth in *Weltover*").  Accordingly, the court concludes that Exxon is not required to demonstrate that a legally significant act occurred in the United States so long as it identifies a direct effect from Defendants' alleged trafficking that is not "purely trivial." *Weltover*, 504 U.S. at 618.

Defendants take up the mantle of triviality as well, arguing that the processing of remittances on expropriated property generates a "trivial" effect in the United States because CIMEX operates remittance locations on only four to ten of the confiscated properties.  Defs.' Br. at 15.  The court rejects this argument at this juncture because the number of former Essosa locations processing remittances in *Cuba* says nothing of the effect in the *United States*. Defendants have not, for instance, supplied any facts establishing the actual volume of remittances processed at those locations or their dollar value.  Absent such evidence, Defendants cannot carry their burden of establishing that the effect in the United States is "trivial."

Defendants next insist that CIMEX's processing of remittances cannot cause a direct effect in the United States because the "locus of the tort" is in Cuba.  *See* Defs.' Br. at 13.  This argument gains no traction because the D.C. Circuit has held that "a foreign locus does not always mean that a tort causes no 'direct effect' in the United States."  *EIG Energy Fund XIV*, 894 F.3d at 347. Accordingly, even if Cuba were the locus of the tort, that does not foreclose the possibility that CIMEX's remittance activity could have a direct effect in the United States.

Additionally, Defendants object that the remittances do not satisfy the direct-effect requirement because they do not cause an injury in the United States.  Defs.' Br. at 13.  Defendants interpret *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich I*), 784 F.3d 804 (D.C. Cir. 2015), *vacated & remanded*, 137 S. Ct. 1312 (2017), to stand for the proposition that a foreign defendant's actions must cause injury in the United States

24

to constitute a direct effect.  Defs.' Br. at 13.  Defendants overread *Helmerich I*.  There, Helmerich & Payne argued that Venezuela's expropriation of its oil rigs had a direct effect in the United States because it had "contract[ed] with third-party vendors in the United States" pursuant to its drilling contracts with Venezuela.  *Helmerich I*, 784 F.3d at 817.  The court found that those contracts did not produce any effect—much less a loss—in the United States because Venezuela's expropriation of Helmerich & Payne's oil rigs had no impact on the contracts:  Helmerich & Payne Venezuela "had already performed all of its obligations under the existing third-party contracts."  *Id.* Venezuela's conduct therefore had no effect on the already-fulfilled contracts and thus no effect in the United States.  *See id.  Helmerich* accordingly stands only for the unremarkable proposition that where there is *no effect* in the United States there is no "direct effect."  *Id.* (finding that where the alleged direct effect was a loss on contracts, "no losses, and therefore no 'direct effect,' occurred in the United States").

Moreover, there is no support in the text of the FSIA for Defendants' position that a "direct effect" must be an injury.  The statute merely requires that the act outside the United States "cause[] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  It notably does not require a direct *injury*.  Indeed, the D.C. Circuit has previously held that "[n]othing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff."  *Cruise Connections*, 600 F.3d at 666 (quoting 28 U.S.C. § 1605(a)(2)).  Thus, the court concludes that the direct effect of CIMEX's trafficking need not cause an injury in the United States to satisfy the commercial activity exception.

Defendants also argue that, even if CIMEX's remittance business can be said to have an effect in the United States, that effect is not direct.  *See* Defs.' Br. at 14.  According to Defendants, the effect of CIMEX's remittance business depends on the decisions of independent third parties:

"[p]ersons in the United States must decide to send remittances; they must decide to use [Western Union], not other companies; and the recipients must decide to collect the remittance at one of a handful of locations situated on former Essosa land from among over 500 available [Western Union] locations." *Id.* The court is unconvinced. The effect of CIMEX's remittance business in the United States is not rendered indirect simply because third parties make choices about the origination and collection points for remittances. Defendants concede that "only remittances generated in the U.S. are currently being paid out in Cuba" and that CIMEX is prohibited "from collecting money in Cuba to be paid out in the United States or in any other country." Valmaña Decl. ¶¶ 14–15. Thus, CIMEX's entire remittance business is aimed at bringing money from the United States into Cuba. Those money transfers are direct, without any intermediary. CIMEX cannot hide behind the decisions of third parties to sever the directness of the effect when the very business line it operates is exclusively designed for U.S. residents to send money to Cuba. *Cf. EIG Energy Fund XIV*, 894 F.3d at 348 (finding a direct effect where the plaintiff "allege[d] that its United States presence was not mere happenstance to [defendants], but that [defendants] 'targeted' U.S. investors").

