**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **EXXON MOBIL CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-1277 (APM)** |
| | ) | |
| **CORPORACIÓN CIMEX S.A. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**MEMORANDUM OPINION AND ORDER**

Plaintiff Exxon Mobil Corporation brought this action under Title III of the Cuban Liberty and Democratic Solidarity Act of 1996 (LIBERTAD), 22 U.S.C. § 6082(a)(1)(A), to recover money damages arising from the trafficking of confiscated property by various Defendants who are instrumentalities of the Cuban government. On April 20, 2021, the court held that it has subject matter jurisdiction over one such instrumentality, Defendant Corporación Cimex (S.A.) ("CIMEX"), under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"). *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, No. 19-cv-1277 (APM), 2021 WL 1558340, at *17 (D.D.C. Apr. 20, 2021). It also ordered limited jurisdictional discovery as to two other instrumentalities, Defendants Unión Cuba-Petróleo and Corporación CIMEX S.A. (Panama). *Id.* at *20. A central issue before the court was whether it could exercise subject matter jurisdiction pursuant to the commercial activity exception or whether the expropriation exception alone applied. *Id.* at *8. The court held that it could consider jurisdiction under both exceptions and ultimately found only the commercial activity exception was satisfied. *Id.* at *8–19.

Just three days after issuing its decision, the D.C. Circuit decided *Ivanenko v. Yanukovich*, which also considered the interaction of the expropriation and commercial activity exceptions. *See*

995 F.3d 232, 234 (D.C. Cir. 2021).  To ensure that its decision was consistent with current D.C. Circuit precedent, the court ordered the parties to notify it if they "believe[d] that the *Ivanenko* decision impact[ed] this court's" prior decision.  Minute Order, Apr. 23, 2021.

Defendants took the court up on its invitation.  They filed a motion for reconsideration that is ostensibly based on the D.C. Circuit's decision in *Ivanenko*.  *See* Defs.' Mot. Pursuant to the Court's Apr. 23, 2021 Minute Order, ECF No. 66 [hereinafter Defs.' Mot.].  It suffices to say that Defendants' motion argues more than just the applicability of *Ivanenko*.  Although perhaps more than it bargained for, the court nonetheless has exercised its discretion to consider Defendants' additional arguments regarding the applicability of the commercial activity exception.  For the reasons that follow, the court denies Defendants' motion for reconsideration.

## I.

In *Ivanenko v. Yanukovich*, the D.C. Circuit held that Ukraine was flexing "quintessentially sovereign" powers when it seized the plaintiffs' property via "an exercise of eminent domain." 995 F.3d at 239 (quoting *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 890 (D.C. Cir. 2006)). The D.C. Circuit found that Ukraine's confiscation of the plaintiffs' property "could not have been carried out by a private participant in the marketplace," and regardless of Ukraine's "motives" in confiscating the property and "subsequent use" of the plaintiffs' property as a golf course and sports facility, its exercise of sovereign powers precluded application of the commercial activity exception. *Id.*  The court cautioned that a foreign sovereign's "'subsequent acts' with [a plaintiff's] property" do not necessarily "'transform the expropriation into commercial activity.'"  *Id.* (alteration omitted) (quoting *Rong*, 452 F.3d at 890).  Otherwise, the court reasoned, "'almost any subsequent disposition of expropriated property could allow the sovereign to be haled into federal court under FSIA.'"  *Id.* (quoting *Rong*, 452 F.3d at 890).

This potential to end-run the expropriation exception by relying on the commercial activity exception is at the heart of Defendants' motion for reconsideration.  They argue that, even if the commercial activity exception can be read literally to apply to claims related to expropriated property (that is, to claims like Exxon's trafficking claim), the court should refrain from applying the commercial activity exception because to do so would allow plaintiffs to sue foreign sovereigns for expropriation without satisfying the expropriation exception's requirement that the expropriation violate international law.  *See* Defs.' Mot., Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. Pursuant to Court's April 23, 2021 Minute Order, ECF No. 66-2 [hereinafter Defs.' Br.], at 2–7.  With careful pleading, Defendants urge, any claim for expropriation could be rewritten as a claim for trafficking.  *See id.*  The court rejects these concerns as applied to this case.

