# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
Spring, TX 77389

*Plaintiff*,

v.

CORPORACIÓN CIMEX S.A. (Cuba)
Edificio Sierra Maestra,
Calle Primera Esquina 0
Miramar, Playa, La Habana, Cuba

CORPORACIÓN CIMEX S.A. (Panama)
Edificio Sierra Maestra,
Calle Primera Esquina 0
Miramar, Playa, La Habana, Cuba

AND

UNIÓN CUBA-PETRÓLEO
Avenida Salvador Allende No. 666,
Entre Soledad y Oquendo
Municipio Centro Habana
La Habana, Cuba

*Defendants*.

Case No. 19-cv-1277-APM

**~~SECOND~~THIRD AMENDED COMPLAINT**

For its ~~Second~~Third Amended Complaint in this action, Plaintiff Exxon Mobil Corporation ("Plaintiff" or "ExxonMobil") states as follows:

**NATURE OF ACTION**

1. Plaintiff brings this Complaint against Defendant Corporación CIMEX S.A.~~,~~ ~~an entity registered in Cuba,~~ (a/k/a Corporación de Importación y Exportación S.A.), an entity registered in Cuba ("CIMEX

Cuba"), Defendant Corporación CIMEX S.A., a Panamanian entity ("CIMEX Panama"), and Defendant Unión Cuba-Petróleo ("CUPET") for unlawful trafficking in Plaintiff's confiscated property in violation of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the "Act" or the "Helms-Burton Act"), codified at 22 U.S.C. §§ 6081–60856021 *et seq*.

2. Plaintiff holds a certified claim from the Foreign Claims Settlement Commission ("FCSC") for property—including service stations, an oil refinery, and related oil production and distribution assets—that was expropriated by the Fidel Castro regime in 1960, in violation of international law since no compensation has been paid to the owners, including oil refineries and service stations, which are still in use today even though Plaintiff has never received any compensation for this property.[1] [1] Plaintiff's certified claim is attached hereto as Exhibit 1.[2] 1.[2]

3. CIMEX Cuba and CIMEX Panama (collectively, "CIMEX") are alter egos of one another, sharing the ultimate same ownership, with the same officers and directors, working out of the same office at the same address without any regard for corporate formalities or respecting the separateness of either entity.. CIMEX is a commercial conglomerate owned by the Cuban state. It operates in a range of sectors, including import/export, retail, banking, and remittances. CIMEX operates service stations and supermarkets throughout the island of Cuba.

4. CIMEX uses and continues to profit from the confiscated property by, among other things, operating the confiscated service stations in cooperation with CUPET, the state-owned oil company of Cuba.. CIMEX additionally—directly and indirectly—continues to profit from the confiscated refinery and confiscated production and distribution assets through the sale of gasoline and other products at the service stations.

[1] Congress established the FCSC, a quasi-judicial, independent agency within the Department of Justice, which adjudicates claims of U.S. nationals against foreign governments for expropriation and other issues.

[2] Foreign Claims Settlement Commission's Decision No. CU-3838 (Sept. 3, 1969).

5. CUPET additionally uses and continues to profit from the confiscated property through its use of the Ñico López Refinery (formerly known as the Belot Refinery) and certain terminals and plants used in conjunction with the refinery operations.

5. CUPET is Cuba's state-owned oil and gas company and is responsible for the country's petroleum including exploration, extraction, refining, storage, and domestic distribution of fuels and lubricants. CUPET continues to profit from the confiscated property through, among other things, its use of the confiscated refinery and production and distribution assets. CUPET also continues to profit—directly and indirectly—through the sale of its products at the confiscated service stations.

[1] Congress established the FCSC, a quasi-judicial, independent agency within the Department of Justice, which adjudicates claims of U.S. nationals against foreign governments for expropriation and other issues.

[2] Foreign Claims Settlement Commission's Decision No. CU-3838 (Sept. 3, 1969).

6. Title III of the Act, 22 U.S.C. §§ ~~6081–6085~~6081 *et seq.*, permits Plaintiff to bring private actions against any person who, like CIMEX and CUPET, knowingly and intentionally traffics in confiscated property without authorization from the rightful owner. However, ~~Plaintiff has not yet had the opportunity to do so because,~~ until ~~recently~~2019, private rights of action were suspended pursuant to the authority given to the President of the United States under the Act.

7. The President ~~has~~ delegated the suspension authority to the United States Secretary of State~~. On March 4, 2019, the State Department announced a partial lifting of the suspension to permit private actions to proceed, beginning March 19, 2019, against Cuban entities or sub-entities identified on the State Department's restricted entities list. On or about April 2, 2019, the partial lifting of the suspension was extended again through May 1, 2019. Most recently,~~, who announced on April 17, 2019, ~~the State Department announced a full lifting of~~that the suspension would be fully lifted beginning May 2, 2019. ~~In his remarks regarding the decision~~ Specifically, Secretary of State Pompeo made clear that "[e]ffective May 2nd … the right to bring an action under Title III of the Libertad Act will be implemented in full." The original Complaint in this matter was filed on May 2, 2019. The First Amended Complaint was filed on November 12, 2019. (Dkt. 28). The Second Amended Complaint was filed on March 6, 2020, resolving a dispute concerning CIMEX (Panama)'s status as a defendant. (Dkt. 33).

8. Because Defendants CIMEX and CUPET are trafficking in confiscated property in violation of the Act, they are subject to private actions under Title III of the Act. Accordingly, Plaintiff brings this statutory action to enforce its long-outstanding claim and obtain the compensation it is rightfully due under the Act.

## JURISDICTION AND VENUE

9. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § ~~1330~~1331 because this action ~~is a nonjury civil action against agencies or instrumentalities of a foreign state, as that term is defined in~~arises under the laws of the United States, specifically Title III of the Helms-

Burton Act. *See Exxon Mobil Corp. v. Corporacion CIMEX S.A. (Cuba)*, 146 S. Ct. 1909, 1920–21, 609 U.S. __ (2026) (establishing that suits under the Helms-Burton Act proceed under 28 U.S.C. § 1603(b), on a claim for judgment with respect to which there is no sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA") pursuant to (i) the FSIA's commercial activity exception for acts that occur "outside the territory1331 and holding that Cuban agencies and instrumentalities are not immune from jurisdiction of the courts of the United States for claims arising under the Helms-Burton Act); 22 U.S.C. §§ 6023(11), 6082.

10. ~~of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" under 28~~Pursuant to Fed. R. Civ. P. 4(k)(1)(C), personal jurisdiction over the Defendants exists as a matter of law because Congress has authorized service on the Defendants by federal statute. Specifically, the Helms-Burton Act, 22 U.S.C. § ~~1605~~6082(~~a~~c)(2), ~~(ii) the FSIA's expropriation exception under 28 U.S.C. § 1605(a)(3), because rights in property taken in violation of international law are in issue and that property (or property exchanged therefor) is "owned or operated by~~provides that "[i]n an action under this section, service of process on an agency or instrumentality of ~~the~~a foreign state ~~and that agency or instrumentality is engaged in~~in the conduct of a commercial activity~~ in the United States," and/or (iii) Title III of the Act, which imposes civil liability on any person (including agencies or instrumentalities of foreign states) who traffics in property confiscated by the Cuban Government and which mandates that the provisions of Title III of the Act control over the provisions of Title 28 of the~~, or against individuals acting under color of law, shall be made in accordance with section 1608 of title 28." *See Exxon Mobil*, 146 S. Ct. at 1920–21. Defendants have been served in a manner consistent with that provision: CUPET was served on June 10, 2019 (Dkt. 13), CIMEX Panama waived service on March 18, 2020 (Dkt. 36), and CIMEX Cuba filed a consent motion to set the time to respond to the complaint on August 2, 2019 in which it agreed to "waiv[e] objections to and/or any defenses concerning insufficient process and/or insufficient service of process" in exchange for Plaintiff's agreement that October 8, 2019 would be the date "by which Defendants must answer or move with respect to the Complaint." (Dkt. 19 at 2).

~~U.S. Code. *See* 22 U.S.C. §§ 6023(11), 6082.~~

11. Because this claim arises under federal law, personal jurisdiction is established under Fed. R. Civ. P. 4(k)(2) by service of a summons or filing a waiver of service as long as "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B)

exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

12. Defendants are not subject to jurisdiction in any state's court of general jurisdiction.

~~10. Subject matter jurisdiction also is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Act, codified at 22 U.S.C. § 6021 *et seq.*~~

13. As explained in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), Rules 4(k)(1) and 4(k)(2) are adequate to support personal jurisdiction so long as jurisdiction comports with the Fifth Amendment's notion of due process. Fifth Amendment due process is met where, as here, Congress has enacted legislation that directly implicates important federal policies aimed at protecting American citizens abroad. *Id*. at 19-20.

14. Exercise of personal jurisdiction over Defendants is also reasonable. ExxonMobil has a strong interest in obtaining relief from Cuba's long-standing misappropriation and trafficking in its property.

15. Furthermore, Congress has made clear that the United States has more than an interest in adjudicating this dispute; Title III fulfills Congress's "obligation" to protect U.S. citizens from wrongful confiscations through the provision of private remedies in "the courts of the United States." 22 U.S.C. §§ 6081(10)–(11). These interests are particularly strong here where Defendants are the primary actors generating the "badly needed financial benefit, including hard currency, oil, and productive investment and expertise" to the Cuban government which "undermines the foreign policy of the United States." *Id.* § 6081(6).

16. Nor can Defendants be remotely surprised by the exercise of jurisdiction here. Defendants have had actual and/or constructive notice of Plaintiff's claim for decades. The Act exempts certified claimants from the pre-suit notice requirement of 22 U.S.C. § 6082(a)(3) precisely because the FCSC certification process provides notice that confiscated property is the subject of a valid, adjudicated U.S. claim. Plaintiff's certified claim has been a matter of public record since

September 3, 1969. *See* Ex. 1 (attached hereto). And Defendants, as agencies and instrumentalities of the government that expropriated the property, have been on notice since the Act's passage in 1996—as reflected by the 1996 passage of Cuban Law No. 80, discussed in greater detail below—and even more so since the lifting of the suspension in 2019,[3] that trafficking in the Confiscated Property would subject them to suit in the courts of the United States. This level of notice satisfies any fairness requirement under the Fifth Amendment.

17. Defendants also have expropriated and continued to traffic in the property of a U.S. company, have engaged in solicitation efforts with U.S. producers, and regularly do business in and with the U.S., including processing and facilitating remittances from the United States to Cuba and importing and selling U.S. products. The harm Defendants have caused and continue to cause is occurring in the United States to Plaintiff.

18. Alternatively, Defendants are not entitled to Fifth Amendment due process protections because they are alter egos of the Cuban state under *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983), and its progeny. According to *Bancec* and *Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316 (D.C. Cir. 2025), factors bearing on state control include: (1) economic control; (2) entitlement to profits; (3) role of government officials; (4) whether the state is the real beneficiary; and (5) whether recognizing separate corporate identities would permit the foreign state to obtain benefits while avoiding its obligations. *See Archirodon Constr. (Overseas) Co. Ltd. v. Gen. Co. for Ports of Iraq*, No. CV 22-1571, 2024 WL 3844800, at *4 (D.D.C. Aug. 16, 2024). As demonstrated below, each of the

[3] The Cuban Ministry of Foreign Affairs issued a formal statement on January 18, 2019 "reiterat[ing] the postulates contained in the Law to Reaffirm the Cuban Dignity and Sovereignty (Law No. 80) and emphasiz[ing] that the Helms-Burton Act is illegal, inapplicable and is void of any value or legal effect. Consequently, any claim filed under this law by a natural or juridical person, regardless of their citizenship or nationality, will be rendered null." *See* "Cuba: Declaration of the Ministry of Foreign Affairs," *Cubaminrex* (Jan. 17, 2019), *available at* https://misiones.cubaminrex.cu/en/articulo/cuba-declaration-ministry-foreign-affairs.