Defendants lodge two final objections. They contend that, under the commercial activity exception, "the act upon which Plaintiff's action is 'based' . . . must cause[] [the] direct effect in the United States," and because Exxon's action is not "based upon" CIMEX's remittance business, the remittances cannot be the cause of the requisite direct effect. Defs.' Br. at 14 (quoting 28 U.S.C. § 1605(a)(2)). It is not entirely clear what Defendants contend Exxon's action *is* based upon, but the court has little doubt that CIMEX's use of confiscated property to participate in the remittance business is an "act . . . in connection with a commercial activity," as required by section 1605(a)(2). Relatedly, Defendants assert that even if CIMEX's processing of remittances qualifies

26

as a direct effect, the processing of remittances provides the court with jurisdiction over only that portion of Exxon's claim that concerns the specific CIMEX service stations that process remittances.  *See* Defs.' Br. at 14–15.  In so arguing, Defendants seem to suggest that the court's jurisdiction as to Exxon's single Title III claim against CIMEX is divisible based on the properties that do and do not cause the direct effect.  Defendants cite no authority for this novel proposition, and the court declines to adopt such a jurisdiction-parsing approach.

ii.     *Sale of Imported U.S. Food and Consumer Goods*

Exxon next argues that CIMEX's sale of imported U.S. goods at the former Essosa service stations has a direct effect in the United States.[2]  Pl.'s Br. at 22–23.  Defendants counter that this activity does not cause a direct effect in the United States because CIMEX itself does not import goods from the United States.  Defs.' Reply Mem. of P. & A. in Supp. of Mot. to Dismiss & for Other Relief, ECF No. 49 [hereinafter Defs.' Reply Br.], at 6–7.  Instead, it purchases U.S. goods through another Cuban company, Alimport, thereby causing its sales of U.S. goods to have, at most, an indirect effect in the United States.  *Id.*

Defendants' argument overlooks two critical facts not in dispute.  The first is that CIMEX exercises some degree of discretion in carrying U.S. goods for sale in its convenience stores; CIMEX does not contend that it is compelled to offer U.S. goods.  Although CIMEX purports not to instruct Alimport on "the country from where the products should be sourced," CIMEX and Alimport have a supply contract pursuant to which CIMEX specifies "the products and their amounts that CIMEX-Cuba will purchase from Alimport for the next calendar year."  Second Decl.

---

[2] Exxon alleges in the Second Amended Complaint that both "CIMEX and CUPET use Confiscated Property to sell American goods to Cuban consumers."  SAC ¶ 109.  In its briefing, however, Exxon argues only that CIMEX sells American goods at service stations.  *See* Pl.'s Br. at 21–22; *see also* Pl.'s Br., Decl. of Jared R. Butcher, ECF No. 47-2, ¶¶ 22–28 (providing evidence related to CIMEX's involvement in imports but not CUPET's involvement).  Accordingly, the court considers whether importing American goods constitutes a direct effect as to CIMEX only.

of Mali Suris Valmaña, ECF No. 53 [hereinafter Second Valmaña Decl.], ¶ 6. Thus, American products reach CIMEX's shelves only when CIMEX has placed an order for goods. Alimport in turn buys some of the goods CIMEX has ordered from the United States, and CIMEX makes a business decision to carry them. As such, CIMEX has a decisional role in marketing U.S. goods from its convenience stores.

The second is that CIMEX's sale of U.S. goods generates demand for U.S. goods. Although Valmaña says that "CIMEX-Cuba does not give any direction to Alimport about the country from where the products should be sourced, the companies from which the products should be purchased, or the brands of a product," and that "Alimport decides all this on its own," *id.*, such explanation defies basic economics. If CIMEX opted not to carry U.S. goods, Alimport would not purchase them, or at the very least would not purchase them in the same quantities. Put differently, CIMEX's purchase of U.S. goods through Alimport creates demand for goods from the United States, and such demand constitutes a direct effect in the United States. Though the exact dollar amount of U.S. goods sold by CIMEX is unclear, the court safely can say it is valued in the millions annually; even Defendants do not seriously suggest it is a "trivial" amount.[3] Exxon therefore has established a prima facie case that CIMEX's sale of U.S. goods has a direct effect on U.S. markets. *See EIG Energy Fund XIV*, 894 F.3d at 345 (finding prima facie case where plaintiff had "alleg[ed] that [defendant] specifically targeted U.S. investors"); *see also Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016) (finding prima facie direct

---

[3] Exxon contends that "CIMEX imports hundreds of millions of dollars' worth of food and consumer goods from the U.S.," Pl.'s Br. at 21, but the State Department fact sheet Exxon cites refers to the export value of all U.S. goods to Cuba, not just those sold by CIMEX, Bureau of W. Hemisphere Affs., U.S. Dep't of State, U.S. Relations with Cuba, Bilateral Relations Fact Sheet (Nov. 22, 2019), https://www.state.gov/u-s-relations-with-cuba/. As a result, the exact dollar value of CIMEX's sale of U.S. goods is not established on this record.

effect where plaintiffs showed that defendant "contemplated investment by United States persons" and such investment actually occurred (internal quotation marks omitted)).