The Supreme Court's decisions in *Saudi Arabia v. Nelson* and *OBB Personenverkehr AG v. Sachs* teach that the court must separate antecedent conduct that is related to a wrongful act from the conduct that actually forms the "foundation" of the claim.  *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 36 (2015); *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993).  In *Nelson*, the Court refused to apply the commercial activity exception to claims of personal injury that arose from plaintiff Scott Nelson's performance of an employment contract with Saudi Arabia.  507 U.S. at 358.  Saudi Arabia's recruitment and employment of Nelson "alone," the Supreme Court explained, "entitle[d] the Nelsons to nothing under their theory of the case."  *Id.*  Rather, the Nelsons' claim concerned "personal injuries caused by [Saudi Arabia's] intentional wrongs and by [Saudi Arabia's] negligent failure to warn Scott Nelson that [it] might commit those wrongs."  *Id.*  The Court concluded that "[t]hose torts, and not the arguably commercial activities that *preceded* their commission, form[ed] the basis for the Nelsons' suit."  *Id.* (emphasis added).  Likewise, in *Sachs*, the Supreme Court explained that it lacked jurisdiction over the plaintiff's

3

claims for "traumatic personal injuries [sustained] when she fell onto the tracks at the Innsbruck, Austria, train station." *Sachs*, 577 U.S. at 29, 36.  Even though the plaintiff had purchased a Eurail pass in the United States to board the train, the antecedent commercial activity of selling the Eurail pass did not give rise to liability on plaintiff's claims "[w]ithout the existence of the unsafe boarding conditions in Innsbruck."  *Id.* at 35.  Therefore, the Court held, "the incident in Innsbruck" was the "foundation" of plaintiff's claim, not the U.S. ticket sale. *Id.* at 35–36.

Here, the "foundation" of Exxon's Title III claim is a private commercial act, and not the antecedent sovereign act of expropriation.  A sovereign is not immune for the former type of act but remains immune with respect to the latter.  *See Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021) (stating that, under the "restrictive view" of sovereign immunity embodied in the FSIA, "immunity extends to a sovereign's public but not its private acts," and that the commercial activity exception "comport[s] with the overarching framework of the restrictive theory"); *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) ("[W]e . . . began to limit our recognition of sovereign immunity, denying that immunity in cases 'arising out of a foreign state's strictly commercial acts,' but continuing to apply that doctrine in 'suits involving the foreign sovereign's *public acts*,'" (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983))).  Title III creates liability for "any person that . . . traffics" in "property confiscated by the Cuban government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1)(A).  The term "traffics" is defined in purely commercial terms.  It encompasses, broadly speaking, the use or disposition of the confiscated property.[1]  The original

---

[1] A person "'traffics' in confiscated property if that person knowingly and intentionally –

   (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

public act of confiscation by the sovereign alone does not constitute "trafficking."  Confiscation without trafficking is therefore *not* actionable under Title III.  *See Exxon Mobil Corp.*, 2021 WL 1558340, at *9 (observing that "liability under the Act attaches only when a U.S. person's property has been confiscated *and* trafficked").  The definition of "person" further underscores that the "foundation" of a Title III claim is a commercial act, and not a sovereign one.  "Person" is defined to mean "any person or entity, *including* any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11) (emphasis added).  So, Title III makes any subsequent user of confiscated property, and not just an "agency or instrumentality" of Cuba, liable for trafficking in such property.  These statutory definitions thus make clear that private commercial activity, and not the sovereign act of expropriation, is at the heart of Exxon's claim under Title III.  Evaluating a "trafficking" claim under the commercial activity exception, as the court did here, naturally follows from that conclusion.

This straightforward reading of Title III should settle the matter, but Defendants argue that more is necessary.  They urge that, "when, as here, there are FSIA provisions that more explicitly and precisely address the particular activity at hand, and with restrictions not found in the commercial activity exception," the Supreme Court's decision in *Federal Republic of Germany v. Philipp* "teaches that an additional analysis must be undertaken."  Defs.' Reply Mem. of P. & A. in Supp. of Mot. Pursuant to the Court's Apr. 23, 2021 Minute Order & For Recons., ECF No. 69,

---

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property."