Defendants meets these criteria. Moreover, as demonstrated further below, CIMEX Cuba and CIMEX Panama (collectively, "CIMEX") are alter egos of one another, sharing the same ultimate ownership, with the same officers and directors, working out of the same office at the same address without any regard for corporate formalities or respecting the separateness of either entity.

19. 11. Pursuant toTo the extent 28 U.S.C. § 1330(b) still applies to this action following the Supreme Court's decision in *Exxon Mobil*, 146 S. Ct. at 1920–21, personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) onceupon service has been made under 28 U.S.C. § 1608.

12. Alternatively, pursuant to 28 U.S.C. § 1330(b) and consistent with the United States Constitution and laws, personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) due to Defendants' contacts with this District and with the United States as a whole as a result of their unlawful trafficking activities and their commercial activities, which are explained in detail below.

20. In any event, and regardless of the applicable jurisdictional framework, Defendants maintain substantial contacts with the United States that confirm the reasonableness of this Court's exercise of personal jurisdiction, including targeting U.S. interests, processing and facilitating remittances from the United States to Cuba, maintaining ongoing commercial relationships with U.S. suppliers, and conducting U.S.-directed business development and outreach.

21. 13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4) and pursuant to 28 U.S.C. § 1391(b)(3).

22. 14. The amount in controversy exceeds $50,000 as required by 22 U.S.C. § 6082(b).

23. ~~15.~~ Plaintiff paid the special fee for filing an action under Title III of the Helms-Burton Act contemporaneous with the ~~original~~Second Amended Complaint (Dkt. ~~1~~33), which ~~is~~was $6,548 at the time pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

**PARTIES**

24. ~~16.~~ Plaintiff Exxon Mobil Corporation is a U.S. national and a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at ~~5959 Las Colinas Boulevard, Irving, Texas 75039~~22777 Springwoods Village Parkway, Spring TX 77389. Plaintiff was formerly known as the Standard Oil Company ("Standard Oil") and is the recipient and owner of the certified claim attached as Exhibit 1. Effective July 1, 2026, Plaintiff became a wholly owned subsidiary of ExxonMobil Holdings Corporation, a publicly traded Texas corporation. At all times, the certified claim has remained with Plaintiff.

25. ~~17.~~ Defendant Corporación CIMEX S.A. (Cuba) (a/k/a Corporación de Importación y Exportación S.A.) is a commercial conglomerate owned by the government of Cuba and is an alter ego of CIMEX Panama. Specifically, CIMEX Cuba is a *sociedad anónima* with nominative ~~shares[3]~~ shares[4] owned by Cuban government officials and entities and subordinated to the Cuban Ministry of the Revolutionary Armed Forces ("MINFAR"). CIMEX Cuba has its principal place of business at Edificio Sierra Maestra, Calle Primera Esquina 0, Miramar, Playa, La Habana, Cuba. CIMEX Cuba, which is Cuba's largest commercial conglomerate with annual revenues reportedly as high as $~~2.6~~3.4 billion and $1.2 billion in earnings as of ~~2015,[4]~~ March 2025,[5] engages in a variety of foreign

---

[4] The shares of a Cuban "*sociedad anónima*" must be nominative shares by Law 498 of 1959.

[5] This was reported after the account books of Grupo de Administración Empresarial S.A. ("GAESA," *see* ¶¶ 99–101 *infra*) were partially made public in December 2025. *See* Nora Gamez Torres, "Where is Cuba's Money? Secret Records Show the Military Has Massive Cash Hoard," *Miami Herald* (Jan. 31, 2026), *available at* https://www.miamiherald.com/news/nation-world/world/americas/cuba/article311488962.html.

commerce across a variety of industries. On information and belief, CIMEX Cuba was registered in Cuba in 1995.

---

[3] The shares of a Cuban "*sociedad anonima*" must be nominative shares by Law 498 of 1959.

[4] This was reported by CIMEX's Vice President Leticia Morales during the 2016 IMTC Conference in Cuba.

(Continued…)

26. 18. CIMEX Cuba is an agency or instrumentality of the Cuban state. It is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary. Also, CIMEX Cuba is rightfully treated as an agent of the government of Cuba with respect to the conduct at issue here.

27. 19. On information and belief, Defendant Corporación CIMEX S.A. (Panama), which was incorporated in the Republic of Panama on May 8, 1979,[5] 1979,[6] is an alter ego of CIMEX Cuba. CIMEX Panama was incorporated as a *sociedad anónima* under Panamanian law.[7] After this incorporation, Corporación CIMEX S.A. decided to incorporate itself in Cuba as well.[8] On information and belief, CIMEX Panama shares the same address, the same officers and directors, and the same ownership and control by MINFAR. Plaintiff reasonably expects discovery to reveal that Defendants On information and belief, MINFAR, and the government of Cuba have disregarded corporate formalities with respect to CIMEX Panama and have used it to perpetuate fraud.

28. 20. CIMEX Panama is an agency or instrumentality of the Cuban state. It is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary. Also, CIMEX Panama is rightfully treated as an agent of the government of Cuba with respect to the conduct at issue here.

29. 21. Defendant CUPET Unión Cuba-Petróleo is the Cuban state-owned oil company, with its principal place of business at Oficios 154 E / Amargura y Tte Rey, Avenida Salvador Allende No. 666, Entre Soledad y Oquendo Municipio Centro Habana Vieja, Havana La Habana,

[6] Public Deed (Escritura Pública) No. 5,412, May 8, 1979. Notaria Quinta del Circuito. Panama, Republica de Panama.

[7] Dkt. 47-1, Decl. of Dr. Joan Martínez Evora in Supp. of Pl's Opp. to Defs' MTD ¶ 191.

[8] *Id.* ¶ 192.

Cuba. Among other things, CUPET operates Cuba's oil refineries and produces and distributes petroleum products.

30. ~~22.~~ CUPET is an agency or instrumentality of the Cuban state. It is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary. ~~Also, CUPET is properly treated as an agent of the government of Cuba with respect to the conduct at issue here.~~

---

~~[5] Public Deed (Escritura Publica) No. 5,412 of May 8, 1979. Notaria Quinta del Circuito. Panama, Republica de Panama.~~

**BACKGROUND**

**I. Plaintiff's Pre-Expropriation Business Operations in Cuba**

31. ~~23.~~ Over 100 years ago, when Plaintiff was known as Standard Oil, it initiated business operations in Cuba by obtaining an interest in a refinery near Havana, Cuba.

32. ~~24.~~ As Standard Oil grew its business in Cuba, it established several subsidiaries. One such subsidiary was ~~These subsidiaries included: (1)~~ Esso Standard Oil, S.A. ("Essosa")~~,~~. Essosa was formed in 1951 as a wholly owned Panamanian subsidiary~~, formed in 1951,~~ of Standard Oil with responsibility for operations in the Caribbean Basin and was headquartered in Havana until 1959~~; and (2)~~ .

33. Two other Standard Oil subsidiaries were Esso Standard (Cuba) Inc. and Esso (Cuba) Inc., ~~two~~each Delaware corporations organized in 1957 and qualified to do business in Cuba for exploring for and producing crude oil ~~(collectively,~~. Collectively, Esso Standard (Cuba) Inc. and Esso (Cuba) Inc. are the "Exploration Companies."~~).~~

~~**Expropriation by the Cuban Government**~~

~~25. Plaintiff's certified claim involves the property formerly owned by Essosa and the Exploration Companies.~~

34. Throughout the time it operated in Cuba, Essosa operated an integrated petroleum business in Cuba that included refining, importation, distribution, storage, and retail fuel operations. Essosa's operations included the Belot Refinery and an extensive network of terminals, plants, and related petroleum infrastructure located throughout Cuba.

35. Essosa also owned and operated three ocean terminals, one island terminal, and seven bulk and package plants strategically located throughout Cuba to support its refining, storage, transportation, and distribution activities.

36. Essosa maintained oil exploration operations in Cuba. Together with Texaco and Cuba's Economic and Social Development Bank, Essosa financed twenty-five drilling rigs in Camagüey Province to develop oil resources associated with the North Cuba Basin.

37. ~~26. Prior to 1959, the~~The Exploration Companies maintained an office in Cuba for geological studies ~~and~~. The Exploration Companies owned assets in Cuba incident to the functioning of the office.

38. As a wholly owned subsidiary of Standard Oil, Essosa's assets were beneficially owned by Standard Oil. When Cuba expropriated Essosa's property, the loss was suffered by Standard Oil as the ultimate owner.

## II. Expropriation by the Cuban Government

39. ~~27.~~ On October 30, 1959, Cuban government inspectors from Fomento Nacional ("National Development") arrived at the office of the Exploration Companies and confiscated and copied all files, maps, and other records of geological exploration. After the copying incident and the passage of Law 625 of November 29, 1959, which changed the basis for granting mineral concessions, the Exploration Companies stopped all exploration efforts on the island. On February 1, 1960, the Exploration Companies closed their office in Cuba.

40. ~~28.~~ On July 1, 1960, Essosa's property rights were expropriated in violation of international law pursuant to Resolution No. 33 issued by the Cuban Petroleum Institute, which was issued pursuant to Resolution No. 190 of June 30, 1960 by Cuban Prime Minister Fidel

Castro. The Director General of the Cuban Petroleum Institute appointed Major Onelio Pino as "Interventor" of Essosa for "all the properties and installations that [Essosa] may have in Cuba."

41. 29. As a result, Essosa not only lost control over its assets, but it was also was forced to end its ongoing operations. Essosa was prohibited from operating its expanded Belot Refinery, which was completed in early 1958 and employed 530 people. Essosa was also was forced to abandon its Cuban-based marketing operation with, which employed over 500 employees who werepeople engaged in selling and distributing products through more than one thousand retail outlets. And Furthermore, Essosa was also forced to cease operating its service stations in Cuba.

42. 30. Essosa subsequently appeared on the list of nationalized entities published in Resolution No. 1 of August 6, 1960 pursuant to Cuba's Law 851.

43. 31. The Cuban Government expropriated the following assets from Essosa in violation of international law:

(a) Belot Refinery (Havana), a newthen-new 35,000 barrel-per-day refinery, including:

i. a marine terminal;
ii. a 8,800 pounds-per-day grease plant;
iii. a 205 barrel-per-day lube blending and packaging plant; and
iv. 109 storage tanks with a total capacity of 2.4 million barrels.

(b) Bulk products terminals, including:

i. three ocean terminals;
ii. seven inland terminals; and
iii. seven bulk and packaging plants.

(c) Service station properties, including:

i. 117 service station properties; and
ii. 176 loans outstanding to service station owners secured by mortgages.

44. 32. These assets are hereinafter referred to as the "Confiscated Property." The assets listed in Paragraph 43(a) are hereinafter referred to as the "Refinery Assets." The assets listed in

Paragraph 43(b) are hereinafter referred to as the "Distribution Assets." The assets listed in Paragraph 43(c) are hereinafter referred to as the "Service Station Assets."

45. ~~33.~~ Cuba has never paid, and Plaintiff has never received, compensation for the expropriation of the Confiscated Property.

**III. Certification of Plaintiff's Claim by the Foreign Claims Settlement Commission**

46. ~~34.~~ In response to the expropriation of the Confiscated Property, Standard Oil filed a claim with the FCSC pursuant to Title V of the International Claims Settlement Act of 1949, which gives the FCSC jurisdiction over expropriation claims of U.S. nationals against the Government of Cuba.

47. ~~35.~~ Pursuant to 22 U.S.C. § 1643b(a), the FCSC "shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States."

48. ~~36.~~ Pursuant to 22 U.S.C. § 1643a(3), "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba …."