Defendants disclaim that Alimport is acting as CIMEX's agent when it purchases goods in the United States, *see* Second Valmaña Decl. ¶ 6, but even if no agency relationship actually exists, the fact that CIMEX affects U.S. markets through a third party does not render its buying and selling of U.S. goods an indirect effect. *Cf. EIG Energy Fund XIV*, 894 F.3d at 346 (rejecting "a highly restrictive causation requirement under which contributing factors readily and predictably caused by the defendant's same act would preclude jurisdiction"). That is especially true here where "Alimport is the *exclusive* importer [in Cuba] of foodstuffs from the United States." Second Valmaña Decl. ¶ 6 (emphasis added); *see also* Pl.'s Br., Decl. of Jared R. Butcher, Ex. 195, ECF No. 47-5, at 131 ("In May of 2002, the Cuban government designated Alimport as the exclusive purchasing agent for U.S. based companies that want to export food products direct from the United States to Cuba."). CIMEX cannot import goods from the United States itself, and so its procurement and sale of U.S. products must be accomplished through Alimport, the sole source authorized under Cuban law to purchase such goods. Alimport's role as exclusive importer of U.S. goods into Cuba is not the kind of "intervening element" that breaks or attenuates the causative chain. *See Princz*, 26 F.3d at 1172 (finding "[m]any events and actors necessarily intervened between" work the plaintiff performed as a slave in Nazi Germany for "firms directly supporting the Nazi war effort against the United States . . . and any effect felt in the United States"); *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1185–86 (D.C. Cir. 2013) (rejecting theory that Iran's manufacture of a helicopter that resembled the helicopters the plaintiff manufactured created a disincentive for plaintiff "to create quality products" because such an "incentive-based theory would require the intervention of a host of

actors"). CIMEX's purchase and sale of imported U.S. goods from Essosa's confiscated property therefore satisfies, at the pleadings stage, the direct-effect requirement.[4]

iii.  *Continued Use of the Confiscated Property*

Exxon next asserts that Defendants' unauthorized use of confiscated property causes a direct effect in the United States because it harms Exxon, a U.S. citizen. Pl.'s Br. at 23–25. Exxon adds that "Defendants' trafficking . . . cuts off a flow of capital, personnel, data, equipment, and materials to the U.S., including compensation that should be made to Plaintiff in the U.S." *Id.* at 24.

Exxon's argument is squarely foreclosed by *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175. In *Bell*, the D.C. Circuit explained that "[i]nterference with a property right does not necessarily demonstrate a 'direct effect' under the FSIA." *Id.* at 1184. Where "[a]ll of the tortious acts occurred outside of the United States[,] . . . [t]he fact that an American individual or firm suffers some financial loss from a foreign tort, cannot, standing alone, suffice to trigger the exception to immunity." *Id.* (internal quotation marks omitted); *see also Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1142 (D.C. Cir. 2020) ("We have squarely held that 'harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement.'" (quoting *Cruise Connections*, 600 F.3d at 665)); *Allen v. Russian Federation*, 522 F. Supp. 2d 167, 189 (D.D.C. 2007) ("[A] mere financial loss to United States residents, without more, is not a direct effect in the United States." (internal quotation marks omitted)). The mere financial loss that Exxon arguably has sustained in the United States as a consequence of

---

[4] None of the foregoing is meant to suggest that discovery might not shed further light on the relationship between CIMEX and Alimport, and thus impact the court's ultimate view on whether CIMEX's purchase of U.S. goods from an intermediary for sale in its stores gives rise to a direct effect in the United States.

Defendants' trafficking in confiscated property thus does not constitute a direct effect for purposes of the commercial activity exception.

Exxon's contention that Defendants' conduct has "cut[] off a flow of capital, personnel, data, equipment, and materials in the U.S.," Pl.'s Br. at 24, fares no better.  In so claiming, Exxon compares Defendants' alleged trafficking to the joint venture at issue in *Foremost-McKesson*, 905 F.2d 438.  *See* Pl.'s Br. at 23–25.  That analogy is a weak one, however, for Exxon's claim of domestic harm is entirely unsubstantiated even at the pleadings stage.  In *Foremost-McKesson*, Iranian agencies and instrumentalities had entered into a joint venture with the plaintiff.  *See* 905 F.2d at 440–41.  Through the joint venture, Foremost assisted in establishing a dairy in Iran by "provid[ing] the top management for the dairy and controll[ing] its Board of Directors."  *Id.* at 440–41.  "[T]here was a constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging between the United States and Iran to support the operation of [the] Dairy."  *Id.* at 451.

In contrast, Exxon has not alleged *any* flow of capital, personnel, or materials between the United States and Cuba.  If anything, Exxon's allegations suggest that Standard Oil set up largely self-sufficient subsidiary operations in the Cuban market.  For example, Exxon alleges that Standard Oil established a Panamanian subsidiary that had "responsibility for operations in the Caribbean Basin and headquarter[s] in Havana" and two exploration companies that were "qualified to do business in Cuba for exploring for and producing crude oil," maintained "an office in Cuba for geological studies[,] and owned assets incident to the functioning of the office."  SAC ¶¶ 24, 26.  Exxon makes no allegation that there was a steady flow of capital, management, or materials between Standard Oil and its subsidiaries in Cuba.  Accordingly, Exxon has not

established a direct effect in the United States from Defendants' mere commercial use of confiscated assets.

iv.    *Competition in the global oil market*

The court now turns its focus to CUPET. Exxon argues that CUPET's trafficking in confiscated property has had a direct effect in the United States because CUPET uses such property to compete with Exxon in the global oil market. *See* Pl.'s Br. at 25–27. Specifically, Exxon points to a number of joint ventures that CUPET has entered with Exxon's competitors that involve the use of Essosa's confiscated property, in particular the Ñicó Lopez Refinery. *Id.* at 26.