22 U.S.C. § 6023(13).

at 8.  In *Philipp*, the Supreme Court declined to apply the expropriation exception to a plaintiff's claims that Germany had expropriated an art collection from Jewish citizens during the Holocaust. *See* 141 S. Ct. at 708–09.  The would-be heirs of the art collection argued that the Court had jurisdiction over the dispute under the expropriation exception to the FSIA—which applies to "property taken in violation of international law," 28 U.S.C. § 1605(a)(3)—because "Germany's purchase of the [art] was an act of genocide and the taking therefore violated the international law of genocide." *Philipp*, 141 S. Ct. at 709.  The Supreme Court disagreed.  "[T]he expropriation exception," it explained, "is best read as referencing the international law of expropriation rather than of human rights." *Id.* at 712.  In so holding, the Supreme Court noted that the expropriation exception was not the best vehicle for claims based on human rights abuses because "[w]here Congress did target injuries associated with such acts, including torture or death, it did so explicitly and with precision." *Id.* at 713.  Those provisions targeting human rights abuses and the restrictions on jurisdiction they incorporated, the Court reasoned, "would be of little consequence if human rights abuses could be packaged as violations of property rights and thereby brought within the expropriation exception to sovereign immunity." *Id.* at 714.

Defendants hang their hats on that final passage of *Philipp*.  They argue that *Philipp* stands for the proposition that even though an exception, "when read literally," can apply to a given situation, it should not be applied where a more obvious exception could also apply.  *See* Defs.' Br. at 5–7.  And here, they suggest, the expropriation exception is the better fit.

Defendants' attempt to wring a new analytical framework from *Philipp* is unavailing. There, the Supreme Court relied on the "legal and historical backdrop" in which Congress drafted the expropriation exception to conclude that the phrase "rights in property taken in violation of international law," 28 U.S.C. § 1605(a)(3), is "best read as referencing the international law of

expropriation rather than of human rights." *Philipp*, 141 S. Ct. at 712.  The Supreme Court thus never held that the expropriation exception could "literally" apply to property taken in violation of the international law of genocide at all.

Nor does the court read *Philipp* to subtly require a court to determine in all cases whether another exception "more explicitly and precisely address[es] the particular activity at hand" before finding conduct fits under a given FSIA exception.  *See* Defs.' Reply at 8.  *Philipp* referred to the provisions of the FSIA that explicitly address human rights to explain how Congress's approach to codifying exceptions for human rights abuses differs from Congress's approach in the expropriation context, not to mandate that courts apply only the FSIA exception best suited for a claim.  *See* 141 S. Ct. at 713–14.  The Court considered the expropriation exception a poor fit for the plaintiffs' claims because the expropriation exception does not bear the restrictive hallmarks of other FSIA exceptions based on human rights and because there was "no reason to suppose Congress thought acts of genocide or other human rights violations to be especially deserving of redress only when accompanied by infringement of property rights."  *Id.* at 714.  The Court was not, however, requiring lower courts to apply the best fitting FSIA exception—and only the best fitting FSIA exception—in all cases.  In fact, later in the opinion, the Court noted that "[c]laims concerning Nazi-era art takings could be brought under the expropriation exception" so long as the property was taken in violation of the international law of expropriation.  *Id.* at 715.  Far from a wide-ranging instruction that only the most plainly applicable FSIA exception can be invoked for a claim, the Court was simply instructing that the conduct complained of must fit the exception.[2]

---

[2] Defendants also appear to suggest that *Philipp* did away with the requirement that the court look to the "gravamen" of the plaintiff's claim in determining whether the commercial activity exception applies, arguing that "[t]he gravamen

Defendants further protest that applying the commercial activity exception to property that was also expropriated would ruffle foreign feathers because it would permit claims based on takings that were not committed in violation of international property law.  Defs.' Br. at 5–6.  But Congress had to consider the effect on international relations of *every* exception to foreign sovereign immunity, including the commercial activity exception, in drafting the FSIA. Defendants have given the court no reason to believe that Congress thought that the restrictions in the commercial activity exception—all of which limit jurisdiction to claims with some connection to commerce in the United States, *see* 28 U.S.C. § 1605(a)(3)—were insufficient to preserve international relations while prosecuting offensive conduct.   And, importantly in this case, Congress knew that the private cause of action it had created likely would lead to confrontation with Cuba.  That is surely why Congress empowered the President to suspend Title III's private right of action for sequential periods of up to six months upon notification to Congress that "the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba."   *Id*. § 6085(b)(2).   Thus, Defendants' concern that relying on the commercial activity exception here might "produc[e] friction in our relations" with Cuba is a consequence that Congress already considered and embraced.  *Helmerich & Payne*, 137 S. Ct. at 1322.[3]