49. ~~37.~~ As required by the International Claims Settlement Act, the FCSC determined the validity and amount of Standard Oil's claim and the value of the expropriated properties, rights, or interests by the valuation most appropriate to the Confiscated Property.

50. ~~38.~~ After reviewing Standard Oil's ownership, the FCSC found that Standard Oil qualified as a U.S. national within the meaning of the International Claims Settlement Act. *See* Ex. 1 at 2.

51. 39. The FCSC then evaluated Standard Oil's property claim. It noted that Standard Oil provided "extensive evidence in support of the claim" including a trial balance of Essosa's assets that was prepared by Essosa's employees following the expropriation of Essosa. This trial balance of assets was even approved by the Cuban Institute of Petroleum before the Cuban Government permitted it to be delivered to the comptroller of Essosa for the permanent records of the company. *See* Ex. 1 at 5.

52. 40. The FCSC also reviewed various documents and affidavits in support of Standard Oil's claim, including records pertaining to: "[banking balances,], cash on hand, accounts receivable, investments, inventories, property, plant and equipment, as well as prepaid and deferred charges, and extensive data pertaining to the liabilities of Essosa." Ex. 1 at 5.

53. 41. After an extensive review of Essosa's assets and liabilities, the FCSC certified that Standard Oil suffered a loss of $71,611,002.90 as a result of the Cuban government's expropriation of the Confiscated Property. The FCSC certified the claim in this amount and further awarded interest on this amount at the rate of 6 percent% per annum from the date of loss to the date of settlement. *See* Ex. 1 at 9.

54. The FCSC certified the claim to Standard Oil—not to Essosa—because Standard Oil, as the U.S. national that wholly owned Essosa, was the entity entitled to assert the claim under the International Claims Settlement Act.

55. Under the Helms-Burton Act, the FCSC's certification is "conclusive proof of ownership" of the confiscated property. 22 U.S.C. § 6083(a)(1). The FCSC's decision to certify the claim to Standard Oil thus conclusively establishes that Plaintiff—Standard Oil's corporate successor—owns the claim to the property that Essosa operated.

56. 42. Standard Oil changed its name to Exxon Corporation in 1972. In 1999, Exxon Corporation changed its name to Exxon Mobil Corporation, the Plaintiff in this action. At all times,

the certified claim has remained with the same corporate entity—Plaintiff—and has never been assigned, transferred, or otherwise conveyed to any other person or entity.

57. ~~43.~~ Plaintiff has never settled the outstanding certified ~~claims~~claim or received any payment from any entity with respect to the principal or interest due on its certified claim.

**IV. The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

58. ~~44.~~ On March 12, 1996, President Clinton signed into law the LIBERTAD Act of 1996 (also known as the "Helms-Burton Act" and referred to herein as the "Act"). Title III of the Act provides a right of action to U.S. nationals who owned property in Cuba that was confiscated on or after January 1, 1959.

59. ~~45.~~ Title III authorizes the President to suspend the right of action for sequential periods of up to six months. On July 16, 1996, President Clinton notified Congress that he would be allowing the Act to go into effect on August 1, 1996, but that he would suspend the right of action under Title III for six months. Since that decision, every President (or Secretary of State) ~~has~~ issued a sequential six-month suspension of the right of action until ~~recently~~2019.

60. In *direct* response to the passage of the Helms-Burton Act, Cuba enacted Law No. 80, the Reaffirmation of Cuban Dignity and Sovereignty Act, on December 24, 1996. Cuban Law No. 80 makes it illegal to cooperate with any Helms-Burton Act plaintiff, or with any representative of the Government of the United States of America in furtherance of claims brought pursuant to the Helms-Burton Act. Because Cuba was on notice that it could be haled into U.S. courts for Helms-Burton Act cases, and it sought to "us[e] all possible legal formulas to help to protect the[] interests" of foreign investors in Cuba, Article 8 of Law No. 80 declared "illegal" any act of "collaboration, direct or indirect, which favors the application of the Helms Burton Act." *Id.* art. 8 (translated from Spanish). Criminal penalties for violations of Cuban Law No. 80 are set forth in Cuban Law No. 88, which was passed in 1999.

61. ~~46.~~ On January 16, 2019, Secretary of State Pompeo reported to Congress that Title III would be suspended for forty-five days beyond February 1, 2019 as the State Department conducted a "careful review of the right to bring action under Title III in light of the national interests of the United States and efforts to expedite a transition to democracy in Cuba."

62. ~~47.~~ On March 4, 2019, Secretary Pompeo reported to Congress that the suspension of Title III would be maintained for 30 days through April 17, 2019 except as to certain Cuban entities or sub-entities that were identified by name on the State Department's List of Restricted Entities and Sub-entities Associated with Cuba (known as the Cuba Restricted List).

63. ~~48.~~ On April 3, 2019, Secretary Pompeo announced his decision to continue this partial suspension of Title III for two additional weeks, through May 1, 2019.

64. ~~49.~~ On April 17, 2019, Secretary Pompeo announced that Title III ~~will~~would go into full effect as of May 2, 2019.

65. ~~50.~~ Section 302 of the Act provides the following civil remedy:

> *SEC 302: (a) Civil Remedy.—*
>
> (1) Liability for trafficking.--(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . .

22 U.S.C. § 6082(a)(1).

66. ~~51.~~ Section 302 implements a key purpose of the Act, which is to permit U.S. nationals to bring claims against Cuban ministries and state-owned enterprises that engage in unlawful trafficking. For example:

a. Congress found that trafficking in property confiscated from U.S. nationals benefits "the current Cuban Government" and "undermines the foreign policy of the United States." 22 U.S.C. § 6081(6).

b. Regarding remedies, Congress found that "[t]he international judicial system … lacks fully effective remedies" thereby permitting unjust enrichment "by governments and private entities at the expense of the rightful owners of the property." *Id.* § 6081(8).

c. Congress further recognized the U.S. Government's "obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies." *Id.* § 6081(10).

67. ~~52.~~ Given these findings, Section 302 of the Act unsurprisingly includes Cuban governmental entities within its scope.

68. ~~53.~~ Specifically, the definition of a "person" who may be liable for trafficking includes "any person or entity, including any agency or instrumentality of a foreign state" as defined by the FSIA, 28 U.S.C. § 1603(b). *See* 22 U.S.C. § 6023(1), (11).

69. ~~54.~~ A person is liable for trafficking in confiscated property under the Act "if that person knowingly and intentionally—

i. sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

ii. engages in a commercial activity using or otherwise benefiting from confiscated property, or

iii. causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property."

~~iii.~~ 22 U.S.C. § 6023(13).

70. ~~55.~~ Since Plaintiff has never authorized any person to engage in the activities covered by the Act's definition of trafficking with respect to the Confiscated Property, Section 302 provides Plaintiff with a private right of action against any person—including Cuba's state-owned enterprises—that has trafficked in the Confiscated Property.

## V. Procedural History

71. Plaintiff filed the instant suit on May 2, 2019, the day the suspension of the private right of action under Title III was lifted. Dkt. 1. Plaintiff subsequently served CUPET and CIMEX Cuba in accordance with 28 U.S.C. § 1608, as required by 22 U.S.C. § 6082(c)(2). (Dkts. 13, 19).

72. Plaintiff filed the First Amended Complaint on November 12, 2019 (Dkt. 28), and the Second Amended Complaint, adding CIMEX Panama as a defendant, on March 6, 2020. (Dkt. 33). CIMEX Panama was also duly served. (Dkt. 36).

73. Defendants moved to dismiss the Second Amended Complaint (Dkt. 42), and oral argument was held on March 10, 2021. Defendants asserted that each Defendant was an agency or instrumentality of the Cuban state and subject to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"). On April 20, 2021, this Court denied the motion as to CIMEX Cuba, finding that ExxonMobil had sufficiently alleged the applicability of the FSIA's commercial activity exception. This Court deferred ruling on the applicability of the commercial activity exception as to CUPET and CIMEX Panama. Finally, this Court rejected ExxonMobil's arguments that the FSIA's expropriation exception provided for jurisdiction and that the Helms-Burton Act abrogates Defendants' claimed sovereign immunity. (Dkt. 64).

74. CIMEX Cuba subsequently filed an interlocutory appeal in the United States Court of Appeals for the District of Columbia Circuit.

75. This Court further granted motions to certify interlocutory appeals filed by CUPET, CIMEX Panama, and ExxonMobil to permit all issues addressed in the briefing below to be

presented to the Court of Appeals. (Dkt. 77). Each of these appeals was consolidated by the D.C. Circuit.

76. The D.C. Circuit held oral argument on the consolidated case on January 19, 2023.

77. The D.C. Circuit decided the case on July 30, 2024. In a divided opinion, the D.C. Circuit held the Helms-Burton Act did not abrogate Defendants' sovereign immunity and the FSIA's expropriation exception was inapplicable. The majority held that the district court needed to undertake additional analysis before determining whether jurisdiction existed under the commercial activity exception. Writing in dissent, Judge Randolph stated that in his view, the Helms-Burton Act established a specific, independent, and exclusive cause of action that, when considered alone, deprived the Cuban defendants of immunity from suit. The D.C. Circuit remanded the case to this Court for further analysis on the applicability of the FSIA's commercial-activity exception.

78. ExxonMobil filed a petition for certiorari on December 27, 2024. The question presented was whether the Helms-Burton Act abrogates foreign sovereign immunity in cases against Cuban instrumentalities or whether parties proceeding under the Act must also satisfy an exception under the Foreign Sovereign Immunities Act.

79. On August 27, 2025, the Solicitor General filed an *amicus curiae* brief in support of ExxonMobil's position.

80. The Supreme Court granted certiorari on October 3, 2025. On October 14, 2025, this Court stayed pending discovery proceedings until resolution of the Supreme Court appeal. (Dkt. 115).

81. Oral argument was held before the Supreme Court on February 23, 2026.

82. The Supreme Court issued a decision in favor of ExxonMobil on June 23, 2026. The Court held that the Helms-Burton Act itself abrogates the sovereign immunity of Cuban agencies

and instrumentalities and confers subject matter jurisdiction on the federal courts irrespective of the FSIA.

83. On July 29, 2026 the D.C. Circuit recalled its previous mandate (Dkt. 118), and on August 28, 2026 the D.C. Circuit issued a new mandate. (Dkt. 119).

## VI. The Act's Presumption in Favor of Certified Claims

84. 56. Section 302(d) of the Act mandates a presumption in favor of the Plaintiff's certified claims:

> , noting "There **shall be a presumption** that the amount for which a person is liable . . . is the amount that is certified [" by the FCSC under the International Claims Settlement Act of 1949]. 22 U.S.C. § 6082(a)(2) (emphasis added).

57. The Act's presumption in favor of certified claims extends not only to the amount of liability, but also to the claimant's ownership and entitlement to treble damages. According to Section 303(a)(1), which deals with the "[c]onclusiveness of certified claims," in any action brought under Title III, "the court shall accept as **conclusive proof of ownership** of an interest in property a certification of a claim to ownership of that interest that has been made by the [" FCSC under Title V of the International Claims Settlement Act of 1949]." 22 U.S.C. § 6083(a)(1) (emphasis added).

§ 6083(a)(1) (emphasis added).

85. 58. Under Section 302(a)(3) of the Act, "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages if a U.S. national owns a certified claim to that property. 22 U.S.C. § 6082(a)(3)(A) & (3)(C).

86. 59. Congress intentionally conferred these entitlements on certified claims. The utilization of the certified claim process was viewed as a positive feature of the Act. and reflected Congress' clear deference to the experience and expertise of the FCSC in investigating and adjudicating losses overseas. The Conference Report from the Committee of Conference states that "courts shall give a strong presumption to the findings of the FCSC." The Conference report continued:

> The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III]. The committee of conference also notes the recognized special expertise of the FCSC in determining the amount and validity of claims to confiscated properties overseas. H.R. Rep. 104-468, at 63 (1996).