This argument is simply another version of Exxon's contention that it has been harmed by Defendants' continued use of confiscated property. It, too, fails to make out a direct effect. The court assumes for present purposes, without deciding, that trafficking in confiscated property could have a direct effect in the United States on the rightful owner's competitive position. But Exxon has alleged no such direct effect here. At most, it makes generalized allegations of competitive harm, which are not enough. Nowhere, for example, does Exxon allege that it actually has competed, domestically or internationally, against any joint venture involving CUPET. Nor has Exxon alleged that any other U.S. company has done so. Moreover, at least two of the joint ventures that Exxon cites—with Melbana Energy and Castrol, B.V.—involve exploration of Cuba's oil fields or production for the Cuban *domestic* market. *See id.* Exxon has not shown how it or any U.S. company could have competed in either marketplace given the U.S. sanctions regime against Cuba.

Exxon points to Congress's finding when passing the LIBERTAD Act that traffickers "profit[] from economically exploiting Castro's wrongful seizures" and have refused to pay the appropriate compensation. *See id.* at 27 (quoting 22 U.S.C. § 6081(11)). A congressional finding

is of course owed due consideration.  But untethered from any real-world facts particular to the plaintiff before the court, such a finding cannot by itself establish a prima facie case for jurisdiction.

The cases on which Exxon relies to establish that anticompetitive effects constitute a direct effect are inapposite.  In *WMW Machinery*, the court did not find that the foreign defendant's actions had a direct effect in the United States merely by harming the plaintiff's competitive advantage, as Exxon claims, *id.*; instead, the court found a direct effect where a joint venture agreement and agency contract created an obligation to export certain machine tools to the plaintiff in the United States. *WMW Machinery, Inc. v. Werkzeugmaschinehandel GmbH IM Aufbau*, 960 F. Supp. 734, 741 (S.D.N.Y. 1997) (holding "[t]he financial loss sustained by WMW was an 'immediate consequence' of the nonperformance of . . . contractual obligations" that required the export of "machine tools to WMW in the United States").  And in *American Bonded Warehouse Corp. v. Compagnie Nationale Air France*, the court found jurisdiction based on the defendant's alleged anticompetitive activities *in the United States* and thus did not need to consider whether activity outside the United States had a direct effect there.  *See* 653 F. Supp. 861, 863–64 (N.D. Ill. 1987) (concluding the court had subject matter jurisdiction where defendant sought to eliminate competition in "an industry of freight forwarders specializing in consolidating shipments from people residing in America to their relatives and friends in Vietnam").

v.    *CUPET's pollution of U.S. waters*

Exxon next claims that CUPET's operation of the confiscated refinery and processing facilities has polluted the Gulf of Mexico, constituting a direct effect in the United States.  Pl.'s Br. at 27.  Exxon also alleges that CUPET has participated in "lobbying and industry meetings" as a consequence of this polluting activity and that such participation independently causes a direct

33

effect in the United States.  *Id.* at 27–28.  Defendants respond that any pollution from the confiscated refinery has not passed through the boundary of U.S. territorial waters and therefore is beyond the United States for purposes of the FSIA.  Defs.' Br. at 16.  They further dispute that CUPET representatives participated in lobbying and industry meetings and argue that such meetings in any event are too trivial to constitute a direct effect.  Defs.' Reply at 3–4.

   CUPET's asserted pollution of the Gulf of Mexico does not constitute a direct effect in the United States on the present record because Exxon has failed to show that any such pollution has reached the territorial waters of the United States.  For purposes of the FSIA, the "United States" is defined to "include[] all territory and waters, continental or insular, subject to the jurisdiction of the United States."  28 U.S.C. § 1603(c).  The Supreme Court has interpreted that definition to refer exclusively to "the territorial jurisdiction of the United States," *Amerada Hess*, 488 U.S. at 441, which extends "12 nautical miles from the baselines of the United States determined in accordance with international law," Presidential Proclamation No. 5928, Territorial Sea of the United States of America, 54 Fed. Reg. 777, 777 (Dec. 27, 1988).  Exxon alleges that CUPET's pollution extends "40-50 miles" from Cuba's shore, bringing it "at or near the United States-Cuba maritime boundary."  SAC ¶ 103.  The U.S.-Cuba maritime boundary, however, is farther ashore than the U.S. territorial boundary.  *See* Office of Coast Survey, Nat'l Oceanic & Atmospheric Admin., U.S. Dep't of Commerce, U.S. Maritime Limits & Boundaries, https://nauticalcharts.noaa.gov/data/us-maritime-limits-and-boundaries.html (last visited Apr. 7, 2021) (delineating both the U.S. maritime boundary and the U.S. territorial boundary).  Exxon therefore has not shown that CUPET's alleged pollution penetrates the U.S. territorial boundary, and thus has not established that pollution from the refinery has a direct effect in the United States.