Nor can the court agree, as Defendants argue, that "Congress has addressed the immunity of agencies that are engaged in the commercial use of expropriated property" only in the expropriation exception.   Defs.' Br. at 6 (emphasis omitted).   Despite Defendants' repeated

---

analysis may not always be the best tool to respect and implement the FSIA's purpose and framework."  Defs.' Br. at 7.  But nothing in *Philipp* suggests any divergence from the "gravamen" analysis required by *Nelson* and *Sachs*.

[3] The court has been given no reason to believe that any nation other than Cuba could be subject to a Title III claim. Neither party has identified any instance in which Cuba has sold expropriated property to another sovereign that now "traffics" in that property.

insistence, neither the Supreme Court nor the D.C. Circuit has instructed that only one FSIA exception may apply to a given claim, even if the case involves expropriated property. Indeed, the D.C. Circuit has "never held that in order to proceed against a foreign government, a claim must fall into just one FSIA exception." *de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1103 (D.C. Cir. 2017). To the extent Defendants suggest that *Philipp* altered that holding, it is not this court's place to so hold. *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges, like panels of this court, are obligated to follow controlling circuit precedent until either we, sitting en banc, or the Supreme Court, overrule it."); *Nat'l Wildlife Fed'n, Inc. v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 3d 126, 130 (D.D.C. 2018) ("[T]his Court is not free to ignore binding circuit precedent because of a possible inconsistency with an intervening decision of the Supreme Court.").

Finally, Defendants assert without citation or explanation that "there is no basis in international law at all, whether in 1976 or now, for applying the 'commercial activity' exception on the basis of the commercial use of expropriated property." Defs.' Br. at 6. It is frankly unclear what Defendants meant for the court to take away from this passing remark. Regardless, they cite no authority—international or domestic—for the proposition that a case involving confiscated property categorically must satisfy the expropriation exception and can qualify under no other exception.

## II.

Next, Defendants grapple with the fact that the D.C. Circuit has twice applied the commercial activity exception in cases involving expropriated property, first in *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 2017), and then in *de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017). Defendants contend that in those cases the

"proper showing" of commercial activity was made because, unlike here, the parties had a relationship outside the expropriation of property. Defs.' Br. at 7–8. In contrast, they argue, in cases, like this one, where there was no contractual or commercial relationship between the parties other than the expropriation, the D.C. Circuit has found the commercial activity exception inapplicable. Defs.' Br. at 8 (citing *Rong*, 452 F.3d at 889–90).

The touchstone of the commercial activity exception, however, is not the parties' relationship to one another. Rather, it is whether commercial activity forms "the 'basis' or 'foundation' for a claim"; whether commercial activity gives rise to the "'elements . . . that if, proven, would entitle a plaintiff to relief'"; and whether "'the gravamen of the complaint'" sounds in commercial activity. *Sachs*, 577 U.S. at 33–34 (quoting *Nelson*, 507 U.S. at 357). Thus, while Defendants have identified a feature of *Foremost-McKesson* and *de Csepel* that is not present here, they have not established that *Foremost-McKesson* and *de Csepel* compel this court to apply an inquiry beyond the one the Supreme Court articulated in *Sachs* and *Nelson*.