87. ~~60.~~ Under the text of the Act and in accordance with the intent of Congress, Plaintiff's certified claim is entitled to (i) a presumption of accuracy with regard to its amount; (ii) be treated as conclusive proof with regard to Plaintiff's ownership of the Confiscated Property; and (~~3~~iii) a judgment on the claim that includes treble damages.

## VII. Cuba's Control over Plaintiff's Confiscated Property

88. ~~61.~~ The Communist Party of Cuba has been the ruling party in Cuba for the past ~~six~~seven decades, during which time leadership of the Party, and the country as a whole, has been dominated by the Castro family.

89. ~~62.~~ Under the rule of the Castro family and their communist allies, the Cuban government has established a system that repudiates private property ownership in favor of a socialist economic system based on government ownership of property as the fundamental means of production and the government's total control over the planned direction of the economy. The State directs, regulates, and monitors economic activity, reconciling national, territorial, collective, and individual interests supposedly for the benefit of society. Socialism is enshrined in the Cuban Constitution (*see, e.g.*, Article 19, Cuban Constitution of 2019), and socialist planning constitutes the central component of the system of governance for economic and social development.

90. ~~63.~~ Property in Cuba belongs to the State, and the State decides who is permitted to operate it and under what terms. Cuban laws, government functions, and corporate structures

can be—and frequently are—altered whenever it suits the interests of the Castro family and their allies.

91. ~~64.~~ The state of "property rights" in Cuba has been well established in Cuba's Socialist Constitutions of 1976 and 2019. Article 15 of the 1976 Constitution,[~~6~~ 9] as amended in 1992 and 2002, defines the State property of all the people to include all commercial property, with only a minor exception for small farmers and cooperative lands. It also makes a clear reference to expropriation as the origin of State property by including "the sugar mills, factories, fundamental means of transportation, and all enterprises, banks, and installations that have been nationalized and expropriated from imperialists, large landowners, and the bourgeoisie."[~~7~~10]

92. ~~65.~~ According to Article 23 of the 2019 Cuban Constitution, the following are socialist property of the people: "the lands that do not belong to individuals or cooperatives composed of these individuals, the subterranean areas, mineral deposits, the mines, the forests, the waters, the beaches, the means of communication, and the natural resources both living as well as nonliving within the exclusive economic zone of the Republic."[11] And according to Article 24 of the 2019 Constitution, ~~socialist~~"[s]ocialist property that belongs to the entire population includes other assets, such as general interest infrastructure, key industries, and economic and social facilities, as well as other goods that are strategic for the ~~country's~~country's economic and social development.[~~8~~]"[12]

---

[9] *See* CONSTITUCIÓN DE LA REPÚBLICA DE CUBA [CONST.], Feb. 24, 1976 (as amended June 26, 2002), art. 15.

[10] *Id.*

[11] *See* CONSTITUCIÓN DE LA REPÚBLICA DE CUBA [CONST.], Feb. 24, 2019, art. 23.

[12] *Id.* art. 24; *see also* art. 1.1 of the Cuban Decree-Law 227 of 2002 (the "State Patrimony Law," defining State property to include the set of assets and rights subject to the socialist state property regime of all the people and those acquired, built or created by the State). *Decreto Ley No. 227, del Patrimonio Estatal* [DLPE] [Decree-Law No. 227, On State Patrimony Law], Jan. 8, 2002,

(Continued…)

93. 66. Thus, the Confiscated Property and virtually all other commercial property in Cuba belongs to the Cuban government. These properties may not be transferred as property to

---

[6] *See* Art. 15 of the 1976 Cuban Constitution as amended in 2002.

[7] *Id.*

[8] *See also* Art. 1.1. of the Cuban Decree-Law 227 of 2012 (the "State Patrimony Law" defining State property to include the set of assets and rights subject to the socialist state property regime of all the people and those acquired, built or created by the State).

---

*Gaceta Oficial* [GO], No. 2, Jan. 10, 2002.
https://www.gacetaoficial.gob.cu/sites/default/files/go_o_02_2002.pdf.

natural or legal persons and are governed by principles that render them unalienable, imprescriptible, and unseizable under Cuban law. Additionally, any transfer of other rights not involving the transfer of the properties themselves must have the prior approval of the Council of Ministers, which is a body of Cuban government officials charged with overseeing the country's economic and social development and protecting the political, economic, and social foundations of the State.

94. 67. The Cuban government assigns State property to budgeted entities, unions, and enterprises as prescribed in the law, but these entities cannot transfer, encumber, or disposaldispose of State property. Therefore, these entities act as administrators of State property. While these entities have their own assets, mainly accounts receivablesreceivable, inventory, and other assets for working capital purposes, they act as agents of the Cuban government, which dictates all aspects of their operations.

95. 68. For example, it was the Cuban government, through its Council of Ministers, that decided to transfer Plaintiff's Confiscated Property to CUPET and CIMEX. The government created CUPET, and permitted it to operate the confiscated Ñico López Refinery (formerly known as the Belot Refinery) and certain confiscated terminals and plants used in conjunction with the refinery operations, when it ordered the merger of two other state-owned entities to form CUPET. The government also ordered the transfer of confiscated servicesservice stations to CIMEX as part of the state-mandated break upbreakup of another Cuban commercial conglomerate called CUBALSE.

96. The Cuban government's transfer of the Confiscated Property to CUPET and CIMEX was itself an act taken with knowledge that the property had been expropriated from a U.S. national. Cuba enacted Law No. 80, the Reaffirmation of Cuban Dignity and Sovereignty Act, on December 24, 1996—in direct response to the passage of the Helms-Burton Act—making it illegal to cooperate with any claim brought under Title III. The enactment of Law No. 80 demonstrates that Cuba, and

by extension its agencies and instrumentalities including Defendants, were aware that the Helms-Burton Act exposed them to liability for trafficking in confiscated property belonging to U.S. nationals.

97. 69. For the time being, CIMEX and CUPET are permitted to operate Plaintiff's Confiscated Property, but their operations remain subject to the control of the Cuban government, which retains ownership of the Confiscated Property.

**VIII. Cuba's Control over Defendants and Facilitation of Trafficking in Plaintiff's Property**

98. ~~70.~~ The control that the Cuban government exercises over CIMEX and CUPET is extensive and exceeds the normal supervisory control exercised by a parent over a subsidiary.

99. ~~71.~~ CIMEX is a de facto branch of the Cuban military, engaging in commercial activities to fund the military. Since at least 2010, CIMEX has been wholly owned, operated, and controlled by MINFAR, acting through a conglomerate called Grupo de Administración Empresarial S.A. ("GAESA").

100. ~~72.~~ According to a report by the ~~Miami Herald in 2017, MINFAR's web of state-owned enterprises has increased its control over the Cuban economy in the past decade, including by absorbing CIMEX into GAESA in 2010. GAESA now operates in "virtually every profitable area of the Cuban economy" and is led by a general in the Cuban army who is also a member of~~ New York Times in May 2026, GAESA has become the dominant economic actor in Cuba, reportedly controlling between 40% and 70% of the Cuban economy.[13] Through CIMEX and other subsidiaries, GAESA controls hundreds of service stations, money-transfer businesses, supermarkets, currency exchanges, telecommunications assets, and one of Cuba's biggest commercial banks (Banco Financiero Internacional). Observers have described GAESA as a military-controlled conglomerate that functions as a "state within a state," operating outside normal governmental oversight while remaining closely aligned with the Cuban military and the Castro family.~~[9]~~[14]

[13] *See* Maria Abi-Habib & Lazaro Gamio, "The Secretive Conglomerate that Controls Cuba's Economy," *N.Y. Times* (May 16, 2026), *available at* https://www.nytimes.com/interactive/2026/05/16/world/americas/cuba-military-conglomerate-gaesa-economy-explained.html.

[14] *Id.*

101. 73. Although CIMEX isCuba and CIMEX Panama are each denominated as a *sociedad anónima*, in reality it fails to observeneither observes the corporate formalities associated with independent corporate entities. CIMEX normally issues stock certificates—without consideration—to government entities and a select few government officials, including high-ranking members of its management team who act on behalf of GAESA, MINFAR, and the Cuban government as the ultimate owner and beneficiary of CIMEX's profits. Another indicator from Per CIMEX's corporate records is that, all of these shareholders are usually present at shareholder meetings, which further shows that the company is—reinforcing that CIMEX Cuba and CIMEX Panama are actually controlled by a small group of government officials, entities, and their agents. Consistent with that lack of corporate separateness, the President of FINCIMEX also serves as the President of CIMEX Cuba and CIMEX Panama.[15]

[9] *See* Nora Gámez Torres, "High on Cuba policy proposal: restricting U.S. business deals with Cuba's military-run entities," *Miami Herald* (June 12, 2017), available at https://www.miamiherald.com/news/nation-world/world/americas/cuba/article155772469.html.

(Continued…)

[15] Dkt. 42-4, Decl. of Mali Suris Valmaña in Supp. of Defs.' MTD ¶ 24; Financiera Cimex, S.A. (FINCIMEX Panama) was originally created and registered in the Republic of Panama by Public Deed (Escritura Pública) No. 474 of January 24, 1984 and later created as a Cuban *sociedad anónima* (FINCIMEX Cuba) by Public Deed (Escritura Pública) No. 172 of May 15, 1995. Both FINCIMEX Panama and FINCIMEX Cuba act as partners of remittance forwarders in the United States, as set forth below.

102. ~~74.~~ CIMEX serves another important goal of the Cuban government, which is to break the U.S. embargo against Cuba. Since CIMEX Panama's creation in the late 1970s, CIMEX has functioned as a Cuban intelligence vehicle to circumvent the embargo.~~[10]~~ [16] CIMEX Panama, as a Panamanian company ~~with unknown shareholders~~, was able to open accounts in different banks around the world, obtain credits, and conduct import-export transactions to and from Cuba, including operations in the United States through affiliates and other Cuban agents. That was one of the reasons why the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated both CIMEX~~, its~~ Cuba and CIMEX Panama as well as their affiliates~~,~~ and agents as Specially Designated Nationals ~~during the Reagan Administration.~~ ("SDNs")—a status which CIMEX has maintained for decades.[17]

103. ~~75.~~ In reality, CIMEX lacks any separateness or independence from MINFAR, and instead, it is dominated by MINFAR and the Cuban government and operated for the benefit of MINFAR and the Cuban government. Recognizing a separate corporate entity for CIMEX would permit Cuba to obtain benefits while avoiding its obligations.

104. ~~76.~~ The head of CIMEX is a former officer in the Cuban military, and senior MINFAR officers are in charge of the various commercial activities conducted by CIMEX, including CIMEX's operation of service stations.

~~77.~~ The extensive control exerted by MINFAR over CIMEX was further confirmed when the State Department added CIMEX as a sanctioned entity on the Cuba Restricted List ("CRL") in 2017. CIMEX was placed on the CRL as part of a broader initiative by the U.S.

---

[16] *See* Maria C. Werlau, *Fidel Castro, Inc.: A Global Conglomerate*, *in* 15 CUBA IN TRANSITION 375 (Assoc. for the Study of the Cuban Econ., 2005), https://www.ascecubadatabase.org/wp-content/uploads/2014/09/v15-werlau.pdf.

[17] "Treasury Designates & Blocks 10 Entities for Cuban Embargo Violations," *available at* https://home.treasury.gov/news/press-releases/js1161

government to impose sanctions on businesses controlled by the Cuban military. Specifically, the CRL represents "the U.S. Department of State's list of entities and subentities sub-entities that are "under the control of, or acting for or on behalf of, the Cuban military, intelligence, or security services or personnel with

---

[10] *See* Maria C. Werlau, "Fidel Castro, Inc.: A Global Conglomerate," Association for the Study of the Cuban Economy (2005).