Nor does the fact that CUPET representatives attended a handful of one-off meetings in the United States constitute a direct effect, at least on the present record.  CUPET has disclosed five meetings concerning ecology that a single representative attended in the United States between November 2016 and March 2019, and Exxon points to those meetings as evidence of a direct effect.  *See* Pl.'s Br. at 27 (citing Defs.' Mot., Second Decl. of Roberto Suárez Sotolongo, ECF No. 42-7 [hereinafter Second Sotolongo Decl.], ¶ 16).  But these brief meetings did not "amount[] to more than transitory and insubstantial contact for purposes of the Act," and therefore cannot constitute a direct effect in the United States.  *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1109 (D.C. Cir. 1982) (internal quotation marks omitted) (finding "two isolated meetings" did not support jurisdiction under first clause of commercial activity exception).

vi.     *CIMEX (Panama)*

Exxon does not allege that CIMEX (Panama) has itself engaged in commercial activity that has a direct effect in the United States; rather, it seeks to secure jurisdiction based solely on the contention that CIMEX (Panama) is the alter ego of Cuban CIMEX.  *See* Pl.'s Br. at 29, 60; SAC ¶ 3.  In support, Exxon claims that CIMEX and CIMEX (Panama) "shar[e] the ultimate same ownership, with the same officers and directors, working out of the same office at the same address without any regard for corporate formalities or respecting the separateness of either entity."  SAC ¶ 3.  These allegations are sparse to say the least, and they are not sufficient to overcome CIMEX (Panama)'s presumed immunity, even at the pleadings stage.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 7 (D.D.C. 2009) (noting veil piercing is appropriate only "upon proof, that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it" (internal quotation marks omitted) (quoting *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008)).

35

*      *      *

In sum, with respect to the requirement of direct effects in the United States, the court concludes: (1) CIMEX's processing of remittances and its purchase and sale of goods imported from the United States have a direct effect in the United States; (2) Defendants' use of Exxon's confiscated property and CUPET's competition in the global oil market, alleged pollution, and participation in a handful of meetings in the United States have not caused a direct effect in the United States; and (3) no acts of CIMEX (Panama), directly or as an alter ego of CIMEX, have been shown to have a direct effect in the United States.

### 3.     *The Expropriation Exception*

Exxon also argues that the court has subject matter jurisdiction over this dispute under the FSIA's expropriation exception.  *See* Pl.'s Br. at 34.  As relevant to Exxon's claims, the expropriation exception strips a foreign state's immunity in any case:

> in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  "For the exception to apply, . . . the court must find that: (1) rights in property are at issue; (2) those rights were taken in violation of international law; and (3) a jurisdictional nexus exists between the expropriation and the United States."  *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007) (cleaned up).  The parties lodge numerous arguments about the expropriation exception's applicability, but the court finds that whether Exxon has identified a property right recognized by international law is dispositive of their dispute.  *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.* (*Helmerich II*), 137 S. Ct. 1312, 1319 (2017) (explaining "whether the rights asserted are rights of

a certain kind, namely, rights in 'property taken in violation of international law,' is a jurisdictional matter").

Exxon alleges that its rights in property were taken when Cuba nationalized the assets of its subsidiary Essosa.  *See* SAC ¶¶ 28–31, 92–101, 107–110, 116.  Defendants argue that Exxon does not have a property right in the assets of its subsidiary under international law because, while a parent company has an *interest* in the rights of its subsidiary's property, only the subsidiary has rights in its property.  *See* Defs.' Br. at 21–25.  As Defendants see the matter, a parent's property rights in its subsidiary are not in issue unless the state takes over the subsidiary's entire enterprise, and Cuba has not taken over Essosa's entire enterprise.  *See id.* at 23–25.  Relying on decisions of the Iran-United States Claims Tribunal and a number of arbitration rulings, Exxon responds that it does not need to show that Essosa's entire enterprise was taken over in order to establish a property right recognized by international law.  Pl.'s Br. at 42–45.

To determine whether Exxon has a property right that was taken in violation of international law, the court looks to customary international law.[5]  *See Philipp*, 141 S. Ct. at 715 ("[T]he phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation."); *Helmerich III*, 743 F. App'x at 449 (noting that where an "express international agreement, such as a treaty" does not control, the court looks to "customary international law").  Customary international law refers to "the 'general and consistent practice' that states follow out of 'a sense of legal obligation' to the international community."  *Helmerich III*, 743 F. App'x at 449 (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 102(2)).

---

[5] Exxon initially argued that "U.S. cases interpreting the expropriation exception's elements control over international law."  Pl.'s Br. at 42.  Following the Supreme Court's decision in *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, however, Exxon abandoned that argument.  *See* Pl.'s Notice of Suppl. Authority, ECF No. 55, at 2 n.1.