Moreover, this case is different from those like *Rong* and *Ivanenko*, in which the expropriation itself gave rise to the claim and caused the harm sought to be remedied, and the plaintiff relied on subsequent commercial acts to secure jurisdiction under the commercial activity exception. *See Ivanenko*, 995 F.3d at 236 (noting the Ivanenkos brought claims under the Racketeer Influenced and Corrupt Organizations Act and for "wrongful expropriation, fraud, abuse of process, and conversion"); *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 86 (D.D.C. 2005) (noting Rong asserted claims "for conversion, expropriation, the violation of international law and unjust enrichment"). Here, the core of a Title III claim is "trafficking," which is quintessentially a commercial act. It is the trafficking of expropriated property that gives rise to the injury and the cause of action that Congress defined, not the original expropriation itself. Thus,

10

unlike in *Rong* and *Ivanenko*, the court does not need to stretch the original confiscation of property to implicate the commercial activity exception.

### III.

Finally, Defendants point to three other cases to support their position, but none persuades the court to change course. Defendants first cite to *Garb v. Republic of Poland*, where the Second Circuit reasoned "that subsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation." 440 F.3d 579, 587 (2d. Cir. 2006). There, the Second Circuit accepted the district court's conclusion that "Plaintiffs' claims—alleging a violation of customary international law, conversion, constructive trust, and seeking equitable accounting as well as restitution—are 'based upon' the manner in which the property was obtained, not its subsequent management." *Garb v. Republic of Poland*, 207 F. Supp. 2d 16, 31 (E.D.N.Y. 2002). The same cannot be said here. Again, under Title III, liability attaches only if the person "traffics in" confiscated property. 22 U.S.C. § 6082(a)(1)(A). The "subsequent management" of the property is thus pivotal to Exxon's ability to make out a claim—if the property is not used commercially, then Exxon has no cause of action. Accordingly, unlike in *Garb*, the commercial use of Exxon's confiscated property is not "too attenuated" or "not substantive enough" to satisfy the commercial activity exception. 440 F.3d at 578.

Defendants next point to *Africa Growth Corp. v. Republic of Angola*, where the court concluded that the "gravamen" of the plaintiffs' claims was "that Angola permitted the [defendants] to utilize their official titles and ranks to effect the unlawful taking of [the plaintiff's] assets, and that [the plaintiff] has been denied fair and due process of law in Angola." No. 17-cv-2469 (BAH), 2019 WL 3253367, at *4 (D.D.C. July 19, 2019) (cleaned up). The district court

there found it dispositive that the plaintiff was attempting to prosecute Angola's "failure to regulate effectively the exercise of government agents' power and to provide due process of law, which," the court concluded, constituted "quintessentially sovereign conduct." *Id.* at *5 (cleaned up). Likewise, in the third case on which Defendants rely, *Allen v. Russian Federation*, the court refused to apply the commercial activity exception to sovereign conduct. *See* 522 F. Supp. 2d 167, 187–88 (D.D.C. 2007). The *Allen* plaintiffs attempted to invoke the commercial activity exception where the Russian Federation had arrested a corporation's owners, executives, and counsel; investigated the corporation; seized the corporation's stock; initiated tax proceedings and assessed tax penalties on the corporation; and auctioned off the corporation's subsidiary and largest asset to pay the corporation's tax assessments. *Id.* As in *Africa Growth Corp.*, the *Allen* court concluded that the commercial activity exception was inapplicable because the "activities undertaken . . . could not be undertaken by private citizens." *Id.*

In contrast, a claim for trafficking under the LIBERTAD Act can be brought against "*any person*" that is trafficking in confiscated property. 22 U.S.C. § 6082(a)(1)(A) (emphasis added). Put differently, the trafficking penalized under section 6082(a)(1)(A) need not be carried out by a sovereign. Exxon's claim runs to the trafficker of the property and therefore targets private conduct. In this case, that private conduct happens to be Cuba's. In *Africa Growth Corp.* and *Allen*, the plaintiffs' claims, no matter how artfully pled, could not have been brought against a nongovernment actor. *See Africa Growth Corp.*, 2019 WL 3253367, at *5; *Allen*, 522 F. Supp. 2d at 187–88. The linchpin of a Title III claim is the subsequent commercial activity to which the expropriated property is put to use, and that places Exxon's claim in a meaningfully different posture from the claims at issue in *Africa Growth Corp.* and *Allen*.

12

## IV.

For the foregoing reasons, Defendants' Motion Pursuant to the Court's April 23, 2021 Minute Order, ECF No. 66, is denied.

Dated:  October 8, 2021

Amit P. Mehta
United States District Court Judge

13