(Continued…)

which direct financial transactions would disproportionately benefit such services or personnel at the expense of the Cuban people or private enterprise in Cuba."[11][18]

105. 78. Like CIMEX, CUPET is subordinate to the Cuban government. Its operations are dictated by the Ministry of Energy and Mines.

106. 79. CUPET was established on March 25, 1992 by Resolution No. 23/1992, issued by the Cuban Ministerio de la Industria Básica (Ministry of Basic Industry). As provided for in that Resolution, Unión del Petróleo and Unión del Combustible were merged to form CUPET, which "for all legal purposes, is a continuation of Unión del Petróleo and Unión del Combustible and is subrogated to their place and status."

107. 80. CUPET is one of a prominent group of Cuban entities called OrganizaciónesOrganizaciones Superiores de Dirección Empresarial ("OSDEs"). Pursuant to Decree 336 of 2017, the Cuban Council of Ministers creates OSDEs as subordinated entities to the Cuban government and determines their organizational structure, including decisions regarding mergers, acquisitions, and liquidations.[19] Under Cuban law, the OSDEs are considered national entities for all relevant purposes.

108. 81. The President of the Council of Ministers appoints the President or General Director General of CUPET and other OSDEs. The Council of Ministers appoints a Vice President of its body or a Minister to exercise controlling functions over CUPET, and other OSDEs, including the following:

---

[18] "List of Restricted Entities and Subentities Associated with Cuba as of July 14, 2025," *U.S. Dep't of State* (July 14, 2025), *available at* https://www.state.gov/division-for-counter-threat-finance-and-sanctions/cuba-restricted-list.

[19] Decreto No. 336, de Consejo de Ministros [CM] [Decree No. 336], Gaceta Oficial Extraordinaria [GOE], No. 58, Dec. 13, 2017, https://www.cibercuba.com/s/gacetaoficial/decreto-336-de-2017-de-consejo-de-ministros

[11] "List of Restricted Entities and Subentities Associated with Cuba as of March 12, 2019," U.S. Department of State (Mar. 12, 2019), available at https://www.state.gov/cuba-sanctions/cuba-restricted-list/list-of-restricted-entities-and-subentities-associated-with-cuba-as-of-march-12-2019/.

a. Evaluating theCUPET's socio-economic results of CUPET based on the indicators approved in the plan;

b. Controlling theCUPET's investment process and development programs;

c. Controlling theCUPET's implementation of the Cuban government's Economic and Social Policy Guidelines, as appropriate;

d. Controlling CUPET's compliance with the provisionsCuban regulations on the transfer of technology to and from abroad, ensuring the technological sovereignty of the country;

e. Controlling the economic effects in Cuba from the companies that make up CUPET, including its foreign trade operations;

f. Controlling theCUPET's application of foreign investment policy, collaboration, and its results;

g. Evaluating the President or Director General of CUPET and approving his work plan; and

h. Fulfilling any other purpose assigned by the Council of Ministers or provided by Cuban law;.

109. 82. The Cuban Ministry of Energy and Mines, as designated by the Cuban Council of Ministers, is responsible for the following controlling functions over CUPET among others:

a. Approving short and mid-term plans, submitted by CUPET, ensuring compliance with Cuban government directives;

b. Advising the Minister and the Governing Board of CUPET in itsregarding their direction and control of the enterprises;

c. Establishing the indicators to evaluate the results of the management of CUPET and its enterprises, thereby controlling itsCUPET's compliance with Cuban government directives;

d. Dictating ~~the performance of CUPET~~CUPET's quarterly and ~~annually~~annual performance;

e. Investigating—jointly with CUPET—business opportunities with foreign capital ~~to be presented to the Executive Council of Ministers or the Council of State, as prescribed by law, for further authorizations;~~; and

f. Directing, coordinating, executing and controlling CUPET's compliance with the Cuban government's approved policy ~~approved by Cuban government~~ for the sustainable development of the ~~activities of the~~Cuban oil and gas sector ~~in the country~~.

~~83. In light of these facts, it is not surprising that CUPET describes itself on LinkedIn as a "Government Agency" that "is owned and operated by the Cuban national government."~~

110. ~~84.~~ Not only does the Cuban government control CUPET's operations, but it also dictates the uses of CUPET's profits, including the taxes to be paid and the distribution and uses of the remaining profits. By law, CUPET is required to pay taxes to the State Treasury on its net profits, establish reserves from its post-tax profit for losses and contingencies, and pay a minimum of 50% of the remainder of the profit to the State.[20] Furthermore, the Cuban government uses CUPET to subsidize operations of other state-owned enterprises, which are assigned quotas of gasoline for their vehicles by the Cuban Ministry of Economy and Planning and which receive prepaid gas cards issued by CIMEX subsidiary ~~FINANCIERA CIMEX S.A. ("~~FINCIMEX~~").~~~~[12]~~. In this way, the Cuban government diverts profits from gasoline sales to subsidize the gasoline consumption of various state-owned enterprises.

~~[12] Financiera Cimex, S.A. (FINCIMEX Panama) was originally created and registered in the Republic of Panama by Public Deed (Escritura Publica) No. 474 of January 24, 1984 and later created as a Cuban *sociedad anonima* (FINCIMEX Cuba) by Public Deed (Escritura Publica) No. 172 of May 15, 1995. Both FINCIMEX Panama and FINCIMEX Cuba are currently active and acting as partners of remittance forwarders in the United States, as set forth below.~~

[20] Dkt. 23, Defs' Memo in Supp. of MTD at 38 (citing Dkt. 23-3, Moreno Cruz Decl. at ¶¶ 4n-4p).

111. 85. Like CIMEX, CUPET lacks any separateness or independence from the Cuban government, and instead, it is dominated by the Cuban government and operated for the benefit of the Cuban government. Recognizing a separate corporate entity for CUPET would permit Cuba to obtain benefits while avoiding its obligations.

112. Indeed, Defendants do not contest that the entities are owned by the Cuban state or that the Cuban state has a right to profits, assigns property, appoints officers, authorizes major decisions, and ensures compliance with Cuban state objectives.[21]

**IX. Defendants' Trafficking of Plaintiff's Property**

113. Defendants have been knowingly and intentionally trafficking in, and continue to traffic in, the Confiscated Property in numerous ways. Defendants' knowing and intentional conduct is directed at and causes harm to Plaintiff and others in the United States.

86. Congress explicitly found that trafficking in confiscated property has direct effects in the United States when it passed the Act. Specifically, Congress found that trafficking (i) poses a national security threat to the United States by supporting the Castro regime, (ii) undermines U.S. foreign policy, (iii) jeopardizes the rightful claims of U.S. nationals, (iv) impedes the ability of the U.S. government to return confiscated property to the rightful owners, and (v) undermines the "free flow of commerce." *See* 22 U.S.C. §§ 6021, 6022, 6081.

87. Defendants' unlawful trafficking, as set forth herein, materially contributes to these direct effects in the United States.

114. 88. Defendants' unlawful trafficking also unjustly enriches Defendants at the expense of Plaintiff by denying Plaintiff both capital and the continued use ofis knowing and intentional. Each Defendant is aware that the Confiscated Property, which is another effect that Congress found

[21] Despite this concession, Defendants have previously and incorrectly asserted that conduct does not rise to the "day-to-day" control required to overcome the *Bancec* presumption. *See* Dkt. 42-3, Defs' Memo in Supp. of Second MTD, Sec. VI.A.

when it passed the Act. *See* 22 U.S.C. § 6081(8). was expropriated from a U.S. national. Furthermore, as discussed above, such expropriation was conducted pursuant to explicit directives from the Cuban government, including Resolution No. 33 issued by the Cuban Petroleum Institute, which was in turn issued pursuant to Resolution No. 190 of June 30, 1960 by Cuban Prime Minister Fidel Castro. Moreover, the FCSC's certified claim (Ex. 1) has been a matter of public record since 1969. The Helms-Burton Act and Cuban Law No. 80 were each passed in 1996, and each Defendant has long been on clear notice that continuing to traffic in the Confiscated Property would open them up to potential federal court jurisdiction.

89. Defendants' unlawful trafficking, as set forth herein, is, and has been, conducted without Plaintiff's authorization, which Defendants are, and have been, required to obtain from Plaintiff in the United States. *See* 22 U.S.C. § 6023(13)(A).

90. Plaintiff's investigation is ongoing, and Plaintiff reasonably believes that discovery is likely to reveal additional trafficking and commercial activities conducted by Defendants or their agents either in the United States or directly affecting the United States. **Defendants' Trafficking of Plaintiff's Property: Commercial Activities in the Oil Market**

91. CUPET is a Cuban state-owned oil company and engages in a variety of

***A. Defendants' Trafficking in the Refinery and Distribution Assets***

115. As Cuba's state-owned oil company, CUPET is responsible for the ownership, operation, management, development, and commercialization of all of Cuba's petroleum infrastructure, including refining, importation, storage, transportation, exploration, and production activities. This includes all of the Refinery and Distribution Assets.

116. Prior to 1960, the Refinery Assets operated as the Belot Refinery and were part of an Essosa-operated integrated petroleum business in Cuba that included refining, importation, distribution, storage, and retail fuel operations. Essosa's operations included the Belot Refinery and an extensive network of terminals, plants, and related petroleum infrastructure located throughout Cuba.

117. After they were confiscated in 1960, the Refinery Assets were merged with another facility and became known as the Ñico López Refinery. This facility remains in operation today and is owned, controlled, and operated by CUPET and its affiliates.

commercial activities in the global oil market.

92. The Belot Refinery is now known as the Ñico López Refinery. Essosa operated the refinery in the 1950s before it was nationalized in 1960 by the Government of Cuba. Thereafter, the Belot Refinery was merged with another refinery and became known as the Ñico López Refinery, which is currently operated by CUPET.

118. 93. According to CUPET's websiteCUPET, the Ñico López Refinery is one of four Cuban refineries owned and operated by CUPET.[13] (The others are Sergio Soto, Camilo Cienfuegos, and Hermanos Diaz.) One of the refineries' main objectives is to supply the domestic needs forthat CUPET owns and operates in Cuba. The refinery continues to serve as a principal component of Cuba's petroleum infrastructure and is used for the refining, processing, storage, and distribution of petroleum products, including gasoline, diesel fuel, and fuel oil for domestic consumption.

119. CUPET has owned, and continues to own, control, manage, operate, maintain, develop, and/or commercially benefit from Plaintiff's Confiscated Property, including the Refinery and Distribution Assets as part of its integrated operations. CUPET exploits these assets in numerous ways, in connection with:

a. The importation, receipt, storage, refining, processing, transportation, and distribution of crude oil and petroleum products throughout Cuba;

94. According to CUPET's website, prior to 1960, Essosa and other "transnational" companies "assumed the import, refining, and supply of fuel in Cuba." The companies were paid by the Cuban government for barrels of oil extracted from their wells and also for the "refining and the production of derivatives" that would be sold at the companies' "network of gas stations."[14]

95. Prior to 1960, Essosa had extensive marketing operations in Cuba and in connection with such operations, owned three ocean terminals, one island terminal and seven bulk and package plants at commercially strategic points throughout the island. Ex. 1 at 4.