The D.C. Circuit in *Helmerich III* explained the state of customary international law with respect to the property rights at issue here:  that of a shareholder in the expropriated assets of a wholly owned subsidiary.  *See id.* at 454 ("Our question, therefore, is whether H&P-IDC [the parent] has adequately alleged that Venezuela and [its state-owned entities] expropriated H&P-V [the subsidiary] itself in violation of international law.").  The court there observed that "[i]nternational law undisputedly protects the 'direct rights' shareholders enjoy in connection with corporate ownership, including 'the right to any declared dividend, the right to attend and vote at general meetings, [and] the right to share in the residual assets of the company on liquidation.'" *Id.* (quoting *Barcelona Traction, Light & Power Co.* (Belg. v. Spain), Judgment, 1970 I.C.J. 3, 36 ¶ 47 (Feb. 5)).  Furthermore, "[i]t is also well established that a state violates international law if it takes 'measures that have an effect equivalent to a formal expropriation of [a foreign] shareholder's own property rights,' even if the state does not formally divest the shareholder of its shares." *Id.* (quoting Suppl. Br. for the U.S. as Amicus Curiae at 10, *Helmerich III*, 743 F. App'x 442 (No. 13-7169), 2018 WL 2981075, at *10 [hereinafter U.S. Suppl. Br.]).  But "not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights." *Id.*  Only "where state action 'is aimed at the direct rights of the shareholder as such,'" can the action "form the basis for an international expropriation claim." *Id.* (quoting *Barcelona Traction*, 1970 I.C.J. at 36, ¶ 47).  Quoting from an amicus brief submitted by the United States, the Circuit detailed:

> [W]hen a state permanently takes over management and control of [a foreign shareholder's] business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless, it has indirectly expropriated the ownership

> of that business and has responsibility under customary international
> law to provide just compensation to the shareholder.

*Id.* (quoting U.S. Suppl. Br. at 12).  On the other hand, "a state's expropriation of a corporation's property that does not result in the expropriation of the entire enterprise is not an indirect expropriation of foreign shareholders' direct rights under customary international law, even if it reduces the value of the shares to zero."  U.S. Suppl. Br. at 10.

Exxon urges that international law states just the opposite.  Relying on decisions of the Iran-United States Claims Tribunal and investor-state arbitration rulings as evidence of customary international law, Exxon argues that customary international law permits a parent company to bring a claim based on its indirect interest in its subsidiary's property.  *See* Pl.'s Br. at 43–44.  But Exxon's reliance on the decisions of the Iran-United States Claims Tribunal is misplaced.  That Tribunal's decisions reflect the application of a specific agreement between Iran and the United States.  *See* Office of the Assistant Legal Adviser for Int'l Claims & Inv. Disputes, U.S. Dep't of State, Iran-U.S. Claims Tribunal, https://www.state.gov/iran-u-s-claims-tribunal/ (last visited Mar. 23, 2021).  "[S]pecific, bargained-for agreements between nations . . . offer little evidence that the signatories would perceive 'a sense of legal obligation' to follow the same rules under international custom absent a negotiated treaty."  *Helmerich III*, 743 F. App'x at 452 (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 102(2)).  Nor can the handful of investor-state arbitration decisions on which Exxon relies overcome the contrary view of the International Court of Justice, which is "accorded great weight" in determining customary international law, *see Restatement (Third) of the Foreign Relations Law of the United States* § 103 cmt. b.  Put simply, Exxon has not marshalled enough evidence from reputable sources of customary international law to support its position that, as a general and consistent practice of

39

states, a parent holds property rights in the assets of its subsidiary whose value has not been entirely destroyed by an expropriation. *See Helmerich III*, 743 F. App'x at 449.

The question before the court therefore is whether Cuba's expropriation of Essosa's Cuban property "completely destroy[ed] the beneficial and productive value of [Exxon's] ownership of" Essosa, effectively rendering Exxon's shares "useless." *Id*. at 455. The undisputed evidence is that Cuba's expropriation did not have such effect. Defendants have presented substantial evidence of Essosa's continued operation even after the confiscation of its Cuban assets. *See* Defs.' Mot., Decl. of Lindsey Frank, ECF No. 42-10, ¶¶ 2–19. They have (1) identified deeds filed with the Public Registry in Panama showing that Essosa has consistently held annual shareholders meetings and that Essosa held Board of Directors meetings as recently as 2019, *id.* ¶¶ 2–5; (2) produced a 2011 court decision noting that Essosa operated at least 40 fuel stations at the time, *id.* ¶ 11; and (3) submitted public records showing that Essosa began operating as Puma Energy Standard Oil, S.A. in 2012 and is currently listed as a company in good standing in the Public Registry of Panama, *id.* ¶¶ 6, 18–19. While Exxon does not explicitly concede that Essosa remains in operation, it has not challenged the voluminous evidence Defendants have produced; its only argument on this score is that it does not need to show that Essosa is defunct. *Cf.* Pl.'s Br. at 42–43 (arguing that it "need not demonstrate that Essosa dissolved"). Because Exxon's claim concerns Essosa's property and Essosa continues to operate as a going concern, Exxon has not established that Cuba's expropriation deprived it of property in violation of international law.