96. Prior to 1960, Plaintiff also maintained oil exploration operations in Cuba.

Plaintiff and Texaco, in partnership with Cuba's Economic and Social Development Bank, financed twenty-five drilling rigs in the Camagüey Province, extracting seepage oil from the newly discovered North Cuba Basin—an oil field that extended about forty miles inland and a

~~hundred miles offshore from the Camagüey Province to well-beyond Cuba's northwestern tip.~~

[13] ~~The website is available at https://www.cupet.cu/?lang=en.~~

[14] ~~The website is available at https://www.cupet.cu/operaciones/refinacion/?lang=en.~~

~~97. CUPET imports and refines crude oil using Plaintiff's Confiscated Property, specifically the Belot Refinery and the plants, terminals, and infrastructure used in the Belot Refinery's operations and the production of petroleum products.~~

b. ~~98. CUPET, along with foreign partners, uses Plaintiff's Confiscated Property for the~~The exploration for and extraction of crude oil~~.~~;

~~99. CUPET also reportedly has business agreements with foreign companies. Among other things, these agreements allow CUPET to import crude oil to supply the domestic needs for petroleum products and engage in joint oil exploration projects in Cuba and the Gulf of Mexico.~~

~~100. CIMEX partners, affiliates, associates, or the like with CUPET in business ventures that involve or benefit from CUPET's oil exploration and importation activities.~~

c. The solicitation of joint ventures and other projects with domestic and foreign partners, including Petróleos de Venezuela S.A. ("PdVSA"), Repsol-YPF S.A., China National Petroleum Corporation, Sonangol Group, and Melbana Energy Ltd., that rely on the Refinery and Distribution Assets; and

d. The solicitation of investment opportunities and other commercial initiatives that involved the Refinery and Distribution Assets.

120. Indeed, CUPET has admitted that two of its integrated enterprises operate and use the Confiscated Property.[22]

121. CIMEX also traffics in the Refinery and Distribution Assets. Through its ownership and operation of the Service Station Assets, CIMEX sells petroleum products—including gasoline, diesel, and lubricants—produced and distributed using the Refinery Assets and, on information and belief, the Distribution Assets.

122. As explained in Paragraphs 88-112, the Cuban state itself is trafficking in the Refinery and Distribution Assets through, among other things, its ultimate ownership of the property. Defendants are, thus, also trafficking by knowingly and intentionally causing, directing, participating in, and/or profiting from the Cuban state's trafficking.

[22] Dkt. 42-7, Second Decl. of Roberto Suárez Sotolongo in Supp. of Defs.' MTD ¶ 25.

123. 101. Defendants' unlawful trafficking activities are commercial activities that cause direct effects in the United States by competing with Plaintiff and other U.S. companies in the global oil market. In particular:harms Plaintiff, a United States national and Texas corporation, in precisely the manner Congress identified when creating the Helms-Burton cause of action.

124. First, Defendants' conduct deprives Plaintiff of the use, value, and economic benefit of the Confiscated Property, and harms Plaintiff's standing in the global oil market. In particular:

a. CUPET toutshas touted its global reach on its website, where it claims to do business in Canada, Mexico, Venezuela, Angola, Russia, China, Brazil, Argentina, Norway, Trinidad and Tobago, and Vietnam.

b. In addition, according to the International Economic Association, CUPET does business through partnerships, associations, affiliations, and the like with foreign companies that do business in the United States and compete with Plaintiff and other U.S. companies. For example, CUPET partnerspartnered with Canadian-based Sherritt International Corp. to operate the joint venture Energas S.A., which produces energy in Cuba. Sherritt has reportedly forecasted for 2019 the export of 1,800-2,100 barrels of oil equivalent that it produces per day. According to estimates, Energas covers up to 10% of Cuba's electricity generation.[23] As of July 2025, natural gas production at the Energas plants increased to approximately 2,500,000 $m^3$.[24]

[23] *See* Amaury Perez Sanchez, "How Energas Turned an Environmental Concern into Cuba's Cheapest Power," *Power Mag* (Mar. 30, 2026), *available at* https://www.powermag.com/how-energas-turned-an-environmental-concern-into-cubas-cheapest-power/.

[24] *Id.*

c. CUPET has also provided offshore exploration opportunities for a range of international companies that compete with Plaintiff and other U.S. companies. In 2011, companies from around the globe were "lining up to hire" Cuba's Scarabeo 9 rig to "search for what are believed to be substantial oil deposits."[15] [25] While much of this off-shore drilling was not successful, CUPET continuescontinued to host annual conferences seeking foreign partners in oil and gas exploration and production—touting, among other things, "existing service and logistics infrastructure."[16][26]

d. CUPET's offshore oil exploration partnerships includehave included notable participants in the global oil market, such as Venezuela's state-owned oil company Petróleos de Venezuela S.A.PdVSA, the Spanish major oil company Repsol-YPF S.A., China's state-owned oil company China National Petroleum Corporation, Sonangol Group of Angola, and Melbana Energy Ltd. of Australia. These partnerships are focused on oil exploration and offshore drilling in the Gulf of Mexico.

e. CUPET has attempted to solicit oil explorationcommercial partnerships involving the Confiscated Property with U.S. companies, despite the U.S. embargo.

*125.* 102. Defendants' unlawful trafficking also causes a direct effect in the United States becauseSecond, CUPET has engaged in commercial activity in the United States inavailed itself of American capital markets to support of itsthese trafficking activities—specifically by obtaining or attempting to obtain financing using the New York capital markets. According to the U.S. government's complaint for forfeiture in *U.S. v.*

[15] Michael Voss, "Cuban oil project fuels US anxieties," *BBC News* (Nov. 15, 2011), https://www.bbc.com/news/world-latin-america-15737573.

[16] The website is available at https://cuba-energy.com/about-cuba.

[25] Michael Voss, "Cuban oil project fuels US anxieties," *BBC News* (Nov. 15, 2011), *available at* https://www.bbc.com/news/world-latin-america-15737573.

[26] The website is archived at https://web.archive.org/web/20200318180149/https://cuba-energy.com/.

*$717,200,000 in U.S. Currency*, Case No. 18-cv-10783 (S.D.N.Y.), various entities in Cuba, including CUPET, worked with a multinational bank to structure, conduct, and conceal U.S. dollar transactions using the U.S. financial system in connection with U.S. dollar credit facilities involving Cuba, including facilities provided to Cuban banks and other entities controlled by Cuba and to Cuban and foreign corporations for business conducted in Cuba.[27] More than $10 billion worth of transactions were conducted through financial institutions located in the County of New York. Two of the largest transactions were consummated to finance oil transactions between a Dutch commodities trading firm and CUPET. The court entered default judgment in favor of the United States on May 29, 2019.

126. 103. Third, Defendants' unlawful trafficking also causes a direct effect in the United States becauseactivities, in particular CUPET's negligent operation of the Ñico López refinery hasRefinery, have caused and continuescontinue to cause considerable environmental damage to the Florida Straits as a result of CUPET's failure to properly maintain the refinery and failure to adhere to the requirements of multilateral environmental treaties to which Cuba is a party. As one commentator explained, Cuba's oil refineries are "deemed by experts to be among the heaviest polluters in the country."[17] [28] The Ñico López refineryRefinery, in particular, dumps hydrocarbons and industrial waste into Havana Bay leading to 25 to 40 times the normal amount of heavy metals in the water. "The polluted waters are going out of the bay during low tide, running northeasterly 40-50 miles,"[18] which would bring the pollution at or near the United States-Cuba maritime boundary.

[27] Complaint, ¶ 6, *U.S. v. $717,200,000 in U.S. Currency*, No. 18-cv-10783 (S.D.N.Y. filed Nov. 19, 2018).

[28] SERGIO DIAZ-BRIQUETS & JORGE PEREZ-LOPEZ, CONQUERING NATURE: THE ENVIRONMENTAL LEGACY OF SOCIALISM IN CUBA 191 (2000); *see also* Michael Martinez, "In Cuba, A Hard River to Clean," *Chicago Tribune* (Sept. 25, 2007), *available at* https://www.chicagotribune.com/news/ct-xpm-2007-09-25-0709250060-story.html.

---

[17] Sergio Diaz-Briquets, et al. *Conquering Nature: The Environmental Legacy of Socialism in Cuba* 191, (2000); *see also* Michael Martinez, "In Cuba, A Hard River to Clean," *Chicago Tribune* (Sept. 25, 2007), https://www.chicagotribune.com/news/ct-xpm-2007-09-25-0709250060-story.html.

[18] Sergio Diaz-Briquets, et al. *Conquering Nature: The Environmental Legacy of Socialism in Cuba* 193 (2000).

127. ~~104.~~ In an effort to mitigate this problem, OFAC has allowed for special licensing of U.S. oil spill mitigation service companies to provide services in Cuba. U.S. companies have obtained licenses from OFAC. On information and belief, CUPET has solicited from and/or contracted with these U.S. companies.

128. Fourth, as discussed further below, the Refinery and Distribution Assets play a central role in Defendants' efforts to capture hard currency from the United States. The gasoline and petroleum products produced through these assets are sold at service stations in order for Defendants to obtain U.S. dollars. The Refinery and Distribution Assets are also used to provide other financial benefits to the Cuban government, including "oil, productive investment and expertise." These uses by Defendants, among other things, undermines the foreign policy of the United States. 22 U.S.C. § 6081(6).

### ***B. Defendants' Trafficking ~~of Plaintiff's Property:~~in the Service ~~Stations~~Station Assets***

129. Defendants have trafficked, and continue to traffic in, Plaintiff's Service Station Assets, which are part of the Confiscated Property.

130. ~~105.~~ CIMEX~~, which~~ is Cuba's largest commercial corporation, with annual revenues reportedly as high as $~~2.6~~3.4 billion as of ~~2015,~~ March 2025.[29]

131. CIMEX engages in a variety of foreign commerce across a variety of industries~~.~~

~~106. For example, CIMEX operates~~, including—as Defendants acknowledge—the operation of over 600 service stations that sell gas and consumer goods across Cuba.~~[19]~~ [30] Over 300 of these

---

[29] *See* Nora Gamez Torres, "Where is Cuba's Money? Secret Records Show the Military Has Massive Cash Hoard," *Miami Herald* (Jan. 31, 2026), *available at* https://www.miamiherald.com/news/nation-world/world/americas/cuba/article311488962.html.

[30] This was reported by CIMEX's Vice President Leticia Morales during the IMTC Cuba 2016 Trade Fair.

service stations are owned and operated by CUPET and CIMEX own and operate over 300 of those service stations under the brand "Servi-Cupet"," as many media reports have confirmed.[20][31]

132. 107. Some of theMany of these service stations operated by CIMEX and CUPET are built on or maintained onare themselves Confiscated Property and have been, and continue to be, operated and used by CIMEX and CUPET for their own profit and benefit, as well as the benefit of others, without Plaintiff's authorization./or are being operated on Confiscated Property. CIMEX has acknowledged that at least one service station presently in operation, Servicentro "Libertad" in Camaguey, corresponds to property formerly owned by Plaintiff, and Plaintiff's investigation to date has revealed numerous others.

133. Defendants are also trafficking in confiscated property by selling gasoline and other products refined using the Refinery Assets and distributed through the Distribution Assets.

108. Some of the gasoline and other petroleum products available at these service stations are produced using the Confiscated Property, specifically the Belot Refinery and the

---

[19] This was reported by CIMEX's Vice President Leticia Morales during Conference IMTC Cuba 2016.