Exxon resists this conclusion by arguing that this court "must presumptively accept Plaintiff's certified claim [from the FCSC] as conclusive proof of Plaintiff's ownership interest in the property at issue." Pl.'s Br. at 40–41. But that argument suffers from two problems. First, the FCSC's certification of a claim at most creates a property right under domestic law, not

international law.  And second, the FCSC certifies claims for ownership interests that are broader

than the property rights recognized under customary international law.  The FCSC has jurisdiction

to adjudicate "any rights *or interests* . . . owned wholly or partially, directly *or indirectly* . . . by

nationals of the United States."   22 U.S.C § 1643b(a) (emphasis added).   By contrast, the

expropriation exception requires the plaintiff to identify "rights in property" that have been "taken

in violation of international law," 28 U.S.C. § 1605(a)(3); *see also Helmerich II*, 137 S. Ct. at 1319

("[W]hether the rights asserted are rights of a certain kind, namely, rights in 'property taken in

violation of international law,' is a jurisdictional matter . . . ."), and as discussed, international law

protects a shareholder's indirect interests in its subsidiary's property against an expropriation only

in limited circumstances not applicable here, *see Barcelona Traction*, 1970 I.C.J. at 36, ¶ 44

(noting "a shareholder's interests" may be "harmed by an act done to the company," but "it is only

one entity"—the company—"whose rights have been infringed").   Thus, Exxon's FCSC claim

does not create a presumption that Exxon has a property right that has been taken in violation of

international law, and the expropriation exception does not apply.[6]

---

[6] Exxon's contention that *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281 (S.D. Fla. 2019), supports the proposition that "indirect ownership is permissible" under the expropriation exception is frankly baffling.  *Garcia-Bengochea* did not address the expropriation exception.  Exxon's citations supporting its claim that "the ultimate owner of an expropriated corporate interest may pursue a claim for expropriation" are likewise inapposite.  *See* Pl.'s Br. at 41.  The D.C. Circuit's vacated decision in *Helmerich I*, 784 F.3d 804, cannot trump the court's pronouncement on remand that "not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights," *Helmerich III*, 743 F. App'x at 454.  And Exxon's cherry-picked quote from *Nemariam*, 491 F.3d at 478, that "a controlling interest in the corporation's stock [is] no different from the corporation's physical assets under section 1605(a)(3)" is unhelpful because the D.C. Circuit there merely held that the expropriation exception extended to both tangible and intangible property rights, *id.* at 479–80 ("The plain language of section 1605(a)(3) . . . does not limit its application to tangible property.").

### C.    Jurisdictional Discovery

To recap, the court has found that the commercial activity exception reaches Exxon's Title III claim against CIMEX, but not against CUPET or CIMEX (Panama).  The court also has concluded that the expropriation exception cannot sustain a claim against any Defendant.

Instead of dismissing aspects of its claim that fall short under the FSIA immunity exceptions, Exxon asks the court to order jurisdictional discovery.  Pl.'s Br. at 33–34.  Specifically, as relevant to CUPET and CIMEX (Panama), Exxon asks for "discovery to test Defendants' declarations" concerning (1) "[t]he overlapping relationships and operations of CUPET, CIMEX-Cuba, and CIMEX-Panama, and the Cuban State's influence and control over each of their operations," (2) "[t]he lack of independence of Defendants' divisions and *empresas*, including their failure to observe corporate formalities, the extent of Defendants' control over them, and their contacts with the U.S. while acting as agents of Defendants," and (3) "[t]he nature, purpose, and extent of Defendants' admitted contacts with various U.S. government officials and private companies, including during travel to the U.S."  *Id*. at 34.

In the context of the FSIA, the D.C. Circuit has said that trial courts "*must* give the plaintiff '*ample opportunity* to secure and present evidence,'" but that "[i]n order to avoid burdening a sovereign that proves to be immune from suit . . . jurisdictional discovery should be carefully controlled and limited."  *Phx. Consulting*, 216 F.3d at 40 (emphasis added) (quoting *Prakash*, 727 F.2d at 1179–80); *see also Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 281 (D.C. Cir. 2014) ("[D]iscovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." (quoting *First City, Tex.-Hous., N.A. v. Rafidian Bank*, 150 F.3d 172, 176 (2d Cir. 1998))).  Assertions amounting to "mere conjecture and surmise" "cannot

42

provide sufficient support to justify jurisdictional discovery." *Nyambal*, 772 F.3d at 281 (internal quotation marks omitted).