[20] *E.g.*, *Reuters*, Cuban state-run media confirms gasoline shortage (Apr. 21, 2017), https://www.reuters.com/article/us-cuba-energy-shortage/cuban-state-run-media-confirms-gasoline-shortage-idUSKBN17N2FZ (reporting that CIMEX and CUPET jointly operate most service stations in Cuba); *Reuters*, Factbox: Cimex, Cuba's largest commercial corporation (Sept. 27, 2010), https://uk.reuters.com/article/us-cuba-corporation-factbox-idUSTRE68Q55320100927 (reporting that CIMEX operates 363 Servi-Cupet gas stations); *BN Americas*, Unión Cuba Petróleo, https://subscriber.bnamericas.com/company-profile/en/union-cubapetroleo-cupet (reporting that CUPET runs a service station chain in association with

---

[31] *See* Dkt. 42-4, Decl. of Mali Suris Valmaña in Supp. of Defs.' MTD ¶ 5; *see also* Cuban state-run media confirms gasoline shortage, *Reuters* (Apr. 21, 2017), *available at* https://www.reuters.com/article/us-cuba-energy-shortage/cuban-state-run-media-confirms-gasoline-shortage-idUSKBN17N2FZ (reporting that CIMEX and CUPET jointly operate most service stations in Cuba); Factbox: Cimex, Cuba's largest commercial corporation, *Reuters* (Sept. 27, 2010), *available at* https://www.reuters.com/article/world/factbox-cimex-cubas-largest-commercial-corporation-idUSTRE68Q553/ (reporting that CIMEX operates 363 Servi-Cupet gas stations); Unión Cuba Petróleo (CUPET), *BN Americas*, *available at* https://subscriber.bnamericas.com/company-profile/en/union-cubapetroleo-cupet (last visited Sept. 20, 2026) (reporting that CUPET runs a service station chain in association with CIMEX).

~~CIMEX).~~

plants and terminals used in conjunction with the Belot Refinery's operations and the production of petroleum products.

134. 109. Additionally, CIMEX and CUPETDefendants use Confiscated Property to sell American goods to Cuban consumers. The service stations, including the Servi-Cupet stations, are the functional equivalent of a 7-Eleven convenience store. The service stations offer for sale a variety of American products, including poultry, cereal, rice, cleaning supplies, frozen vegetables, and alcoholic beverages. CIMEX sources these products, sold in the Servi-Cupet locations and elsewhere, from U.S. companies.

135. As explained in Paragraphs 88-112, the Cuban state itself is trafficking in the Service Station Assets. Defendants are, thus, also trafficking by knowingly and intentionally causing, directing, participating in, and/or profiting from the Cuban state's trafficking.

110. Upon information and belief, CIMEX also obtains other goods and services from companies in the United States from time to time. For example:

a. Tiendas Panamericanas, a chain of grocery stores owned by CIMEX, similarly offers for sale a variety of American food products.

b. CIMEX also reportedly contracted with a Panamanian company to purchase medical supplies manufactured by a U.S. based company called Orthofix.

### C. *Defendants'* **Trafficking of Plaintiff's Property: Remittances from the United States***Remittance Processing Business*

136. 111. Defendants' trafficking includeshas included the use of Confiscated Property—specifically service stationsthe Service Station Assets—to process remittances.

137. 112. Remittances are a substantial source of income incritical component of the Cuban economy. Cuba received an estimated $3.6 billion U.S. dollars in 2018 from remittances, and it is estimated that 90% of these remittances come from the United States. Remittances currently

represent over 50% of the Cuban population's income, providing a much-needed source of hard currency (U.S. dollars) for Defendants and the Cuban government.

138. The Director of CIMEX's financial division, FINCIMEX, previously stated that FINCIMEX processed over 10 million remittances between 2008 and 2016 and that 92% of the remittances came from the United States.[32] The Cuban government also imposes taxes and surcharges on remittances.

139. According to a report by the Inter-American Dialogue, Cuba received an estimated $4 billion U.S. dollars in 2023 from remittances, and it is estimated that over two-thirds of Cuban families on the island receive financial assistance through remittances.[33] In 2023, remittances made up 26% of Cuba's GDP.[34]

*1. CIMEX's Remittance Business is Structured Around Obtaining Remittances from the United States*

140. Given Cuba's reliance on American hard currency, CIMEX has structured and continues to structure its remittance business around obtaining remittances from the United States. Indeed, remittances are generally not received in Cuban pesos. They are, and have been, received in U.S. dollars or in currencies pegged to the U.S. dollar, including Convertible Pesos ("CUC") or, more recently, Moneda Libremente Convertible ("MLC," or Freely Convertible Money).[35]

141. ~~113. The entire remittance process is tightly controlled by the~~In the years prior to the 2019 filing of this lawsuit, the Cuban government (through the Central Bank of Cuba~~.[21] The Cuban government (through the Cuban Central Bank) has~~ ("BCC")) granted CIMEX's financial division,

---

[32] Dkt. 47- 2, Decl. of Jared Butcher in Supp. of Pl's Opp. to Defs' MTD ¶ 21.2.

[33] MANUEL OROZCO, REMITTANCES TO CUBA AND THE MARKETPLACE IN 2024 4 (Inter-Am. Dialogue Mar. 2024), https://thedialogue.org/wp-content/uploads/2024/03/Remittances-to-Cuba-and-the-Marketplace-in-2024-1.pdf.

[34] *See* "USAID Freeze, Guantánamo, and Restricting Remittances in Cuba," *CEDA* (Feb. 14, 2026), *available at* https://www.weareceda.org/en/us-cuba-news-brief/usaidfreeze-guantanamo.

[35] Marc Frank, "As Cuba-US Relations Sour, the Island Needs the Dollar More than Ever," *Reuters* (Jan. 24, 2025), *available at* https://www.reuters.com/world/americas/cuba-us-relations-sour-island-needs-dollars-more-than-ever-2025-01-24/.

FINCIMEX, a license to manage all remittance wire transfers from the United States.~~ CIMEX facilitates remittance transactions through its partnership with a U.S.-based remittance provider.~~[36]

142. ~~114.~~ FINCIMEX~~ is the~~, in turn, entered in an agreement with a well-known American remittance provider, Western Union, whereby it served as Western Union's exclusive agent in Cuba of ~~the US-based remittance provider.~~US-originating remittances.[37]

143. Through this partnership, FINCIMEX ~~currently operates~~operated hundreds of agent locations in Cuba and ~~processes~~processed remittances from agent locations in all fifty states~~,~~ and the District of Columbia~~, and online services via www.aisremesascuba.com. It has~~. It had 500 locations in Cuba, including over 250~~-~~ shared locations with CIMEX, to deliver the remittances to the Cuban population all over the country. FINCIMEX ~~operates~~operated the only Electronic Card Processing Center in Cuba, with modern means and systems endorsed internationally and backed by a partnership with a leading foreign bank. FINCIMEX ~~operates~~operated the international ~~cards of~~ VISA, MASTERCARD, and CABAL cards~~; it~~. FINCIMEX also ~~issues~~issued and ~~operates~~operated all domestic (Cuban) cards~~ to its clients~~, including but not limited to cards holding all the family remittances that ~~are~~were received by official means and processed by Cuban banks.~~[22]~~[38]

~~115. CIMEX and CUPET's service stations function as agent locations in Cuba.~~

~~Remittances may be sent to a variety of locations using their network of service stations,~~

[36] BCC granted specific licenses to FINCIMEX under Resolution No. 103 of 1998 and later under Resolution No. 109 of 1999. *See* Resolución No. 103 de 1998, Banco Central De Cuba [BCC] [Resolution No. 103 of 1998, of the Central Bank of Cuba], Gaceta Oficial [GO], No. 60, Dec. 11, 1998. https://www.directoriocubano.com/servicios/gaceta-oficial/1998/ordinaria/60/; Resolución No. 109/1999, Banco Central De Cuba [BCC] [Resolution No. 109/1999, of the Central Bank of Cuba], Gaceta Oficial [GO], No. 87, Dec. 30, 1999. https://www.gacetaoficial.gob.cu/sites/default/files/go_o_087_1999.pdf.

[37] Dkt. 47- 2, Decl. of Jared Butcher in Supp. of Pl's Opp. to Defs' MTD ¶ 18.2.

[38] According to CIMEX's Vice President Leticia Morales during the IMTC Cuba 2016 Trade Fair.

~~including Servi-Cupet service stations operated through CIMEX's partnership with CUPET.~~

144. CIMEX and its affiliates also solicited and processed American remittances online via www.aisremesascuba.com.

145. In October 2020, the United States Treasury prohibited FINCIMEX from processing remittances, citing its connection to the Cuban military.[39] This caused a disruption in Western Union service to Cuba.

146. In 2022, in order to navigate American sanctions, the BCC replaced FINCIMEX with Orbit S.A. ("Orbit") as the manager of remittances from the U.S., granting Orbit the same license as FINCIMEX had previously held to facilitate its work with Western Union.[40]

147. Remittances from the United States to Cuba resumed in March 2023, through a partnership between Orbit and Western Union.[41]

148. Upon information and belief, Orbit effectively remained under the control of CIMEX. CIMEX's financial infrastructure was used by FINCIMEX and Orbit to process remittances sent to Cuba through Western Union.[42] Moreover, FINCIMEX and Orbit are headquartered a few meters apart in Havana's Playa municipality, and some of FINCIMEX's employees and executives also hold or have held positions at Orbit.[43]

---

[39] *See* Press Release, U.S. Dep't of Treasury, Treasury Prohibits Cuban Military from Processing Remittance-Related Transactions (Oct. 26, 2020), *available at* https://home.treasury.gov/news/press-releases/sm1164.

[40] *See* El Toque, "Remittances to Cuba Once Again in Danger," *Havana Times* (Dec. 5, 2024), *available at* https://havanatimes.org/features/remittances-to-cuba-once-again-in-danger/.

[41] *Id.*

[42] *Id.*

[43] *Id.*

149. In February 2025, the United States updated the CRL, adding Orbit among other entities. Western Union subsequently suspended remittances to Cuba.[44]

150. In February 2026, CIMEX was able to once again restructure its operations to comply with U.S. sanctions law, and Western Union announced that remittances to Cuba would resume.[45]

151. In addition to its relationship with Western Union, CIMEX has facilitated, and continues to facilitate, remittances from the United States through the issuance of prepaid debit cards, including the "Clásica" card.[46] These debit cards are pre-loaded over the Internet with U.S. dollars and can be used to purchase gasoline and goods at CIMEX-operated locations, including its service stations.

---

[21] Cuban Central Bank granted specific licenses to FINCIMEX under Resolution No. 103 of 1998 and later under Resolution No. 109 of 1999. See http://www.bc.gob.cu/institucion/nobancaria/18.

[22] According to CIMEX's Vice President Leticia Morales during Conference IMTC Cuba 2016.

---

[44] Ivan Taylor, "Western Union suspends money transfers to Cuba following U.S. sanctions," *CBS News* (Feb. 11, 2025), *available at* https://www.cbsnews.com/miami/news/western-union-suspends-money-transfers-to-cuba-following-u-s-sanctions/.

[45] Christy Lowry, "We're Back! Send Money to Cuba Again Through Western Union," *Western Union* (Feb. 12, 2026), *available at* https://www.westernunion.com/blog/en/us/were-back-send-money-to-cuba-again-through-western-union/.

[46] "Clasica, New Card for Payments in Dollars in Cuba," *On Cuba News* (Jan. 24, 2024), *available at* https://oncubanews.com/en/cuba/economy/clasica-new-card-for-payments-in-dollars-in-cuba/.

116. Some of the agent locations in Cuba (including Servi-Cupet locations and other locations) have been maintained or built on Plaintiff's Confiscated Property. This means that CIMEX and CUPET are using the Confiscated Property to facilitate the transfer of funds from the United States to Cuba.

117. Remittances are a key component of the Cuban economy, providing a much-needed source of hard currency (U.S. dollars) for the Cuban government. Beginning in 2004, the Cuban government required remittances from the United States to be converted to the Cuban Convertible Peso ("CUC") at a rate controlled by the Cuban Central Bank. The government also imposes a 10 percent tax on remittances.

118. CIMEX, on behalf of the Cuban Central Bank, keeps 100 percent of the remittance fee and delivers the dollars from each remittance to the Cuban Central Bank. The remittance recipient in Cuba receives CUCs (not dollars), which are loaded onto a plastic card when he or she goes to an agent location to retrieve a remittance. The plastic card is akin to a debit card and is distributed and operated by American International Service, S.A. ("AIS").[23] AIS is part of the financial division of CIMEX. AIS cards may be used for the purchase of goods and services at more than 6,500 points of sale, including service stations.