Though the court thinks it is a close call, it will permit limited jurisdictional discovery into the topics identified by Exxon concerning CUPET's and CIMEX (Panama)'s trafficking activities that may have caused direct effects in the United States. Such discovery is limited to the three topics the court has identified. *See supra* pp. 42 (identifying these topics). With respect to CUPET, Defendants have downplayed the significance of CUPET's contacts with the United States, *see* Second Sotolongo Decl. ¶¶ 16–17, and the court has relied on those representations to hold, on the present record, that the commercial activity exception does not apply to CUPET, *see supra* pp. 35. Exxon is entitled to discovery as to those representations. As for CIMEX (Panama), its status as a defendant rests on its relationship with CIMEX, which Exxon contends is one of alter ego. "Our courts have ordered discovery to illuminate alter ego disputes before deciding dispositive motions which asserted lack of jurisdiction over the alleged alter ego." *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 23 (D.D.C. 1999); *see also Melikian v. Corradetti*, 791 F.2d 274, 281–82 (3d Cir. 1986) (ordering discovery on corporate veil piercing because "[t]he issue of whether the corporate veil . . . can be pierced is primarily a question of fact"); *Edgar v. Fred Jones Lincoln-Mercury of Okla. City, Inc.*, 524 F.2d 162, 166–67 (10th Cir. 1975) (permitting discovery on whether to pierce the corporate veil even though it was "clear that the plaintiff's allegations concerning stock ownership and interlocking directors were insufficient standing alone to justify disregard of the corporate entity"). The court therefore will allow limited jurisdictional discovery into the corporate separateness of CIMEX and CIMEX (Panama).

### D.      Standing

In addition to their sovereign immunity defense, Defendants argue that Exxon lacks standing to bring this action.  Defs.' Br. at 45–46.  Specifically, Defendants argue that Exxon's only injury is the loss of Essosa's property due to Cuba's expropriation of that property and Defendants' alleged trafficking has not injured Exxon.  *See id.* at 46.  Exxon responds that it suffered and continues to suffer an invasion of its interests because "Defendants have not compensated Plaintiff or obtained Plaintiff's authorization for use of the Confiscated Property, as Congress required."  *See* Pl.'s Br. at 9–11.

A plaintiff has standing if she has "suffered an injury in fact" that is both causally connected to "the conduct complained of" and can "be redressed by a favorable decision" from the court.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted).

The Supreme Court recognized in *Spokeo* that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law,'" *id.* at 1549 (quoting *Lujan*, 504 U.S. at 578), and "'has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before,'" *id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring)).  Thus, Congress may identify a harm that constitutes an injury in fact, so long as that injury is sufficiently "concrete."  *See id.*; *see also Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) ("[W]hile a legislature may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously

44

inadequate in the law, the legislature cannot dispense with the constitutional baseline of a concrete injury in fact." (internal quotation marks omitted)).

Here, there can be no question that Congress legislated an injury in fact in Title III. Pursuant to section 6082, "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property."   22 U.S.C.  §  6082(a)(1)(A).   In so legislating, Congress recognized that U.S. nationals with claims to trafficked confiscated property have suffered an injury.  Exxon has asserted just such an injury.  *See* SAC ¶ 131 ("CIMEX Cuba, CIMEX Panama, and/or CUPET have and continue to traffic in the Confiscated Property to which Plaintiff owns the claim . . . .").

And Exxon's injury is concrete.  *See Spokeo*, 136 S. Ct. at 1549.  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist," *id.* at 1548 (quoting Black's Law Dictionary 479 (9th ed. 2009)), and an injury is concrete if it is "real, and not abstract," *id.* (internal quotation marks omitted).  Exxon possesses a claim from the FCSC certifying that it "suffered a loss in the total amount of $71,611,002.90."  FCSC Claim at 9.  Quite plainly, a loss totaling almost $72 million constitutes a real and not abstract injury, and Exxon has sufficiently satisfied the concreteness element of standing.

Defendants next argue that there is no causal connection between their unlawful conduct and Exxon's injury.  Defs.' Br. at 46.  Defendants again miss the mark by characterizing Exxon's injury as the expropriation of Essosa's property.  *See id.*  Congress has defined Exxon's injury in terms of the effects of trafficking in the confiscated property, and that injury is plainly "fairly traceable" to Defendants' alleged trafficking—"not the result of the independent action of some third party not before the court."  *See Lujan*, 504 U.S. at 560 (cleaned up).

45

Finally, although Defendants do not challenge the redressability of Exxon's injury, it is clear that, if Defendants are found liable in this action, Title III provides for Exxon to receive "the amount, if any, certified to [it] by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, plus interest." 22 U.S.C. § 6082(a)(1)(A)(i)(I).  A favorable decision would therefore redress Exxon's injury.  *See Lujan*, 504 U.S. at 561.

The court concludes that Exxon has Article III standing to bring a claim under Title III of the LIBERTAD Act.

## V.      CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and defers in part Defendants' Motion to Dismiss.  The court denies Defendants' Motion to Dismiss as to CIMEX and orders limited jurisdictional discovery as to CUPET and CIMEX (Panama).  The parties shall meet and confer and propose to the court by May 4, 2021, a schedule for discovery that is consistent with the limited scope of discovery described in this Memorandum Opinion and Order.

Dated:  April 20, 2021

Amit P. Mehta
United States District Court Judge