119. CIMEX, CUPET, and the Cuban government generate substantial revenue from the remittance transactions. In addition to taxes, CIMEX uses its state-assigned monopoly over the AIS cards to lock Cuban nationals into purchasing products with high mark-ups at its retail locations. For example, CIMEX charges a 240 percent mark-up on purchases of goods with an AIS card, including goods sold at Servi-Cupet stations and other service stations. Both CIMEX

---

[23] American International Service, S.A. is a Panamanian company registered in the Republic of Panama under Public Deed (Escritura Publica) No. 3,362 by Notaria Primera del Circuito on April 25, 1988.

~~and CUPET profit by ensuring that customers who receive remittances will have to spend those remittances at their stations.~~

2. ~~120.~~ *Defendants' ~~remittance business is a commercial activity that occurs in the United States and causes direct effects in the United States.~~Trafficking in the Service Stations is a Critical Aspect of CIMEX's Remittance Business*

~~121. Defendants' remittance business occurs in the United States because U.S. dollars are transferred by persons in the United States using agent locations in the United States. This is not an incidental or tangential occurrence. A primary function of the remittance business, as described above, is to obtain U.S. dollars for the Cuban government and the Cuban financial system, which have limited access to hard currency.~~

152. ~~122.~~ Defendants' ~~remittance business is successful because it offers the only conduit for persons residing in~~service stations, including the confiscated Service Station Assets, have played and continue to play a central role in facilitating the transfer of funds from the United States to ~~transfer U.S. dollars to support family and friends in Cuba. This, in turn, causes direct effects in the United States by creating demand for remittance services in the United States and by enabling transactions—the export of U.S. dollars—in the United States.~~Cuba. Again, these transfers are a critical means by which Defendants, and the Cuban government as a whole, obtain needed hard currency for the Cuban economy.

153. The service stations—many using Western Union branding—serve as locations where remittances can be received by Cubans. Indeed, Defendants have identified multiple remittance locations whose property records contain references to "Esso" or "Standard."[47] As part of this proceeding, Defendants admitted that:

a. 66 of the 668 service stations were being used by CIMEX-Cuba to carry out activities connected to remittances pursuant to an agreement with Western Union;[48]

[47] Defs' First Responses and Objections to Pl's First Interrogatory Requests 8(b).

[48] Dkt. 42-4, Decl. of Mali Suris Valmaña in Supp. of Defs.' Mot. to Dismiss ¶ 6.

b. A number of these service stations carry out activities connected to remittances pursuant to an agreement with Western Union;[49] and

c. There are Western Union locations that had or could have a connection to Essosa.[50]

154. Defendants have deliberately structured their remittance business through these service station locations. The stations serve as primary distribution points for gasoline, food, and other essential products—making them central to the day-to-day lives of Cuban citizens. CIMEX leverages its state-provided monopoly over both remittances and service stations to encourage, and in some cases require, payment in U.S. remittance dollars at its service stations. CIMEX charges a substantial mark-up on goods purchased with those dollars, as well as a transaction fee in U.S. dollars each time a prepaid debit card is loaded with funds.

155. On information and belief, CIMEX service stations, including the Service Station Assets, accept payment only in U.S. dollars for gasoline and advertise gasoline prices in U.S. dollars—thus raising critical hard currency for both CIMEX and CUPET.

156. To ensure their patrons have U.S. dollars to spend, Defendants' remittance business is correspondingly targeted at Americans. Defendants rely on their U.S.-based partner, Western Union, American social media platforms, and at least one other U.S.-based advertiser to promote their remittance business and the convenience of sending remittances to any of their many locations in Cuba (including service stations). Defendants also have relied, and continue to rely on, ".com" websites (*e.g.*, www.acr-pay.com) to facilitate remittances from the United States and, as noted above, encourage or require their patrons to use U.S. dollars.

157. By raising "badly needed…hard currency" using the Confiscated Property, Defendants are undermining the foreign policy of the United States. 22 U.S.C. § 6081.

---

[49] *Id.* ¶ 12.

[50] *Id.*

158. Moreover, on information and belief, remittances that were/are sent through Western Union require Defendants' employees at the service station to access Western Union's U.S.-based systems as part of processing these remittances.

***D. Under the Act, Defendants' Trafficking Activities Necessarily Are Directed At and Cause Harm in the United States***

159. Congress explicitly found that the trafficking activities alleged herein are directed at and cause injury in the United States, including in Plaintiff's home state of Texas. Specifically, Congress found that trafficking (i) poses a national security threat to the United States by supporting the Castro regime, (ii) undermines U.S. foreign policy, (iii) jeopardizes the rightful claims of U.S. nationals, (iv) impedes the ability of the U.S. government to return confiscated property to the rightful owners, and (v) undermines the "free flow of commerce" and "economic development." *See* 22 U.S.C. §§ 6022, 6081.

160. As described above, Defendants' trafficking is directed at ExxonMobil and causes harm in Plaintiff's home state of Texas by interfering with ExxonMobil's fundamental right to own and enjoy the Confiscated Property and profiting at ExxonMobil's expense. *See* 22 U.S.C. § 6081.

161. Moreover, Defendants have asserted that the original confiscation was tied to ExxonMobil's identity as an American company and its perceived role in U.S. political activity.[51]

***E. Defendants' Are Trafficking Without Plaintiff's Authorization***

162. 123. Defendants' trafficking activities have been conducted without Plaintiff's authorization.

163. 124. Plaintiff has not authorized CIMEX or CUPET to refine crude oil using Plaintiff's Confiscated PropertyRefinery Assets, nor has Plaintiff authorized them to produce, transport, make available for sale, or otherwise engage in any commercial activity involving any

[51] Dkt. 42-3, Defs' Memo in Supp. of Second MTD at 36-40.

petroleum products that are or have been produced using Plaintiff's ~~Confiscated Property~~Refinery Assets or Distribution Assets.

164. ~~125.~~ Plaintiff has not authorized CIMEX or CUPET to possess, use, manage, or hold any ~~of~~ Confiscated Property, including the ~~service station properties, nor~~Refinery Assets, Distribution Assets, or Service Station Assets. Nor has Plaintiff authorized

Defendants to engage in any commercial activity involving the Confiscated Property, including the ~~service station properties~~Service Station Assets.

165. ~~126.~~ Accordingly, Defendants have violated the Act by knowingly trafficking in the Confiscated Property after the expiration of the grace period under the Act. Plaintiff is therefore entitled to all relief available under the Act, including actual damages, treble damages, ~~prejudgment and postjudgment~~pre-judgment and post-judgment interest, costs and reasonable attorneys' fees, pursuant to 22 U.S.C. § 6082.

**COUNT I – TRAFFICKING IN CONFISCATED PROPERTY**
**(as against all Defendants)**
**(22 U.S.C. § 6082)**

166. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

167. ~~127.~~ Plaintiff is a U.S. national and owns the claim to property that was confiscated by the Cuban Government after January 1, 1959 (i.e., the Confiscated Property). The claim is certified and is attached as Exhibit 1.

168. ~~128.~~ CIMEX Cuba is a person under the Act, as defined by 22 U.S.C. § 6023(11).

169. ~~129.~~ CIMEX Panama is a person under the Act, as defined by 22 U.S.C. § 6023(11).

170. ~~130.~~ CUPET is a person under the Act, as defined by 22 U.S.C. § 6023(11).

171. ~~131.~~ Based on the facts alleged herein and on information and belief, CIMEX Cuba, CIMEX Panama, and/or CUPET have trafficked and continue to traffic in the Confiscated Property ~~to which Plaintiff owns the claim, including (i) by extracting, importing, and refining crude oil, (ii) by operating service stations in Cuba, and (iii) by engaging in commercial transactions involving the Confiscated Property.~~in violation of Title III of the Act.

172. 132. AdditionallyBased on the facts alleged herein, CIMEX Cuba, CIMEX Panama, and/or CUPET have generated revenues, obtained profits, and realized other benefits from these activities.knowingly and intentionally trafficked in the Confiscated Property by

133. Thus, CIMEX Cuba, CIMEX Panama, and/or CUPET have engaged in trafficking in violation of Title III of the Act through, at a minimum: (i) managing, possessing, and using

the Confiscated Property; (ii) engaging in commercial activities using or otherwise benefiting from the Confiscated Property; and (iii) causing, directing, participating in, and profiting from trafficking in the Confiscated Property by another person, in furtherance of their operations.

a. obtaining control of, managing, using, and holding interests in the Confiscated Property;

b. engaging in commercial activities using or otherwise benefiting from the Confiscated Property, including the extraction, importation, and refining of crude oil, and the operation of service stations in Cuba;

c. generating revenue, obtaining profits, and realizing other benefits from these activities; and

d. causing, directing, participating in, and profiting from trafficking by others.

173. 134. At all relevant times, CIMEX Cuba, CIMEX Panama, and/or CUPET have conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Act.

174. 135. CIMEX Cuba, CIMEX Panama, and/or CUPET have engaged in unlawful trafficking after November 1, 1996, the end of the 3-month grace period after the Act became effective on August 1, 1996.

175. 136. Because Plaintiff holds a certified claim, it is not required to give notice underexempt from the pre-suit notice requirement set forth in 22 U.S.C. § 6082(a)(3). Congress exempted certified claimants from the pre-suit notice requirement because the FCSC certification process itself provides notice that the property is the subject of a valid U.S. claim. Plaintiff's certified claim has been a matter of public record since 1969.

176. 137. Therefore, Plaintiff is entitled to damages in the amount of the certified claim, plus pre-judgment interest at the rate of 6 percent awarded by the FCSCincluding FCSC's 6% interest award, together with statutory interest and treble damages. Plaintiff also is entitled to treble damages, attorney'sattorneys' fees, costs, and post-judgment interest.

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants:

a. Awarding Plaintiff actual damages in the amount of $71,611,002.90;

b. Awarding Plaintiff pre-judgment interest at the rate of 6% per annum from July 1, 1960, as set forth in the FCSC's award;

c. Awarding Plaintiff treble damages pursuant to 22 U.S.C. § 6082(a)(3);

d. Ordering Defendants to pay Plaintiff's reasonable ~~attorney's~~attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a);

e. Awarding Plaintiff post-judgment interest; and

f. Granting all other relief at law or in equity that the Court deems just and proper.

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

Date: ~~March 6, 2020~~September 21, 2026 Respectfully submitted,

~~By:~~ /s/ Steven K. Davidson
Steven K. Davidson (DC Bar #407137)
~~sdavidson@steptoe.com~~
sdavidson@steptoe.com
Michael J. Baratz (DC Bar #480607)
~~mbaratz@steptoe.com~~
mbaratz@steptoe.com
~~Jared R. Butcher~~Emma Marshak (DC Bar #~~986287) jbutcher@steptoe.com~~1048357)
emarshak@steptoe.com
STEPTOE ~~& JOHNSON~~ LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-3000
Facsimile: 202-429-3902

Michael G. Scavelli (*pro hac vice*)
mscavelli@steptoe.com
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: 212-506-3900

*Counsel for Plaintiff*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

| **Summary report:**<br>**Litera Compare for Word 11.16.1.3 Document comparison done on 9/21/2026 4:58:18 PM** | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** US_DIS_DCD_1_19cv1277_d57975327e2427_AMENDED_COMPLAINT_against_All_Defendants_filed_by_(1).docx | |
| **Modified DMS:** iw://usdocs.steptoe.com/dc/41732758/28 - Third Amended Complaint_CIMEX_CUPET.docx | |
| **Changes:** | |
| Add | 703 |
| ~~Delete~~ | 515 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| Table Insert | 1 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1219 |